# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **APTALIS PHARMA US INC., et al.,** | Civil Action No. 13-4158 (MLC)(LHG) |
| Plaintiffs, | |
| v. | |
| **MYLAN PHARMACEUTICALS, INC., et al.,** | **ORDER DENYING DEFENDANTS' MOTION FOR LEAVE TO AMEND INVALIDITY CONTENTIONS** |
| Defendants. | |

THIS MATTER comes before the Court by way of a letter submitted on March 17, 2014 from Defendants Mylan Pharmaceuticals, Inc. and Mylan, Inc. (collectively, "Mylan" or "Defendants"), seeking leave to amend their Invalidity Contentions ("Mylan Req."). Defendants' request was opposed by Plaintiffs Aptalis Pharma US Inc. and Aptalis Pharma Canada Inc. (collectively, "Aptalis" or "Plaintiffs") in their letter of March 25, 2014 ("Opp."). Defendants replied on April 2, 2014 ("Reply"). Plaintiffs filed a sur-reply on April 7, 2014 ("Sur-reply"). The Court has considered the parties' papers without oral argument, pursuant to FED. R. CIV. P. 78. For the reasons set forth below, Defendants' Request is DENIED.

### I.    BACKGROUND

The facts assume the parties' familiarity with the case and therefore are limited to those pertinent to this motion.

Aptalis sued Mylan on July 5, 2013 for infringement of U.S. Patent Nos. 8,217,083 and 8,436,051, based upon Mylan's submission of an Abbreviated New Drug Application

("ANDA"), seeking to market and sell a product that is bioequivalent to Plaintiffs' CANASA®
product. [Docket Entry No. 1]. On November 6, 2013, Aptalis amended its Complaint to add
claims for infringement of a third patent, U.S. Patent No. 7,541,384. [Docket Entry No. 25].

The Court conducted an Initial Scheduling Conference on November 1, 2013. At that
conference, counsel informed the Court that because Mylan's ANDA submission predated the
listing of the patents in the FDA's Orange Book, this case would not have the benefit of the 30-
month stay on Mylan's ANDA approval that is customarily imposed by the Hatch-Waxman Act,
21 U.S.C. § 355(j)(5)(B)(iii). In other words, as the case stands now, the FDA is free to approve
Mylan's ANDA at its discretion irrespective of Aptalis's extant infringement claims, and Mylan
is free to launch its product at risk as soon as it receives that approval. In view of these pressing
circumstances, the Court set an aggressive pretrial schedule for this case.

Under the schedule, Mylan served its Invalidity Contentions on Aptalis on November 22,
2013. In return, Aptalis served Mylan with its Infringement Contentions and its Response to
Mylan's Invalidity Contentions on January 8, 2014. The parties proceeded to exchange their
preliminary claim constructions on January 31, 2014 and their supporting claim construction
evidence on February 12, 2014. On March 5, 2014, the parties filed their Joint Claim
Construction and Pre-Hearing Statement. On May 2, 2014, Mylan filed its opening Markman
Brief. The Markman hearing scheduled before the Honorable Mary L. Cooper, U.S.D.J., for
June 11, 2014, has been temporarily suspended pending the outcome of a discovery dispute.

## II.   LEGAL STANDARD

The District's Local Patent Rules were adopted to further the "goal of full, timely
discovery and provide all parties with adequate notice and information with which to litigate

their cases."[1] *King Pharms., Inc. et al., v. Sandoz, Inc.*, Civ. No. 08-5974, 2010 WL 2015258, at *4 (D.N.J. May 20, 2010)(quoting *Computer Accelerations Corp. v. Microsoft Corp.*, 503 F.Supp.2d 819, 822 (E.D. Tex. 2007)). The rules are designed specifically to "require parties to crystallize their theories of the case early in litigation and to adhere to those theories once they have been disclosed." *Atmel Corp. v. Info. Storage Devices, Inc.*, Civ. No. 95-1987, 1998 WL 775115, at *2 (N.D. Cal. Nov.5, 1998). This is "to 'prevent the 'shifting sands' approach to claim construction.' " *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1364 (Fed.Cir.2006) (citing *Atmel*, 1998 WL 775115, at *2). As distinguished from the liberal standard for amending pleadings under Rule 15, "the philosophy behind amending claim charts is decidedly conservative." *Atmel*, 1998 WL 775115, at *2. However, Rule 3.7 "is not a straitjacket into which litigants are locked from the moment their contentions are served"; instead, "a modest degree of flexibility [exists], at least near the outset." *Comcast Cable Communs. Corp. v. Finisar Corp.*, Civ. No. 06-4206, 2007 WL716131, at *2 (N.D. Cal. March 2, 2007).

Pursuant to L. Pat. R. 3.7, leave to amend invalidity contentions may be granted "only by order of the Court upon a *timely* application and showing of *good cause*." (emphases added). Rule 3.7 provides a nonexhaustive list of circumstances that may support a finding of good cause, absent undue prejudice to the adverse party,:

> (a) a claim construction by the Court different from that proposed by the party seeking amendment; (b) recent discovery of material prior art despite earlier diligent search; (c) recent discovery of nonpublic information about the Accused Instrumentality which was not discovered, despite diligent efforts, before the service of the Infringement Contention; (d) disclosure of an infringement contention by a Hatch–Waxman Act party asserting infringement

---

[1] The Court's decision is informed by districts with analogous local patent rules, such as the Northern District of California and the Eastern District of Texas.

under L. Pat. R. 3.6(g) that requires response by the adverse party
because it was not previously presented or reasonably anticipated;
and (e) consent by the parties in interest to the amendment and a
showing that it will not lead to an enlargement of time or impact
other scheduled deadlines.

L. Pat. R. 3.7. Good cause "considers first whether the moving party was diligent in amending

its contentions and then whether the non-moving party would suffer prejudice if the motion to

amend were granted." *Acer, Inc. v. Tech. Prob. Ltd.*, Civ. Nos. 08-877, 08-882, 08-5398, WL

3618687, at *3 (N.D. Cal. Sept.10, 2010) (citing *O2 Micro*, 467 F.3d 1355, 1355).

The Court may only consider prejudice to the non-moving party, however, if the moving

party is able to demonstrate diligence. *AstraZeneca AB v. Dr. Reddy's Laboratories Inc.*, Civ.

No. 11-2317, 2013 WL 1145359, at *3 (D.N.J. 2013)(citing *Apple v. Samsung*, Civ. No. 11-

1846, 2012 WL 1067548, at *2 (N.D. Cal. Mar. 27, 2012)). Courts have understood diligence to

require a "showing that the party seeking leave to amend acted . . . promptly [in] moving to

amend when new evidence is revealed in discovery." *O2 Micro*, 467 F.3d at 1363. This

requirement is consistent with L. Pat. Rule 3.7's requirement that the motion be "timely." As

with good cause in general, the burden "is on the movant to establish diligence rather than on the

opposing party to establish lack of diligence." *O2 Micro*, 467 F.3d at 1366.

In determining whether good cause exists, courts have also considered such other factors

as (1) the reason for the delay, including whether it was within the reasonable control of the party

responsible for it; (2) the importance of what is to be excluded; (3) the danger of unfair

prejudice; and (4) the availability of a continuance and the potential impact of a delay on judicial

proceedings. *See Oy Ajat, Ltd. v. Vatech Am., Inc.*, Civ. No. 10-4875, 2012 WL 1067900, at

*20–21 (D.N.J. Mar.29, 2012) (collecting cases).

### III.   PARTIES' ARGUMENTS

#### A.   Mylan's Position

Mylan seeks leave to amend its Invalidity Contentions to include indefiniteness arguments based on the use of the term "about" in several of the asserted claims.  It argues that its amendment is needed because Aptalis recently adopted a claim construction position that interprets "about" as "approximately," a position which Aptalis only revealed during the parties' exchange of their respective preliminary claim constructions on January 31, 2014.  Mylan Req. at 5.  Mylan did not foresee this development:

> When Mylan initially drafted its invalidity contentions, it had no expectation that Aptalis would propose an interpretation that inherently allows unlimited variability, rendering the claim indefinite, nor could it have anticipated amending its Invalidity Contentions any earlier than the time Aptalis served its proposed preliminary constructions.

*Id*.  Mylan faults Aptalis for failing to advance its construction, or any construction, as part of its Infringement Contentions.  *Id*.  Therein, Aptalis did not construe "about," but merely parroted the language of the claims, without interpretation, and then copied portions of Mylan's ANDA below the parroted claim language.  *Id*.

Mylan claims diligence in its efforts to address the new issue.  It timely sought Aptalis's consent to an amendment to its Contentions, but after over a week of negotiation attempts, Aptalis refused.  Mylan was left with no choice but to file the instant application.  *Id*.

In parallel, Mylan asserts that its proposed amendment is exercising a right it expressly reserved for itself in its original Invalidity Contentions.  *Id*.  Therein, Mylan states that it "reserves the right to supplement, amend and/or modify these contentions at any time" based

upon a number of reasons, including "relevant positions on claim construction or infringement taken by Aptalis."  Mylan Req., Exhibit B, at 2.

With regard to prejudice, Mylan argues that its request to amend its contentions was made in the early stage of this case, before claim construction or fact discovery were completed and therefore any impact on the case is reduced.  *Id*. at 6.  It also argues that denial of its request would prejudice it greatly, affecting both its invalidity case and its claim construction position.  *Id*. at 7.  The amendments it proposes are not burdensome because it is not raising a new theory of invalidity, but merely expanding on theories of indefiniteness it has already advanced and Aptalis does not need to expend significant resources to modify its position,.  *Id*. at 7-8.  Moreover, Aptalis should not be prejudiced by this amendment because it has been on notice of Mylan's theories of indefiniteness since November 2013 and Sandoz has raised indefiniteness defenses in Aptalis's parallel case against Sandoz, 13-cv-4290.  *Id*. at 8 (citing Joint Claim Construction and Prehearing Statement filed in 13-cv-4290 at 8-9, 11-12).  Finally, should its request be granted, Mylan believes no adjustment to the Court's schedule would be needed.  *Id*.

B.     Aptalis's Position

Aptalis opposes Mylan's request on the grounds of good cause and prejudice.  With respect to good cause, Aptalis points to Mylan's own Paragraph IV certification letters as evidence that Mylan has been analyzing the patents in suit since at least October 2012.  Opp. at 3.  In view of the amount of time Mylan has been studying the patents, and the fact that every asserted claim recites "about" either directly or through dependence on a claim that does, Aptalis is skeptical of Mylan's purported diligence given its failure to raise its current indefiniteness argument until now.  Aptalis questions how Mylan came to specifically address "about" in its non-infringement arguments, but overlooked it in its invalidity position.  *Id*. at 3-4.  Aptalis cites

the Local Patent Rules as well, arguing that it was Mylan's duty to consider whether the plain and ordinary meaning of any of the asserted claim terms supports an indefiniteness argument. *Id*. at 4. Here, not only is Aptalis's construction of "about" its plain and ordinary meaning, it is consistent with established case law from both the Court of Appeals for the Federal Circuit and this District. *Id*. (citing cases which interpret "approximately" as the plain and ordinary meaning of "about").

Aptalis characterizes Mylan's reliance on Aptalis's recent claim construction position as a trumped up excuse. Based on timing, Aptalis posits that Mylan cannot logically claim that its need to amend its contentions was prompted by information in Aptalis's preliminary claim construction served on January 31, 2014, because Mylan itself raised this very indefiniteness argument in papers it supplied at the same time it received Aptalis's constructions. *Id*. at 5. In fact, Aptalis claims that Mylan has since admitted during the meet and confer process that its new indefiniteness arguments are entirely independent of Aptalis's construction of "about." *Id*. at 6. Aptalis's view is that Mylan either simply failed to recognize its indefiniteness argument or intentionally omitted it from its original contentions, and that neither circumstance demonstrates the diligence required for good cause. *Id*.

Aptalis argues that Mylan's lack of good cause is a sufficient basis to deny its motion. *Id*. Nevertheless, Aptalis asserts that the prejudice Mylan's amendment would wreak upon both Aptalis and the Court provides a further basis for denial. *Id*. Mylan's changes would expand the case by introducing a new invalidity argument to every asserted claim, in five different contexts. *Id*. To respond, Aptalis would need both time and resources to reevaluate work it has completed over the past several months. *Id*. It would require revisiting its responses to Mylan's invalidity contentions, its infringement contentions, and its claim construction position. As a practical

matter, it might force Aptalis to reconsider positions it has taken in a parallel suit against Sandoz. *Id.*

IV.    ANALYSIS

      A.    Timing and Good Cause

Mylan filed its motion on March 17, 2014 and alleges that it did not appreciate its need to amend until just two weeks earlier. For the purpose of assessing its timeliness, the Court sees no reason to reject Mylan's representation. Accordingly, the Court finds that Mylan's motion was timely filed.

The Court's inquiry into Mylan's diligence is more searching. Mylan has not explained why it was unable to muster its indefiniteness argument as to "about" more than four months earlier, when it was required to do so under the Local Patent Rules. Mylan endeavors instead to lay the blame at Aptalis's feet for failing to advance Aptalis's claim construction for "about" until now, or to even signal it as part of its infringement contentions. These positions are inconsistent with the District's Local Patent Rules, the Pretrial Scheduling Order for this case, and the settled case law of indefiniteness.

      1.    Local Patent Rules 3.3 and 3.6, and FRCP 16

Under the Local Patent Rules and this Court's Scheduling Order, Mylan was not entitled to receive Aptalis's claim construction prior to framing its indefiniteness position. Local Patent Rule 3.6 prescribes the orderly exchange of contentions and their supporting information for Hatch-Waxman cases. The Rule requires an ANDA applicant to disclose its Invalidity Contentions fourteen days after the Initial Conference. Loc. R. 3.6(c). Under Rule 3.6, those

contentions must contain the disclosures required under Rule 3.3, which include "[a]ny grounds of invalidity based on . . . indefiniteness under 35 U.S.C. § 112(2)." Loc. R. 3.3(d).

Consistent with these Local Patent Rules, pursuant to Federal Rule of Civil Procedure 16, and in consultation with counsel for both parties at the Initial Conference, the Court issued a Pretrial Scheduling Order granting Mylan 21 days, an expansion of the 14 days ordinarily provided under the Local Patent Rule, to serve its Invalidity Contentions on November 22, 2013. [Docket Entry No. 31]. The Order also set a deadline of January 8, 2014 for Aptalis to serve its Infringement Contentions and a deadline for the parties to simultaneously exchange preliminary proposed claim constructions on January 31, 2014. Thus, from the outset of this litigation, Mylan was on notice that it was expected to prepare and serve its Invalidity Contentions before it received Aptalis's Infringement Contentions or Aptalis's preliminary claim constructions.

By the time Mylan was preparing its Invalidity Contentions, it had studied the patents, their prosecution histories, and the prior art it had uncovered to date. *See, e.g.*, Notice of Paragraph IV Certification Regarding U.S. Patent No. 8,217,083, Opp. Exhibit B. It had also received Aptalis's disclosure of asserted claims, each of which recites the term "about" either directly or indirectly. As Mylan admits, Aptalis's disclosure copied, word-for-word, the language of the asserted claims and also cited Mylan's ANDA. Thus, Mylan's most direct evidence as to what the claims mean, at the time it prepared its contentions, was the claims themselves as issued by the U.S. Patent Office and repeated by Aptalis. Still, Mylan urges that it could not have anticipated that Aptalis might take the position that "about" means "approximately." According to Mylan, both the plain and ordinary meaning of "about" and "approximately" suffer from the same defect of failing to provide objective limits as to the range encompassed by the term. Mylan Req. at 6 ("Because the claim elements that include the word

'about' are close to the prior art, not construing the term 'about'—or giving the term its plain and ordinary meaning—would leave Mylan—and any other alleged infringer—without knowledge as to where the bounds of the claims fall.")  This argument only crystallizes the weakness of Mylan's position insofar as it concedes that Mylan did not anticipate that Aptalis might adopt a plain and ordinary meaning of "about."  Had it, Mylan presumably would have perceived its need to raise the indefiniteness arguments it seeks leave to add now.

Without a persuasive explanation, it is difficult for the Court to ascribe diligence to an ANDA applicant who fails to foresee that a patentee might rely on the plain and ordinary meaning of its claim terms.  As movant, Mylan has the burden of establishing its diligence.  Its claim that it *was* surprised does not suffice.  It is Mylan's task to explain the how and why of its surprise, the reasons why a diligent inquiry would not have discovered the grounds for the contentions it seeks to add now.  Mylan has not carried this burden.

2.      Indefiniteness under 35 U.S.C. § 112, Paragraph 2.

Mylan argues that its indefiniteness position was prompted by Aptalis's claim construction of "about," but has cited no authority for a connection between the two, nor has this Court found one.  Section 35 U.S.C. § 112 was amended effective 2012.  The version of the statute applicable to this case requires that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."  35 U.S.C. § 112 ¶2 (2011).  The United States Supreme Court recently restated, unanimously, the considerations pertinent to a § 112, ¶2 inquiry.  "First, definiteness is to be evaluated from the perspective of someone skilled in the relevant art."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120, 2128 (2014) (citations omitted). "Second, in assessing definiteness, claims are to be read in light of the patent's specification and prosecution history.

*Id.* "Third, definiteness is measured from the viewpoint of a person skilled in the art at the time the patent was filed." *Id.* at 4 (interior quotation marks omitted). Overall, the Supreme Court has interpreted Section 112, ¶2 "to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Id.* at 2129. Mylan has advanced no authority to support its assertion that its substantive consideration of definiteness requires a patentee's claim construction and the Court has located none. Accordingly, the Court finds Mylan's argument unpersuasive.

As a practical matter, Mylan may have preferred to craft its validity arguments after careful study of Aptalis's positions with respect to both infringement and claim construction. Strategically, there are any number of advantages to be gleaned from pinpointing the weaknesses of a patentee's litigation positions. The Local Rules, however, require Mylan to speak first, and the substantive patent law and factual record indicate it had the information it needed. That Mylan preferred a better strategic position is not sufficient.

### B. Prejudice

Because the Court finds that Mylan failed to act with diligence, it need not consider prejudice at all. *O2 Micro*, 467 F.3d at 1368; *AstraZeneca AB*, 2013 WL 1145359, at *5; *Jazz Pharmaceuticals, Inc. v. Roxane Laboratories, Inc.*, Civ. No. 10-6108, 2012 WL 3133943, at *8 (D.N.J. July 30, 2012); *Apple,* 2012 WL 1067548, at *14; *Acer Inc.*, 2010 WL 3618687, at *5. Nevertheless, even if the Court were to consider prejudice, that factor would weight in favor of Aptalis as well.

In deciding whether Mylan's proposed amendments would unfairly prejudice Aptalis, the Court considers whether permitting the proposed amendments would (1) require Aptalis to

expend significant additional resources; or (2) significantly delay the resolution of the dispute. *TFH Publications Inc. v. Doskocil Mfg. Co., Inc.,* 705 F.Supp.2d 361, 366 (D.N.J.2010); *see also O2 Micro,* 467 F.3d at 1366–68.

Mylan's proposed Amended Invalidity Contentions would expand its "about" indefiniteness arguments in a section that spans four pages. *Id.* at 41-44.  By its own admission, Mylan's arguments implicate claim elements as to five separate features—drug load, release rate, drug dose, tap density, and surface area—which are recited in approximately 30 asserted claims. At a minimum, it would impose a burden of responding to the new contentions.  As a practical matter, Aptalis cautions that the change would require it to revisit its infringement position, its claim construction position, and its validity positions with respect to prior art.  Mylan's claim that it put Aptalis on notice of its indefiniteness theories in a general way is not sufficient. Whether a claim meets the definiteness requirement of § 112 ¶2 is a fact-specific and term-specific analysis, requiring particulars that Mylan did not provide.  Mylan's attempts to bolster its case by citing Sandoz's arguments in the parallel suit between Aptalis and Sandoz is unavailing for the same reason.  The Court has reviewed the Joint Claim Construction and Prehearing Statement in that case and it finds that Sandoz statements also lack the particulars that might be expected to put Aptalis on specific notice that the term "about" is indefinite.

Mylan has not met its burden of establishing that granting its motion would not significantly delay resolution of the case.  In light of the above, and given this case's tight schedule and the fact that there is no 30-month stay in place, the Court finds that allowing the amendment would work a prejudice on Aptalis.

## V.    CONCLUSION

For the foregoing reasons, and for good cause shown,

**IT IS** on this **20**[th] day of **June, 2014**,

**ORDERED** that Mylan's Motion to Amend its Invalidity Contentions is hereby

DENIED.

**LOIS H. GOODMAN**
**United States Magistrate Judge**

# EXHIBIT 2

<div align="center">

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

</div>

| | |
|---|---|
| **BRISTOL-MYERS SQUIBB CO.,** | **Civil Action No. 10-5810 (MLC)** |
| **Plaintiff,** | |
| v. | **ORDER** |
| **APOTEX, INC., et al.,** | |
| **Defendants.** | |

This matter comes before the Court by way of the January 28, 2013 application by Defendants Apotex, Inc. and Apotex Corp. (hereinafter referred to collectively as "Apotex"), seeking leave to amend their Non-Infringement Contentions and Invalidity Contentions. Docket Entry No. 107 (hereinafter "Application"). Plaintiff, Bristol-Myer Squibb, Inc. ("BMS"), filed a lengthy objection to the amendments on February 6, 2013. Docket Entry No. 112 (hereinafter "Opposition"). Apotex submitted a reply on February 8, 2013. Docket Entry No. 115 (hereinafter "Reply").

The Court considers the application on the papers, pursuant to Fed. R. Civ. P. 78.1(b). Because this decision is intended for the parties only, and because the entire record on the application is subject to motions to seal, the Court refers to certain arguments and factual assertions but has not set them out herein, given the Court's intention that this Order not be placed under seal. For the reasons stated herein, Apotex's request for leave to amend is granted in part and denied in part.

## I. Background and Procedural History

On November 8, 2010, BMS filed a Complaint against Apotex for infringement of four patents which cover BMS's Sprycel (dasatinib) pharmaceutical drug product after Apotex filed

<div align="center">

1

</div>

an Abbreviated New Drug Application with the Federal Drug Administration ("FDA"). *See*
Complaint at Docket Entry No. 1. The four patents at issue are: U.S. Patent No. 7,491,725 (the
" '725" patent), U.S. Patent No. 7,152,856 (the " '856" patent), U.S. Patent No. 7,125,875 (the
" '875" patent), and U.S. Patent No. 6,596,746 (the " '746" patent). The '746 patent covers,
among other things, the active drug ingredient, the dasatinib compound. The '856 and '875
patents cover the methods of using dasatinib to treat cancer. The '725 patent claims a particular
crystalline form of dasatinib. As this is a patent infringement case under the Hatch-Waxman
Act, a 30-month stay of FDA approval is in place, set to run on December 28, 2013.

The Court conducted an initial scheduling conference on April 12, 2011. At the
conference, the Court stressed the importance of adhering to the schedule in light of the 30-
month stay, and in fact tightened the schedule proposed by the parties in the Joint Discovery
Plan. Ultimately, the Court set a schedule, memorialized in an Order dated May 6, 2011.
Docket Entry No. 20. According to the May 6 schedule, Apotex was to, and did, serve its
Invalidity and Non-Infringement Contentions by July 5, 2011. *See id.*; Opposition at 3.[1]
Pursuant to an amended scheduling order, Docket Entry No. 34, BMS filed its Responses to
Apotex's Invalidity and Non-Infringement Contentions on October 7, 2011. Opposition at 3. On
November 29, 2011, the instant case was consolidated with *Bristol-Myer Squibb v. Apotex, Inc.,
et al.*, Docket 11-6918, as the cases were between the same parties and with regard to the same
patents, but related to a new and separate ANDA filed by Apotex for different dosages of the
underlying product. The schedule was amended again and a new Order, dated December 14,
2011 was entered at Docket Entry No. 44. Pursuant to the December 14 Order, Apotex

---

[1] Due to the differences of pagination between the parties' papers and ECF, especially with regard to the pagination
of the voluminous exhibits, all page references herein to documents filed on the docket will be by ECF pagination,
not by the page number that appears on the page of the brief or exhibit itself.

supplemented its Non-Infringement and Invalidity Contentions by January 20, 2012. BMS
supplemented its Infringement and Validity Contentions by February 10, 2012.

The December 14 schedule also set forth the timing of the claim construction process,
which was extended at the request of the parties. *See* Docket Entry No. 52 & 59. In accordance
with the amended schedule, the parties completed their *Markman* submissions, and the Court
held the *Markman* hearing on September 10, 2012 and October 2, 2012. On September 11,
2012, the day after the hearing, the parties sought and received an additional extension of the
schedule, which provided for fact discovery to close on January 11, 2013;[2] opening expert
reports to be served by February 15, 2013; responsive expert reports to be served by March 15,
2013; reply expert reports by April 5, 2013; and the close of expert discovery by May 3, 2013.
The Court also set a schedule by which dispositive motions are to be filed in May, 2013 on an
extended briefing schedule at the parties' request. The Final Pretrial Conference is scheduled for
August 2, 2013. The September 11 Order also provides that trial will begin on September 24,
2013, or as soon thereafter as the Court's schedule allows.

On January 28, 2013, Apotex filed the instant application for leave to amend its Invalidity
and Non-Infringement Contentions. Docket Entry No. 107. Generally speaking, Apotex seeks
to make several amendments, adding references to recently taken depositions of BMS witnesses
and new prior art, and either adding new theories or supplementing existing ones relating to
invalidity and non-infringement.[3] Given the fact that this case is on such a tight schedule, the
Court requested that BMS submit its response by February 1, 2013. When BMS requested an
additional week, the Court convened a conference call on January 31, 2013 to address

---

[2] A short extension of fact discovery for the completion of depositions was granted due to scheduling conflicts of the
witnesses and parties. *See* Docket Entry No. 102. All other discovery was to be completed by January 11, 2013.
[3] The Court notes that there is no definitive list of categories or types of amendments Apotex seeks to make. The
parties rarely agree in their submissions, and in fact each submitted wholly incompatible charts, disagreeing as to
whether Apotex merely seeks to add support for a pre-existing theory or adds entirely new theories.

scheduling. During the call, BMS expressed great concern with the scope, volume and timing of the proposed amendments. Because of the upcoming expert discovery, the undersigned stressed the importance of resolving this issue promptly so as not to impact the schedule, and urged BMS to respond as quickly as possible. After some discussion, BMS proposed making its submission by February 6, 2013, to which the Court agreed. Apotex did not object to the schedule, nor did it request that the schedule include a date for it to reply. Indeed, throughout the call, Apotex never suggested that it intended to reply.

Based on the schedule set for BMS's response, the Court set a tentative date for oral argument on February 11, 2013, with the caveat that the hearing would be canceled if, upon review of the submissions, the Court determined it could rule on the papers.

BMS filed its opposition on February 6, 2013. Docket Entry No. 112. On February 8, 2013, having made an initial review of the papers, the Court concluded that oral argument would not be necessary, and so notified counsel by text order. Later that day, Apotex filed a lengthy reply, supported by voluminous exhibits. *See* Docket Entry No. 115.

## II. Analysis

### a. Standard of Review

The Local Patent Rules govern the litigation process of patent infringement cases in the District of New Jersey. *See* L. Pat. R. 1.2. The Rules are "designed specifically to require parties to crystalize their theories of the case early in the litigation and to adhere to those theories once they have been disclosed." *Atmel Corp. v. Info. Storage Devices., Inc.,* 1998 WL 775115 at *2 (N.D. Cal. 1998).[4] The Court recognizes, however, that the Rules are not a "'straightjacket

---

[4] The District of New Jersey originally developed its Local Patent Rules based on those adopted by the Eastern District of Texas and the Northern District of California. While some changes have been made to the Rules since then, the original purpose and general substance of the Rules still remain closely aligned. The Court therefore finds it appropriate to look to those districts for additional guidance.

into which litigants are locked from the moment their contentions are served,' but instead, 'a modest degree of flexibility [exists], at least near the outset.'" *TFH Publications, Inc., v. Doskocil Manufacturing Co., Inc.*, 705 F. Supp. 2d 361, 366 (D.N.J. 2010), *quoting Comcast Cable Communs. Corp. v. Finisar Corp*, 2007 WL 716131, at *2 (N.D. Cal. March 2, 2007). Accordingly, L. Pat. R. 3.7 expressly permits a party to seek leave to amend its contentions but the party seeking leave must make a particularized showing. The Rule includes a non-exhaustive list of circumstances in which, absent undue prejudice to the non-moving party, a court may permit an amendment, including where the court announces a claim construction different from that posed by the party seeking amendment, and where material information was discovered that was not and could not have been found earlier despite a diligent search. *See* L. Pat. R. 3.7.

While the list is non-exhaustive, the flexibility of the court is constrained by the overarching goal of the Local Patent Rules. It is, therefore, a more conservative standard for amendments in patent cases than is required under Fed. R. Civ. P. 15, which governs amendments to pleadings in general. *AstraZeneca AB v. Hanmi USA, Inc.,* No. 11-760, 2011 WL 5526009, at * 4 (D.N.J. Nov. 14, 2011).

Under R. 3.7, the moving party must establish three factors: 1) the application was timely made; 2) the party has good cause for the application; and 3) there is no undue prejudice to the non-moving party. *Jazz Pharmaceuticals, Inc. v. Roxane Laboratories, Inc.*, No. 10-6108, 2012 WL 3133943, at * 2 (D.N.J. 2012). The failure to establish any one factor may be sufficient for a denial of leave to amend. *See Nautilus Neurosciences, Inc., v. Wockhardt USA LLC*, No. 11-1997 (ES), Docket Entry No. 98, at 6, n.3 (D.N.J. Jan. 23 2013).

The requirement of a timely application is founded on the recognition that "were [the parties] not required to amend their contentions promptly after discovering new information, the

5

contentions requirement would be virtually meaningless as a mechanism for shaping the conduct of discovery in trial preparation." *See O2 Micro Intern. Ltd. v. Monolithic Power Systems*, 476 F.3d 1355, 1366 (Fed. Cir. 2006); *Jazz Pharma.*, 2012 WL 3133943 at *5. A timely application is one in which the party moved for leave to amend at the earliest opportunity it became or could have become aware of the new information that forms the basis for the request to amend. *See Jazz Pharma.*, 2012 WL 3133943 at *5 (rejecting the defendant's argument that a five month period to review new documents constituted diligence). Greater flexibility will be allowed with regard to an amendment sought at or near the outset of the litigation. *See TFH Publications*, 705 F. Supp. 2d at 366 (allowing the plaintiff to amend when the request was made approximately two months after the infringement contentions were initially served).

Good cause is closely aligned with the concept of a timely application, and also looks to the diligence of the party seeking the amendment. *Nautilus Neurosciences*, at 7. A showing of diligence requires more than moving quickly, it "requires diligence throughout the discovery process and that the moving party not only must act promptly upon discovery of new [information], but also must establish that it was diligent in its search." *West v. Jewelry Innovations, Inc.*, Civil No. 07-1812, 2008 WL 4532558, at *2 (N.D. Cal., Oct 8, 2008). Courts have found good cause where parties were diligent in deciphering relevant arguments and moved quickly for leave to amend. *See AstraZeneca AB*, 2011 WL 5526009 at *6 (finding the plaintiff was diligent when it sought leave to amend its validity contentions two and a half months after receiving the new information and less than three months after the plaintiff's original validity contentions were served). In contrast, courts have denied leave where a party unreasonably delayed seeking leave to amend once it had the information in hand. *See King Pharmaceuticals, Inc. v. Sandoz, Inc.*, No. 08-5974, 2010 WL 2015258 at * (D.N.J. May 20, 2010) (finding a lack

of diligence where the defendant knew of the prior art, but failed to recognize its materiality for 18 months).

Last, the court considers the prejudice to the non-moving party. *See AstraZeneca AB*, 2011 WL 5526009 at *7. Undue prejudice may be found where the non-moving party is forced to expend significant additional resources, or where the amendments would delay the resolution of the case. *Nautilus Neurosciences*, at 10. Courts may consider the relevant dates in a case, and the reliance of the parties on that schedule for the development of their respective strategies. *Jazz Pharma.*, 2012 WL 3133943 at *8.

The burden of demonstrating good cause lies with the moving party "rather than on the opposing party to establish a lack of diligence." *Nautilus Neurosciences*, at 7-8. The burden should be met in the first instance in the moving submission. It is not for the moving party to make generalized statements of timeliness, diligence and good cause, and to leave it to the responding party to bear the burden of disproving those allegations in its opposition so that movant can make its case on reply.

The Court notes at the outset that Apotex's moving application, which is seven pages plus attachments, makes generalized and sometimes conclusory statements with regard to timeliness, good cause and the lack of prejudice. *See* Docket Entry No. 107. A single paragraph is devoted to timeliness, essentially arguing that any delay is BMS's fault due to its belated document production. Nowhere does Apotex tie that belated production to its proposed amendments. Docket Entry 107 at 3.

Apotex attempts to close many of these gaps in its reply brief, which really sets forth the heart of Apotex's argument. Because of the importance of the issues raised, the Court has

considered the reply, even though Apotex did not seek to include it as part of the briefing schedule set during the January 31 conference.

### b. Timeliness of the Application

Apotex argues its application is timely because its proposed amendments incorporate new information that was only recently discovered and request for leave was timely sought when BMS refused to give its consent. *See* Application [Docket Entry 107]; Reply at 2. Apotex states the new evidence it cites involves:

> (1) inventor depositions from November 2012-January 2013 (information inherently non-public and not otherwise available to Apotex); (2) documents from over 2.6 million pages that BMS failed to earlier produce; (3) a court order invalidating the foreign versions of BMS's patents; and (4) additional prior art selected to rebut BMS inventor deposition testimony and/or BMS contentions that conflict with inventor depositions testimony.

Reply at 5-6. Apotex argues it made its intention to amend known to BMS on January 10, 2013, had its proposed amendments to BMS by January 18, 2013, and sought leave of court within days of BMS's refusal to consent. Reply at 5. Furthermore, these late revelations from the depositions came on the heels of a generally slow and voluminous document production, a late supplementation of interrogatory responses in January 2013, and various scheduling conflicts. Reply at 5. Because the fault is on, or, at very least shared with, BMS, Apotex says it cannot be held solely responsible for any delay in its request for leave to amend. Application at 3.

BMS counters that Apotex's application is not timely by any measure. BMS asserts that Apotex's claims of a late document production by BMS is a red herring, and that the information actually cited as the basis for the proposed amendments was produced and in the hands of Apotex months earlier, or was information Apotex had the capability of obtaining independently. Opposition at 32-34. BMS further states that Apotex's request for leave to amend is too late

within the schedule of a patent infringement case, as the parties were days from exchanging affirmative expert reports.  Opposition at 28.  At the time of the request, 18 months had already passed since Apotex served its original contentions, and more than a year since it served its supplemental contentions. Opposition at 7.  During that time, BMS says it developed a strategy for the case, based upon Apotex's disclosures.  BMS conducted discovery, retained experts and participated in a *Markman*.  Allowing the amendments would give BMS only days to analyze and incorporate the new information, and to choose and prepare its respective experts. Opposition at 32.  BMS contends it may need to retain new experts if the amendments are permitted and may have to seek another *Markman* hearing.  Opposition at 23.  Indeed, BMS contends that it could well need to re-evaluate its strategy for trial.

The Court can find no case in which a party has been allowed to amend its contentions at this late stage of the litigation, when the *Markman* has been conducted and all fact discovery has been completed.  *See, e.g., Nautilus Neurosciences* (denying amendments sought 14 months after original contentions were exchanged, but before the *Markman* hearing had occurred); *King Pharmaceuticals, Inc. v. Sandoz, Inc.,* 2010 WL 2015258 (D.N.J. May 20, 2010) (denying amendments where the court had  ruled on claim construction and the dates for the final pretrial conference and trial had been set).

There is no question that Apotex's request for leave to amend is untimely.  The parties recently began the exchange of expert reports.  Dispositive motions are to be filed May 17, 2013. The Final Pretrial Conference is scheduled to be conducted on August 8, 2013.  The trial is a mere seven months away, set to begin in September of this year.  This schedule is already tight, in part because of the statutory framework and in part because of the various extensions sought

by the parties. There simply is no room in the schedule to grant further extensions at this late date.

Apotex argues that the lateness of its amendments is not its fault, and material information was uncovered during the final weeks of discovery. Apotex is concerned about prejudice to the presentation of its own case, and accuses BMS of "hiding the ball" until late in the discovery process, thereby preventing Apotex from fully developing its arguments. In light of these concerns, the Court will examine whether Apotex has good cause for the amendments, despite the late hour of its request.

### c. Good Cause and Prejudice[5]

The burden is on Apotex to demonstrate good cause. Apotex asserts it has shown good cause for the amendments for several reasons: it sought to amend as soon as it was possible; the new evidence cited could not have been known to Apotex earlier; and the circumstances here, for example relating to "best mode" contentions, are not contemplated by the Local Patent Rules, and thus Apotex seeks to amend its contentions to combat potential arguments BMS may make. *See* Reply at 5-6. BMS argues that in many cases, Apotex had the ability, knowledge, or access to make the sought-after amendments earlier in the process. *See* Opposition at 25.

BMS provided a chart setting forth the proposed amendments and its understanding of the purpose for which each proposed amendment is to be used. *See* BMS's Chart, Opposition, Exhibit O, Docket Entry No. 112-1. On reply, Apotex submitted its own chart. *See* Apotex's Chart, Reply, Exhibit 2, Docket Entry No. 115-4. Notably, Apotex's chart contains 17

---

[5] Both Apotex and BMS intertwine their arguments of good cause and prejudice. Apotex argues in many instances that BMS is the cause of the late request and it would be prejudiced if the amendments were denied. BMS argues the opposite, that Apotex has failed to demonstrate good cause, and BMS would be prejudiced as a result. As both parties use prejudice and good cause as two sides of the same coin, the Court considers both factors together in determining the appropriateness of the amendments.

10

categories, while BMS's chart contains 82. Apotex does not explain how its chart relates to the one submitted by BMS, and it is virtually impossible to reconcile the two. The Court has therefore been forced to conduct its own in-depth and painstaking review of each of the proposed amendments in an attempt to make sense of the arguments. A brief summary of each party's argument is set forth below.

### i. Apotex's Argument

Apotex seeks to amend its Non-Infringement Contentions to include citations and references regarding three theories that support its position that Apotex's ANDA product lacks stated properties of the patent claims and therefore cannot infringe. *See* Reply 8-11 and Exhibit F, Docket Entry No. 107-3 at 116-17, 120-21. Apotex largely relies on the timing of its obtaining the information relied upon for the amendments, citing to depositions taken in January, 2013 and/or the September, 2012 *Markman* hearing in support of its argument that it could not have amended sooner. *See, e.g.,* Reply at 8. For example, Apotex argues that at the inventor deposition in January 2013, it learned new information regarding testing of the product for infringement purposes. Reply at 9-10. With regard to other proposed amendments, Apotex argues that it is entitled to amend as a preemptory move, in case BMS raises a particular defense to the new contentions and in response to BMS's "prior threat in its infringement contentions that undisclosed testing might be forthcoming in the future." Reply at 10.

In terms of amendments of Invalidity Contentions, Apotex seeks to add 16 new prior art references, numerous references to deposition transcripts and to WO '778, and contentions relating to indefiniteness and written description raised at the *Markman* hearing. Apotex focuses its argument largely on the lack of prejudice to BMS. Reply 11-13. Citing, for example, to a new reference relating to the written description theory, which Apotex contends was brought up

at the *Markman* in September 2012, Apotex argues BMS has been on notice since September that Apotex would raise this issue. Application at 3; Reply at 13-14. Apotex argues that the new prior art is support for its existing positions and merely gives BMS background as to what Apotex's experts may use to illustrate their points to the Court, without introducing anything new. Reply at 11.

Apotex seeks to add evidence, prior art, and a counterargument against BMS's potential use of a theory that the development of the subject matter of the '725 patent was "unexpected." Reply at 12. Apotex states the depositions of BMS's witnesses reflected a change in BMS's wording from its prior statements, denoting that BMS might incorporate a new theory of "unexpected results" as to which Apotex has had no notice. Accordingly, Apotex argues that it would be prejudiced if it is not permitted to amend. Reply at 12.

Apotex also seeks to amend its contentions to add a "best mode" invalidity argument. Reply at 14. Citing that the legal test "expressly evaluates subjectively what the named inventors actually knew and believed to be their best mode," Apotex argues it has good cause as it moved to amend within days of completing the inventors' depositions, which occurred from November 2012 to January 2013. Reply at 14.

Throughout its papers, Apotex gives short shrift to BMS's claims of prejudice. For example, Apotex says that its proposed amendment with regard to testing is really nothing new because BMS has long been on notice that Apotex argues that its product does not infringe. Reply at 9.

Apotex also argues that because much of the need to amend results directly from the testimony of BMS's witnesses, which Apotex argues undermines BMS's own arguments, the

12

only prejudice BMS would suffer is having to undo the damage done by its own witness at the recent deposition. Reply at 8-10.

Apotex also rejects the notion that BMS would need additional discovery or experts, let along another *Markman*. At most, Apotex asserts any new issues could be addressed by BMS's experts through upcoming expert reports.

> ii. BMS's Argument

BMS contests that Apotex has good cause and cites substantial prejudice that it will suffer in both resources and delay of resolution should Apotex be allowed to amend. In many cases, BMS argues that Apotex fails to explain its delay in seeking to amend (or indeed for having failed to address some of the issues raised earlier in the case). According to BMS, Apotex and its experts were aware of the theories they now seek to add, or were alerted to them at very least when they were discussed in prior BMS positions. Opposition at 19 & 27. BMS also cites to instances where Apotex had or could have obtained the information, either because the information was available in the public sphere or was produced in discovery, and a late-scheduled deposition was not required to develop the theory. *See* Opposition at 27-28. In this regard, BMS argues that it was Apotex that delayed discovery, leading to the need to amend. Thus, according to BMS, the delay was the result of Apotex's own lack of diligence in the conduct of discovery. Opposition at 4-5.

The crux of BMS's opposition, however, rests on the substantial prejudice it would suffer should Apotex be allowed to amend. BMS says it relied on Apotex's disclosures, as it should under the Local Patent Rules. Opposition at 11. For almost every category of proposed amendments, BMS catalogs the substantial expenditures it would likely incur. For example, BMS argues that several of the new theories challenge terms construed or defined in the case,

and could impact claim construction and necessitate a new *Markman*. Opposition at 18, 20 & 23. For most of the proposed amendments, BMS claims it would need new fact discovery, experts, and depositions. Opposition at 18, 20, & 23. In addition, BMS asserts that the proposed amendments are so significant that it would have to reevaluate its case strategy, which it has been developing for the last year and a half. Opposition at 11. Even without a new *Markman*, BMS states that the additional work required to present defenses to Apotex's new contentions could not fit within the remaining schedule. Opposition at 18.

> iii. The Court's Findings

In making the present application, the burden rests squarely on Apotex. The Court finds that Apotex has not met that burden except in a very limited circumstance, set forth below. Taken against the backdrop of the current stage of litigation, it is unclear to the Court why certain theories could not have been brought up sooner. Many of the citations and new contentions that Apotex seeks to amend are not only to the January, 2013 depositions, but also to the September 2012 *Markman* hearing. Indeed, BMS argues Apotex could have and should have raised some of these proposed amendments even before the *Markman*. Apotex provides no explanation for the 4-month delay after the *Markman*, especially given the critical timing element at play here. Apotex simply does not explain why depositions were necessary in addition to the *Markman* hearing to establish the need for each amendment. Furthermore, Apotex does not explain why these depositions did not occur earlier. Apotex originally cites to a voluminous document production, but provides no connection between the timeliness of that production of documents and the need for the proposed amendments at this late date. As such, Apotex fails to demonstrate good cause or reasonable diligence.

Apotex's papers raise at least two situations where they seek to amend to bring contentions out of an abundance of caution to proactively address theories BMS may raise in the future. Even if that were the case, the time for proactive behavior has long since passed. The Local Patent Rules are designed to make parties disclose their contentions early in the litigation. This applies to both sides – in essence, both parties live and die by what they contend. Apotex may not amend at this late stage to bring a potential theory; anticipation of a possible argument is not good cause. Apotex is not, however, left without recourse. If BMS does in fact attempt to develop a theory that goes beyond what is reasonably anticipated from its own Contentions, Apotex may seek appropriate relief from the Court.

Finally, of particular concern to the Court is prejudice to the non-moving party and to the schedule in this case. BMS claims Apotex's amendments will require substantial amounts of new discovery, expert analysis, depositions, and potentially a new *Markman*. Looking at the sheer number of new prior art references, and the number of new contentions of non-infringement and invalidity, BMS would at the very least be entitled to the opportunity to review and prepare defenses to all of this new material. BMS says it cannot do so in a vacuum. The parties are currently exchanging expert reports. The volume of the amendments alone indicates this would be impossible to incorporate under the current schedule. It is Apotex's burden to demonstrate good cause, and that good cause is balanced against the potential prejudice to the non-moving party. Here, Apotex attempts too much too late, and the Court therefore finds that to allow the amendments would be prejudicial, both in terms of resources and delay of resolution.

Apotex seeks to add references to the January 2013 depositions in support of previously stated theories. *See* Reply at 11. BMS does not object to the addition of these specific and

limited references. *See* Opposition, FN 2. Thus, Apotex may add references to the recent depositions, but limited to support for pre-existing theories and in accordance with this Order.

## III. Conclusion

For the reasons stated above, the Court **GRANTS** Apotex's application for the limited amendments to add references to recently taken depositions, but which do not add new theories, new prior art, or discussion beyond that which Apotex has already stated in its Invalidity and Non-Infringement Contentions.

The Court **DENIES** leave to amend regarding Apotex's remaining proposed contentions as Apotex has failed to show good cause at this late stage of the litigation, especially given the likely prejudice to BMS and the disruption of the schedule.

## IV. Recently Served Expert Reports

The parties were instructed by the Court to proceed with the expert disclosures pursuant to the schedule as it was set, with an indication that the Court would available to discuss any alterations, should they be needed after a decision was rendered. On February 19, 2013, BMS filed a letter informing the Court that Apotex's expert reports contained arguments and references subject to the current application. *See* Docket Entry No. 117. Apotex responded, by letter dated February 20, that it believed it had complied with the Court's instructions to proceed with expert reports.

The Court has stated above which amendments will proceed and which are denied. The expert reports themselves are not before this Court, and the parties are responsible for reviewing the reports and ensuring they conform with this Order.

For the reasons stated above and for good cause shown,

**IT IS** on this 25th day of **February, 2013**,

**ORDERED** that Apotex's application for leave to amend is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Apotex shall submit its amended Non-Infringement and Invalidity Contentions within 10 days of the entry of this Order; and it is further

**ORDERED** that to the extent necessary, the parties shall serve amended reports in accordance with the rulings set forth above, within 10 days of the entry of this Order.

LOIS H. GOODMAN
United States Magistrate Judge

17

# EXHIBIT 3

```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF NEW JERSEY
 2

 3   PROMETHEUS LABORATORIES INC.,      .
                                        .
 4          Plaintiff,                  .
                                        . Case Nos. 11-cv-01241,
 5   vs.                                . 11-230
                                        .
 6   ROXANE LABORATORIES, INC.,         . Newark, New Jersey
                                        . March 12, 2012
 7          Defendant.                  .
                                        .
 8

 9

10               TRANSCRIPT OF RECORDED OPINION
              Regarding defendant Roxane's request
11          for leave to amend invalidity contentions
               BY THE HONORABLE PATTY SHWARTZ
12             UNITED STATES MAGISTRATE JUDGE

13

14
     APPEARANCES:
15

16   For the Plaintiff:    No one was present

17
     For the Defendant:    No one was present
18

19

20   Audio Operator:

21   Transcription Service:      KING TRANSCRIPTION SERVICES
                                 65 Willowbrook Boulevard
22                               Wayne, New Jersey 07470
                                 (973) 237-6080
23

24
     Proceedings recorded by electronic sound recording; transcript
25   produced by transcription service.
```

Case 2:16-cv-00925-MM-MF Document 69-12 Filed 04/14/17 Page 35 of 500 PageID: 1814
Case 2:11-cv-01241-KM-MAH Document 112 Filed 06/14/12 Page 35 of 90 PageID: 2482

Proceedings                                                          2

```
 1              (Commencement of proceedings)

 2

 3         THE COURT:  This matter has come before the Court

 4    by way of defendant Roxane Laboratories Inc.'s request for

 5    leave to amend its invalidity contentions regarding U.S.

 6    Patent Number 6,248,770, hereinafter the "'770 Patent."  For

 7    the reasons set forth in this Opinion, the request for leave

 8    to amend the invalidity contentions is denied.

 9         By way of background, this case concerns a patent

10    for the methods of use and administration of alosetron

11    hydrochloride to treat Irritable Bowel Syndrome, hereinafter

12    "IBS."  See the Complaint at paragraphs 9 and 10, filed

13    January 14, 2011, in Civil No. 11-230, ECF Number 1; and the

14    Amended Complaint at paragraphs 22 to 25 filed November 18,

15    2011; as well as the Complaint filed in Civil No. 11-1241.

16    IBS is a gastrointestinal diagnosis for patients with

17    abdominal pain, discomfort, and altered bowel function.  See

18    the Plaintiff's Markman Brief at 2 filed December 9, 2011,

19    ECF Number 44 in Civil No. 11-230; and ECF Number 74 filed in

20    Civil No. 11-241.  There are different classifications for

21    IBS, including: (1) diarrhea predominant; (2) constipation

22    predominant; and (3) IBS with alternating stool pattern.  Id.

23         On September 4, 2001, the United States Patent and

24    Trademark Office issued the '770 Patent entitled "Medicaments

25    For the Treatment of Non-Constipated Female Irritable Bowel
```

Case 2:16-cv-09925-JMM-MF Document 69-12 Filed 06/13/17 Page 36 of 500 PageID: 1835
Case 2:11-cv-09241-KM-MF Document 112 Filed 06/14/12 Page 36 of 290 PageID: 2483

Proceedings                                          3

1    Syndrome."  ECF Number 1 filed in Civil No. 11-230; and ECF

2    Number 67 filed in Civil No. 11-1241.  The U.S. Patent and

3    Trademark Office examined the '770 Patent, and on October 19,

4    2010, it issued reexamination certificate canceling or

5    amending the original claims.  Id.  The reexamined claims of

6    the '770 Patent cover methods of use and administration of

7    alosetron or a pharmaceutically acceptable derivative

8    thereof.  Id.

9          Following reexamination, the '770 Patent was listed

10   in the Food and Drug Administration's, hereinafter "FDA,"

11   publication entitled "Approved Drug Products With Therapeutic

12   Equivalents Evaluations," which is also known as the "Orange

13   Book."  See the Complaint at paragraph 11, filed Civil

14   No. 11-230, ECF Number 1; the Amended Complaint at

15   paragraph 26 filed in Civil No. 11-1241, ECF Number 67.

16         Plaintiff holds an approved new drug application

17   for alosetron hydrochloride tablets, which it sells under the

18   name LOTRONEX.  See the Complaint filed January 14, 2011, at

19   paragraph 10 in Civil Action 11-230; the Amended Complaint

20   filed therein at paragraph 25; as well as ECF Number 67 at

21   Civil No. 11-1241.

22         Defendants filed an abbreviated new drug

23   application, hereinafter "ANDA," with the FDA to manufacture

24   and sell alosetron hydrochloride tablets before the '770

25   Patent expires, and submitted a "Paragraph IV certification"

1   alleging that the original claims of the '770 Patent are

2   invalid, unenforceable, and will not be infringed by the

3   activities described in the defendant's ANDA.  See the

4   Original Complaint filed in 11-230, ECF Number 1 at

5   paragraphs 12 through 14; the Amended Complaint at paragraphs

6   25 to 29, ECF Number 67 in Civil No. 11-1241.

7           On January 14, 2011, plaintiff filed a complaint

8   seeking a declaratory judgment that defendant's Paragraph IV

9   certification and notice letter are defective because they do

10  not address the reexamined claims of the '770 Patent.  See

11  ECF Number 1, Civil No. 11-230, the Complaint at paragraphs

12  18 through 24.  The complaint alleges in the alternative that

13  the defendant's submission of its ANDA before the expiration

14  of the '770 Patent constitutes infringement.  Id. at 26.

15          On February 14, 2011, defendant filed an answer to

16  the plaintiff's complaint.  ECF Number 9.

17          On March 4, 2011, the plaintiff filed a separate

18  complaint against defendant for infringement of the '770

19  Patent.  See Civil No. 11-1241, ECF Number 1.

20          On March 30, 2011, defendant filed an answer to

21  that complaint.  Id. at ECF Number 7.

22          On July 28, 2011, the Court ordered that the two

23  cases, Civil Nos. 11-230 and 11-1241 be consolidated for

24  pretrial purposes only.  See the Order dated July 28, 2011,

25  Civil No. 11-1241, ECF Number 29.

Case 2:16-cv-00925-JMM-MF Document 69-2 Filed 04/13/17 Page 38 of 500 PageID: 1847
Case 2:11-cv-01241-KM-MAH Document 112 Filed 06/14/12 Page 38 of 500 PageID: 2485

Proceedings                                                         5

 1              On July 8, 2011, defendant served its invalidity

 2     contentions.  See the Joint Letter dated February 15, 2012,

 3     Civil No. 11-230, ECF Number 49.

 4              On December 9, 2011, both parties filed Markman

 5     opening briefs.  Civil No. 11-230, ECF Number 44; Civil

 6     No. 11-1241, ECF Number 74.  See also Civil No. 11-230, ECF

 7     Number 45; and Civil No. 11-1241, ECF Number 75.

 8              On February 10, 2012, the parties filed responsive

 9     Markman briefs.  See Civil No. 11-230, ECF Number 47; Civil

10     No. 11-1241, ECF Number 100; and Civil No. 11-1241, ECF

11     Number 101.

12              Defendant presented the instant request to amend

13     its invalidity contentions in a joint letter dated

14     February 15, 2012.  Civil No. 11-230, ECF Number 49.

15     Defendant seeks to add two new invalidity contentions.

16     First, defendant seeks to add a contention that the '770

17     Patent is invalid for lack of written description under 35

18     U.S.C. § 112.  Second, defendant seeks to add a contention

19     that the reexamined claims of the '770 Patent are invalid

20     under 35 U.S.C. § 305 for improper reexamination.

21              As to its first proposed invalidity contention,

22     defendant argues that plaintiff's proposed construction of

23     the claim term "experienced symptoms for at least six

24     months," fails to disclose a step of assessing whether an IBS

25     patient has experienced IBS symptoms with diarrhea being

Case 2:16-cv-00925-IMM-MF Document 69-2 Filed 06/14/17 Page 38 of 500 PageID: 1848
Case 2:16-cv-09251-KM-MAH Document 112 Filed 06/14/17 Page 39 of 500 PageID: 2486

Proceedings                                                                6

 1   predominant for at least six months.  Defendant argues that

 2   good cause exists to now add a claim of invalidity based upon

 3   on alleged lack of written description because plaintiff's

 4   proposed claim construction was unavailable to defendant when

 5   it served its invalidity contentions in July 2011.

 6           As to its second proposed invalidity contention,

 7   defendant argues that plaintiff's litigation contention that

 8   a reference entitled "New Product Makes a Difference,"

 9   published by Glaxo Wellcome in Magnet July 19, 1997, and a

10   publication in Rubicon entitled "For Women Only," published

11   in 1997 are being viewed in litigation as not prior art, and

12   that this position is inconsistent with the plaintiff's

13   position before the U.S. Patent and Trademark Office to whom

14   it represented that those references were, in fact, prior

15   art.  The defendant asserts that if these references, namely

16   the Magnet and Rubicon references, are not prior art,

17   reexaminations based upon this prior art before the Patent

18   and Trademark Office was improperly initiated.  Defendant

19   argues that good cause exists because it had no way to

20   anticipate that plaintiff would contend in this case that the

21   Magnet and Rubicon references are not prior art because

22   plaintiff used this prior art as a basis for initiating

23   reexamination proceedings.

24           Defendant also contends that its request to add

25   this contention is not untimely because defendant has been

Case 2:16-cv-09251-MM-MF Document 69-12 Filed 06/13/17 Page 40 of 500 PageID: 4879
Case 2:11-cv-09241-KM-MAH Document 112 Filed 06/14/12 Page 40 of 290 PageID: 2487

Proceedings                                                                    7

1   working on obtaining foreign discovery from a third party,

2   namely GlaxoSmithKline, for several months regarding the

3   prior art issue, and notified plaintiff that it sought to

4   amend its invalidity contentions once it became apparent that

5   defendant would not obtain that foreign discovery until late

6   in the discovery period.

7          Defendant also argues that amending its invalidity

8   contentions will not delay the resolution of this case or

9   prejudice plaintiff because this request comes months before

10  the close of fact discovery, no depositions have been taken,

11  and no third-party documents have been produced.   In

12  addition, with respect to its invalidity contention based

13  upon lack of written description, defendant asserts that such

14  an amendment presents no new issues beyond those addressed in

15  the parties' Markman briefing, and plaintiff is in the best

16  position to know the facts relevant to the requested

17  amendment.

18         Plaintiff argues that amendments to invalidity

19  contentions are not liberally granted, defendant does not

20  have good cause to amend, and defendant's request is not

21  timely.  As to the defendants' first proposed contention,

22  plaintiff argues that: (1) there's no good cause to permit an

23  amendment because plaintiff identified its construction of

24  the term "experienced symptoms for at least six months," more

25  than four months ago, and defendant offers no explanation for

Case 2:16-cv-00925-JMM-MF Document 69-12 Filed 04/13/17 Page 41 of 500 PageID: 1830
Case 2:11-cv-09251-KM-MAH Document 112 Filed 06/14/12 Page 48 of 59 PageID: 2488

Proceedings                                                      8

1  its failure to seek amendment during that time period; and

2  (2) defendant has been on notice for more than one year that

3  plaintiff's claim construction was directed towards the

4  treatment of IBS where diarrhea is predominant.

5       As to defendant's second proposed contention,

6  plaintiff argues that: (1) there is no good cause to amend

7  because defendant delayed seeking amendment of its contention

8  to add a defense under § 305 for more than five months; (2)

9  defendant's justification for its delay due to foreign

10  discovery is baseless; and (3) the proposed contention is

11  directed to an affirmative defense that is not pled in

12  defendant's answer.

13       Plaintiff also asserts that it relied on

14  defendant's existing invalidity contentions to develop its

15  case strategy, and thus the amendments would result in

16  prejudice.

17       L. Pat. R. 3.7 of the local rules of the United

18  States District Court for the District of New Jersey, which

19  governs amendments to invalidity contentions, provides:

20  "Amendment of the infringement contentions or the invalidity

21  contentions may be made by order of the court upon a timely

22  application and showing of good cause.  The application shall

23  disclose whether the adverse party consents or objects.

24  Non-exhaustive examples of circumstances that may, absent

25  undue prejudice to the adverse party, support a finding of

1    good cause, include: (a) a claim construction by the court

2    different from that proposed by the party seeking amendment;

3    (b) recent discovery of material prior art, despite earlier

4    diligent search; (c) recent discovery of non-public

5    information about the accused instrumentality which was not

6    discovered, despite diligent efforts, before the service of

7    the infringement contentions; and (d) disclosure of an

8    asserted claim and infringement contention by a Hatch-Waxman

9    Act plaintiff under L. Pat. R. 33.6(f), that requires

10   response by defendant because it was not previously presented

11   or reasonably anticipated.  The duty to supplement discovery

12   responses under Fed. R. Civ. P. 26(e) does not excuse the

13   need to obtain leave of court to amend contentions."

14   L. Pat. R. 3.7.  Thus, pursuant to Rule 3.7, the Court may

15   permit a party to amend its invalidity contentions provided

16   the following three elements are established: (1) the moving

17   party makes a timely application to the court; (2) there is

18   good cause for the amendment; and (3) there is no undue

19   prejudice to the adverse party.

20         Federal Circuit precedent governs the

21   interpretation of local patent rules because such issues are

22   "intimately involved in the substance of enforcement of the

23   patent right."  O2 Micro International Ltd. v. Monolithic

24   Power Systems Inc., 467 F.3d 1355, 1364 (Fed. Cir. 2006)

25   (internal quotation marks and citations omitted).  The patent

Case 2:16-cv-01925-JMV-MAH   Document 69-2   Filed 08/14/17   Page 43 of 500 PageID: 1832
Case 2:16-cv-01925-JMV-MAH   Document 69-2   Filed 04/13/17   Page 43 of 500 PageID: 2460

Proceedings                                                                 10

 1   rules governing contentions are designed to encourage parties

 2   to provide "early notice of their infringement and invalidity

 3   contentions and to proceed with diligence in amending those

 4   contentions when new information comes to light in the course

 5   of discovery." O2 Micro, 467 F.3d at 1365 to 66.  The local

 6   rules "seek to balance the right to develop new information

 7   in discovery with the need for certainty as to the legal

 8   theories." O2 Micro, 467 F.3d at 1366.  The local rules

 9   require "parties to crystallize their theories of the case

10   early in the litigation." Id. at 1364 (internal quotations

11   and citations omitted).

12        Amendments to infringement and invalidity

13   contentions are not granted as liberally as requests for

14   amendments to pleadings, in part, because "the philosophy

15   behind amending claim charts is decidedly conservative and

16   designed to prevent the 'shifting sands' approach," to a

17   party's contentions.  King Pharmaceuticals Inc. v. Sandoz

18   Inc., Civil No. 08-5974, 2010 WL 20015258 at *4 (D.N.J.

19   May 20, 2010) (internal quotation marks and citations

20   omitted).  Cf. Fed. R. Civ. P. 15(a)(2).

21        New Jersey's local patent rules require that the

22   party seeking leave to amend demonstrate that it has made a

23   "timely application." L. Pat. R. 3.7.  The Federal Circuit

24   has emphasized the importance of this element recognizing

25   that "if the parties were not required to amend their

Case 2:16-cv-01925-JMV-MF Document 69-2 Filed 04/13/17 Page 44 of 500 PageID: 1823
Case 2:16-cv-01925-JMV-MF Document 69-2 Filed 08/14/17 Page 41 of 90 PageID: 2463

Proceedings                                                    11

1    contentions promptly after discovering new information, the

2    contention requirement would be virtually meaningless as a

3    mechanism for shaping the conduct of discovery in trial

4    preparation."  O2 Micro, 467 F.3d at 1366.

5            Defendant has not timely moved to amend its

6    invalidity contentions to include the contention that

7    plaintiff's proposed construction for the claim term

8    "experienced symptoms for at least six months" fails to

9    satisfy the written description requirement under 35 U.S.C.

10   § 112.  Section 112 requires "a written description of the

11   invention and of the manner and process of making and using

12   it ... as to enable any person skilled in the art to which it

13   pertains ... to make and use the same ..."  35 U.S.C. § 112.

14   Defendant claims that plaintiff's proposed claim construction

15   shows that the patent fails to disclose the step of assessing

16   whether an IBS patient has experienced IBS with diarrhea

17   being predominant symptoms for at least six months and

18   therefore would not allow a "person skilled in the art" to

19   determine to undertake that additional step of assessment.

20           To know if a patent is invalid for "lack of written

21   description," a party must show that "the disclosure of the

22   application relied upon reasonably conveys to those skilled

23   in the art that the inventor had possession of the claimed

24   subject matter as of the filing date."  Bard Peripheral

25   Vascular Inc. v. W.L. Gore & Associates Inc., Civil

1   No. 10-1510, 2012 WL 4014373 at *14 (D.N.J. February 10,

2   2012) (quoting Ariad Pharmaceuticals Inc. v. Eli

3   Lilly & Company, 598 F.3d 1336, 1351 (Fed. Cir. 2010)).  This

4   requires consideration of the patent itself and any

5   reexamination certificates.  The defendant has had access to

6   these documents since the inception of the case, as both of

7   these documents were included in the plaintiff's original

8   complaints.  Defendant acknowledges that plaintiff introduced

9   the term "experienced symptoms for at least six months"

10  during reexamination, see the proposed invalidity contention

11  at 65, and the record shows that the U.S. Patent and

12  Trademark Office reissued a reexamination certificate for the

13  '770 Patent on October 19, 2010, approximately 16 months ago.

14  See the Complaint, ECF Number 1 at paragraphs 17 to 19, as

15  well as filed in Civil No. 11-1241 and Civil No. 11-230, ECF

16  Number 1.  Thus, the documents that form the basis for the

17  lack of written description invalidity contention have

18  existed since at least October 2010.  At a minimum, defendant

19  was in possession of these documents at least since the time

20  it was served with the complaint on January 14, 2011.  Thus,

21  defendant's proposed contention that persons skilled in the

22  art would not be able to determine that they had to undertake

23  the alleged additional step, could have been raised in

24  defendant's original contentions.

25          Moreover, even if this contention existed only

Case 2:16-cv-01925-JMV-MF Document 69-2 Filed 04/13/17 Page 46 of 500 PageID: 1825
Case 2:16-cv-01925-JMV-MF Document 69-2 Filed 03/13/17 Page 46 of 500 PageID: 2465
Proceedings                                                          13

 1   under plaintiff's proposed construction of the claim term,

 2   that construction was disclosed on September 23, 2011, and

 3   defendant waited five months to seek to amend its invalidity

 4   contentions to address it.  Filing a request to amend five

 5   months after having the facts upon which to seek to amend it,

 6   constitutes an untimely application.  See O2 Micro, 467 F.3d

 7   at 1367, where it denied leave to amend where the moving

 8   party waited almost three months to file its motion.  Cf.

 9   Mintz v. Dietz and Watson, Civil No. 05-1470, 2009 WL 1868711

10   at *2 (S.D. Cal. June 29, 2009), where the court granted the

11   motion where it was filed three days after the discovery of

12   the new information; and Streak Products Inc. v. Antec Inc.,

13   Civil No. 09-04255, 2010 WL 351752 at *1-2 (N.D. Cal.

14   September 8, 2010), where the court granted leave to a party

15   who filed its application within 10 days of discovering the

16   new information.

17        This application comes five months after the

18   discovery of the fact that the defendant now contends, gives

19   rise to the need to amend.  This is an untimely request, and

20   therefore it is being denied.

21        Defendant also seeks to amend its contention to

22   include the contention that the '770 Patent was improperly

23   reexamined under 35 U.S.C. § 305.  Section 305 allows a

24   patent owner to "propose any amendment to its patent and a

25   new claim or claims thereto in order to distinguish the

Case 2:16-cv-01925-JMV-MF Document 69-2 Filed 04/13/17 Page 47 of 500 PageID: 1826
Case 2:16-cv-01925-JMV-MF Document 69-2 Filed 03/13/17 Page 14 of 200 PageID: 2426

Proceedings                                                    14

```
 1  invention as claimed from the prior art cited under the
 2  provisions of § 301 [of title 35] or in response to a
 3  decision adverse to the patentability of a claim of a
 4  patent." 35 U.S.C. § 305.  Defendant claims that plaintiff's
 5  reexamination was improper as reflected by its present
 6  position concerning certain references it presented during
 7  the reexamination; specifically, plaintiff now contends that
 8  the Magnet and Rubicon references are not prior art, but it
 9  told the U.S. Patent and Trademark Office that these
10  references were prior art.  Defendant asserts that if the
11  Magnet and Rubicon references are not prior art, as plaintiff
12  now contends, then the reexamined claims are invalid under
13  § 305 because they were not added or amended during
14  reexamination to distinguish prior art.
15          To show improper reexamination under 35 U.S.C.
16  § 305, defendant must prove that plaintiff added new claims
17  that enlarged the scope of the patent's coverage.  See Cordis
18  Corp. v. Medtronic AVE Inc., 511 F.3d 1157, 1185 (Fed. Cir.
19  2008).  Under § 305, the Federal Circuit requires courts to
20  consider only whether the added claim broadened the scope of
21  coverage of the original patent.  Id.  "In determining
22  whether a patentee broadened a reexamined claim under 35
23  U.S.C. § 305, this court uses the same test as for reissue
24  claims ... [a] claim is enlarged if it includes within its
25  scope any subject matter that would not have infringed the
```

Case 2:16-cv-01925-JMV-MAH Document 69-2 Filed 04/13/17 Page 48 of 500 PageID: 1837
Case 2:16-cv-01925-JMV-MAH Document 69-2 Filed 04/13/17 Page 45 of 50 PageID: 4765

Proceedings                                                    15

```
 1   original patent."  Hockerson-Halberstadt Inc. v. Converse,

 2   183 F.3d 1369, 1374 (Fed. Cir. 1999) (internal quotation

 3   marks and citations omitted).  The focus under § 305,

 4   therefore, is on the plaintiff's actions before the U.S. PTO

 5   and not whether a particular item is or is not, in fact,

 6   prior art, and the defendant has cited no law to the

 7   contrary.  Because defendant has had access to the

 8   reexamination materials since at least the time it was served

 9   in this case and it had an opportunity to assert that the

10   patent was invalid based upon plaintiff's actions during the

11   reexamination when it served its original contentions,

12   plaintiff's subsequent litigation position did not impact

13   defendant's ability to have done so.

14        Moreover, even if plaintiff's litigation position

15   as to the prior art status of Magnet and Rubicon were

16   relevant to the propriety of the reexamination, plaintiff

17   took that position concerning whether or not Magnet and

18   Rubicon were prior art on August the 22d, 2011, in response

19   to defendant's original invalidity contentions.  Defendant's

20   six-month delay in seeking relief constitutes an untimely

21   application.  See O2 Micro, 467 F.3d at 1367.  Thus,

22   defendant's request to amend its proposed invalidity

23   contention under 35 U.S.C. § 305 is denied as untimely.

24        The Court also considers whether good cause exists.

25   New Jersey's local patent rules also require the party
```

Case 2:16-cv-01925-JMV-MF  Document 69-2  Filed 04/13/17  Page 49 of 500 PageID: 1838
Case 2:16-cv-01925-JMV-MF  Document 69-2  Filed 05/14/17  Page 46 of 90 PageID: 2468

Proceedings                                          16

1   seeking leave to amend to demonstrate that it has made a
2   "showing of good cause."  L. Pat. R. 3.7.  Good cause
3   "requires a showing of diligence."  O2 Micro, 467 F.3d at
4   1366.  And the "burden is on the movant to establish
5   diligence, rather than on the opposing party to establish a
6   lack of diligence."  Id. (internal citations omitted).  The
7   good cause showing "requires diligence throughout the
8   discovery process and that the moving party not only must act
9   promptly upon discovery of new [information], but also must
10  establish that it was diligent in its search."  West v.
11  Jewelry Innovations Inc., Civil No. 07-1812, 2008 WL 4532558
12  at *2 (N.D. Cal. October 8, 2008); Streak Products, 2010 WL
13  3515752 at *2.  As such, the Court "must address whether the
14  party was diligent in discovering the basis for the proposed
15  amendment."  West, 2008 WL 4532558 at *2.
16          The local rules give four non-exhaustive examples
17  of good cause, two of which focus on the moving party's
18  diligence in locating the newly discovered information and
19  its explanation for not including it in the original
20  contention.  L. Pat. R. 3.7.  See O2 Micro, 467 F.3d at 1367.
21  See also King Pharmaceuticals, 2010 WL 2015258 at 4.
22  According to Rule 3.7, examples of situations for good cause
23  may be found, include: "(a) a claim construction by the court
24  different from that proposed by the party seeking amendment;
25  (b) recent discovery of material prior art despite early

1    diligent search; [and] (c) recent discovery of non-public

2    information about the accused instrumentality which was not

3    discovered despite diligent efforts before the service of the

4    infringement contentions ..."  L. Pat. R. 3.7.

5              This, of course, is not a situation where an

6    amendment is necessitated by unexpected court action, nor

7    does it involve the recent discovery of material prior art or

8    the recent discovery of non-public information.  Defendant

9    claims that the proposed construction of the claim term

10   "experienced symptoms for at least six months" forms its

11   basis for seeking to amend its invalidity contention under

12   § 112.

13             As stated previously, defendant was or should have

14   been aware of the necessary information underlying its

15   contention concerning an alleged lack of written description

16   since the inception of the case, because such a contention is

17   based upon the patent and the reexamination certificate.  If

18   defendant failed to formulate this invalidity contention,

19   despite having the necessary information to do so, it cannot

20   show it acted with diligence to constitute good cause.  Even

21   if plaintiff's claim construction was relevant to the

22   defendant's lack of written description contention, defendant

23   has had access to that construction since September 23, 2011.

24   Thus, defendant has been on notice of any potential basis of

25   invalidity arising from plaintiff's claim construction for at

Case 2:16-cv-01925-JMV-MF Document 69-2 Filed 04/13/17 Page 51 of 500 PageID: 1830
Case 2:10-cv-01925-JMV-MAH Document 69-2 Filed 03/14/17 Page 18 of 20 PageID: 2469

Proceedings                                                    18

1    least four and a half months.  Defendant does not offer any

2    excuse for its failure to formulate the lack of written

3    description contention during that period and hence has not

4    shown cause for its failure to act on this information.

5         Moreover, as stated previously, defendant also

6    claims that plaintiff's contention that the <u>Magnet</u> and

7    <u>Rubicon</u> references are not prior art in contrast to its

8    position before the U.S. PTO forms the basis for its proposed

9    invalidity contention under § 305.  As discussed previously,

10   defendant had sufficient information to assess the propriety

11   of the reexamination since the inception of the case.  If

12   plaintiff failed to formulate this invalidity contention,

13   despite having the necessary information to do so, it cannot

14   show the diligence required to constitute good cause under

15   the local rules.  Moreover, even if plaintiff's litigation

16   position as to the prior art status of <u>Magnet</u> and <u>Rubicon</u>

17   were relevant, <u>see</u> the defendant's "improper reexamination"

18   contention, defendant has known about plaintiff's position

19   since August 22, 2011.  Thus, defendant was on notice for at

20   least five and a half months of any potential basis of

21   invalidity arising therefrom.  Defendant does not offer any

22   excuse for its failure to formulate the improper

23   reexamination contention during that period and hence has not

24   satisfied the good cause requirement under L. Pat. R. 3.7.

25        Finally, defendant's effort to excuse its delay

Case 2:16-cv-01925-JMV-MF   Document 69-2   Filed 04/13/17   Page 52 of 500 PageID: 1831
Case 2:16-cv-01925-JMV-MAH   Document 69-2   Filed 03/14/17   Page 19 of 20 PageID: 2465

Proceedings                                                              19

 1    based upon the status of discovery from non-party

 2    GlaxoSmithKline is unavailing.  First, there is no indication

 3    that any discovery from any non-party has any bearing on the

 4    proposed contentions.  If it did, defendant would have been

 5    unavailable to make this application because it would have

 6    lacked sufficient information to do so.  To the contrary,

 7    defendant has had all the information it need to formulate

 8    these contentions and make this application for months.

 9            Second, even if GlaxoSmithKline had information

10    relevant to defendant's invalidity contentions, the parties

11    have been aware that GlaxoSmithKline may have relevant

12    information since before the June 3, 2011, Rule 16 conference

13    and could have taken steps at any time to secure documents

14    from that entity.

15            For these reasons, the defendant has not provided

16    good cause for amending its contentions to add assertions

17    that plaintiff's patent is invalid for lack of written

18    description or improper reexamination.

19            Now, of course, the Court only needs to consider

20    undue prejudice if the moving party moved timely and made the

21    requisite showing of good cause.  O2 Micro, 467 F.3d at 1368.

22    But because the defendant has not shown that it acted with

23    diligence or made a timely application, the Court need not

24    consider whether the amendment would unduly prejudice the

25    plaintiff.

Case 2:16-cv-01925-JMV-MF  Document 69-2  Filed 04/13/17  Page 53 of 500 PageID: 1332
Case 2:16-cv-01925-JMV-MAH  Document 91-2  Filed 03/14/17  Page 20 of 20 PageID: 2470

Proceedings                                                        20

```
1            For all of these reasons, the defendant's request

2   for leave to amend its invalidity contentions is denied.

3            A form of Order consistent with this Opinion will

4   be issued.

5                   (Conclusion of proceedings)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:16-cv-01025-JMV-MF Document 69-2 Filed 04/13/17 Page 54 of 500 PageID: 1393
Case 2:10-cv-01225-JMV-MAH Document 69-2 Filed 03/14/12 Page 21 of 21 PageID: 2473

Certification                                                              21

1                        Certification

2          I, SARA L. KERN, Transcriptionist, do hereby certify

3     that the 21 pages contained herein constitute a full, true,

4     and accurate transcript from the official electronic

5     recording of the proceedings had in the above-entitled

6     matter; that research was performed on the spelling of proper

7     names and utilizing the information provided, but that in

8     many cases the spellings were educated guesses; that the

9     transcript was prepared by me or under my direction and was

10    done to the best of my skill and ability.

11         I further certify that I am in no way related to any of

12    the parties hereto nor am I in any way interested in the

13    outcome hereof.

14

15

16

17

18    S/ *Sara L. Kern*                    March 13, 2012

19    _____          _____
      Signature of Approved Transcriber              Date

20

21
      Sara L. Kern, CET**D-338
22    King Transcription Services
      65 Willowbrook Boulevard
23    Wayne, NJ 07470
      (973) 237-6080

24

25

# EXHIBIT 4

# CONNELL FOLEY LLP

## ATTORNEYS AT LAW

85 LIVINGSTONE AVENUE
ROSELAND, NJ 07068-3702
(973) 535-0500
FAX: (973) 535-9217

OTHER OFFICES

JOHN A. PINDAR (1969)
GEORGE W. CONNELL (2005)
ADRIAN M. FOLEY, JR.
GEORGE J. KENNY*
KENNETH F. KUNZMAN
SAMUEL D. LORD
RICHARD D. CATENACCI
RICHARD J. BADOLATO*
PETER D. MANAHAN
JOHN B. MURRAY
MARK L. FLEDER
KEVIN J. COAKLEY
THOMAS S. COSMA
KATHLEEN S. MURPHY
PATRICK J. MCAULEY
PETER J. PIZZI*
KEVIN R. GARDNER
ROBERT E. RYAN
MICHAEL X. MCBRIDE*
JEFFREY W. MORYAN
EDWARD S. WARDELL
PETER J. SMITH*
WILLIAM P. KRAUSS
BRIAN G. STELLER
PHILIP F. MCGOVERN, JR.
KAREN PAINTER RANDALL
LIZA M. WALSH
JOHN P. LACEY
MICHAEL J. CROWLEY-
TIMOTHY E. CORRISTON*

PATRICK J. HUGHES*
JAMES C. MCCANN*
JOHN D. CROMIE
ANGELA A. IUSO*
WILLIAM T. MCGLOIN*
BRENDAN JUDGE
STEPHEN A. URBAN
CHARLES J. HARRINGTON III
STEPHEN V. FALANGA*
TRICIA O'REILLY*
ANTHONY F. VITIELLO*
MARC D. HAEFNER
JONATHAN P. MCHENRY
BRAD D. SHALIT*
M. TREVOR LYONS*
CRAIG S. DEMARESKI*
W. NEVINS MCCANN*
THOMAS J. O'LEARY*
MITCHELL W. TARASCHI
MICHAEL A. SHADIACK
OWEN C. MCCARTHY*
PATRICIA A. LEE*
AGNIESZKA ANTONIAN*
CHRISTOPHER J. TUCCI*
NEIL V. MODY*
STEVE BARNETT*
THOMAS M. SCUDERI*
JOSEPH M. MURPHY*
NANCY A. SKIDMORE*
CHRISTINE S. ORLANDO

HARBORSIDE FINANCIAL
CENTER
2510 PLAZA FIVE
JERSEY CITY, NJ 07311
(201) 521-1000
FAX: (201) 521-0100

1500 MARKET STREET
12TH FLOOR,
EAST TOWER
PHILADELPHIA, PA 19102
(215) 246-3403
FAX: (215) 665-5727

THE ATRIUM, SUITE E
309 MORRIS AVENUE
SPRING LAKE, NJ 07762
(732) 449-1440
FAX: (732)449-0934

888 SEVENTH AVENUE
9TH FLOOR
NEW YORK, NY 10106
(212) 307-3700
FAX: (212) 262-0050

LIBERTY VIEW
457 HADDONFIELD
ROAD, SUITE 230
CHERRY HILL, NJ 08002
(856) 317-7100
FAX: (856) 317-7117

COUNSEL

JOHN W. BISSELL
EUGENE J. CODEY, JR.
FRANCIS J. ORLANDO
FRANCIS E. SCHILLER*
EUGENE P. SQUEO*
NOEL D. HUMPHREYS*
ANTHONY ROMANO II*

DOUGLAS J. SHORT*
JAMES M. MERENDINO
MICHELE T. TANTALLA*
HECTOR D. RUIZ*
ROBERT A. VERDIBELLO*
JENNIFER C. CRITCHLEY*
PATRICK S. BRANNIGAN*
CHRISTINE I. GANNON*
PHILIP W. ALLOGRAMENTO III*
LAURIE B. KACHONICK*
ANDREW C. SAYLES*
STEPHEN D. KESSLER
CHRISTOPHER ABATEMARCO*
ANTHONY J. CORINO*
WILLIAM D. DEVEAU*
MEGHAN BARRETT BURKE*
RUKHSANAH L. LIGHARI*
BRITTANY E. MIANO*
STACIE L. POWERS*
NICOLE B. DORY*
MICHAEL BOJBASA-
EKTA B. PATEL+
CHRISTOPHER M. HEMRICK*
SUSAN KWIATKOWSKI*
MONICA SETH*

KARIN I. SPALDING*
JODI ANNE HUDSON*
RICHARD A. JAGEN
JASON E. MARX*
ALEXIS E. LAZZARA
DANIEL B. KESSLER

MELISSA D. LOPEZ
ANDREW L. BARON*
JASON D. FALK*
MICHAEL J. SHORTT+
JOANNA S. RICH*
VICTORIA N. MANOUSHAGIAN-
PATRICK J. MURPHY, III
MEGHAN K. MUSSO
BRENDAN W. CARROLL*
EDMUND J. CAULFIELD*
SYDNEY J. DARLING*
JESSICA L. PALMER
NEIL V. SHAH*
STEPHEN R. TURANO*
TARA L. TOULOUMIS*
STEVEN A. KROLL*
ROBERT M. DIPISA*
MATTHEW A. BAKER+
MICHAEL J. CREEGAN*
THOMAS M. BLEWITT, JR.+
BRIAN S. WOLFSON
SONYA B. COLE*
MARY F. HURLEY
DANIELLE M. NOVAK+
JAMES E. FIGLIOZZI-

*ALSO ADMITTED IN NEW YORK
+ALSO ADMITTED IN PENNSYLVANIA
-ONLY ADMITTED IN NEW YORK
PLEASE REPLY TO ROSELAND, NJ

May 14, 2012

**VIA ECF AND FEDERAL EXPRESS**
Hon. Mark Falk, U.S.M.J.
United States Post Office & Courthouse
1 Federal Square, Room 457
Newark, New Jersey, 07101-0999

Re:    Noven Pharmaceuticals v. Watson Laboratories, Inc. et al.,
       Civ. No. 11-5997 (DMC/MF)

Dear Judge Falk:

Pursuant to L. Pat. R. 3.7, Watson respectfully seeks leave to amend its invalidity contentions to: (1) identify additional claims that are invalid under 35 U.S.C. § 112, ¶ 1, for lack of written description; (2) add additional supporting evidence from the file histories of related patent applications owned by Plaintiff in support of Watson's previously asserted defenses under 35 U.S.C. §§ 102 and 103; and (3) add three prior art references cited in those file histories. (Ex. A, Am. Contentions Redline, pp. 50-67, 97, 125, 128-33.)

Watson discovered the additional claim defects and this additional supporting evidence while preparing Watson's claim construction positions for the parties' April 27, 2012 exchange of preliminary claim constructions and supporting evidence pursuant to this Court's January 20, 2012 Scheduling Order. (Dkt. 29, Scheduling Order, ¶ 6.)

Watson promptly notified Plaintiff of its decision to seek leave on April 26 – the very same day that Watson realized the need for an amendment and on May 2 provided Plaintiff with a

2707285-01

Hon. Mark Falk, U.S.M.J.
May 14, 2012
Page 2

redlined draft of Watson's proposed contentions.[1] (Ex. B, 4/27-5/2 Emails Lydigsen & Dahiya.) In response to Plaintiff's May 4 request, on May 7, Watson summarized its good cause for amending. (*Id.*, 5/4-5/7 Emails Lydigsen & Pe.) On May 9, Plaintiff refused consent, claiming that Watson's amendment – even at this early pre-claim construction stage is "inexcusable." (*Id.*, 5/9 Email Pe to Lydigsen.)

Good cause for amendment exists given Watson's recent discovery of the subject matter it seeks to add to the contentions, the early pre-claim construction stage of the litigation and the fact that Noven will suffer no prejudice as a result of the amendment.

I.    **Background of Watson's Invalidity Contentions**

As Your Honor may recall, and by way of background, this action for alleged patent infringement arises out of the filing of Watson Laboratories, Inc.'s Abbreviated New Drug Application ("ANDA") No. 200147, which seeks approval to market and sell generic methylphenidate transdermal patches of certain dosages. Plaintiff, which markets and sells the branded product, Daytrana®, filed suit on October 13, 2011, claiming that Watson's proposed generic products infringe U.S. Patent Nos. 6,210,705 ("'705 patent") and 6,348,211 ("'211 patent") (collectively, "patents-in-suit"). Watson denies the allegations and seeks a declaration that the patents-in-suit are invalid and/or are not infringed.

Based on Watson's claims that the patents-in-suit are invalid, and pursuant to this Court's January 20, 2012 Scheduling Order (Dkt. 29), Watson served its invalidity contentions in accordance with L. Pat. R. 3.3 and 3.6 two weeks later on February 3, 2012. Watson's contentions included a 110-page narrative detailing Watson's invalidity positions as well as a 58-page claim chart pin-pointing the prior art's disclosure of each limitation of the asserted claims for which Watson alleges anticipation and/or obviousness. On the same day, Watson also submitted its 26-page non-infringement contentions. Although Watson's invalidity contentions alleged anticipation and obviousness of the asserted claims, Watson inadvertently omitted citations to two anticipatory references as to several specific limitations in the original chart.

---

[1] In an effort to make this amendment as comprehensive as possible, Exhibit A contains several additional clarifying revisions to the redlined draft provided to Plaintiff on May 2. First, Defendants have added a statement reserving their right to rely on the file histories of all related and foreign counterpart applications of the patents-in-suit. (Ex. A, Am. Contentions, pp. 51, 125.) Second, Defendants have corrected two unintentional omissions from the Claim Chart Redline. Specifically, Defendants have added a citation to the '286 patent for the "rate in excess of 0.05 mg/kg/hr" limitation of claim 31 of the '211 patent (*Id.*, Am. Chart, pp. 94) and have added several pin cites to each new citation to U.S. Patent No. 5,656,286 ("'286 patent") (*e.g.*, *id.*, pp. 6-7 (adding pin cites to col. 1, ll. 46-54, col. 4, ll. 20-23, col. 10, ll. 12-19, col. 28, l. 7, col. 32, ll. 51-65, col. 34, ll. 60-62, col. 35, ll. 4-8)).

Hon. Mark Falk, U.S.M.J.
May 14, 2012
Page 3

Following a dispute between the parties as to whether Watson's contentions and accompanying claim chart were sufficiently clear, Watson served a replacement chart on February 20. Plaintiff objected to the replacement chart as improperly seeking an amendment to the invalidity contentions without leave of Court. Watson then sought an order from the Court permitting the replacement of the original chart with the corrected chart. On March 6, this Court issued an order permitting Watson to replace the chart. The Court noted that Watson "promptly sought to clarify/amend their contentions and charts" and that there would be "no undue prejudice or delay that will result from allowing the replacement contentions and/or claim charts at this early stage of the proceedings." (*Id.*, ¶ 5).

II.    **Good Cause Exists For Watson's Prompt Request For Leave To Amend**

Watson has good cause to amend its invalidity contentions in light of the new defenses and evidence it discovered in the course of investigating claim construction positions. This Court considers four factors in determining whether good cause exists under L. Pat. R. 3.7: (1) the reason for the delay and whether a party has been diligent; (2) the availability of a continuance and potential impact of a delay on judicial proceedings; (3) the danger of unfair prejudice; and (4) the importance of what is being excluded. *Oy Ajat, Ltd. v. Vatech Am., Inc.*, No. 10-4875 (PGS), 2012 WL 1067900, at *20 (D.N.J. Mar. 29, 2012).

As detailed below, good cause exists for Watson to amend its invalidity contentions at this early stage to incorporate defenses and new evidence discovered as a result of Watson's timely development and investigation of its claim construction positions. (Dkt. 29, Scheduling Order, ¶ 6); *see Arbitron, Inc. v. Int'l Demographics Inc.*, No. 2:06-CV-434 (TJW), 2008 WL 4755761, at *2 (E.D. Tex. Oct. 29, 2008). These additions to Watson's potentially dispositive invalidity defenses at this early stage will neither delay the proceedings nor prejudice Plaintiff.

A.    **Watson's Timely Claim Construction Investigation Led to the Discovery of Section 112 Invalidity Defenses and New Supporting Evidence**

On April 26, Watson was finalizing its preliminary claim constructions and supporting evidence pursuant to L. Pat. R. 4.2(a) and (b) and this Court's January 20, 2012 Scheduling Order. In an effort to identify evidence potentially relevant to claim construction, Watson initiated a review of the file histories of several European counterpart applications as well as the file histories of several U.S. patent applications related to the patents-in-suit.[2] Watson's review of these file histories alerted Watson to: (1) the fact that additional limitations of the patents-in-suit are invalid pursuant to 35 U.S.C. § 112, ¶ 1 for failure to meet the written description requirement; (2) the United States Patent and Trademark Office's ("USPTO") rejection of many of the arguments on

---

[2] Attached as Exhibit C is a family tree showing the relationship between the patents-in-suit, the European counterpart applications, and the subsequently filed U.S. patent applications, which claim priority to the patents-in-suit. Notably, application nos. 12/981,154 and 13/071,048 are still pending. The file histories of these applications are Noven's documents.

Hon. Mark Falk, U.S.M.J.
May 14, 2012
Page 4

which Plaintiff relies to refute Watson's invalidity defenses pursuant 35 U.S.C. §§ 102 and 103; and (3) three pieces of additional prior art cited during the prosecution of subsequently-filed applications related to the patents-in-suit.

Watson's review of the European counterpart file histories on April 26 revealed that claims nearly identical in scope to the asserted claims of the '705 patent were rejected based on inadequate specification support. Specifically, both the original claims of European Application No. 98963179.0 and every asserted claim of the '705 patent require that the "composition comprises no more than about 5 wt % of acid functional monomers."[3] (hereinafter, "wt % limitation"). However, neither the European specification nor the '705 specification describe a composition in which the total combined amount of acid functional monomers in the component parts is no more than about 5 % by weight. Watson determined that the European Patent Office's ("EPO") rationale for rejecting the claims of the European counterpart demonstrated that the asserted claims of the '705 patent are invalid for failing to comply with the written description requirement of 35 U.S.C. § 112, ¶ 1.

Immediately upon discovering this fatal defect on April 26, Watson contacted Plaintiff's counsel to apprise Plaintiff of this additional section 112 defense and Watson's intent to seek leave to amend its invalidity contentions (Ex. B, 4/27-4/28 Emails Dahiya & Lydigsen), even though Watson's review of the materials was ongoing. Plaintiff's counsel requested a redlined copy of the proposed amended contentions before making a decision on whether Plaintiff would consent to Watson's proposed amendment. (*Id.*) Watson responded, advising that its review was ongoing, and that it would provide Plaintiff with a redlined draft of Watson's proposed amendment once Watson had completed its review of the relevant materials. (*Id.*) In the interim, Watson laid out its written description defense for the wt % limitation, including citations to the European counterpart's file history, in its preliminary proposed claim construction submission on April 27. (Ex. D, Watson Claim Constr., pp. 4-7)

Watson's review of the European counterpart file histories continued in the late evening of April 26 and into April 27. The EPO's rejection of claims of European Patent Application No. 04004843.1 that contained broad rate and duration limitations lacking any basis in the application, prompted Watson to consider whether the similarly broad limitations of claims 22-26 and 30-31 of the '211 patent are likewise invalid under 35 U.S.C. § 112, ¶ 1 due to inadequate written description support.

---

[3] Independent claims 16, 18, and 25 include the same requirement, but are worded slightly differently to require that "acid functional monomers are present in an amount of no more than about 5 wt %." Dependent claims 17 and 24 contain a limitation requiring that the "acid functional monomers are present in an amount of no more than about 1 wt %," which suffers from the same written description deficiency as the 5 wt % limitation.

Hon. Mark Falk, U.S.M.J.
May 14, 2012
Page 5

Watson's review then turned to the file histories of the related U.S. applications.[4]  This review revealed additional evidence in support of Watson's previously asserted invalidity defenses under 35 U.S.C. §§ 102 and 103, including a decision by the USPTO Board of Appeals and Interferences upholding the rejection of Plaintiff's patent claims as obvious.[5]  These file histories also alerted Watson to the significance of three new prior art references (U.S. Patent Nos. 5,446,070 and 5,574,090 and JP H2-255611) and additional disclosures – as understood by a person of ordinary skill – of one reference on which Watson relied in its original contentions (the '286 patent).[6]

On May 2, 2012, Watson provided Plaintiff with a redlined version of its proposed amendment, which included the section 112 defect previously identified by Watson on April 26, the additional section 112 defects and the supplemental supporting evidence for Watson's existing anticipation and obviousness defenses, which were uncovered by Watson's review over the next several days.  (Ex. B, 5/2 Email Lydigsen to Dahiya.)  On May 4, Plaintiff requested that Watson explain the good cause for the proposed amendment, and Watson responded to Plaintiff's request on May 7, summarizing its good cause.  (*Id.*, 5/4-5/7 Emails Lydigsen & Pe.)  On May 9, Plaintiff refused consent, calling Watson's amendment "wholly improper" and "inexcusable."  (*Id.*, 5/9 Email Pe to Lydigsen.)

B.   **Watson's Early Pre-Claim Construction Amendment Will Neither Delay the Proceedings Nor Prejudice Plaintiff**

Good cause exists here because Watson's amendments at this early stage in the litigation will not delay the proceedings or prejudice Plaintiff.

Watson's amended invalidity contentions will have no effect on this Court's schedule, given that little more than document production has occurred in this case.  Claim construction is just beginning; opening claim construction briefs are not due until July 20, 2012.  (Dkt. 29, Scheduling

---

[4] Plaintiff's counsel's assertion that Watson was not diligent because it did not "'learn[ ]' of the relevance of these file histories" prior to submitting its invalidity contentions (Ex. B, 5/9 Email Pe to Lydigsen) contrasts sharply with Plaintiff's prior objection to producing the file histories because they are allegedly "neither relevant to any claim or defense nor reasonably calculated to lead to the discovery of admissible evidence." (Ex. E, Sidley Objections, pp. 14-16.)

[5] The bulk of Watson's amendment consists of a discussion of these file histories, which are Noven's documents and merely lend further support to Watson's February 3 contentions.  (Ex. A, Contentions, pp. 50-67.)  This amendment is also warranted at this time because the USPTO's rationale contradicts Plaintiff's positions on non-obviousness.

[6] As evidenced by Watson's identification of over 70 material prior art references in its 110-page invalidity contentions and accompanying 58-page L. Pat. R. 3.3(c) chart, Watson engaged in extensive searching prior to submitting its February 3 contentions.  Despite these diligent efforts, Watson did not uncover the prominent role these 4 prior art references played in the related U.S file histories and thus, in turn, their significance to the patents-in-suit.

Hon. Mark Falk, U.S.M.J.
May 14, 2012
Page 6

Order ¶ 10.) Further, no depositions have been taken, fact discovery will not close until November 2, 2012, opening expert reports are not due until November 30, 2012, and no trial date has been set. (*Id.*, ¶¶ 8, 17 & 20.) Thus, Watson's amended invalidity contentions will have no effect on this Court's schedule.

Plaintiff's claim of prejudice in its email refusing consent rings hollow given the early pre-claim construction stage of this litigation. (*See* Ex. B, 5/9 Email Pe to Lydigsen.) Noven's complaint that it has somehow been prejudiced because it has already "identified terms for claim construction, and proposed constructions and provided cited support," is belied by the facts. First, Watson notified Noven of its intent to amend *before* the deadline for exchanging claim constructions and offered to extend the deadline in light of the amendment. (*See id.*, 4/27 Emails Lydigsen & Dahiya.) Noven cannot claim prejudice given that it nonetheless chose to proceed with the exchange on schedule. Second, on May 4, Noven revised its proposed constructions for the wt % limitation in an apparent attempt to combat the section 112 defense Watson seeks to add to its contentions. (*See* Ex. F, 5/4 Email Pe to Lydigsen.) In support of its new constructions, Noven relies on the file histories of the same U.S. related applications that it seeks to prevent Watson from adding to its invalidity contentions. (*Id.*, 5/8 Email Pe to Lydigsen (citing file histories of U.S. Patent Application Nos. 10/024,513 and 11/812,198).) Moreover, Plaintiff's claim construction amendment underscores the fact that Plaintiff has sufficient time to adjust its strategy to account for Watson's amendment and will not been prejudiced here.

Indeed, courts have frequently granted leave to amend when the litigation is at similarly early stages due to the lack of prejudice to the plaintiff. *See Arbitron*, 2008 WL 4755761, at *1-2 (permitting additional indefiniteness defense despite 7-month delay where a claim construction hearing had not yet occurred "[g]iven the importance of the indefiniteness defense to [the defendant] and the absence of any potential prejudice to the plaintiff in allowing the amendment . . . ."); *see also Streak Prods. Inc. v. Antec, Inc.*, No. C09-04255 RS (HRL), 2010 WL 3515752, at *2 (N.D. Cal. Sept. 8, 2010) (allowing amendment where there was "no discovery deadline or trial date yet set" allowing "plenty of time to analyze and conduct discovery" related to the amended invalidity contentions); *Avago Techs. Gen. IP PTE Ltd. v. Elan Microelecs. Corp.*, No. C04-05385 JW (HRL), 2007 WL 1449758, at *2 (N.D. Cal. May 15, 2007) (granting leave where plaintiff would "have known about th[e] theory for almost three months before its opposition to the relevant summary judgment motion is due" and "all of the documents that th[e] theory is based on have been in [plaintiff's] possession . . . ."); *Computer Acceleration Corp. v. Microsoft Corp.*, 481 F. Supp.2d 620, 627 (E.D. Tex. 2007) (granting leave to amend invalidity contentions despite the defendant's "dilatory conduct" due to the "lack of unfair prejudice to [plaintiff]" and "ample opportunity for [plaintiff] to respond to the new invalidity contentions").

### C.     Public Policy Favors Amendment

Moreover, the public policy in favor of deciding issues of patent invalidity on their merits weighs in favor of granting leave here. *See Avago*, 2007 WL 1449758, at *2 ("[T]he court wishes to have this invalidity issue decided on its merits in the interest of promoting substance over form."); *Streak Prods.*, 2010 WL 3515752, at *3 ("Courts prefer to decide case[s] on the merits, rather than on procedural grounds."). Watson, and the public, should not be denied the opportunity

Hon. Mark Falk, U.S.M.J.
May 14, 2012
Page 7

to present the strongest case possible for invalidating the patents-in-suit merely because Watson did not learn of the evidence contained in the file histories of the related applications until after the submission of its invalidity contentions on February 3.

In sum, and as this Court noted in its prior order, L. Pat. R. 3.7 "is not a straightjacket into which litigations are locked from the moment their contentions are served [and] flexibility exists, at least near the outset." (Dkt. 36, Order (citing *THF Publ'n, Inc. v. Doskocil Mfg. Co.*, 705 F. Supp.2d 361, 365-66 (D.N.J. 2010)).) Leave to amend is warranted here where Watson only recently discovered the section 112 defenses and supporting evidence for its existing defenses, the amendment will not delay the case, and the amendment will not prejudice Plaintiff.

Accordingly, Watson respectfully requests that this Court grant Watson leave to amend its invalidity contentions pursuant to L. Pat. R. 3.7

Respectfully,

s/ *Liza M. Walsh*

Liza M. Walsh

LMW/pxm

Cc: All Counsel of Record via ECF and Email

# EXHIBIT 5

Liza M. Walsh
Hector D. Ruiz
Joseph L. Linares
WALSH PIZZI O'REILLY FALANGA LLP
One Riverfront Plaza
1037 Raymond Boulevard, Suite 600
Newark, New Jersey 07102
(973) 757-1100

*Of Counsel:*
George C. Lombardi (admitted *pro hac vice*)
Michael K. Nutter (admitted *pro hac vice*)
Samuel S. Park (admitted *pro hac vice*)
Kevin E. Warner (admitted *pro hac vice*)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois 60611-9703
(312) 558-5600

Charles B. Klein (admitted *pro hac vice*)
Eimeric Reig-Plessis (admitted *pro hac vice*)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 2006-3817
(202) 282-5000

*Attorneys for Defendant/Counterclaim-Plaintiff Actavis LLC*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ABRAXIS BIOSCIENCE, LLC and CELGENE CORPORATION, | Civ. A. No. 2:16-cv-01925 (JMV-MF) |
| Plaintiffs, | |
| v. | **DEFENDANT'S PROPOSED CLAIM TERMS FOR CONSTRUCTION** |
| ACTAVIS LLC, | |
| Defendant. | |

Pursuant to Local Patent Rule 4.1 for the United States District Court for the District of New Jersey, and this Court's August 17, 2016 Scheduling Order (DE No. 46), Defendant/Counterclaim Plaintiff Actavis LLC ("Actavis"), based on evidence available to it now, provides the following list of claim terms which Defendant contends should be construed by the Court to Plaintiffs/Counterclaim Defendants Abraxis Bioscience, LLC and Celgene Corporation (collectively "Plaintiffs").

Defendant expressly reserves the right to make any modifications, additions or deletions to the list of claim terms identified below after receiving Plaintiffs' list of claim terms which Plaintiffs contend require construction or as a result of further discussions with Plaintiffs. Additionally, because claim construction discovery is ongoing, Defendant expressly reserves the right to update, supplement, revise, or otherwise modify this list of proposed claim terms requiring construction, in light of further investigation and discovery, including evidence not yet received. This list of proposed terms shall not be construed as: (i) an admission that any particular claim language requires construction beyond its plan and ordinary meaning as understood by a person of ordinary skill in the art; or (ii) an admission that any particular claim language constitutes a substantive claim limitation.

Subject to the foregoing, Defendant identifies the following claim terms as requiring construction by the Court:

| U.S. Patent No(s). | Claim # | Term |
|---|---|---|
| 7,820,788; 7,923,536; 8,138,229 | '788 patent: 1-9  '536 patent: 1-4, 7, 8, 11, 14  '229 patent: 1-3, 6-8, 11- | "weight ratio of albumin to paclitaxel in the composition" |

| | 16, 19-24, 27-30, 33-35, 38-39, 42-43, 46-48 | |
|---|---|---|
| 7,820,788; 7,923,536; 8,138,229 | '788 patent: 10-12<br><br>'536 patent: 5, 6, 9, 10, 12, 13, 15, 16<br><br>'229 patent: 31-32, 44-45 | "ratio (w/w) of albumin to the paclitaxel in the pharmaceutical composition" |
| 8,138,229 | '229 patent: 4-5, 9-10, 17-18, 25-26, 36-37, 40-41, | "weight ratio of albumin to the paclitaxel in the pharmaceutical composition" |

Dated: November 4, 2016

*s/Liza M. Walsh*
Liza M. Walsh
Hector D. Ruiz
Joseph L. Linares
WALSH PIZZI O'REILLY FALANGA LLP
One Riverfront Plaza
1037 Raymond Boulevard, Suite 600
Newark, New Jersey 07102
(973) 757-1100

*Of Counsel:*
George C. Lombardi (admitted *pro hac vice*)
Michael K. Nutter (admitted *pro hac vice*)
Samuel S. Park (admitted *pro hac vice*)
Kevin E. Warner (admitted *pro hac vice*)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois 60611-9703
(312) 558-5600

Charles B. Klein (admitted *pro hac vice*)
Eimeric Reig-Plessis (admitted *pro hac vice*)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 2006-3817
(202) 282-5000

*Attorneys for Defendant/Counterclaim-Plaintiff
Actavis LLC*

3

## CERTIFICATE OF SERVICE

I, Joseph L. Linares, hereby certify that I am an attorney at Walsh Pizzi O'Reilly Falanga

LLP, counsel for Defendant Actavis LLC ("Actavis") in Civ. A. No. 2:16-cv-01925.   On

November 4, 2016, I caused a true and correct copy of Actavis' proposed terms for claim

construvction to be served by electronic mail upon the following attorneys of record for

Plaintiffs:

| | |
|---|---|
| Charles M. Lizza | F. Dominic Cerrito |
| Sarah A. Sullivan | Eric C. Stops |
| William C. Baton | Evangeline Shih |
| SAUL EWING LLP | Andrew S. Chalson |
| One Riverfront Plaza, Suite 1520 | Catherine T. Mattes |
| Newark, New Jersey 07102-5426 | QUINN EMANUEL URQUHART & |
| (973) 286-6700 | SULLIVAN LLP |
| clizza@saul.com | 51 Madison Avenue, 22nd Floor |
| | New York, New York 10010 |
| Anthony M. Insogna | (212) 849-7000 |
| J. Patrick Elsevier, Ph.D. | |
| Lisamarie LoGiudice, Ph.D. | |
| JONES DAY | |
| 12265 El Camino Real #200 | |
| San Diego, California 92130 | |
| (858) 314-1200 | |

I hereby certify the foregoing statements made by me are true.  I am aware that if any of

the foregoing statements are willingly false that I am subject to punishment

Dated: November 4, 2016                                        *s/Joseph L. Linares*
                                                                        Joseph L. Linares

# EXHIBIT 6

| | |
|---|---|
| **From:** | Reig, Eimeric <EReigPlessis@winston.com> |
| **Sent:** | Wednesday, November 23, 2016 6:16 PM |
| **To:** | Catherine Mattes; Joseph Linares |
| **Cc:** | clizza@saul.com; ssullivan@saul.com; wbaton@saul.com; Nick Cerrito; Eric Stops; Evangeline Shih; Andrew Chalson; llogiudice@jonesday.com; aminsogna@jonesday.com; jpelsevier@jonesday.com; Park, Sam; Warner, Kevin E.; Liza M. Walsh; Hector D. Ruiz; Barbara E. Troyan; Lin, Sharon |
| **Subject:** | RE: ABRAXIS BIOSCIENCE, LLC et al v. ACTAVIS LLC, 16-1925-JMV-MF |

Counsel,

Pursuant to Local Rules 4.1 and 4.2, Actavis agrees that no claim terms need to be construed by the Court at this time, and therefore withdraws its preliminary disclosure of proposed claim terms for construction dated November 4, 2016. Actavis reserves all rights, however, to supplement its disclosures pursuant to the Local Patent Rules based on any positions Plaintiffs may take or any additional evidence that may be discovered in this action.

Regards,
Eimeric

**Eimeric Reig**
Winston & Strawn LLP
D: +1 (202) 282-5508
winston.com



**From:** Catherine Mattes [mailto:catherinemattes@quinnemanuel.com]
**Sent:** Friday, November 04, 2016 9:56 PM
**To:** Joseph Linares <jlinares@walsh.law>
**Cc:** clizza@saul.com; ssullivan@saul.com; wbaton@saul.com; Nick Cerrito <nickcerrito@quinnemanuel.com>; Eric Stops <ericstops@quinnemanuel.com>; Evangeline Shih <evangelineshih@quinnemanuel.com>; Andrew Chalson <andrewchalson@quinnemanuel.com>; llogiudice@jonesday.com; aminsogna@jonesday.com; jpelsevier@jonesday.com; Lombardi, George C. <GLombard@winston.com>; Nutter, Michael K. <MNutter@winston.com>; Klein, Chuck <CKlein@winston.com>; Park, Sam <SPark@winston.com>; Warner, Kevin E. <KWarner@winston.com>; Reig, Eimeric <EReigPlessis@winston.com>; Liza M. Walsh <lwalsh@walsh.law>; Hector D. Ruiz <hruiz@walsh.law>; Barbara E. Troyan <btroyan@walsh.law>; Lin, Sharon <SLin@winston.com>
**Subject:** ABRAXIS BIOSCIENCE, LLC et al v. ACTAVIS LLC, 16-1925-JMV-MF

Counsel,

At this time, Plaintiffs do not contend that any claim terms should be construed by the Court. Plaintiffs reserve their right, however, to supplement their disclosures pursuant to the Local Patent Rules based on Defendants' proposed claim terms and/or proposed constructions, or based on any additional evidence that they may discover in this action, including in response to Defendants' proposals and/or by proposing additional claim terms and/or constructions.

Regards,
Catherine

**Catherine Mattes**
*Associate*
**Quinn Emanuel Urquhart & Sullivan, LLP**

51 Madison Avenue, 22nd Floor
New York, NY 10010
212-849-7567 Direct
212.849.7000 Main Office Number
212.849.7100 FAX
CatherineMattes@quinnemanuel.com
www.quinnemanuel.com

The contents of this message may be privileged and confidential. If this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under applicable tax laws and regulations.

# EXHIBIT 7

No. 17-1120

# United States Court of Appeals for the Federal Circuit

JANSSEN BIOTECH, INC. and NEW YORK UNIVERSITY
*Appellants,*

v.

CELLTRION HEALTHCARE CO., LTD., CELLTRION, INC., and HOSPIRA INC.,
*Appellees.*

Appeal from the U.S. District Court for the District of Massachusetts,
Nos. 15-cv-10698-MLW and 16-cv-11117-MLW, Judge Mark L. Wolf

## APPELLEES' RESPONSE BRIEF

Charles B. Klein
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006
(202) 282-5100

Samuel S. Park
Dan Hoang
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-9500

Melinda Kay Lackey
WINSTON & STRAWN LLP
1111 Louisiana Street, 25th Floor
Houston, Texas 77002
(713) 651-2600

James F. Hurst
Elizabeth A. Cutri
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
(312) 862-2200

John C. O'Quinn
William H. Burgess
C. Alex Shank*
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 879-5000

March 7, 2017

**U.S. Patent No. 6,284,471 Claim 1 (Appx197):**

    **1.** A chimeric antibody comprising at least part of a human immunoglobulin constant region and at least part of a non-human immunoglobulin variable region, said antibody capable of binding an epitope specific for human tumor necrosis factor TNFα, wherein the non-human immunoglobulin variable region comprises an amino acid sequence selected from the group consisting of SEQ ID NO: 3 and SEQ ID NO: 5.

**U.S. Patent No. 6,790,444 Claims 1 and 2 (Appx293):**

    **1.** The chimeric antibody cA2.

    **2.** A chimeric antibody comprising at least part of a human IgG1 constant region and at least part of a non-human immunoglobulin variable region, said antibody capable of binding an epitope specific for human TNFα, wherein the non-human immunoglobulin variable region comprises an amino acid sequence selected from the group consisting of SEQ ID NO: 3 and SEQ ID NO: 5.

**U.S. Patent No. 5,656,272 Claims 1 and 7 (Appx380):**

    **1.** A method of treating TNFα-mediated Crohn's disease in a human comprising administering to the human an effective TNF-inhibiting amount of an anti-TNF chimeric antibody, wherein said anti-TNF chimeric antibody comprises a non-human variable region or a TNF-binding portion thereof and a human constant region.

    **7.** A method of treating TNFα-mediated Crohn's disease in a human comprising administering to the human an effective TNF-inhibiting amount of chimeric anti-TNF antibody cA2.

**U.S. Patent No. 5,698,195 Claims 1 and 6 (Appx472):**

    **1.** A method of treating rheumatoid arthritis in a human comprising administering to the human an effective TNF-inhibiting amount of an anti-TNF chimeric antibody, wherein said anti-TNF chimeric antibody comprises a non-human variable region or a TNF antigen-binding portion thereof and a human constant region.

    **6.** A method of treating rheumatoid arthritis in a human comprising administering to the human an effective TNF-inhibiting amount of chimeric anti-TNF antibody cA2.

# CERTIFICATE OF INTEREST

Counsel for Appellees Celltrion Healthcare Co., Ltd., Celltrion, Inc., and Hospira Inc. certify the following:

| 1. Full name of Party Represented by us: | 2. Name of any Real Party in Interest not identified in response to Question 3: | 3. Parent corporations and publicly held companies that own 10% or more of the stock in the party |
|---|---|---|
| Celltrion Healthcare Co., Ltd. | N/A | Celltrion Holdings Co., Ltd. (Korean corporation) |
| Celltrion, Inc. | | Ion Investments B.V. (Netherlands corporation owned 100% by Temasek, an investment company based in Singapore) |
| | | One Equity Partners IV, L.P. (Cayman Islands company 100% owned by JP Morgan) |
| Hospira Inc. | | Pfizer Inc. |

**4.     The names of all law firms and the partners or associates who appeared for the party now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:**

Kirkland & Ellis LLP
Marcus E. Sernel
Dennis J. Abdelnour
Jeanna M. Wacker
Stefan M. Miller
Bryan S. Hales
James H. McConnell
Ryan P. Kane

Winston & Strawn LLP
Steffen N. Johnson
Peter E. Perkowski
Michelle C. Replogle

Burns & Levinson LLP
Dennis J. Kelly
Andrea L. Martin

# TABLE OF CONTENTS

Statement of Related Cases ..................................................... vii

Preliminary Statement............................................................ 1

Statement of the Issues........................................................... 4

Statement of the Case ............................................................ 5

I.    Legal Background............................................................ 7

    A.    Obviousness-Type Double Patenting ..................... 7

    B.    Terminal Disclaimers ............................................ 8

    C.    The "Safe Harbor" of 35 U.S.C. § 121................... 9

    D.    Patent Terms and the URAA ............................... 12

    E.    This Court's Decisions in *Gilead* and *Abbvie*........................ 13

II.    Patents and Technological Background ........................ 15

    A.    The '471 Patent ................................................... 18

    B.    The Reference Patents ........................................ 19

        1.    The '444 Patent ....................................... 19

        2.    The '272 and '195 Patents ..................... 19

III.    District Court Proceedings............................................ 20

    A.    The "*Gilead* Motion" (Invalidity of the '471 Patent Over the '444 Patent) ..................................................... 20

    B.    The "Reexam Motion" (Invalidity of the '471 Patent Over the '272 and '195 Patents) ........................................ 23

        1.    Prosecution of the '471, '272, and '195 Patents .......... 23

        2.    The District Court's Resolution of the Reexam Motion................................................. 25

IV.    The Concurrent *Ex Parte* Reexamination Leading to Appeal No. 17-1257 .......................................................... 28

Summary of the Argument ...................................................... 29

Standard of Review ................................................................ 31

Argument ............................................................................... 31

I.   The earlier-expiring '444 patent's claims render the '471 patent's claims invalid for obviousness-type double patenting. ...31

   A.   *Gilead* reaffirmed the longstanding principle that the inventor must permit the public to use his patented invention—and obvious variants—once the patent expires...................................................................32

   B.   This appeal does not differ materially from *Gilead*. ...........36

   C.   The URAA does not immunize pre-URAA patents from obviousness-type double patenting by post-URAA reference patents..................................................................41

   D.   Janssen's attempts to interject equitable or intent-based elements into the obviousness-type double patenting analysis fail. ..............................................................45

II.  The '471 patent's claims are also invalid for obviousness-type double patenting over the '272 and '195 patents' claims...............50

   A.   Section 121's safe harbor does not apply. .............................50

   B.   The one-way test for obviousness-type double patenting applies..................................................................59

      1.   The district court correctly held, consistent with *Berg* and the MPEP, that the one-way test applies to same-day filings. ......................................................60

      2.   As a matter of law, the PTO was not "solely" responsible for delays in the '471 patent's prosecution. ................................................................63

   C.   Even under the two-way test, the '471 patent's claims are invalid. ...............................................................67

Conclusion.................................................................73

# TABLE OF AUTHORITIES

## Cases

*Abbvie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Trust*,
    764 F.3d 1366, 1372 (Fed. Cir. 2014) ..........................7, 8, 13, 15, 21, 43

*Amgen Inc. v. F. Hoffman-La Roche Ltd.*,
    580 F.3d 1340 (Fed. Cir. 2009) ................................11, 26, 51, 52, 58, 59

*Application of Schneller*, 397 F.2d 350 (CCPA 1968) ......................45, 48

*Application of Thorington*, 418 F.2d 528 (CCPA 1969) .........................48

*Cancer Research Tech. Ltd. v. Barr Labs., Inc.*,
    625 F.3d 724 (Fed. Cir. 2010) ...............................................................47

*Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955 (Fed. Cir. 2001)....45, 48

*Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*,
    689 F.3d 1368 (Fed. Cir. 2012) .............................................................48

*Ex parte Janssen Biotech, Inc.*, Appeal No. 2016-6590,
    2016 WL 6921121 (P.T.A.B. Nov. 14, 2016) .............................28, 29, 54

*Ex parte Pfizer*, Appeal No. 2009-4106,
    2010 WL 532133 (B.P.A.I. Feb. 12, 2010) .............................................40

*G.D. Searle LLC v. Lupin Pharms., Inc.*,
    790 F.3d 1349 (Fed. Cir 2015) ..................................11, 26, 27, 51, 54-58

*Geneva Pharm., Inc. v. GlaxoSmithKline PLC*,
    349 F.3d 1373 (Fed. Cir. 2003) ............................................12, 57, 68-72

*Gilead Sci., Inc. v. Natco Pharma Ltd.*,
    753 F.3d 1208 (Fed. Cir. 2014) .......2, 4, 6-9, 13-15, 20-22, 29, 31-46, 49

*Gilead Sciences, Inc. v. Lee*, 778 F.3d 1341 (Fed. Cir. 2015) ..................66

*Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011)............47

*Harper v. Va. Dep't of Taxation*, 509 U.S. 86 (1993) ...............................58

*Heartland By-Products, Inc. v. United States*,
   568 F.3d 1360 (Fed. Cir. 2009) ............................................................. 58

*Immersion Corp. v. HTC Corp.*,
   826 F.3d 1357 (Fed. Cir. 2016) ................................................... 43, 62, 63

*In re Basell Poliolefine Italia S.P.A.*,
   547 F.3d 1371 (Fed. Cir. 2008) .......................................... 60, 65, 68, 72

*In re Berg*, 140 F.3d 1428 (Fed. Cir. 1998) ...................................... 59-63

*In re Braat*, 937 F.2d 589 (Fed. Cir. 1991) ..................................... 48, 49

*In re Byck*, 48 F.2d 665 (CCPA 1931) ...................................................... 69

*In re Emert*, 124 F.3d 1458 (Fed. Cir. 1997).................................... 60, 65

*In re Fallaux*, 564 F.3d 1313 (Fed. Cir. 2009) ............................. 59-61, 65

*In re Hubbell*, 709 F.3d 1140 (Fed. Cir. 2013). 7, 27, 45, 48, 60, 61, 64, 65

*In re Longi*, 759 F.2d at 892 (Fed. Cir. 1985) ........................................... 8

*In re Van Ornum*, 686 F.2d 937 (CCPA 1982)................................... 45, 48

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007) .................................. 47

*Maymi v. Puerto Rico Ports Auth.*, 515 F.3d 20 (1st Cir. 2008).............. 31

*Miller v. Eagle Mfg. Co.*, 151 U.S. 186 (1894) ....................................... 7, 8

*Momenta Pharms., Inc. v. Teva Pharms. USA, Inc.*,
   809 F.3d 610 (Fed. Cir. 2015) .............................................................. 31

*Odiorne v. Amesbury Nail Factory*,
   18 F. Cas. 578 (C.C.D. Mass. 1819)....................................................... 7

*Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368 (Fed. Cir. 2005) ...... 48

*Petrolite Corp. v. Baker Hughes Inc.*, 96 F.3d 1423 (Fed. Cir. 1996) ..... 47

*Pfizer, Inc. v. Lee*, 811 F.3d 466 (Fed. Cir. 2016) ................................... 66

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*,
    518 F.3d 1353 (Fed. Cir. 2008) ......9, 11, 12, 26, 43, 51, 54-56, 58, 68-72

*Rexnord Indus., LLC v. Kappos*, 705 F.3d 1347 (Fed. Cir. 2013) ...........63

*Singer Mfg. v. June Mfg.*, 163 U.S. 169 (1896)..............................8, 35, 36

*SmithKline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006) ......................................................71, 72

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)..............................38

*Suffolk Co. v. Hayden*, 70 U.S. (3 Wall.) 315 (1866) ...........................7, 43

*Sun Pharm. Indus., Ltd. v. Eli Lilly & Co.*,
    611 F.3d 1381 (Fed. Cir. 2010) ..................................................45, 68-72

*Therasense, Inc. v. Becton, Dickinson & Co.*,
    649 F.3d 1276 (Fed. Cir. 2011) ...........................................................47

*Voda v. Cordis Corp.*, 536 F.3d 1311 (Fed. Cir. 2008) ...........................58

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
    520 U.S. 17 (1997)..........................................................................46, 47

**Statutes**

35 U.S.C. § 101.................................................................................8, 43

35 U.S.C. § 121.........................3, 5, 9, 10, 21, 25-29, 43, 50-52, 54, 56-59

35 U.S.C. § 154..............................................12, 13, 18, 41-43, 66

35 U.S.C. § 253.............................................................................8, 42, 43

35 U.S.C. § 271.......................................................................................6

42 U.S.C. § 262.......................................................................................6

Uruguay Round Agreements Act,
    Pub. L. 103-465, 108 Stat. 4809 (1994).................................................12

**Rule**

Fed. R. Civ. P. 54 ...................................................................5, 6, 28

**Other Authorities**

37 C.F.R. § 1.142 ..........................................................................10

37 C.F.R. § 1.530 ..........................................................................53

37 C.F.R. § 1.704 ..........................................................................66

MPEP § 201.06 .....................................................................10, 52-53

MPEP § 201.07 ...............................................................................11

MPEP § 201.08 .....................................................................11, 52-53

MPEP § 804 ............................................................................61, 63

MPEP § 817 ..................................................................................10

MPEP § 821.02 ..............................................................................10

## STATEMENT OF RELATED CASES

No appeal has previously been taken from the proceedings below.

*In re Janssen Biotech, Inc.*, Appeal No. 17-1257 is related and has been designated as a companion appeal to this case in an order dated December 16, 2016, and entered in both dockets.

As explained in greater detail in this brief, in proceedings leading to this appeal, the district court invalidated claims 1, 3, and 5-7 of U.S. Patent No, 6,284,471 for obviousness-type double patenting for two independently sufficient reasons. *First*, the district court granted what is referred to in the record and Janssen's opening brief as the "*Gilead* motion"—finding those claims invalid for obviousness-type double patenting over U.S. Patent No. 6,790,444. *Second*, the district court granted what is referred to in the record as the "reexam motion" (so called because it relied on the same references as were at issue in the *In re Janssen* reexamination)—finding those same claims invalid for obviousness-type double patenting over both U.S. Patent No. 5,698,195 and No. 5,656,272.

In the proceedings leading to Appeal No. 17-1257, the Patent Trial and Appeal Board affirmed the Examiner's final rejection, after *ex parte* reexamination, of claims 1-7 (*i.e.*, all claims at issue in this appeal, and al-

so claims 2 and 4) for obvious-type double patenting. The affirmed rejections were based on the same reference patents as in the "reexam motion" at issue in this appeal. Thus, if this Court affirms the final decision in No. 17-1257, this appeal will necessarily be moot. *See* Janssen Br. 5. The claims and grounds of invalidity at issue in both appeals are shown in the chart below.

| **Appeal** | **Reference Patents** | **'471 Claims Invalid for Obviousness-Type Double Patenting** |
|---|---|---|
| 17-1120 (district court, this appeal) | "*Gilead* Motion": No. 6,790,444 | 1, 3, 5-7 |
| | "Reexam Motion": Nos. 5,698,195 and 5,656,272 | 1, 3, 5-7 |
| 17-1257 (Board) | Nos. 5,698,195 and 5,656,272 | 1-7 |

# PRELIMINARY STATEMENT

This appeal concerns the consequences that follow when a party re-peatedly claims the same invention in multiple patent applications as part of a broad evergreening strategy to stifle competition. Janssen's '471 pa-tent is one of more than *forty* patents from the same family. And Janssen *does not dispute* that the claims of the '471 patent are not patentably dis-tinct over at least three of those patents. There are well-settled conse-quences to claiming the same subject matter over, and over again, and Janssen certainly knew that—or should have. It has been the law for more than 160 years that a patent grant is based on the inventor's implicit promise to the public to permit free use of the claimed invention—and ob-vious variants—once the patent expires. Thus, where an inventor holds multiple patents that are not patentably distinct, the earliest expiration date controls.

Against that backdrop, Janssen made calculated decisions when prosecuting its patents. Janssen accepted the benefits of its choices; it must also accept the costs. Instead, Janssen asks the Court to shift those costs to the public by carving out new exceptions to the doctrine of obvi-ousness-type double patenting—exceptions that would require the Court to

repudiate the reasoning of prior decisions addressing the same issues raised here.  There is no reason to re-write the law as Janssen asks.

*First*, in 2001, Janssen chose to file the application that led to the '444 patent.  Because Janssen claimed a 1991 priority date, Janssen knew that any resulting patent would expire in 2011.  And because of more than a century of obviousness-type double patenting precedent, Janssen knew that other patents it had that were not "patentably distinct" from the '444—but expired later—risked invalidation.  Janssen nonetheless prosecuted its '444 patent to issuance, and benefited from having the '444 and '471 patents in force at the same time for several years.  Janssen must accept the consequence of that choice:  The public is now entitled to practice the inventions claimed in the '444 patent and the indistinct variants claimed in the '471 patent.  Because the '471 patent—which Janssen concedes is not "patentably distinct" from the '444 patent—expires later, it is invalid for obviousness-type double patenting.  *Gilead* and more than a century of precedent require that conclusion.

*Second*, when Janssen was prosecuting the '471 patent, it chose to file the application as a continuation-in-part—*not a divisional application*—in response to a restriction requirement.  Again, Janssen accepted

the benefits of its choice:  the continuation-in-part label allowed Janssen to add new matter to its application, which it did.  However, Janssen's choice meant that it could not invoke 35 U.S.C. § 121's "safe harbor"—which protects only *divisional applications* filed in response to a restriction requirement.  Yet, now that it serves Janssen's purposes to do so, Janssen tries to re-write history, asking this Court to save its patent from invalidity over the '272 and '195 patents on the basis of Janssen's later filings in the PTO. Those later filings are legally irrelevant here.  In the face of similar tactics, this Court has repeatedly held that § 121 is strictly limited to patents resulting from applications actually filed as divisionals.

At the same time, Janssen asks the Court to ignore that it filed the continuation-in-part application that became the '471 patent on the same day as it filed the application that became the '272 patent.  It does so in hopes that this Court will hold that its patents should be analyzed under the rarely-applied "two-way" test for obviousness-type double patenting, rather than the usual "one-way" test.  But Janssen's same-day filings meant that it had no right to expect that patents resulting from those applications would issue in any particular order—and there is thus no reason to apply the "two-way" test.  Moreover, based on undisputed facts, and as

3

the PTO has already determined, the PTO was not *solely* responsible for the '471 patent issuing after the '272 patent. As a matter of law, that means the "two-way" test cannot apply. In any event, the district court correctly found that the '471 patent is invalid over both the '195 and '272 patents, even under the "two-way" test.

In sum, no matter how it is approached, the '471 patent is invalid for obviousness-type double patenting—for the two independent reasons the district court gave, and for those the Board gave following the reexamination at issue in companion appeal No. 17-1257. (Affirming the Board's decision would render this appeal moot. Janssen Br. 5.) For any or all of those reasons, the judgment should be affirmed.

## STATEMENT OF THE ISSUES

Whether the district court's judgment that the asserted claims of the '471 patent are invalid for obviousness-type double patenting should be affirmed for either or both of the following reasons:

**1.** The '471 patent's claims are invalid over the '444 patent's claims, where Janssen disputes only whether the holding of *Gilead* applies, on the ground that the '471 was a "transitional" patent—based on an application filed before the URAA went into effect—while the '444 patent is a post-

4

URAA patent.

**2.** The '471 patent's claims are invalid over the '272 and '195 patents' claims, where Janssen disputes the following:

**a.** Whether 35 U.S.C. § 121's safe harbor—which applies only to patents issued from divisional applications—applies where the '471 patent issued from a continuation-in-part application.

**b.** Whether invalidity of the '471 patent over the '272 or '195 patents should be assessed under the two-way test, which applies only if the PTO is solely responsible for the '471 patent having been filed before, but issued after, the reference patents—where the '471 and '272 patents' applications were filed on the same day and where Janssen's actions added more than a year to the prosecution of the '471 patent.

**c.** Whether, even if the two-way test applies, the '471 patent is nonetheless invalid, where the '471 patent discloses the same uses of its claimed composition that are claimed in the '272 and '195 patents.

## STATEMENT OF THE CASE

This is an appeal from partial final judgment (certified for appeal under Rule 54(b)) that claims 1, 3, and 5-7 of U.S. Patent No. 6,284,471 are invalid for obviousness-type double patenting.  Appx1 (judgment); Appx44-

61 (Rule 54(b) certification).  Janssen Biotech, Inc. and New York University ("Janssen") sued Celltrion Healthcare Co., Ltd., Celltrion Inc., and Hospira Inc. ("Celltrion") under 42 U.S.C. § 262 and 35 U.S.C. § 271(e)(2)(C), alleging infringement of the '471 patent and others.  The '471 patent is part of a family of more than 40 patents issued to Janssen.  It claims antibodies including infliximab, an ingredient in Janssen's biologic drug Remicade.  Celltrion's allegedly infringing product, Inflectra, is biosimilar to Remicade.

Two independent rulings support the judgment on appeal.  Appx2-8.

*First*, the district court granted Celltrion's motion for summary judgment (referred to in the record as the "*Gilead* motion") that the asserted claims of the '471 patent are invalid for obviousness-type double patenting over U.S. Patent No. 6,790,444.  Appx11-19 (opinion); Appx672-680 (oral ruling); Appx198-293 ('444 patent).

*Second*, the court granted Celltrion's motion for summary judgment (the "reexam motion") that the same claims of the '471 patent are invalid for obviousness-type double patenting over U.S. Patent Nos. 5,698,195 and 5,656,272.  Appx20-43 (opinion); Appx791-811 (oral ruling); Appx381-473 ('195 patent); Appx294-380 ('272 patent).

## I.    Legal Background

### A.    Obviousness-Type Double Patenting

Obviousness-type double patenting limits patentees "to one patent term per invention or improvement," and enforces the inventor's implicit promise to the public that, in return for the patent, the public will be free to use the invention after the patent expires. *Gilead Sci., Inc. v. Natco Pharma Ltd.*, 753 F.3d 1208, 1212 (Fed. Cir. 2014). Thus, a claim is invalid for obviousness-type double patenting when it is not "patentably distinct" from (anticipated by, or obvious over), a claim in another, earlier-expiring patent held by a common inventor or owner. *Id.* at 1212-13; *In re Hubbell*, 709 F.3d 1140, 1146-48 (Fed. Cir. 2013).

Courts have applied the obviousness-type double patenting doctrine in this fashion for more than 160 years. *See Suffolk Co. v. Hayden*, 70 U.S. (3 Wall.) 315, 317 (1866); *Miller v. Eagle Mfg. Co.*, 151 U.S. 186, 197-98, 202 (1894); *Gilead*, 753 F.3d at 1212 (collecting cases). The doctrine is older than the requirement of patent claims. *See Odiorne v. Amesbury Nail Factory*, 18 F. Cas. 578, 579 (C.C.D. Mass. 1819) (Story, J.); *Abbvie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Trust*, 764 F.3d 1366, 1372 (Fed. Cir. 2014) (discussing *id.*); *Gilead*, 753 F.3d at 1212 (same).

The doctrine is grounded in the Patent Act's text and public policy. *Abbvie*, 764 F.3d at 1372; *Longi*, 759 F.2d at 892.  35 U.S.C. § 101 provides that "'[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, ... may obtain *a* patent therefor.'" *Abbvie*, 764 F.3d at 1372 (original emphasis, quoting 35 U.S.C. § 101). "Thus, § 101 forbids an individual from obtaining more than one patent on the same invention, *i.e.*, double patenting." *Id.*

The policy is to enforce the public's rights under the bargain at the heart of the patent system:  "in exchange for a patent, an inventor must fully disclose his invention and promise to permit free use of it at the end of [the] patent term." *Gilead*, 753 F.3d at 1212; *see also Singer Mfg. v. June Mfg.*, 163 U.S. 169, 185 (1896); *Miller,* 151 U.S. at 197-98.  That bargain would be effectively circumvented, and a patentee's rights unfairly expanded at the public's expense, if an inventor were to hold multiple patents with different expiration dates, all on the same invention or obvious variants of it.

## B.    Terminal Disclaimers

In 1952, Congress passed 35 U.S.C. § 253, which allows patentees to disclaim the end of their patent terms.  Patentees may avoid the effect of

obviousness-type double patenting by filing terminal disclaimers that cause otherwise later-expiring patents on obvious variations of an earlier-expiring patent to expire at the same time as the earlier-expiring patent. *Gilead*, 753 F.3d at 1213-14; *Application of Braithwaite*, 379 F.2d 594, 601 (CCPA 1967).

### C.    The "Safe Harbor" of 35 U.S.C. § 121

Congress created a narrow exception to obviousness-type double patenting in 35 U.S.C. § 121's third sentence.

The first sentence authorizes the PTO to issue restriction requirements during prosecution:  when "two or more independent and distinct inventions are claimed in one application," the PTO may "require the application to be restricted to one of the inventions."

The third sentence "provides a safe harbor (for patents or applications derived as the result of a restriction requirement) from attack based on the original application (or a patent issued therefrom), or based on applications or patents similarly derived from the same restriction requirement."  *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 518 F.3d 1353, 1360 (Fed. Cir. 2008).  That sentence reads:

> A patent issuing on an application with respect to which a requirement for restriction under this section has been made, or

on an application filed as a result of such a requirement, shall
not be used as a reference either in the Patent and Trademark
Office or in the courts *against a divisional application* or
against the original application or any patent issued on either
of them, if *the divisional application* is filed before the issuance
of the patent on the other application.

35 U.S.C. § 121.[1]

In practice, a restriction requirement typically informs the patent
applicant how many separate inventions the PTO believes are in the appli-
cation, and which claims correspond to each invention.  MPEP § 817; *see
also* Appx1809-1810.  The applicant is asked to respond by "electing" one
group of claims to continue prosecuting.  The non-elected claims are with-
drawn, but can be prosecuted in separate applications if the applicant de-
sires.  *See* 35 U.S.C. § 121; 37 C.F.R. § 1.142(b); MPEP § 821.02.

The Manual of Patent Examining Procedure defines three types of
applications based on earlier applications—divisionals, continuations, and
continuations-in part:

- ***Divisionals***: "A later application for an independent or distinct
  invention … *disclosing and claiming only subject matter disclosed
  in the earlier or parent application*, is known as a divisional appli-
  cation." MPEP § 201.06.  "A divisional application is often filed as
  a result of a restriction requirement made by the examiner."  *Id.*

---

[1] All quoted emphasis is added unless otherwise indicated.

10

- ***Continuations***: "A continuation application is an application for the invention(s) disclosed in a prior-filed copending nonprovisional application," whose "disclosure … *must not include any subject matter which would constitute new matter* if submitted as an amendment to the parent application." *Id.* § 201.07.

- ***Continuations-in-part***: "A continuation-in-part is an application … repeating some substantial portion or all of the earlier nonprovisional application *and adding matter not disclosed in the said earlier nonprovisional application*." *Id.* § 201.08.

Although these may be filed in response to a restriction requirement, a restriction requirement is not a prerequisite. The main distinguishing feature of continuation-in-part applications—unlike divisionals or continuations—is that the applicant may add new matter not disclosed in the earlier application. *See Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1353 (Fed. Cir. 2009); *Pfizer*, 518 F.3d at 1359.

Section 121's "safe harbor" thus operates as follows. If a patent applicant originally files an application that the PTO requires the applicant to split into multiple applications (the original and divisional applications), the directly-resulting patents cannot be used against each other for obviousness-type double patenting purposes.

This Court has emphasized that a "strict test" applies to the safe harbor in light of the public interest served by obviousness-type double patenting, and the "potential windfall … to a patentee." *G.D. Searle LLC v.*

11

*Lupin Pharms., Inc.*, 790 F.3d 1349, 1354 (Fed. Cir 2015) (quoting *Geneva Pharm., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1382 (Fed. Cir. 2003)). "[B]y its literal terms, [the safe harbor] protects *only 'divisional application[s]'* (or the original application) and patents issued on such applications," and nothing more. *Pfizer*, 518 F.3d at 1360; *see id.* at 1362 ("The difference between divisional applications and CIPs … was well known at the time Congress enacted the 1952 Patent Act."). Moreover, precedent requires "consonance": "the applicant must maintain the line of demarcation between the independent and distinct inventions that prompted the restriction requirement" to invoke the safe harbor. *Id.* at 1359.

### D.    Patent Terms and the URAA

The term of a U.S. patent is governed by 35 U.S.C. § 154, and begins when the patent issues. Before June 8, 1995, a U.S. patent generally expired 17 years from the date it issued. 35 U.S.C. § 154 (1988).

In 1994, Congress enacted the Uruguay Round Agreements Act ("URAA"), Pub. L. 103-465, 108 Stat. 4809, 4983 § 532 (1994) . Following the URAA, a patent's term still begins when it issues, but expires 20 years from the date the earliest application to which it claims priority was *filed*:

12

> [The rights granted under a patent] shall be for a term begin-
> ning on the date on which the patent issues and ending 20
> years from the date on which the application for the patent was
> filed in the United States or, if the application contains a spe-
> cific reference to an earlier filed application or applications un-
> der [various sections of 35 U.S.C.] from the date on which the
> earliest such application was filed.

35 U.S.C. § 154(a)(2) (1994).

The URAA also contains a transition provision, which applies to the

'471 patent.  A patent from an application filed before June 8, 1995 expires

on the later of **(a)** 20 years after the filing date of its earliest priority ap-

plication (the post-URAA rule), or **(b)** 17 years from issuance (the pre-

URAA rule).  *Id.* § 154(c)(1).

## E.    This Court's Decisions in *Gilead* and *Abbvie*

In *Gilead*, the Court considered the continued vitality of obviousness-

type double patenting after the URAA.  753 F.3d 1208.  Before the URAA,

nearly all U.S. patent terms were 17 years.  If one patent issued before an-

other, it expired sooner.  A delayed issue date meant a later expiration

date.  Following URAA, however, **(1)** it is possible for one patent to both

issue later and expire sooner than another, and **(2)** a delayed issue date

means a delayed start to the patent term, but not a delayed end.

That was the situation in *Gilead*:  the patentee asserted a patent

that issued in 1998 and expired in 2016 (below, blue).  The defendant ar-

gued that the patent was invalid for obviousness-type double patenting over a patent that issued in 1999 but expired in 2015 (below, red). 753 F.3d at 1210.



Thus, *Gilead* confronted the following question: "Can a patent that issues after but expires before another patent qualify as a double patenting reference for that other patent?" 753 F.3d at 1211-12. The Court "conclude[d] under the circumstances of this case that it can." *Id.* at 1212. It canvassed the purpose and history of the obviousness-type double patenting doctrine at length, and concluded that the core of the doctrine was the inventor's implicit promise to the public that it would be free to use the invention after the inventor's patent expired. Although pre-URAA cases had discussed double-patenting in terms of both issue and expiration dates, "*the date that really mattered*," *Gilead* explained, was the expiration date. *Id.* at 1215. "[T]he primary ill avoided by enforcement of the double pa-

tenting doctrine is restriction on the public's freedom to use the invention claimed in a patent and all obvious modifications of it after that patent *expired*." *Id.* (original emphasis).  Thus, "[l]ooking … to the earliest expiration date of all the patents an inventor has on his invention and its obvious variants best fits and serves the purpose of the doctrine of double patenting." *Id.* at 1216.

Four months later, the Court reaffirmed and clarified *Gilead*:  We now make explicit what was implicit in *Gilead: the doctrine of obviousness-type double patenting continues to apply where two patents that claim the same invention have different expiration dates*." *Abbvie*, 764 F.3d at 1374 (internal citations omitted).

## II.    Patents and Technological Background

This case involves multiple Janssen patents, all relating to chimeric (*i.e.,* derived from more than one animal species) anti-TNFα antibodies. "TNFα" is a type of tumor necrosis factor, Appx153 (9:45-51)—*i.e,* a type of protein that causes inflammation and is implicated in diseases such as rheumatoid arthritis and Crohn's disease.   Appx149(1:27-30, 45-47); Appx153(9:36-40); Appx165(34:3-25).

The '471 patent asserted here— and the '444, '272, and '195 reference patents—are all part of a family of more than 40 patents and 30 applications, all relating to chimeric anti-TNFα antibodies.  The '471 patent's family tree is shown on the next page, with the '471 patent outlined in red, and the three reference patents outlined in green.



## A.    The '471 Patent

The '471 patent (Appx111-197) is titled *Anti-TNFA Antibodies and Assays Employing Anti-TNFA Antibodies*.  It claims chimeric antibodies capable of binding an epitope (region) of human TNFα.  Appx197(97:18-98:44).  Claim 1 is illustrative:

> **1.** A chimeric antibody comprising at least part of a human immunoglobulin constant region and at least part of a non-human immunoglobulin variable region, said antibody capable of binding an epitope specific for human tumor necrosis factor TNFα, wherein the non-human immunoglobulin variable region comprises an amino acid sequence selected from the group consisting of SEQ ID NO: 3 and SEQ ID NO: 5.

Appx197(97:18-25).  SEQ ID NO: 3 and SEQ ID NO: 5 are amino acid sequences of regions of a cloned antibody called "cA2."  Appx152(7:20-25).

The patent is subject to the URAA's transitional rule, 35 U.S.C. § 154(c)(1), for calculating its expiration date.  The application directly leading to the '471 patent, U.S. No. 08/192,093, was filed in February 1994.  Appx838.  After more than seven years of prosecution, the '471 patent issued September 4, 2001, *id.*, and, standing alone, would expire September 4, 2018.  Appx2.

## B. The Reference Patents

### 1. The '444 Patent

The '444 patent claims chimeric antibodies, including cA2, capable of binding human TNFα. Appx293(109:17-25). The '444 patent's term is subject to the post-URAA calculation. It issued September 14, 2004 (after the '471 patent), Appx198, and expired July 11, 2011. Appx2. It is undisputed that the '471 and '444 patents' claims are not patentably distinct from each other. Janssen Br. 11 n.1; Appx12.

### 2. The '272 and '195 Patents

Like the '471 patent, the '272 and '195 patents are subject to the URAA's transitional rule for patent terms. Both issued in 1997 and expired in 2014.

Both patents claim methods of treating diseases with an anti-TNF chimeric antibody, including cA2. Claim 1 of the '272 patent claims a method of treating Crohn's disease. Appx380 (97:2-7). Claim 7 (among others) specifically claims use of the cA2 antibody:

> **7.** A method of treating TNFα-mediated Crohn's disease in a human comprising administering to the human an effective TNF-inhibiting amount of chimeric anti-TNF antibody cA2.

Appx380(98:12-15).

19

The '195 patent resembles the '272 patent, but claims treatment of rheumatoid arthritis rather than Crohn's disease.  Claim 1 provides:

> **1.**  A method of treating rheumatoid arthritis in a human comprising administering to the human an effective TNF-inhibiting amount of an anti-TNF chimeric antibody, wherein said anti-TNF chimeric antibody comprises a non-human variable region or a TNF antigen-binding portion thereof and a human constant region.

Appx472(107:52-57).  Claim 6 (among others) claims use of the cA2 antibody:

> **6.** A method of treating rheumatoid arthritis in a human comprising administering to the human an effective TNF-inhibiting amount of chimeric anti-TNF antibody cA2.

Appx472(108:57-59).

## III.   District Court Proceedings

Janssen sued Celltrion for infringement of claims 1, 3, and 5-7 of the '471 patent.  Appx83; Appx63.  In two motions, which the district court granted, Celltrion sought summary judgment invalidating the '471 patent's claims' for obviousness-type double patenting on two independent grounds.

### A.   The "*Gilead* Motion" (Invalidity of the '471 Patent Over the '444 Patent)

Celltrion's first summary judgment motion argued that the '471 patent was invalid for obvious-type double patenting over the '444 patent.

20

Janssen conceded that the '471 patent's claims were not patentably distinct from the '444 patent's claims; it only disputed whether the '444 patent could properly serve as a reference for obviousness-type double patenting purposes.[2]

As explained above, the '471 patent issued from a pre-URAA application, so the patent's term started in September 2001 and would have run, standing alone, until September 2018 (17 years after issuance). Appx2. The '444 patent, however, issued from a post-URAA application, so it was issued in 2004 and expired in 2011 (20 years from 1991 priority date). *Id*.



Although this Court had held in *Gilead* and *Abbvie* that obviousness-type double patenting continues to apply following the URAA, Janssen's argument was that a patent with a term subject to the post-URAA calculation (the '444 patent) should not be used as a reference to invalidate a pa-

---

[2]     Janssen does not contend that the "safe harbor" of 35 U.S.C. § 121 applies with respect to whether the '444 patent's claims render the '471 patent's claims invalid. *See* Appx519(15-17).

tent subject to the transitional rule (the '471 patent). Janssen tried to distinguish *Gilead* on the basis that the asserted patent and the reference patent in *Gilead* were both subject to the post-URAA calculation. The district court concluded that was a distinction without a difference, Appx13; Appx18, holding that the principles articulated in *Gilead* and 160+ years of obviousness-type double patenting precedent did not depend on whether the two patents were subject to the same rule for calculating expiration dates. The court noted that *Gilead* "essentially rejected [Janssen's] argument here that the URAA manifests a statutory intent to provide patents emerging from applications filed before 1995 with at least 17 years' protection despite the otherwise applicable judicial doctrine of obviousness-type double patenting." Appx15 (citing *Gilead*, 753 F.3d at 1216); *see also id.* (the "URAA is silent on this issue"). And even though *Gilead* involved two post-URAA patents, Appx13, the court concluded that the "reasoning in *Gilead* indicates that the Federal Circuit would in this case find the '471 patent obvious and invalid in view of the expired '444 patent," Appx17. The court thus concluded that the '444 patent could be an obviousness-type double patenting reference to, and thus invalidated, the '471 patent's claims. Appx18.

## B.     The "Reexam Motion" (Invalidity of the '471 Patent Over the '272 and '195 Patents)

In a second summary judgment motion, Celltrion contended that the '471 patent's asserted claims were also invalid for obviousness-type double patenting over the '272 and '195 patents.  Appx20.  The '471, '272, and '195 patents issued from related continuation-in-part ("CIP") applications. Their expiration dates are all subject to the URAA's transitional calculation (the later of 20 years from the priority date or 17 years from issuance).

### 1.     Prosecution of the '471, '272, and '195 Patents

As shown below, the '471, '272, and '195 patents all claim priority to two later-abandoned parent applications: U.S. Nos. 08/010,406 and 08/013,413.  *See* Appx149(1:4-6); Appx332(1:5-7); Appx419(1:5-14).



The '413 parent application (top row, right) was filed in 1993 and contained 57 claims.  Appx1809.  The examiner concluded that it claimed five distinct inventions, and thus issued a restriction requirement. Appx1809-1810.  In response, Janssen elected to continue prosecution in the '413 application of one invention, Appx4107-4116; Appx4207-4212, but later abandoned that application.

***The '471 Patent.***  Janssen also filed Application No. 08/192,093, which led directly to the '471 patent.  Importantly, Janssen filed that application as a *continuation-in-part* of the '413 and '406 applications (above, top row), because it contained new matter not disclosed in either parent. Appx149 (1:4-7); Appx2333 ¶93; Janssen Br. 15-16 (citing Appx4112). Prosecution continued on the '093 application for more than seven years. Janssen requested several extensions of time, Appx834; Appx1312-1331, declined an opportunity for the patent to issue in 1997, Appx2183; Appx2192-2196, and added more than a year to the prosecution by filing a notice of appeal it did not pursue.  Appx2211-2214; Appx2914-2925.  In 2001, the '093 application issued as the '471 patent.  As noted above, standing alone, the '471 patent would expire in September 2018.

***The '272 and '195 Patents.*** On the same day that it filed the application leading to the '471 patent, Janssen also filed the application leading to the '272 patent—again as a continuation-in-part of the '413 and '406 applications. Appx294; Appx332 (1:5-8). The '272 patent issued in 1997 and expired in 2014.

Months after filing the application leading to the '272 patent, Janssen filed the application leading to the '195 patent—as a continuation-in-part of three applications: (a) the application that led to the '272 patent, (b) the '093 application that led to the '471 patent, and (c) a third application. *See* Appx381; Appx419 (1:6-22). Like the '272 patent, the '195 patent issued in 1997 and expired in 2014.

## 2.   The District Court's Resolution of the Reexam Motion

The district court concluded that the '471 patent's claims were invalid for obviousness-type double patenting over the '272 and '195 patents' claims.

*First*, the court rejected Janssen's argument that § 121's safe harbor precluded use of the '272 and '195 patents as reference patents against the '471 patent. Appx28-33. As explained above, § 121 provides a limited "safe harbor" for patents issuing from divisional applications filed in re-

sponse to a restriction requirement.  *See* § I.C, *supra*.  As just explained, however, none of the '471, '272, and '195 patents issued from divisionals resulting from a restriction requirement; all were filed as continuation-in-part applications.  *See § III.B.1, supra*.

Janssen argued that the '471 patent should be treated as having resulted from a divisional application.  Appx32-33.  During a then-pending reexamination, Janssen noted, the PTO had "allowed an amendment to label the relevant application a divisional."  Appx32.  The district court rejected Janssen's argument, based on a close reading of this Court's decisions in *Pfizer*, *G.D. Searle*, and *Amgen*, and the text of § 121.  Appx28-33. Section 121's safe harbor is limited to patents resulting from divisional applications filed in response to a restriction requirement—not the continuation-in-part applications Janssen chose to file.  *See* Appx33 (Under *Amgen*, *Pfizer*, and *G.D. Searle*, "only patents resulting from applications filed as divisional are protected by the § 121 safe harbor.").  Janssen's attempt at retroactively relabeling its patent was unavailing because, among other reasons, even if the patent were to emerge from reexamination relabeled as a "divisional," the application would still not be a divisional "filed before the issuance of other relevant patents as required by § 121."

Appx32.  In *G.D. Searle*, this Court had rejected the same effort by a pa-
tentee to rewrite history with a post-issuance change of labels.  Appx32.

    *Second*, because the '471 patent falls outside § 121's safe harbor, the
court considered whether its claims are invalid for obviousness-type double
patenting over the '272 and '195 patents' claims.  Appx33-42.  An obvious-
ness-type double patenting analysis typically requires only a "one-way"
test, asking whether the challenged patent's claims would have been obvi-
ous over a reference patent's claims.  Appx33-34 (citing *Hubbell*, 709 F.3d
at 1149).

    A "two-way" test applies in the "unusual circumstance" that "the
PTO is *solely* responsible for the delay in causing the second-filed applica-
tion to issue prior to the first."  Appx34 (citing *Hubbell*, 709 F.3d at 1149).
Under the two-way test, a challenged patent's claims are invalid only if
they are not patentably distinct from the reference patent's claims *and*
vice-versa.  *Id.*

    The district court concluded that the "one-way" test applies to the
'272 patent vis-à-vis the '471 patent.  Appx33-38.  Because Janssen did not
dispute invalidity under the one-way test, the court invalidated all the as-
serted claims on that basis.  *Id.*

*Finally,* "in the interest of completeness," Appx38, the court also applied the two-way test, and held that the '272 and '195 patents' claims were obvious over the '471 patent's claims, and thus that the '471 patent's claims were invalid even under the two-way test. Appx39-42.

In sum, the district court concluded that all asserted claims of the '471 patent are invalid for obviousness-type double patenting on two separate theories. The court also entered partial final judgment under Fed. R. Civ. P. 54(b). Appx44-61.

## IV. The Concurrent *Ex Parte* Reexamination Leading to Appeal No. 17-1257

In the decision leading to companion Appeal No. 17-1257, the Board upheld an examiner's final rejection of claims 1-7 of the '471 patent for obviousness-type double patenting over the '272 and '195 patents. *Ex parte Janssen Biotech, Inc.*, Appeal No. 2016-6590, 2016 WL 6921121, at *1-2. (P.T.A.B. Nov. 14, 2016). Like the district court, the Board concluded that the '471 patent does not benefit from § 121's safe harbor. *Id.* at *3. The Board also found that Janssen "was responsible for significant delays in the prosecution of the '471 patent," and thus applied the one-way test for obviousness-type double patenting. *Id.* at *7-*14. Because Janssen did not dispute the obviousness of the '471 patent's claims over the '272 and

'195 patents' claims under that test, the Board affirmed the examiner's re-
jection of claims 1-7 of the '471 patent. *Id.* at *14.

## SUMMARY OF THE ARGUMENT

**I.** *The Gilead Motion.* This Court has for decades applied the ob-
viousness-type double patenting doctrine according to a basic principle:
when a patent expires, the public is free to use not only the same invention
claimed in the expired patent but also obvious variants. Congress has
never, including through the URAA, abrogated that principle. Janssen
concedes that the '471 and '444 patents' inventions are not patentably dis-
tinct. Thus, once the '444 patent expired in 2011, the public was free to
use the invention claimed in the '444 patent, as well as the concededly ob-
vious variants claimed in the '471 patent. *Gilead*'s clearly applicable rea-
soning, longstanding obviousness-type double patenting doctrine, and
Janssen's choice to prosecute the '444 patent all demand that result.

**II.** *The "Reexam" Motion (involving the '272 and '195 patents).*

**A.** This Court has consistently held that § 121's safe harbor ap-
plies only to patents issuing from divisional applications. The '471 patent
was filed as, and issued from, a continuation-in-part application, not a di-

visional.  None of Janssen's arguments or *post hoc* attempts to restyle the
'471 patent's application as a divisional can change that reality.

> ***B.*** The one-way test governs whether the '471 patent is invalid for
obviousness-type double patenting over the '272 and '195 patents.  First,
as to the '272 patent, the '272 and '471 patents resulted from applications
filed on the same day, so the "unusual circumstance" in which the two-way
test applies is not present.  Because of the same-day filing, there is no is-
sue of any patent application overtaking another.  Second, as to both the
'272 and '195 patents, as matter of law it cannot be said that the PTO was
*solely* responsible for the '471 patent's delayed issuance.  Because Janssen
does not contest the invalidity of the '471 patent's claims under the one-
way test, those claims are invalid for obviousness-type double patenting
over *both* the '272 and '195 patents.

> ***C.*** The district court correctly held that even if the two-way test
applies, the '471 patent's claims are invalid.  Janssen does not dispute that
the '471 patent's claims are obvious over the '272 and '195 patents' claims.
The '272 and '195 patents are also obvious over the '471 patent.  The '471
patent's claims to chimeric antibodies encompass the cA2 antibody.  Be-
cause those claims are to compositions, the '471 patent's specification can

be consulted in an obviousness-type double patenting analysis, and that specification discloses the use of the claimed antibodies (cA2, specifically) to treat rheumatoid arthritis and Crohn's disease. This is what the '272 and '195 patents claim. The '272 and '195 patents' claims are obvious over the '471 patent's claims, and thus the '471 patent's claims are invalid even under the two-way test.

## STANDARD OF REVIEW

The district court's summary-judgment rulings are reviewed *de novo*. *Momenta Pharms., Inc. v. Teva Pharms. USA, Inc.*, 809 F.3d 610, 614-15 (Fed. Cir. 2015); *Maymi v. Puerto Rico Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008).

## ARGUMENT

**I. The earlier-expiring '444 patent's claims render the '471 patent's claims invalid for obviousness-type double patenting.**

For more than 160 years, courts have applied the obviousness-type double patenting doctrine to enforce a "bedrock principle of our patent system": "when a patent expires, the public is free to use not only the same invention claimed in the expired patent but also obvious or patentably indistinct modifications of that invention." *Gilead*, 753 F.3d at 1214.

31

Janssen's '444 patent expired in 2011.  Janssen concedes that the '471 patent's claims are not patentably distinct from the '444 patent's claims.  The district court thus correctly held that the public's right to use the invention of the '444 patent—and the obvious variants claimed in the '471 patent—began in 2011, and that the '471 patent was therefore invalid for obviousness-type double patenting.  Janssen's contrary arguments rest on a clear misreading of *Gilead* and disregard for the principles underlying obviousness-type double patenting.

### A.   *Gilead* reaffirmed the longstanding principle that the inventor must permit the public to use his patented invention—and obvious variants—once the patent expires.

Before the URAA, nearly all patent terms were 17 years, and a patent that issued before another necessarily expired first.  As shown below, the main relevant change brought about by the URAA was the possibility that one patent could both issue *after* and expire *before* a second patent.



In *Gilead*, this Court confronted the question, "Can a patent that is-sues after but expires before another patent qualify as a double patenting reference for that other patent," 753 F.3d at 1211-12, and answered in the affirmative. *Id.* at 1212, 1217.

The patentee (Gilead) argued—much as Janssen does here—that it would be unfair to the patentee and contrary to precedent to allow a later-issuing, earlier-expiring patent (red line in the bottom picture above) to be used as an invalidating reference patent. Gilead argued that what should be important is the date the first patent *issued*, and that obviousness-type

double patenting was only meant to protect against constructively extending the term of the first-*issued* patent. Specifically, Gilead argued the following:

> According to these well-settled principles, then, it is the *issuance* of the first patent that signals the beginning of the term of protection for the patentee's invention. …

> If a second patent subsequently issues to the same inventors, the question … is whether the *second patent* provides an unjustified timewise extension of the right to exclude granted by the *first patent*.

Br. for Appellees, No. 13-1418 (ECF#26) at 25 (filed Sept. 16, 2013) (original emphasis), *available at* 2013 WL 5435227. Further, Gilead argued, where the term of one patent is entirely subsumed within another, there should be no role for obviousness-type double patenting, as the "full term" of the patentee's rights—i.e., the full term of the *first-issued* patent—would have been the same with or without the later-issuing, earlier-expiring patent. *Id.* at 35; *see Gilead*, 753 F.3d at 1214 (noting Gilead's arguments that the later-issuing, earlier-expiring patent "in no way extends the term of the exclusivity for the [other] patent," and that the focus should have been "on the potential term extension for the [first-issuing, later-expiring patent] … because [that patent] issued first.").

This Court squarely rejected each of those arguments.  The core of the obviousness-type double patenting doctrine, *Gilead* held, was the public's right to use the patented invention after the patent *expires*.  Thus, the relevant question was not which of two indistinct patents *issued* first, but which one *expired* first.  753 F.3d at 1212 ("The prohibition against double patenting … is based on the core principle that, in exchange for a patent, an inventor must fully disclose his invention and promise to permit free use of it at the end of his patent term … The bar against double patenting was created to preserve that bargained-for right held by the public."); *see also Singer*, 163 U.S. at 185.  Thus, while it made sense in pre-URAA court decisions to refer to the respective patents' issue dates, that was because those dates "had previously served as a reliable stand-in for *the date that really mattered*—patent expiration." *Gilead*, 753 F.3d at 1215.

The Court thus saw "little import … in the fact that the [earlier-issuing, later-expiring] patent issued first." *Id.* at 1214.  Instead, it concluded that "it is the comparison of Gilead's patent *expiration dates* that should control." *Id.* at 1215.  *Gilead* did not newly establish that principle; it merely affirmed that principle's centrality to the obviousness-type double patenting doctrine.  After discussing more than a century of precedent

from the Supreme Court and courts of appeals, *Gilead* explained, "[t]he double patenting doctrine has always been implemented to effectively uphold that principle," *i.e.*, "that when a patent expires, the public is free to use not only the same invention claimed in the expired patent but also obvious or patentably distinct modifications." *Id.* at 1212; *see also Singer*, 163 U.S. at 185 ("It is upon this condition that the patent is granted."); *Application of Robeson*, 331 F.2d 610, 614 (CCPA 1964) (similar).

Janssen concedes that the '444 and '471 patents are not patentably distinct. The '444 patent expired in 2011. Thus, under longstanding precedent, the public's right to use that invention—and the variants claimed in the '471 patent—necessarily began in 2011. It is not delayed until the '471 patent would otherwise expire.

## B. This appeal does not differ materially from *Gilead*.

Janssen emphasizes that *Gilead* involved two post-URAA patents, whereas this case involves a pre-URAA patent (subject to the transitional rules) and a post-URAA reference patent. That is true as a factual matter, but is no basis for distinguishing *Gilead*. *Gilead*'s holding, and the principles it explained, apply equally here to invalidate the '471 patent.

Because the URAA changed the relationship between issuance dates, expiration dates, and priority dates, the Court was required in *Gilead* to determine which of those dates was important for obviousness-type double patenting. *Gilead* reasoned—consistent with more than a century of precedent—that obviousness-type double patenting had always been "based on the core principle that, in exchange for a patent, an inventor must fully disclose his invention and promise to permit free use of it at the end of his patent term." 753 F.3d at 1212. Thus, the "date that really matter[s]" is the expiration date, *id.*, and "[l]ooking … to the earliest expiration date of all the patents an inventor has on his invention and its obvious variants best fits and serves the purpose of the doctrine of double patenting." *Id.*

Those same principles dictate affirmance here. The '444 patent expired in 2011, and to permit the '471 patent to continue beyond that date would be inconsistent with Janssen's promise to the public to permit free use of the '444 patent and its obvious variants once that patent expired in 2011.

Janssen attaches significance to *Gilead*'s use of "under the circumstances." *See, e.g.*, Janssen Br. 11, 36-37 (citing *Gilead*, 753 F.3d at 1212, 1217). But nothing in *Gilead* indicates that the Court limited its holding

to post-URAA patents invalidating other post-URAA patents. Neither paragraph using "under the circumstances" says a word about the URAA. *Gilead*, 753 F.3d at 1212, 1217. *Gilead*'s second use of "under the circumstances" may indicate that the Court meant to preserve the option of terminal disclaimers, but that cannot help Janssen here:

> We therefore hold that an earlier-expiring patent can qualify as an obviousness-type double patenting reference for a later-expiring patent under the circumstances here. *In cases where such obviousness-type double patenting is present, a terminal disclaimer can preserve the validity of the later-expiring patent by aligning its expiration date with that of the earlier-expiring patent.* That disclaimer will most effectively enforce the fundamental right of the public to use the invention claimed in the earlier-expiring patent and all obvious modifications of it after that patent's term expires.

*Id.* at 1217. As *Gilead* explains, "using the expiration date as a benchmark in post-URAA cases of obviousness-type double patenting preserves the ability of inventors to use a terminal disclaimer of later-expiring patents to create one expiration date." *Id.* at 1216. Here, Janssen has not exercised that option by disclaiming the '471 patent's term beyond the '444 patent's expiration date.

To the extent that Janssen would read anything more into *Gilead*'s use of "under the circumstances," there is no basis for doing so. Judicial opinions are not to be read like statutes. *St. Mary's Honor Ctr. v. Hicks*,

509 U.S. 502, 515 (1993). And, consistent with the federal judiciary's duty to decide only "cases" or "controversies," U.S. Const. Art. III, the holding of every judicial decision is in some sense "under the circumstances" of the case before the court. Here, the legally relevant "circumstances" are the same as those in *Gilead*.

Janssen's selective quotation of other passages in *Gilead* likewise fails to show that Janssen's pre- vs. post-URAA distinction makes a difference. In *Gilead*, this Court described pre-URAA patents' terms as "inextricably intertwined with [their] issuance date," which the Court concluded was "critical to a double patenting analysis" of such patents. 753 F.3d at 1214-15; *see* Janssen Br. 37 (quoting the same). But the Court did not thereby suggest that its reasoning would be inapplicable to pre-URAA patents. *Gilead*, 753 F.3d at 1214-15.

To the contrary, the Court used that description of pre-URAA patents to *reject* Gilead's argument (akin to Janssen's here) that earlier precedent forbade the use of a later-issuing patent as a reference to invalidate an earlier-issuing patent. *Id.* at 1214. The Court instead correctly recognized that its earlier decisions' "focus on controlling the patent term of the later *issued* patents in those cases makes perfect sense: before the URAA,

later issued patents *expired* later." *Id.* at 1215 (original emphasis). Thus, the Court concluded, "for double patenting inquiries" concerning pre-URAA patents, "looking to patent issue dates had previously served as a reliable stand-in for *the date that really matter[s]*"—expiration. *Id.*

Further confirming that *Gilead* does not support Janssen, *Gilead* noted that "the district court did not cite" *Ex parte Pfizer*, Appeal No. 2009-4106, 2010 WL 532133 (B.P.A.I. Feb. 12, 2010). *Id.* at 1211 n.2. (Janssen does not cite that case either). In *Pfizer*, as here, an earlier-expiring post-URAA patent was used as a reference to invalidate for obviousness-type double patenting a later-expiring pre-URAA patent. *Pfizer*, 2010 WL 532133, at *1-2, *15, *21-25. Although *Gilead* did not specifically comment on that posture, *Gilead* emphasized *Pfizer*'s recognition that "an extension of a patentee's 'right to exclude the public from practicing' the invention in an expired patent" is "'precisely what obviousness-type double patenting was intended to prevent.'" 753 F.3d at 1211 n.2 (quoting *Pfizer*, 2010 WL 532133, at *21).

40

## C. The URAA does not immunize pre-URAA patents from obviousness-type double patenting by post-URAA reference patents.

Janssen contends that an affirmance here would "jettison Congress' judgment" in 35 U.S.C. § 154(c)(1) that pre-URAA patents' terms "shall be the greater of 17 years from issuance or 20 years from filing." Janssen Br. 42. That argument is largely rebutted by Janssen's concession (on the same page of its brief) that Congress did not intend the URAA to "disturb the consistent application of the doctrine of double patenting." *Id.* (quoting *Gilead*, 753 F.3d at 1216). Despite that concession, what Janssen seeks here is a categorical exception to the doctrine for the invalidation of pre-URAA patents by post-URAA reference patents. Such an exception would be inconsistent with the principles explained in *Gilead* and 160+ years of prior precedent.

*First*, the purpose and effect of the URAA's transition rule should be apparent as a matter of common sense. Congress was changing the way patent terms were calculated, and needed to decide whether, at the time of the change, pending applications and in-force patents would be subject to the new rule, the old rule, or some combination of both. Congress chose a combination. Thus, 35 U.S.C. § 154(c)(1) provides that certain patents af-

41

fected by the transition will have a term "the greater of the 20-year term as provided in subsection (a), or 17 years from grant, subject to any terminal disclaimers." That is an ordinary transition rule, not an absolute statement that the term of an affected patent shall not only be a certain length—but shall *also* be immune from other laws such as obviousness-type double patenting. And if anything, the final five words of that passage—"subject to any terminal disclaimers"—refute Janssen's argument. Janssen contends that § 154(c)(1) reflects Congress' judgment that patents affected by the URAA are *absolutely* entitled to at least a 17-year term, notwithstanding other legal principles that might affect that term. But the text of § 154(c)(1) reflects not only that the term of transitional patents like the '471 *is* subject to other legal principles—but that Congress specifically contemplated that such patents *would* be subject to obviousness-type double patenting. As *Gilead* explains, § 253's terminal disclaimer provision was enacted specifically with obviousness-type double patenting in mind. 753 F.3d at 1212-13.

*Second*, Janssen's attempt to glean an implicit immunity from obviousness-type double patenting from the URAA's transition rule is inconsistent with Janssen's concession that Congress did not intend the URAA

to "disturb the consistent application of the doctrine of double patenting." Janssen Br. 42. It appears to be common ground between Janssen and Celltrion that Congress' history of amending the Patent Act indicates acceptance of the obviousness-type patenting doctrine. Indeed, as this Court noted in *Abbvie*, the doctrine is grounded in part in the text of the Patent Act itself. 764 F.3d at 1372 (discussing § 101). Since the Supreme Court announced the double-patenting doctrine in *Suffolk*, Congress has amended the Patent Act at least a half-dozen times. *See Immersion Corp. v. HTC Corp.*, 826 F.3d 1357, 1361 (Fed. Cir. 2016) (collecting amendments). During that time, Congress has passed measures such as 35 U.S.C. § 253 (terminal disclaimers) and 35 U.S.C. § 121 (safe harbor for divisional applications), which implicitly recognize the vitality of the obviousness-type double patenting doctrine, and which affirm that doctrine's core principle of enforcing the inventor's implicit promise to the public to permit free use of his invention after his patent expires. *See Pfizer*, 518 F.3d at 1360-62 (legislative history of § 121); *Gilead*, 753 F.3d at 1213-14 (terminal disclaimers). Congress has never displaced or overruled the obviousness-type double patenting doctrine. If anything, that history reflects a consistent congressional understanding that the patent-term calculations of § 154

remain subject to other principles of patent law, such as obviousness-type double patenting.

*Third*, Janssen's argument is inconsistent with *Gilead*'s holding that obviousness-type double patenting continues to apply even when a reference patent's term is completely subsumed in the challenged patent's term. Janssen repeats—six times—that "the only reason" the '471 patent expires later than the '444 patent is because Congress passed the URAA. Janssen Br. 2, 6, 11, 24, 31, 37. In *Gilead*, the patentee likewise argued, and the district court agreed, that the only reason the challenged patent expired later than the reference patent was "a result of changes to patent laws." *Gilead*, 753 F.3d at 1211 (quoting district court). This Court *reversed*. Even if the URAA led to the situation of one patent both issuing before and expiring after another, the "core principle" of obviousness-type double patenting—the inventor's promise to permit free use of his invention when the patent expired, *id.* at 1212—requires courts to continue to "[l]ook[] … to the earliest expiration date of all the patents an inventor has on his invention." *Id.* at 1216. That same principle requires affirmance here.

**D.   Janssen's attempts to interject equitable or intent-based elements into the obviousness-type double patenting analysis fail.**

Janssen's last attempt to escape *Gilead* and more than a century of precedent consists of arguments that it would somehow be "unfair" to Janssen to apply obviousness-type double patenting here, because Janssen did not engage in "gamesmanship."  Janssen's arguments are unsound.

*First*, obviousness-type double patenting is an objective test, much like obviousness.  The inquiry comprises two steps: (1) construing the claims of the two patents, and (2) determining whether those differences render the claims patentably distinct.  *Sun Pharm. Indus., Ltd. v. Eli Lilly & Co.*, 611 F.3d 1381, 1384-85 (Fed. Cir. 2010).  This Court and its predecessor have reiterated that a principal justification for obviousness-type double patenting is "to prevent unjustified timewise extension of the right to exclude granted by a patent *no matter how the extension is brought about.*"  *Hubbell*, 709 F.3d at 1145; *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 967-68 (Fed. Cir. 2001); *In re Van Ornum*, 686 F.2d 937, 943-44 (CCPA 1982); *Application of Schneller*, 397 F.2d 350, 354 (CCPA 1968).

Janssen relies heavily on *Gilead's* statement that the patentee in that case had "crafted" separate chains of applications for the '375 and '483

patents.  Janssen Br. 2, 10, 35, 37.  But there was no finding of "gamesmanship" in *Gilead*, nor any implication that such a finding is a prerequisite to obviousness-type double patenting.  Indeed, *Gilead* did not disturb the district court's finding that the patentee had *not* engaged in gamesmanship.  753 F.3d at 1211.

To be sure, *Gilead* did recognize the *potential* for gamesmanship if the obviousness-type double patenting analysis were governed only by patents' issuance dates.  *Id.* at 1215-16.  But to recognize that a rule may incentivize or deter gamesmanship is not the same thing as requiring a *finding* of gamesmanship before enforcing the rule.  In *Warner-Jenkinson*, the Supreme Court rejected a similar misreading of *Graver-Tank* concerning the doctrine of equivalents:  "*Graver Tank* refers to the prevention of copying and piracy when describing the benefits of the doctrine of equivalents.  That the doctrine produces such benefits, however, does not mean that its application is limited only to cases where those particular benefits are obtained."  *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 34 (1997).  Janssen's argument relies on a similar misreading of *Gilead*.

Like obviousness-type double patenting, many rules in patent law serve purposes of conferring benefits and deterring harms, but are gener-

46

ally enforced without requiring proof that the harms or benefits appear in any particular case, and without delving into the litigants' subjective intentions. This is true of both statutory and judge-made rules. *See, e.g.*, *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (obviousness); *Warner-Jenkinson*, 520 U.S. at 36-37 (doctrine of equivalents); *Petrolite Corp. v. Baker Hughes Inc.*, 96 F.3d 1423, 1426 (Fed. Cir. 1996) (experimental use exception).

There are, to be sure, doctrines such as prosecution laches, inequitable conduct, and indirect infringement that implicate questions of intent or misconduct resembling "gamesmanship." *See, e.g.*, *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 760-61 (2011); *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (en banc); *Cancer Research Tech. Ltd. v. Barr Labs., Inc.*, 625 F.3d 724, 729 (Fed. Cir. 2010). But Janssen cites nothing to indicate that obviousness-type double patenting is in that category, and as just explained, consistent precedent is to the contrary.

*Second*, Janssen argues that permitting it to enforce the '471 patent after the '444 patent expires is not "unjustified," "improper," or "undue." Those words appear in some decisions addressing obviousness-type double

patenting.  *See, e.g.*, *Schneller*, 397 F.2d at 354 ("fundamental reason" for obviousness-type double patenting doctrine is to "prevent[] the unjustified timewise extension of the right to exclude granted by a patent no matter how the extension is brought about").  In context, however, "unjustified," "improper," and "undue" merely express the conclusion that follows from a finding of obviousness-type double patenting:  if a patent is invalid for obviousness-type double patenting, then it follows that the patentee is not "justified" in asserting the challenged patent after the reference patent expires.  *See*, *e.g.*, *Hubbell*, 709 F.3d at 1145; *Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*, 689 F.3d 1368, 1379 (Fed. Cir. 2012); *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1375 (Fed. Cir. 2005); *Eli Lilly*, 251 F.3d at 967-68; *Van Ornum*, 686 F.2d at 943-44; *Application of Thorington*, 418 F.2d 528, 537 (CCPA 1969).

In only one, narrow, obviousness-type double patenting decision does "justification" appear to do any meaningful work.  In *In re Braat*, 937 F.2d 589 (Fed. Cir. 1991), the Court found that a patentee was not "unjustified" in effectively extending its patent term where—solely due to the PTO's actions beyond the patentee's control, a broader patent issued after a narrower patent, and the later-issued broader patent's claims encompassed

the earlier-issued narrow patent. *Id.* at 594-95. In other words, the effective extension of a patent term through multiple patents with different expiration dates is only ever "justified" when the PTO is solely responsible.

Janssen does not, however, argue that this case is similar to *Braat.* Instead, it argues that it was Congress' enactment of the URAA that caused the '471 patent to expire after the '444 patent. Janssen Br. 2, 6, 11, 24, 31, 37. But it was Janssen's decision to file for the '444 patent in 2001 while claiming a 1991 priority date—not Congress' enactment of the URAA in 1994—that led to the '471 patent issuing before and expiring after the '444 patent. And this Court has never recognized a change in law as justifying an exception to the consistent operation of obviousness-type double patenting. To the contrary, *Gilead* rejected such an argument. *See* § I.B, *supra*; 753 F.3d at 1211, 1214-17.

*Finally*, there is no unfairness to Janssen in any event. When Janssen filed for the '444 patent in January 2001—years after the URAA's enactment—it was almost certainly aware, or at least should have been, of the URAA's effect on patent terms, and in particular that the '444 patent would expire before the '471 patent. Janssen nonetheless took a calculated risk in procuring the '444 patent—not unlike what Gilead did in procuring

49

its second-issuing, first-expiring patent. During the '444 patent's term, Janssen benefited from having both patents in force at the same time. Any competitor would have to either design around or invalidate claims of both patents; not just one. Once the '444 patent expired in 2011, however, Janssen was required, under more than a century of consistent obviousness-type double patenting precedent, to make good on its implicit promise to the public—to permit free use of the '444 patent's invention and obvious variants. The district court appropriately held Janssen to that promise here. That ruling should be affirmed.

## II. The '471 patent's claims are also invalid for obviousness-type double patenting over the '272 and '195 patents' claims.

The district court's determination that the '471 patent's claims are invalid for obviousness-type double patenting over the '272 and '195 patents' claims provides a second, *independent* basis for affirming the judgment.

### A. Section 121's safe harbor does not apply.

As explained above, 35 U.S.C. § 121 "provides a safe harbor (for patents or applications derived as the result of a restriction requirement) from attack based on the original application (or a patent issued therefrom), or based on applications or patents similarly derived from the same

50

restriction requirement." *Pfizer, Inc.*, 518 F.3d at 1360.  "[B]y its literal terms, [the safe harbor] protects *only 'divisional application[s]'* (or the original application) and patents issued on such applications." *Id.*  The safe harbor is subject to a "strict test" to avoid the "potential windfall … to a patentee." *G.D. Searle*, 790 F.3d at 1354.

Janssen does not dispute that, in response to the examiner's restriction requirement, Janssen chose to file the '093 application (directly leading to the '471 patent) as a continuation-in-part, *not* as a divisional. Janssen Br. 15.  Nor does Janssen dispute that the application was properly labeled a continuation-in-part because it disclosed new matter not described in the '413 application.  *Id.* at 15-16; Appx2333 ¶93.

Thus, by its "literal terms," and as consistently applied by this Court, § 121's safe harbor cannot protect the '471 patent.  *Pfizer*, 518 F.3d at 1360-62.  This Court has rejected, explicitly or implicitly, all of Janssen's contrary arguments.

In *Amgen*, Amgen filed *continuation* applications following a restriction requirement.  580 F.3d at 1347-48.  Amgen argued that the applications also met the requirements for divisional applications.  Thus, because those continuation applications could have been labeled as division-

51

als, Amgen asked the Court "to look to [those] application[s'] substance—not [their] designation—to determine whether [they] qualifie[d] as … divisional application[s] under § 121's safe harbor." *Id.* at 1351. This Court rejected Amgen's divisional-in-all-but-name argument, declining to depart from a "strict application of the plain language of § 121, which affords its benefits to 'divisional application[s].'" *Id.* at 1353. It made no difference that Amgen's applications "*could* have been filed as divisional applications." *Id.* at 1354. What mattered was that they "were *filed* as continuation applications instead of divisional applications." *Id.* Accordingly, the resulting patents "do not receive the protections afforded by § 121's safe harbor." *Id.*

Like Amgen, Janssen argues that the '093 application was in substance a divisional of the restricted '413 application, and thus the '471 patent should benefit from § 121's safe harbor. Janssen Br. 46, 48. But Janssen's arguments are weaker than Amgen's. In *Amgen*, the Court accepted that Amgen might have benefited from the safe harbor had it simply filed the same application as a divisional rather than a continuation. *Amgen*, 580 F.3d at 1353-54. Continuation-in-part applications like Janssen's, however, by definition add new matter and cannot be labeled as

52

divisionals.  MPEP §§ 201.06, 201.08.  Here, it is only after a series of sub-
stantive amendments and maneuvers years after the fact that Janssen ar-
gues the '471 patent is *now* "a divisional in form as well as in substance."
Janssen Br. 46.

But Janssen's procedural machinations to retroactively designate the
'471 patent as issuing from a divisional application are also unavailing.
During reexamination (ultimately leading to companion Appeal No. 17-
1257), Janssen petitioned to amend the '471 patent by (1) deleting all but
one paragraph of its specification and inserting the text of the '413 applica-
tion's specification, (2) deleting the priority claim to and incorporation by
reference of the '406 application, and (3) designating the '471 patent a di-
visional of the '413 application.  Appx4104.  Although the Central Reexam-
ination Unit's director entered Janssen's amendment—based on the un-
derstanding that 37 C.F.R. § 1.530 "demands entry of amendments when
submitted in compliance with the rules and accompanied by the appropri-
ate fees," Appx4105—that makes no difference here.

As an initial matter, the amendments would not be legally effective
unless and until the reexamination and appeals are complete and a reex-
amination certificate issues.  *See* 37 C.F.R. § 1.530(k).  The Board, howev-

er, has ordered the claims cancelled.  In any event, even if treated as effective, the amendments cannot rewrite history to give Janssen the benefit of the safe harbor.

*First*, nothing in the Director's order indicates that Janssen's amendments were entered to invoke § 121's protection.  Appx4105.  The Board rejected any such implication, concluding that Janssen's amendments were entered for "procedural reasons," and "[t]he Director did not, in granting the petition, indicate that the effect of the amendment would be to confirm the '093 Application as a divisional."  *Janssen*, 2016 WL 6921121, at *6.

*Second*, *G.D. Searle* conclusively rejects Janssen's argument.  *G.D. Searle* and this Court's earlier decision in *Pfizer* involved a related group of patents, depicted below.



The patents and applications trace back to the '594 application (upper left), which was subject to a restriction requirement. *G.D. Searle*, 790 F.3d at 1351. Following that restriction requirement, the '629 application was filed as a continuation-in-part of the '549 application, and the '113 application (red) was later filed as a continuation-in-part of the '629 application. *Id.* at 1352.[3] The '068 patent issued from the '113 application. *Id.*

In *Pfizer*, this Court concluded that the '068 patent was invalid for obviousness-type double patenting over the '165 patent (issued from a divisional of the '594 application), in critical part because the '068 patent is-

---

[3]    More precisely, the '113 application was the national-stage counterpart of the international-stage PCT '720 application, which was filed as a continuation-in-part of the '629 application. *G.D. Searle*, 790 F.3d at 1352.

sued from a continuation-in-part, not a divisional, application, and thus was excluded from § 121's safe harbor. *G.D. Searle*, 790 F.3d at 1352.

After *Pfizer*, the patentee filed another application (the RE '319 application) to reissue the '068 patent (ultimately as the RE '048 patent). *Id.* at 1353. The patentee then sued for infringement of the RE '048 patent, which the defendant again contended was invalid for obviousness-type double patenting over the '165 patent. *Id.* at 1353-54.

In prosecuting the RE '319 application, the examiner had allowed the patentee in *G.D. Searle* to (1) delete material from the '068 patent's specification not disclosed in the '594 application, (2) revise, add, and delete claims, and (3) designate the '113 application a divisional of the '594 application. *Id.* at 1353. Despite those amendments, this Court concluded that the RE '048 patent was not entitled to § 121's safe harbor because it did not issue on either the '594 application or a divisional of the '594 application. *Id.* at 1354. The critical break in the chain was the '113 application. *Id.* at 1354-55. Although later designated a divisional in the RE '048 patent, this Court concluded that the '113 application could not, in fact, be a divisional because it contained matter not present in the parent '594 application. *Id.* at 1355. The patentee's deletion of that new matter from the

RE '048 patent did "not retroactively alter the nature of the '113 application." *Id.*

The simpler but parallel facts here compel the same conclusion. As in *G.D. Searle*, Janssen cannot "retroactively alter the nature" of its application to invoke § 121's safe harbor. Even setting aside that Janssen's amendments are not legally effective, it remains a historical fact that *the '471 patent did not issue on a divisional* of the '413 application (or the '413 application itself). *Id.* at 1354-55.

Janssen's effort to distinguish *G.D. Searle* clearly misreads that decision. *G.D. Searle* acknowledged that permitting Pfizer retroactively to convert the '113 application into a divisional of the '594 application would be unfair to be public because Pfizer had previously enjoyed exclusivity over the '068 patent's claimed inventions, relying on the '113 application's new matter. *Id.* at 1355. The Court's statement that the result avoided unfairness to the public does not invite an equitable balancing of the patentee's interests against the public's. The Court was construing a statute and applying the text as written, consistent with the "strict test" explained in earlier decisions. *Id.* at 1354 (quoting *Geneva*, 349 F.3d at 1382).

*Finally*, Janssen argues that the district court ignored five purported "fact issues about the safe harbor's applicability." Janssen Br. 49. Of those five, four (Nos. (1), (2), (3), and (5) at page 49 of Janssen's brief) are not disputed issues of material *fact* at all, but legally irrelevant allegations by Janssen that, before this Court's decisions in *Pfizer*, *Amgen*, and *Searle*, some practitioners and PTO employees may have believed that § 121's safe harbor extended more broadly than this Court later determined that it did. Consistent with the duty of the judiciary to say what the law is, it is well-established that when a court "applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule." *Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 97 (1993); *Heartland By-Products, Inc. v. United States*, 568 F.3d 1360, 1365 (Fed. Cir. 2009); *Voda v. Cordis Corp.*, 536 F.3d 1311, 1328 & n.10 (Fed. Cir. 2008).

Janssen's remaining "fact issue"—"concerning … the absence of claims in the '471 patent that are supported by additional matter not present in the '413 Parent Application," Janssen Br. 49—is likewise legally ir-

relevant.  As discussed above, *Amgen* rejected that sort of divisional-in-all-but-name argument, ruling that section 121 must be applied as written to apply only to patents resulting from applications actually filed as divisionals, not applications that possibly could have been filed as divisionals.

Because Janssen filed the '093 application as a continuation-in-part, this Court's "strict test" bars the '471 patent's claims from § 121's safe harbor.

## B.  The one-way test for obviousness-type double patenting applies.

By default, this Court considers obviousness-type double patenting under a "one-way" test— asking whether the challenged claims are obvious over the reference patent's claims.  *In re Berg*, 140 F.3d 1428, 1432 (Fed. Cir. 1998).

In specific "unusual circumstance[s]," however, a "two-way" test applies, which asks whether the reference patent's claims are *also* obvious over the challenged patent's claims.  *In re Fallaux*, 564 F.3d 1313, 1316 (Fed. Cir. 2009).  The two-way test "is a narrow exception to the general rule of the one-way test."  *Id.*  It applies when a patent applicant files two applications in one order, but the resulting patents issue in the opposite order, and "the PTO is *solely* responsible for the delay in causing the sec-

ond-filed application to issue prior to the first." *Id.*; *see also In re Emert*, 124 F.3d 1458, 1461 (Fed. Cir. 1997); *In re Basell Poliolefine Italia S.P.A.*, 547 F.3d 1371, 1376 (Fed. Cir. 2008).  In that circumstance—where an earlier-filed application is essentially overtaken by a later-filed application at the PTO and issues second *solely* because of PTO delay, the obviousness-type double patenting inquiry compares the later-expiring patent's claims to the first, *and* vice-versa.  Whether the one-way or two-way test applies is a question of law, *Hubbell*, 709 F.3d at 1149; *Emert*, 124 F.3d at 1460, and depends on an applicant's *responsibility* for prosecution delays, not its intent.  *Fallaux*, 564 F.3d at 1317.

If the one-way test applies with respect to *either* the '272 or '195 patent, Janssen concedes that the '471 patent is invalid.  Janssen Br. 20 n.3.

## 1. The district court correctly held, consistent with *Berg* and the MPEP, that the one-way test applies to same-day filings.

The district court correctly concluded that the one-way test applies vis-à-vis the '471 and '272 patents.  Appx35-38.  The court recognized that "the two-way test [is] appropriate … in the unusual circumstance that the PTO is solely responsible for the delay in causing *the second-filed application to issue prior to the first*."  Appx35 (quoting *Berg*, 140 F.3d at 1437 and

60

citing *Hubbell*, 709 F.3d at 1159; *Fallaux*, 564 F.3d at 1313, 1316). Because the '471 and '272 patents' applications were filed on the same day, there was no "first-filed" or "second-filed" application—only two simultaneously-filed applications. In that circumstance, the MPEP provides—in a passage that remains unchanged to this day—that the one-way test applies. MPEP § 804 (July 1988) ("If … both applications are filed on the same day, only a one-way determination of distinctness is needed …") (citing *In re Berg*, 140 F.3d 1438 (Fed. Cir. 1998)). *Berg* explains that the two-way test applies "only … when the applicant could not avoid separate filings, and *even then*, only if the PTO controlled the rates of prosecution to cause the later filed species claims to issue before the claims for a genus in an earlier application." 140 F.3d at 1435. Thus, "[t]he essential concern was to prevent rejections for obviousness-type double patenting when the applicants filed first for a basic invention and later for an improvement, but, through no fault of the applicants, the PTO decided the applications in reverse order of filing." *Id.* at 1432.

In other words, the "two-way" test was meant to address the situation of an applicant who files broader claims first and more specific claims second, with the reasonable expectation that the patents will issue in that

same order—but where, through no fault of the applicant, the order in which the patents issue is the reverse of the order of filing. But where, as here, a patentee files two applications on the same day, there is no issue of reverse-ordering, no reason to expect that the patents will issue in any particular order, and thus no reason to deviate from the traditional one-way test. As *Berg* explained, one who files two applications on the same day takes "a calculated risk" that either one could issue before the other. *Id.* at 1435. That is the risk Janssen took.

Janssen argues that the two-way test is "not intended to reward or punish order of filing." Janssen Br. 52. But the issue is not one of rewards and punishments. The "one-way" test is the general rule, and the "two-way" test is a narrow exception into which Janssen does not fit.

Janssen suggests that the Court "should *treat* the application for the '471 patent as having been filed" before the '272 patent's application because it has a lower serial number. *Id.* at 53. Janssen relies on *Immersion* (which Janssen concedes addressed a different issue). *Id.* at 54. Janssen waived this argument by failing to raise it below. But regardless, this Court has not required the PTO to enforce its rules and procedures by slicing time into smaller-than-a-day units. *Immersion* recognized the Patent

Act's "pervasive[ ]" use of day-sized units for agency events. *Immersion*, 826 F.3d at 1362, 1365. The MPEP's same-day rule of § 804.II(B)(2)(b) is an analogous determination—it clearly states that "[i]f … both applications are filed on the same day, *only a one-way determination* of distinctness is needed …." Having taken a calculated risk—the 50/50 chance that, all else equal, the '471 and '272 patents might issue in a different order than Janssen would prefer—Janssen must accept that the one-way test applies. There is no reason for this Court to revisit that settled principle.

>    **2.    As a matter of law, the PTO was not "solely" responsible for delays in the '471 patent's prosecution.**

The district court correctly applied the rule of *Berg* and the MPEP to find that the one-way test applied between the '471 and '272 patents. However, this Court may also affirm for the separate reason that, as a matter of law, the PTO was not *solely* responsible for delays in prosecuting the '471 patent's application. *See Rexnord Indus., LLC v. Kappos*, 705 F.3d 1347, 1356 (Fed. Cir. 2013) (The "correctness of the decision appealed from can be defended by the *appellee* on any ground that is supported by the record.") (original emphasis). That is an independent basis to find that the one-way test applies—not only for the '272 patent but also the '195.

"Whether a one-way or two-way analysis applies is a question of law that [this Court] review[s] without deference," *Hubbell*, 709 F.3d at 1149. Even though the district court noted that "there *may* be a genuine factual dispute" about the PTO's responsibility for delays in prosecution, Appx38, on the undisputed record of the '471 patent's seven-year prosecution, as a matter of law it cannot be said that the PTO was *solely* responsible.

In addition to obtaining numerous extensions, delays attributable to Janssen (or at least not solely to the PTO) include the following:

*First*, Janssen added more than a year to the prosecution by filing a notice of appeal with the Board, then changing its mind. Following a final rejection in May 1996, Janssen requested a three-month extension to file a notice of appeal. Appx2211-2212. In May 1997, Janssen requested a four-month extension to file its opening brief. Appx2214. But Janssen did not appeal, and instead filed an amendment in response to the May 1996 rejection, including adding claims 134 and 135 (now asserted claims 5 and 6). Appx2914-2925; Appx2337 ¶¶115-118.

*Second*, though the patent issued in 2001, Janssen forwent an opportunity to have the patent issue in 1997. In August 1997, the examiner rejected some claims, but concluded that others were allowable if rewritten.

Appx2183.  Instead of seeking allowance, Janssen requested withdrawal of the finality of the August 1997 rejection, Appx2192; Appx2196, and sought a two-month extension to respond to it.  Appx2216.  As noted above, the patent did not ultimately issue until 2001.

As a matter of law, the PTO was not *solely* responsible for the '471 patent's delayed issuance.  *Fallaux*, 564 F.3d at 1316.  This Court has declined to apply the two-way test in similar circumstances where, as here, an applicant "received numerous time extensions in various filings," *compare Emert*, 124 F.3d at 1459-61 (patentee waited the full six-month statutory period to respond to office actions), *with* Appx2009; Appx2211-2212; Appx2214; Appx2216; and the claims asserted in litigation did not appear in prosecution until years after the patent's priority date.  *See Hubbell*, 709 F.3d at 1149-50; *Fallaux*, 564 F.3d at 1317; *Basell*, 547 F.3d at 1376; Appx149(1:4-14) (earliest application in '471 patent's priority chain filed in 1991); Appx2914-2925 (Janssen adding claims 134 and 135 in May 1997); Appx2337 ¶¶115-118 (claims 134 and 135 correspond to asserted claims 5 and 6).

Further confirming that the PTO is not *solely* responsible for the delay in the '471 patent's issuance, Janssen's conduct would fail the test for

"reasonable efforts to conclude prosecution" under the PTO's regulations addressing the analogous context of patent-term adjustments. Although not applicable here, the Patent Term Guarantee Act and implementing regulations are instructive on the general question of assessing responsibility for delays in prosecution. Some patents' terms can be extended by adding days attributable to PTO delay during prosecution and subtracting days "during which the applicant failed to engage in *reasonable efforts to conclude prosecution.*" 35 U.S.C. § 154(b)(2)(C)(i). *See Pfizer, Inc. v. Lee*, 811 F.3d 466, 468-69 (Fed. Cir. 2016); 37 C.F.R. § 1.704. Under that standard, the PTO has concluded that taking longer than three months to (a) respond to an office action making a rejection or (b) file an appeal brief after filing a notice of appeal with the Board constitute failures "to engage in reasonable efforts to conclude prosecution"—both of which Janssen did here. *See* 37 C.F.R. §§ 1.704(b), (c)(11); *Gilead Sciences, Inc. v. Lee*, 778 F.3d 1341 (Fed. Cir. 2015) (upholding 37 C.F.R. § 1.704(c)(8)). Given the PTO's considered judgment that taking longer than three months is unreasonable delay, it follows that Janssen is at least partially responsible for the delays in the '471 patent's issuance.

In sum, because the undisputed facts show the PTO not *solely* responsible for delays in the '471 patent's issuance, Janssen is not entitled to the two-way test. And because Janssen does not dispute that the '471 patent's claims are invalid for obviousness-type double patenting over the '272 and '195 patents' claims under the one-way test, the district court's judgment should be affirmed for this additional reason.

## C.   Even under the two-way test, the '471 patent's claims are invalid.

Even if this Court concludes that there are genuine factual disputes concerning whether the one-way or two-way test applies, the district court correctly found that the '471 patent's claims are invalid even under the two-way test. Janssen does not dispute the obviousness of the '471 patent's claims over the '272 and '195 patents' claims; it only disputes whether the '272 or '195 patents' claims are obvious over the '471 patent's claims.[4] They are, as the district court correctly held. Appx38-42. Janssen's contrary arguments are without merit.

*First*, Janssen's main argument is that the district court categorically should not have looked to the '471 patent's specification in its obviousness-

---

[4] It is undisputed that if *either* the '272 or '195 patent's claims are obvious over the '471 patent's claims then the '471 patent is invalid under the two-way test.

type double patenting analysis. This Court has definitively rejected that argument. In *Basell*, this Court recognized "that certain instances may exist where a patent's disclosure may be used." 547 F.3d at 1378-79. And in *Geneva*, *Pfizer*, and *Sun*—which involved materially identical facts to this case—the Court did just that.

In *Geneva*, a claim to a method of inhibiting β-lactamase (a bacterial enzyme) using "clavulanic acid or a pharmaceutically acceptable salt thereof" was challenged for obviousness-type double patenting over the reference (Fleming) patent's claim to "[p]otassium clavulanate" (a clavulanic acid salt). 349 F.3d at 1385. The Court "examine[d] the *specifications* of both patents to ascertain any overlap in the claim scope for the double patenting comparison." *Id.* Because the Fleming patent disclosed potassium clavulanate's utility—"administration to patients to combat bacteria that produce ß-lactamase," *id.* at 1385, the Court concluded that the challenged patent's claims were invalid for obviousness-type double patenting over Fleming. *Id.* at 1375, 1377, 1385-86.

Critical to *Geneva* was the principle that governs here: "a claim to a method of using a composition is not patentably distinct from an earlier

claim to the identical composition in a patent disclosing the identical use."

*Id.* at 1385-86. The Court explained:

> It would shock one's sense of justice if an inventor could receive a patent upon a composition of matter, setting out at length in the specification the useful purposes of such composition, manufacture and sell it to the public, and then prevent the public from making any beneficial use of such product by securing patents upon each of the uses to which it may be adapted.

*Id.* at 1386 (quoting *In re Byck*, 48 F.2d 665, 666 (CCPA 1931)).

*Pfizer* reiterated that principle, 518 F.3d at 1363 & n.8, and likewise concluded that challenged claims for methods of using a composition were invalid for obviousness-type double patenting over a reference patent's claims to the composition—again, expressly relying on the reference patent's disclosure of the *use* claimed in the challenged patent. *Id.* at 1363.

*Sun* again reaffirmed that same approach:

> Thus, the holding of *Geneva* and *Pfizer*, that a "claim to a method of using a composition is not patentably distinct from an earlier claim to the identical composition in a patent disclosing the identical use," extends to any and all such uses disclosed in the specification of the earlier patent.

611 F.3d at 1387; *see also id.* at 1388 ("we have expressly held that, where a patent claims a compound, a court performing an obviousness-type double patenting analysis should examine the specification to ascertain the coverage of the claim").

Under *Geneva*, *Pfizer*, and *Sun*, the '272 or '195 patents' claims are not patentably distinct over the '471 patent's claims. Janssen concedes that claim 1 of the '471 patent encompasses the cA2 antibody. Appx1529 ¶13. And the '471 patent's specification describes the use of the claimed antibodies, including specifically cA2, to treat rheumatoid arthritis and Crohn's disease. Appx165-182 (33:52-34:25, 58:23-65:67, 66:20-68:20). The '272 and '195 patents, in turn, claim methods of using chimeric antibodies (including cA2) to treat Crohn's disease and rheumatoid arthritis, respectively. Appx380(97:2-98:16); Appx472(107:52)-Appx473(110:17). As a matter of law, those claimed methods of use cannot be patentably distinct from the '471 patent's claims to chimeric antibodies, where the '471 patent discloses identical uses for those antibodies. *Sun*, 611 F.3d at 1387-88; *Pfizer*, 518 F.3d at 1363 & n.8; *Geneva*, 349 F.3d at 1385-86.

*Second*, Janssen argues that *Geneva*, *Pfizer*, and *Sun* considered the reference patents' specifications only because the reference patents' claims did not recite any utility for their claimed compositions. Janssen Br. 58. Even accepting that reading would not help Janssen because the '471 patent's claims *also* do not recite any utility for its claimed compound. The "capab[ility] of binding an epitope specific to human necrosis factor TNFα,"

Janssen Br. 59 (quoting Appx197), is a property of the compound—not a separate utility.  The "utility" comes from administering the compound to a patient to treat Crohn's disease or rheumatoid arthritis.

Regardless, Janssen's reading is unsound, and essentially asks the Court to limit inconvenient precedent to its facts.  No part of this Court's reasoning in *Geneva*, *Pfizer*, or *Sun* relied on utility (or lack thereof) recited in the claims at issue.  Indeed, none of the passages Janssen cites expressly states that the claims failed to recite a utility.  Janssen Br. 58-59.  In particular, *Sun* did not say so.  *See* 611 F.3d at 1385.  Janssen's addition of "[only]" to its quotation of *Sun* misstates *Sun*'s reasoning.  Janssen Br. 58.

*Finally*, Janssen asserts, with little explanation, that the two-way test cannot be applied without expert testimony, and that there is a "failure of proof" because Celltrion's experts did not address the two-way test specifically.  Janssen Br. 60-61.  To the extent the argument is even developed enough to be preserved, *cf. SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006), it is wrong.

As an initial matter, the technology in *Geneva*, *Pfizer*, and *Sun* was at least as complex as here—*see Sun*, 611 F.3d at 1383-84 (gemcitabine

and cancer-treatment methods); *Pfizer*, 518 F.3d at 1357-58; *Geneva*, 349 F.3d at 1385—and the Court did not rely on expert testimony (or findings thereon).  Rather, there, as here, the Court confronted the straightforward question of comparing a claim to a method of using a composition with an earlier claim to the composition in a patent that disclosed that same use. The record here allowed the district court to make that comparison and to conclude that the principle of *Geneva*, *Pfizer*, and *Sun* resolved the matter: "a claim to a method of using a composition is not patentably distinct from an earlier claim to the identical composition in a patent disclosing the identical use." *Geneva*, 349 F.3d at 1385-86.  If there is any failure of relevant testimony, it is Janssen's:  its experts did not address the '471 patent's specification in analyzing the obviousness of the '272 and '195 patents' claims, Appx3618-3651; Appx3653-3667—which, as explained above, is necessary to the inquiry under *Geneva*, *Pfizer*, and *Sun*.[5]

---

[5] Janssen's opening brief abandons its argument to the district court that a factual dispute existed over the obviousness of the '272 or '195 patent's claims to *methods of using a species* over the '471 patent's claims to a *genus of compositions*.  *See* Appx4507-4508.  Janssen cannot revive that argument in its reply brief.  *SmithKline*, 439 F.3d at 1319-21.  The argument is meritless in any event.  *See Basell*, 547 F.3d at 1377-78 (challenged species claim invalid over a reference patent's genus claim).

Even under the two-way test, the asserted claims are invalid for obviousness-type double patenting.  For that reason—*or* the '471 patent's claims' invalidity under the one-way test, *or* invalidity over the '444 patent's claims—the judgment should be affirmed.

## CONCLUSION

The district court's judgment should be affirmed.

March 7, 2017                                    Respectfully submitted,

                                                 */s/James F. Hurst*
                                                 _____

Charles B. Klein                                 James F. Hurst
WINSTON & STRAWN LLP                             Elizabeth A. Cutri
1700 K Street, N.W.                              KIRKLAND & ELLIS LLP
Washington, D.C. 20006                           300 North LaSalle
(202) 282-5100                                   Chicago, Illinois 60654
                                                 (312) 862-2200
Samuel S. Park
Dan Hoang                                        John C. O'Quinn
WINSTON & STRAWN LLP                             William H. Burgess
35 West Wacker Drive                             C. Alex Shank*
Chicago, Illinois 60601                          KIRKLAND & ELLIS LLP
(312) 558-9500                                   655 Fifteenth Street, N.W.
                                                 Washington, D.C. 20005
Melinda K. Lackey                                (202) 879-5000
WINSTON & STRAWN LLP
1111 Louisiana Street, 25th Floor
Houston, Texas 77002
(713) 651-2600

                        *Counsel for Appellees*

---

* Admitted in California; supervised by principals of the Firm

## CERTIFICATE OF SERVICE

On March 7, 2017, this brief was submitted to the Court through the

CM/ECF system, and thereby served on all parties.


/s/ William H. Burgess


## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATION

This brief complies with the type-volume limitation of Federal Rule

of Appellate Procedure 32(a)(7).  According to the word processing system

used to prepare this document, the brief contains 13,983 words.

/s/ William H. Burgess

# EXHIBIT 8

```
 1                   UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
 2

 3                                  )
     JANSSEN BIOTECH, INC.,         )
 4   and NEW YORK UNIVERSITY,       )
                                    )
 5           Plaintiffs,            )
                                    )   Civil Action
 6   v.                             )   No. 15-CV-10698-MLW
                                    )
 7   CELLTRION HEALTHCARE CO.,      )
     LTD, CELLTRION, INC., and      )
 8   HOSPIRA, INC.,                 )
                                    )
 9           Defendants.            )
                                    )
10

11

12           BEFORE THE HONORABLE MARK L. WOLF
                 UNITED STATES DISTRICT JUDGE
13

14                     MOTION HEARING

15
                      August 16, 2016
16                      10:02 a.m.

17

18         John J. Moakley United States Courthouse
                   Courtroom No. 10
19                 One Courthouse Way
               Boston, Massachusetts  02210
20

21

22
               Kelly Mortellite, RMR, CRR
23              Official Court Reporter
         John J. Moakley United States Courthouse
24            One Courthouse Way, Room 5200
               Boston, Massachusetts  02210
25                  mortellite@gmail.com
```

```
 1    APPEARANCES:

 2    On behalf of Plaintiffs:
      Barbara L. Mullin, Esq.
 3    Akin Gump Strauss Hauer & Feld LLP
      Suite 4100
 4    Two Commerce Square
      2001 Market Street
 5    Philadelphia, PA 19103-7013
      215-965-1200
 6    bmullin@akingump.com

 7    Gregory L. Diskant, Esq.
      Jamison Davies, Esq.
 8    Irena Royzman, Esq.
      Patterson, Belknap, Webb & Tyler LLP
 9    1133 Avenue of the Americas
      New York, NY 10036
10    212-336-2710
      gldiskant@pbwt.com
11    jmdavies@pbwt.com
      iroyzman@pbwt.com
12
      Heather Repicky
13    Nutter McLennen & Fish LLP
      Seaport West
14    155 Seaport Boulevard
      Boston, MA 02210
15    617-439-2747
      arepicky@nutter.com
16
17    On Behalf of Defendants:
      Charles B. Klein, Esq.
18    Winston & Strawn, LLP
      1700 K Street, N.W.
19    Washington, DC 20006
      202-282-5000
20    cklein@winston.com

21    James F. Hurst, Esq.
      Elizabeth Cutri, Esq.
22    Kirkland & Ellis LLP
      300 North LaSalle
23    Chicago, IL 60654
      (312) 862-2000
24    james.hurst@kirkland.com
      elizabeth.cutri&kirkland.com
25
      (Continued on next page)
```

Case 2:16-cv-01025-JMV-MF5 Document 69-1 Filed 04/13/17 Page 160 of 500 PageID: 1439
Case 1:15-cv-10658-MLW Document 232 Filed 08/25/16 Page 3 of 194

3

1    APPEARANCES:  (continued)

2    Dan H. Hoang
     Winston & Strawn LLP
3    35 W. Wacker Drive
     Chicago, IL 60601
4    (312) 558-9509
     dhoang@winston.com

5
     Andrea L. Martin, Esq.
6    Dennis J. Kelly, Esq.
     Burns & Levinson LLP
7    125 Summer Street
     Boston, MA 02110
8    617-345-3000
     amartin@burnslev.com
9    dkelly@burnslev.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:16-cv-01925-JMV-MF5 Document 69-1 Filed 04/13/17 Page 161 of 500 PageID: 1440
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 4 of 194

4

```
 1                    P R O C E E D I N G S
 2             THE COURT:  Good morning.  Would counsel please
 3     identify themselves for the Court and for the record.
 4             MR. DISKANT:  Yes, Your Honor.  I'm Greg Diskant on
 5     behalf of the plaintiffs.  And with me at counsel table is my
 6     colleague Irena Royzman, also from my firm, Patterson Belknap,
 7     and Barbara Mullin from Akin Gump.  Sitting behind us is Eric
 8     Harris, who is inside lawyer at Johnson & Johnson, which is
 9     Janssen's parent, Jamison Davies from Patterson Belknap,
10:08  10     another colleague of mine, our tech support, Scott Burke, and
11     sitting behind us, because there's not enough room at counsel
12     table, Heather Repicky from the Nutter firm as our local
13     counsel.
14             THE COURT:  Thank you.
15             MR. HURST:  Your Honor, Jim Hurst.  I'm here on behalf
16     of the defendants, Celltrion and Hospira.  We also have some
17     Kline representatives here, Jeff Myers from Pfizer/Hospira and
18     David Kim from Celltrion.  And I'll let each of the counsel at
19     counsel table introduce themselves, Your Honor.
10:09  20             THE COURT:  Thank you.
21             MS. CUTRI:  Good morning, Your Honor.  Elizabeth Cutri
22     of Kirkland & Ellis.
23             THE COURT:  Actually, could you each spell your last
24     names, please.
25             MS. CUTRI:  Sure.  My last name is C-u-t-r-i.
```

Case 2:16-cv-01925-JMV-MF5 Document 69-1 Filed 04/13/17 Page 162 of 500 PageID: 1441
Case 1:15-cv-10658-MLW  Document 232  Filed 08/25/16  Page 5 of 194

5

```
  1              THE COURT:  Thank you.
  2              MR. KLEIN:  Good morning, Your Honor.  Chuck Klein
  3       from Winston & Strawn.  I'm sorry.  It's K-l-e-i-n.
  4              MR. HOANG:  Good morning, Your Honor.  Dan Hoang,
  5       H-o-a-n-g, from Winston & Strawn.
  6              MS. MARTIN:  Good morning, Your Honor.  Andrea Martin,
  7       M-a-r-t-i-n, from Burns & Levinson.
  8              MR. KELLY:  Good morning, Your Honor.  Dennis Kelly
  9       from Burns & Levinson for the defendants in the case.
10:10 10       THE COURT:  Okay.  I'm Judge Wolf.  You have me
 11       outnumbered.  I've gone almost 31 years without trying to make
 12       a joke because everybody thinks they need to laugh at it.
 13       Anyway.  There are a lot of you.
 14              As I understand, we're here today primarily for
 15       hearings on the defendants' two motions for summary judgment
 16       concerning the '471 patent and a Markman on hearing claim
 17       construction with regard to the '083 patent.  If there's
 18       anything left when I decide those issues, which I aim to do
 19       before these hearings conclude tomorrow or Thursday, there will
10:11 20       be a question of the trial date.
 21              There's also a motion -- well, a stipulation that the
 22       second case recently filed by the plaintiffs and assigned to
 23       me, docket number 16-11117, should be consolidated with this
 24       case, proceed on the same already-established schedule, and the
 25       trial on liability and damages should or would be bifurcated.
```

Case 2:16-cv-01925-JMV-JBC Document 69-1 Filed 04/13/17 Page 163 of 500 PageID: 1442
Case 1:15-cv-10658-MLW Document 252 Filed 08/25/16 Page 6 of 194

6

 1          I'm inclined to address that stipulation after I

 2   decide the motions for summary judgment on the '471 and

 3   construe the claim language in the '083 that's in dispute

 4   because, as I said, that would affect as a practical matter

 5   whether there's going to be anything left to consolidate the

 6   second case with.

 7          So subject to hearing from you, that's how I intend to

 8   proceed.  With regard to the agenda, your joint status report

 9   is reasonable and helpful.  I'll hear your argument first on

10:12 10  what's called the *Gilead* summary judgment motion concerning the

11   '471.  I have immersed myself in that.  I expect I'll be able

12   to decide that motion in the course of these hearings.  We'll

13   proceed next to what the parties call the reexamination summary

14   judgment motion concerning the '471.  I'm not quite so deeply

15   into that one.

16          Then we'll go to the claim construction of the '083

17   patent, which I've studied carefully.  Then we'll go to the

18   plaintiffs' motion to expedite the trial, which I think would

19   be moot if I grant the motions for summary judgment and agree

10:13 20  with the defendants' claim construction on the '083.  Then we

21   can talk about consolidating the two cases, which makes sense.

22          But is that the agenda you wanted to follow?

23          MR. HURST:  Yes, Your Honor.

24          MR. DISKANT:  Yes, Your Honor.

25          THE COURT:  All right.

```
           1              And about how much time do you think you would like to

           2    present your views on each of the three substantive motions?

           3    Just for planning purposes.

           4              MR. HURST:  I would think for each of the motions, at

           5    least from our side in the neighborhood of 30 to 40 minutes,

           6    maybe a little bit longer, depending on questions and so forth.

           7              THE COURT:  It will probably be longer.

           8              MR. HURST:  Okay.

           9              THE COURT:  Go ahead.

10:14     10              MR. DISKANT:  Expecting that's what Your Honor would

          11    say, I'm thinking more about an hour for each of ours, but

          12    we're certainly prepared to respond --

          13              THE COURT:  That's fine.  I'm sure you're, as usual,

          14    very well prepared on this.  Within those parameters I think we

          15    should be able to get through the two motions for summary

          16    judgment on the '471 today, hopefully including my decision on

          17    the Gilead motion, and then we'll just keep going.  But we have

          18    tomorrow and, if necessary, Thursday.

          19              All right.  With regard to the motion for summary

10:15     20    judgment on the invalidity of U.S. Patent number 6,284,471, the

          21    '471 patent, for obviousness-type double patenting, I have some

          22    questions that you can address wherever they would -- the

          23    responses would most naturally take your presentation.

          24              As I said earlier, I've studied this.  My tentative

          25    view is that the defendants are entitled to summary judgment on
```

Case 2:16-cv-01925-JMV-MF5 Document 69-1 Filed 04/13/17 Page 165 of 500 PageID: 1444
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 8 of 19

8

1    this issue.  I don't view the question as decided by *Gilead*

2    because the facts are different.  So I don't feel bound by the

3    decision, in other words -- do you know whether it's pronounced

4    *Gilead* or *Gilead*?

5              MR. HURST:  *Gilead* I think is the way we pronounce it.

6              MR. DISKANT:  That's what we're doing anyway.

7              THE COURT:  The facts of *Gilead,* two patents had

8    applications after 1995, the effective date of the URAA.  Here

9    one patent was applied for before and one afterwards.  I

10:17 10   intended to ask you whether there were any other decisions that

11   have addressed this factual scenario.  Yesterday the defendant

12   provided the *MLC* intellectual property decision which, as I

13   read it, came out in the way the defendant favors.  But I want

14   to -- I'm interested in knowing whether there's any relevant

15   authority that wasn't cited.

16              I note that in *Pfizer* -- I'm sorry -- that in *Gilead*

17   at note 2 the Federal Circuit cited the Board of Patent Appeals

18   decision in *Pfizer*, which is analogous to the factual situation

19   in this case, and arguably indicates how it would decide this

10:18 20   case since it brought it to the parties' attention.  But I'd

21   like you to address the implications of that footnote.  I'm

22   interested in what's in the record or what inferences I should

23   draw as to why the plaintiffs sought the '444 patent for the

24   antibody when it already was covered by the '471 patent for the

25   genus that included that antibody.  Was it because of a concern

```
 1    that the '471 would be found invalid for obviousness double

 2    patenting in view of patents different from the two at issue in

 3    this case?  Has the PTO now held the '471 invalid for this

 4    reason, as the defendants assert in docket number 195 at page

 5    5?

 6                Again, to be transparent, it appears to me at this

 7    point that the patentee made a judgment to try to strengthen

 8    the patent claims knowing that if the '444 issued, it would

 9    expire in 2011, not in 2018, like the '471 would if standing

10    alone, and that it was foreseeable that it might lose seven

11    years of patent protection, and it decided that it was

12    worthwhile to take that risk.

13                I don't know whether that's what the Federal Circuit

14    would call gamesmanship, but I'm having to essentially fill in

15    a gap in the statutory scheme and think about, you know, what

16    Congress would have done if it had addressed this issue as it

17    could have.  And it seems to me that the statute manifests a

18    desire to be fair with regard to people's expectations.  So I

19    wonder whether or why it would be unfair to the plaintiff to

20    find in effect that the patent protection expired for these two

21    closely related patents in 2011 in view of the -- particularly

22    in view of the Federal Circuit's reasoning in Gilead.

23                Then this may be more for the defendant.  The

24    plaintiffs understandably argue that when they got the '471

25    patent they expected it provided protection until 2018 under
```

```
 1    the URAA.  Why shouldn't they get that?  As I understand it,

 2    the plaintiff does not contest for the purpose of this motion

 3    or does not contend for the purpose of this motion that the

 4    Section 121 safe harbor provision applies, but that should be

 5    confirmed or clarified.  In addition, it's my understanding

 6    that the plaintiff concedes the inventions claimed in the '471

 7    and '444 patents are not patentably distinct.  Again, that

 8    should be confirmed or clarified.

 9         Someplace in all of that you've written and previously

10:22 10  argued, I was educated to understand, that Remicade generates

11    revenue of more than a billion dollars a year and may cost

12    patients or their insurers $20,000 a year, but I don't know if

13    that's in the record before me for the purpose of this motion.

14    I think I asked you this previously, but has the PTO in the

15    reexamination held the '471 invalid for double patenting in

16    view of other patents than the '444?

17         So those are some of the questions.

18         It's the defendant's motion.  I'm inclined to decide

19    it in favor of the defendant.  You're probably intending to go

10:23 20  first?

21         MR. HURST:  I planned on it, Your Honor.

22         THE COURT:  All right.  Go ahead.

23         MR. HURST:  As we did last time, I have some

24    PowerPoint presentations here.

25         THE COURT:  Okay.  I would have been disappointed if
```

1  you didn't.

2          MR. HURST:  I don't know how many copies -- two,

3  three?

4          THE COURT:  Two.  We actually are probably going to

5  need a third to mark because my law clerk and I may mark these

6  up, so we'll make this PowerPoint presentation Exhibit A of

7  today's date.  It's not evidence for the purposes of the motion

8  for summary judgment; however, it will illustrate what's being

9  shown and discussed.

10:24 10          MR. HURST:  Do you need one?

11          THE COURT:  No.  That's okay.

12          MR. HURST:  I'm sorry.

13          Your Honor, this is our motion over *Gilead*.  Based on

14  your comments, I have some background information which I'll

15  hurry through.

16          THE COURT:  Okay.

17          MR. HURST:  And you tell me if it's too remedial,

18  given it does sound like you're pretty deeply into this.

19          This doesn't seem to be working.  Turning it on would

10:25 20  help.

21          You indicated that there were factual differences

22  between *Gilead* and this case, and there are.  We don't think

23  those factual differences are material, in part, Your Honor,

24  because all *Gilead* did is apply the bedrock principle of double

25  patenting to the post-GATT world.

Case 2:16-cv-01925-JAK-MRW  Document 69-1  Filed 04/13/17  Page 169 of 500  PageID: 1448
Case 1:15-cv-10698-MLW  Document 252  Filed 03/25/16  Page 12 of 194

12

1          THE COURT:  GATT is the URAA?

2          MR. HURST:  It is.  It's simpler to say.  Some people

3     refer to it as GATT and URAA.  I tend to say GATT.  So this

4     principle, it's a bedrock principle where patent system -- you

5     can find it literally in cases from the 1800s, that says that

6     when a patent expires, the public is free to use not only that

7     same invention but any obvious modifications.  And *Gilead* said

8     that the double patenting doctrine has always been implemented

9     to effectively uphold that principle.

10:26  10          What that means is when you get a patent, you make a

11    deal, and the deal is when that patent expires, you will not

12    stand in the way of the public's right to practice that

13    invention or any obvious modifications with a different patent.

14          THE COURT:  You'll get to this, but the plaintiff may

15    start by pointing out that, by its terms, the '471, which was

16    applied for in 1994, standing alone would expire in 2018.

17          MR. HURST:  Right.  That's true.  And one of the

18    things -- and I will get to it, but as long as you raised it,

19    what plaintiffs are relying on is a statute that existed since

10:27  20    well before GATT.  It actually has existed since -- is it 1961?

21    I have a slide for this.  It says you get a 17-year term on a

22    patent.  That has always been true, but that never insulates

23    patents from invalidity challenges, whether it's anticipation,

24    obviousness, lack of enablement or double patenting.  The

25    statutory term of a patent is not some insurance policy against

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 170 of 500 PageID: 1449
Case 1:15-cv-10698-MLW Document 202 Filed 08/25/16 Page 13 of 194

13

1    an invalidity challenge.  It's never been held to be.  And it

2    wouldn't really make sense, right?

3            So here's the situation.  As you noted, there's no

4    contention there's any patentable distinction between the two

5    patents.  This is slide 3.  Janssen has acknowledged that.  So

6    our situation is on the bottom.  The '444 patent term, it got

7    the term that it was entitled to get by law, and then it

8    expired in 2011.  So you got another seven years.

9            The problem is that when it expired, according to a

10:28 10   principle that's existed since the 1800s, the public had a

11   right to practice the '444 patent invention and similar

12   inventions, but there's a patent standing in the way, the '471

13   patent.  And literally since the 1800s, the law has been that

14   you can't do that; that second patent is invalid for double

15   patenting.  It's an extra seven years beyond the statutory term

16   that by law the '444 patent was entitled to.

17           Just a little bit of background in how this all

18   arises, Your Honor, I think it might be helpful for a little

19   context, how the world changed after GATT, right?  Before

10:29 20   GATT --

21           THE COURT:  G-A-T-T, for the record?

22           MR. HURST:  G-A-T-T, all caps.

23           So before GATT, it was, patents got 17-year terms from

24   the date of issuance, 17-year starts from the date of issuance.

25   So when courts were talking about double patenting, they often

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 171 of 500 PageID: 1450
Case 1:15-cv-10698-MLW Document 282 Filed 03/25/16 Page 14 of 194

14

1    talked about the earlier issued patent versus the later issued

2    patent.  And it made sense because it was just a proxy for

3    expiration.  If it was later issued, it had a later expiry.  If

4    it was earlier issued, then you had an earlier expiry.  So you

5    could find cases doing double patent analysis interchanging

6    those terms.  They would sometimes talk about the

7    earlier-expiring invalidating the later-expiring.  Sometimes

8    they'd say the earlier-issuing invalidating the later-issuing.

9    That was the issue in *Gilead*.

10:29 10        Should we be looking at issuance dates or expiry

11   dates?  Because in the post-GATT world -- am I, like, too basic

12   for you right now?

13        THE COURT:  No.  It's okay.  It's just confirming my

14   understanding.  I know the Federal Circuit wrote about this in

15   *Gilead*.  But it's okay.

16        MR. HURST:  But here is the -- it can flip now.  Under

17   the law, now it can flip.  Why?  Because you get 20 years from

18   your priority application, and the priority application might

19   have different -- there might be different priority

10:30 20   applications for the different patents.

21        And the patent term changes, too, because, say you

22   prosecute for five years, well, then you get a patent that only

23   lasts for 15 years.  If you prosecute for ten years, you only

24   get ten years, or in this case of the '444 patent, prosecution

25   lasted 13 years.  So Janssen is therefore entitled to seven

1   years.  But you have this flip.  So the question is raised.

2   What's the question?  The question --

3           THE COURT:  The prosecution, when you say it lasted 14

4   years, that's 14 years from 1991, but the application for the

5   '444 was filed in, what, 2001?

6           MR. HURST:  Yeah, I think the one that led directly to

7   the '444 patent, but the priority application was back in '91.

8           THE COURT:  Okay.  Which is also the priority

9   application for the '471?

10:31 10         MR. HURST:  Yes.  They have the same priority

11  application.  But here, what *Gilead* raises is a purely legal

12  issue in our view.  This legal issue, Your Honor -- this is

13  actually a quote.  This is slide 5.  It's actually a quote from

14  *Gilead*, except I put in '444 and '471.  "Can a patent," the

15  '444 patent, "that issues after but expires before another

16  patent, "the '471 patent," qualify as a double patenting

17  reference for that other patent?"  That is literally the issue

18  that *Gilead* addressed and it applies directly here.

19          But here is what I think it turns on, and I think you

10:31 20 actually alluded to it, Your Honor.  The question turns on

21  whether the standard rule from the 1800s applies to these three

22  different circumstances.  We're in the third circumstance.

23  Everybody agrees that the standard rule applies to two pre-GATT

24  patents.  Of course, it's been around since the 1800s.

25  Everybody agrees that that standard rule applies to two

post-GATT patents.  That's *Gilead*.

So the argument that Janssen is raising is what about one pre versus one post?  I've read through the briefs.  I'm not seeing any principled reason why there would be an exception here, but it would apply here in the second one.

THE COURT:  Well, I frame this somewhat differently perhaps than you do at least.  I think this is a question of statutory intent.  So the GATT is a statute, right?

MR. HURST:  Yeah.

THE COURT:  And Congress and the president to some extent but not completely addressed what to do in a transitional period.  So I think the statute said in 1995, for patents where the application directly leading to the patent was filed before 1995, that would be 17 years of patent protection the way there had been previously.

For patents where the application was filed after 1995, in fact, the date of the GATT, it would be 20 years from the priority date, right?  So it would have been very easy if Congress had addressed what happens in the factual scenario here.  The plaintiffs will argue we get the benefit of -- you know, Congress intended that we would get 17 years on the '471, and we should get 17 years.

MR. HURST:  Think of it this way, Your Honor.  All you're doing is you're pointing out the way you calculate how long a patent lasts.  That's all.  There were mechanisms for

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 174 of 500 PageID: 1453
Case 1:15-cv-10698-MLW Document 232 Filed 03/25/16 Page 17 of 194

17

1  counting how long a patent lasted prior to GATT.  There's a

2  mechanism for calculating how long patents last after GATT.

3  There's a patent -- there's a time period for both.  But none

4  of that changes the fact that double patenting is a separate

5  inquiry.  It's always been a separate inquiry.

6       Patent term calculations never thwart double

7  patenting, never has.  You would have to literally find that

8  Congress intended to overrule the doctrine of double patenting.

9  And there's really no basis for that.

10:35 10       In fact, literally this doctrine has been around since

11  the 1800s, and all *Gilead* said is, You know what?  There's no

12  reason to change the doctrine.  It still applies even in a

13  post-GATT world.

14       And here is what I mean.  When you look at the *Gilead*

15  opinion itself, the way they frame the issue in their holding,

16  their holding, the way they frame the issue and their

17  reasoning, it all applies directly to this case notwithstanding

18  the factual distinction that you point out, Your Honor.  Look

19  at the way they frame the issue.

10:35 20       THE COURT:  Hold on a second.  I'm just going to pull

21  out my copy of the decision.

22       Go ahead.

23       MR. HURST:  I think I misspoke before when I said that

24  the 17-year term has been in a statute since 1961.  It's

25  actually 1861.  And despite that statutory 17 years, patents

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 175 of 500 PageID: 1454
Case 1:15-cv-10698-MLW Document 252 Filed 03/25/16 Page 18 of 194

18

1    have been invalidated for double patenting for over 150 years.

2    So the way they frame the issue, they frame it in a way that

3    applies directly to this case.  "This appeal presents a narrow

4    question:  Can a patent that issues after but expires before

5    another patent qualify as a double patenting reference for that

6    other patent?"  That's literally the issue before Your Honor.

7            THE COURT:  But the plaintiff is going to tell me that

8    you didn't read the next line, which says, "We conclude under

9    the circumstances of this case that it can, and therefore the

10   District Court erred in excluding the '375 patent as a

11   potential double patenting reference for the '483 patent."  And

12   that's echoed in other places in the decision.  They say "in

13   these circumstances," which I think means with two post-GATT

14   patents, and therefore the issue hasn't been -- the issue

15   presented by the facts of this case hasn't been decided by the

16   Federal Circuit in a way that I'm obliged to follow.  It's an

17   open issue that I have to decide, subject to review.

18            Do you agree with that or do you --

19            MR. HURST:  I disagree with the conclusion that the

20   phrase "under the circumstances" has anything to do with

21   whether the two patents are post-GATT there versus one

22   pre-GATT, one post-GATT.

23            THE COURT:  So what do you contend "under the

24   circumstances" means?

25            MR. HURST:  It's actually -- to me, it's just a

1    reference to the circumstances of this case where you have one

2    patent, the patent that's later-expiring, versus another patent

3    that's not patentably distinct being earlier-expiring.

4    Different circumstances could lead to different results.

5            For instance, a terminal disclaimer.  A terminal

6    disclaimer would eliminate the double patenting.  If the safe

7    harbor had been available, you might have a different

8    circumstance, or if you had a situation where you had an

9    argument for that rare two-way test, you might have a different

10:38 10    result.  Nowhere in this decision that we see does the Federal

11    Circuit place any emphasis at all on the fact that both

12    patents' calculations for their terms happen to be post-GATT.

13            You said counsel would point out to me that I didn't

14    refer to the next sentence.  He couldn't have said that because

15    I was about to get to it.

16            THE COURT:  Okay.  Good.

17            MR. HURST:  So if you go to page 7, this is the

18    phrase.  "We therefore hold that an earlier-expiring patent can

19    qualify as an obviousness-type double patenting reference for a

10:39 20    later-expiring patent under the circumstances here."  The point

21    I was going to make is the one I just made, Your Honor, which,

22    there's literally nothing in the opinion that says, Well, we're

23    just talking about where one is pre-GATT and one post-GATT.

24    How do you know that?  Look at the actual holding.  I have it

25    on page 7.  You have your case in front of you.  I wish I had a

```
 1    more precise -- it's 1217.  What they say is, "Because the
 2    obviousness-type" -- shall I read it?  "Because the
 3    obviousness-type double patenting doctrine prohibits an
 4    inventor from extending his right to exclude through claims in
 5    a later-expiring patent that are not patentably distinct from
 6    the claims of the inventor's earlier-expiring patent."  That's
 7    a mouthful.
 8            THE COURT:  Hold on a second.
 9            MR. HURST:  Sure.
10            THE COURT:  I don't see that on page 1217.
11            MR. HURST:  My worry is that my point is for the
12    bottom quote.  It's 1210.  I apologize, Your Honor.
13            THE COURT:  1210.  Okay.
14            MR. HURST:  Okay.  But you don't have to guess about
15    what caused the court to reach this conclusion, and there's
16    nothing saying it's pre-GATT -- special circumstance is one is
17    pre-GATT and one is post-GATT, because I'm not going to reread
18    it, but they tell you, because the obviousness-type double
19    patenting doctrine works as it does, we agree with *Natco* that
20    the '371 patent qualifies as an obviousness-type double
21    patenting reference.  That first clause before the holding,
22    that applies directly here.  We have a situation where an
23    inventor extended his or her right to exclude through claims in
24    a later-expiring patent that are not patentably distinct, that
25    would be the '471, from the claims of the inventor's
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 178 of 500 PageID: 1457
Case 1:15-cv-10698-MLW Document 252 Filed 03/25/16 Page 21 of 194

21

1    earlier-expiring patent, the '444.

2            THE COURT:  I think your argument is that if we were

3    doing this before the GATT in 1995 and both patents had 17-year

4    life and the '444 expired first, then the '471 would be

5    invalid.

6            MR. HURST:  Yes.  And GATT doesn't change that.  And

7    here is the thing that I guess jumped out at me.  We've all

8    reread this opinion a bunch of different times, but because

9    it's so central, it's literally how you read this opinion, we

10:42 10   do think it's controlling, obviously.  I'm not making any

11   secret of that.  But look at some of the key things that the

12   court relied on.  This is throughout the opinion.  They are

13   saying that this prohibition against double patenting is based

14   on what they call a core principle, something the Supreme Court

15   established long ago, that "in exchange for a patent" -- this

16   is page 1212 -- "in exchange for a patent" --

17           THE COURT:  Wait a minute.  Which slide are you on

18   now?

19           MR. HURST:  Slide 8.

10:43 20         THE COURT:  Slide 8, okay.

21           MR. HURST:  They call it "a core principle of our

22   patent system that the inventor must" -- now I'm reading yellow

23   highlighting -- "inventor must promise to permit free use of it

24   at the end of his patent term.  The bar against double

25   patenting was created to preserve that bargained-for right held

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 179 of 500 PageID: 1458
Case 1:15-cv-10698-MLW Document 252 Filed 08/25/16 Page 22 of 194

22

1    by the public."  It's actually a condition of getting a patent

2    granted, that you agree when your patent expires you're not

3    going to stand in the way of the public practicing your

4    invention with a different patent.  You know what they cite for

5    that?  This is the United States Court, United States Supreme

6    Court, 1896, that core principle of our system.  This gets to

7    one of the issues that you raised when you were commenting on

8    the motion at the front end, Your Honor.

9         Janssen acted deliberately here.  This was not a

10:44 10   secret to them, okay?  They got the '471 patent in 2001.  They

11   made a deliberate decision to accept the '444 patent in 2004.

12   It's not relevant to the motion about why they did that, just

13   not relevant.  But you can surmise reasons one might do that.

14   They knew it was going to expire earlier.  They certainly knew

15   about the standard case law they're saying about the condition

16   and the promise to allow your invention to become publicly

17   available and you wouldn't stand in the public's way.  They

18   knew all of that.  Why would they do it?

19        It might be -- I'm just speculating here, and I do not

10:45 20   think it's relevant or material to the motion, but it might be

21   simply that they thought this would provide them an advantage.

22   They may have thought that the '444 patent was a better patent.

23   It's a narrower patent.  It didn't have the double patenting

24   invalidity problems that the '471 patent has.  The Patent

25   Office at this point in time, just to confirm what you

1    believed, the Patent Office has in fact held the '471 patent to

2    be invalid for double patenting.  Not over the '444 patent.

3    That's not before the Patent Office.  That's only before you.

4    But over two different patents.  The reexam patent we've been

5    talking about, '195, '272.  Maybe that's why.

6              THE COURT:  See, let me give you a chance to address

7    this.

8              MR. HURST:  Sure, I want to, yeah.

9              THE COURT:  In my present conception, the motive may

10:46 10   have some relevance.  In other words, if a statute was passed

11   and it continued the historic 17-year length of patent

12   protection for patents filed before 1995, and I think Congress

13   wanted to create a bright-line 20-year test for all patents and

14   probably treat people who had the reasonable expectation that

15   they'd get 17 years when they invested before 1995 in getting a

16   patent, that protection, so I may hear, you know, Congress

17   didn't want to treat people in that class unfairly.  But I

18   think this is, as I say, a matter of it's not so much inferring

19   statutory intent because they didn't address it.

10:47 20            MR. HURST:  Didn't address that, right.

21              THE COURT:  It's a gap.  But then there are certain

22   canons of statutory construction.  You look at the scheme.  So

23   to me, whether this is fair or unfair to Janssen has some

24   relevance, but I did -- you know, I have thought about, they

25   could have had 17 years and they would have taken the risk that

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 181 of 500 PageID: 1460
Case 1:15-cv-10698-MLW Document 262 Filed 08/25/16 Page 24 of 194

24

1       the '471 would have been found invalid for some reason.  Why

2       get the '444 which foreseeably would at least present this

3       issue and create uncertainty unless they felt they could get

4       something in return, and that is stronger patent protection for

5       a drug that at some point I've been told generates more than a

6       billion dollars a year in revenue.

7                  MR. HURST:  I think it's closer to four billion in the

8       United States.

9                  THE COURT:  Four billion dollars in revenue?  Is that

10:48 10  in the record?

11                 MR. HURST:  I don't think it's the record.  It's

12      close.

13                 THE COURT:  No.  I said is it in the record of the

14      motion --

15                 MR. HURST:  Oh, is it in the record.

16                 THE COURT:  -- for summary judgment?

17                 MR. HURST:  I don't believe it's in the summary

18      judgment record but it's in the record elsewhere in other

19      motions.

10:48 20            Let me address that, and I have I guess two points --

21      three points.  I'll make my quick ones first.  My quick point

22      is, my first quick point is, they did this with their eyes

23      open.  They knew what the law was; and whether they were hoping

24      that the law wouldn't apply post-GATT or not, they took that

25      risk for their own reasons, so they did it with their eyes

1    open.

2           My second point is, I think it would be a stretch to

3    say that Congress had any intent to do away with standard

4    double patenting law that's been around since the 1800s.  And

5    that's all *Gilead* did.  *Gilead* said we're going to apply a rule

6    that's existed forever to this post-GATT world.

7           Here is my third point, though, and I think it -- I

8    hope it addresses your question, your thoughts, pretty

9    directly.  Doesn't your logic, wouldn't your logic take things

10:49 10   way too far?  And I'll tell you why.

11          THE COURT:  My logic is part of the reason I'm

12   inclined to rule for you, but go ahead.

13          MR. HURST:  And I should -- the question you asked,

14   you said, Well, didn't Congress, when they said we're going to

15   give 17 years pre-GATT --

16          THE COURT:  That's a -- okay.  Go ahead.

17          MR. HURST:  You're repeating, Your Honor; I understand

18   that.  That same analysis, like Congress must have intended

19   that the 17 years would continue to be available regardless of

10:50 20   the calculation for patents post-GATT, that same argument was

21   available to *Gilead*, in the *Gilead* case.  Why?  Because

22   Congress created mechanisms for determining how long the

23   patents last.  And the patentee in *Gilead* made a similar

24   argument.  They said the world is different now post-GATT so

25   you should apply different rules.  And so they're saying I had

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 183 of 500 PageID: 1462
Case 1:15-cv-10698-MLW Document 282 Filed 08/25/16 Page 26 of 194

26

```
 1    an expectation in Gilead under the statute for calculating the
 2    terms that my later-expiring patent was going to get a date
 3    that was later-expiring.  I had that settled expectation, given
 4    what Congress did.  And yet Gilead invalidated the
 5    later-expiring patent for double patenting.
 6             So it's the same type of rationale, right?  There's no
 7    greater reason to say that a patentee who relies on the
 8    pre-GATT calculation has better protection against double
 9    patenting than a patentee who relies on the post-GATT
10:51 10    calculation for how long their patents last.  They both have
11    the same sort of argument that, gosh darn, I read the statute,
12    and I was entitled to believe my patent would last that long.
13    The easy response for that is, you got to read double patenting
14    cases to determine whether or not your patent is valid.  You've
15    got to read anticipation cases, obviousness cases.
16    Calculations for patent terms never insulate or provide
17    insurance to a patent against an invalidity filing.
18             It's not just Gilead.  Also, Your Honor, there are
19    later cases that confirm that Gilead's holding is what it is
10:51 20    and that it should therefore apply.  Because it's a really
21    simple, straightforward holding:  Does your later-expiring
22    patent claim the same or similar invention.  If so, if you
23    can't argue safe harbor, the patent is invalid, and they're not
24    arguing safe harbor.  But this is the AbbVie case from the
25    Federal Circuit 2014.
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 184 of 500 PageID: 1463
Case 1:15-cv-10698-MLW Document 282 Filed 03/25/16 Page 27 of 194

27

1          THE COURT:  Hold on a second.  I've got that right

2     here, too.

3          MR. HURST:  It's page 10 that I'm looking at of what

4     I'm looking at.

5          THE COURT:  What slide, please?

6          MR. HURST:  Slide 10.

7          THE COURT:  Okay.

8          MR. HURST:  So this was the situation in *AbbVie*, it

9     was actually related to patents owned by Janssen's predecessor,

10:53 10    Centocor.  This is *AbbVie*'s summary of *Gilead*.  So here is how

11    the issue arose.  There was a double patenting challenge.  It

12    was two post-GATT patents.  What the patentee argued in the

13    case, Your Honor, was in the post-GATT world, we should have a

14    different rule.  In fact, the patentee said, Let's do away with

15    double patenting altogether.  What they argued is that

16    pre-GATT, there was a lot of opportunities for gamesmanship

17    because you had a greater ability to determine issuance dates

18    and therefore a greater ability to determine expiry dates.

19         The patentee has less control post-GATT because it all

10:54 20    turns on when they filed the application, so there's less

21    opportunity during prosecution to manipulate the expiration of

22    the patent.  So what they argued is, in *AbbVie,* let's do away

23    with the double patenting altogether.  And what *AbbVie* held is

24    we now make explicit what was implicit in *Gilead*.  The doctrine

25    of obviousness-type double patenting continues to apply where

```
 1    two patents that claim the same invention have different

 2    expiration dates, and they're talking about the post-GATT

 3    world.  So they're literally saying what I believe Gilead said,

 4    which is, We're not going to do away with the double patenting.

 5    That standard black letter rule still applies into the future.

 6              THE COURT:  I don't recall the facts in AbbVie.  Were

 7    they again --

 8              MR. HURST:  Two post-GATT, two post-GATT.

 9              I guess the point I'm trying to make is, the way the

10:55 10  Federal Circuit addressed the issue is literally, Should we

11    apply the old rule even after GATT, and the court said in

12    really clear terms, Yes, it will continue to apply where two

13    patents that claim the same invention have different expiration

14    dates.  That is our situation.  We have two patents that claim

15    the same or obvious variations with different expiration dates.

16              We cited a series of District Court cases to Your

17    Honor.  They're not on-point cases, not at all, but we just

18    cite them to show -- until the one yesterday -- just to show

19    that people are reading Gilead the way that we're reading it.

10:55 20  The Federal Circuit has recently explained that expiration

21    dates, not issuance dates, are determinative, and that of

22    course is contrary to Janssen's argument here.

23              I'm sure you read the MLC case that we sent yesterday.

24              THE COURT:  I read note 4.  I didn't study the case.

25              MR. HURST:  So note 4 is really the only part of the
```

opinion that addresses the issue that we are faced with here

before Your Honor. But the point here is the court here read

*Gilead* the exact same way as we do and actually addressed quite

specifically this contention that *Gilead* can be distinguished

based on the fact that there was one pre-GATT and one post-GATT

patent. I mean, the Northern District of Illinois -- sorry,

the Northern District --

            THE COURT: California.

            MR. HURST: -- of California, right. They refute this

in the ways that we're arguing. They say, No, no, look at

*Gilead*'s holding. It applies directly to both situations, both

two post-GATT or one pre-GATT and one post-GATT. They quote

*Gilead,* an earlier-expiring patent can qualify as an

obviousness-type double patenting reference for a

later-expiring patent. And they say the fact that the patent

in *Gilead* was governed by the URAA was not relevant to the

court's reasoning. *Gilead*'s holding was based on the principle

that -- and this is the principle I've been emphasizing -- when

a patent expires the public is free to use not only the same

invention claimed in the expired patent but also obvious or

patentably indistinct modifications.

            That is our situation. The '471 is blocking the

public's right to practice the '444 patent. So there's a few

things that made me -- let me address some of Janssen's

particular arguments. One of the things that Janssen has

1    argued to Your Honor is, the differences in term -- this is

2    slide 12 -- the differences in terms between the '471 and the

3    '444 are due entirely to the change in the law, not any

4    improper actions by Janssen.  That's the argument that they

5    made.

6              Your Honor, that is exactly the argument that the

7    patentee made in *Gilead,* and the District Court accepted it.

8    This is from the Federal Circuit's opinion, *Gilead.*  "In the

9    District Court's view, any extensions of the patent terms at

10:58 10   issue were not unlawful because the extensions were not a

11   result of gamesmanship but instead were a result of changes to

12   patent laws."

13             So when Janssen says, Hey, there was a change in the

14   law; this isn't our fault; that's literally the position that

15   the *Gilead* patentee made and the position that the District

16   Court accepted, that it was really just a change in the law,

17   and of course the Federal Circuit reversed.  So it's the same

18   argument.

19             Another thing that Janssen says to Your Honor is you

10:58 20   should look at the *Abbott* and *Brigham* cases.  These were two

21   District Court cases decided before *Gilead.*

22             THE COURT:  Right.

23             MR. HURST:  And the Federal Circuit in *Gilead*

24   literally cited those cases.  It said, relying on two District

25   Court cases, "the District Court below concluded that a

1    later-issued but earlier-expiring patent cannot serve as a

2    double patenting reference."  That's the exact premise --

3    that's the exact holding that the Federal Circuit reversed in

4    *Gilead*.  But here is -- to one of your other questions, Your

5    Honor, as a footnote, I believe that sentence, I believe this

6    sentence -- but I -- actually, I'm not 100 percent sure now --

7    there was a citation to *Pfizer*.

8              THE COURT:  Hold on a second.

9              MR. HURST:  Let me see if I'm right about that.

10:59 10        THE COURT:  I think the citation to *Pfizer* is later.

11             MR. HURST:  I'm being told, yes, it is later.  It's

12   note 2.

13             THE COURT:  Right.  It is actually a note to --

14             MR. HURST:  It is.

15             THE COURT:  It is a note to the *Brigham* and *Abbott*

16   cases.

17             MR. HURST:  I should have trusted my memory on that.

18             So anyway, look, there's no question there was

19   uncertainty about this before *Gilead* came out.  I freely

11:00 20  acknowledge that.  Folks were wondering whether post-GATT

21   double patenting would be applied in the same way.  And two

22   District Courts said, No, it's not going to be.  Obviously

23   *Gilead* disagreed with that.

24             But here is the part that -- right after citing those

25   two District Court cases, I think it's fair to say that the

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 189 of 500 PageID: 1468
Case 1:15-cv-10698-MLW Document 282 Filed 03/25/16 Page 32 of 194

32

 1    Federal Circuit sort of chastised the District Court a little

 2    bit.  The District Court did not cite ex parte *Pfizer*.

 3              THE COURT:  Well, it may be that the parties didn't

 4    cite it to the District Court.  All right.  I didn't view -- go

 5    ahead.

 6              MR. HURST:  Your Honor, that was my reading, and it

 7    might be wrong.  But they said the District Court relied on

 8    these two District Court decisions, but the District Court

 9    didn't cite the contrary decision in *Pfizer*, and *Pfizer* goes

11:01 10    exactly our way in the exact same circumstances.  There was one

11    pre-GATT patent and one post-GATT patent.  And no reason to go

12    through it, but the Federal Circuit summarizes *Pfizer* in a way

13    that exactly repeats their reasoning for the overall decision.

14              THE COURT:  What do you think the significance of that

15    is for this case?

16              MR. HURST:  I think the significance of that is that

17    the Federal Circuit is saying in parallel, while they are in

18    this case dealing with two post-GATT patents, they're citing

19    with approval *Pfizer,* which deals with one post-GATT, one

11:01 20    pre-GATT, and they describe the court's decision in exactly --

21    it's a perfect summary of their own holding.

22              THE COURT:  Well, I don't know if it's a perfect

23    summary of their own holding.  It seems to me that it

24    communicates that the Federal Circuit was aware that the

25    factual scenario in this case could arise and was signaling,

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 190 of 500 PageID: 1469
Case 1:15-cv-10698-MLW Document 282 Filed 03/25/16 Page 33 of 134

33

```
 1    even if it didn't have that factual scenario before it, that it

 2    would decide the issue the same way.

 3              MR. HURST:  I think that's a fair reading of it, but I

 4    think it's even more direct than that, just because the holding

 5    was broad enough to cover this case.  The issue presented was

 6    broad enough to cover this case.  All of its rationale is broad

 7    enough to cover this case.  Look how they describe *Pfizer*.

 8    They describe it as if it's addressing the exact same issue as

 9    they're seeing no distinction between *Pfizer*'s case and our

11:02 10  case.

11              They say, "According to the board, it was the patent

12    term and not the patent issue date that determines if a claim

13    qualifies as a double patenting reference.  The later-expiring

14    patent in the board's opinion would impermissibly block the

15    public from practicing the invention."  That's the argument

16    we're making here.  Then they go on to say, "which is precisely

17    what obviousness-type double patenting was intended to prevent,

18    an extension of the patentee's right to exclude the public from

19    practicing the invention of an expired patent."

11:03 20            THE COURT:  And the language comes from the decision

21    of the Board of Patent Appeals.

22              MR. HURST:  True.

23              THE COURT:  And it's quoted in *Gilead*.

24              MR. HURST:  The Federal Circuit chose to quote a core

25    principle from the *Pfizer* Board of Patent Appeals decision that
```

Case 2:16-cv-01925-JMV-MF   Document 69-1   Filed 04/13/17   Page 191 of 500 PageID: 1470
Case 1:15-cv-10698-MLW   Document 252   Filed 03/25/16   Page 34 of 194

34

1    they then themselves relied on to reach their own holding that

2    was perfectly consistent.

3         Here is another one of the things -- I said before,

4    when you read this opinion, all of its rationale and reasoning

5    and the bases for these opinions applies here as well.  Here is

6    one of the points that the District Court -- I'm sorry, that

7    the Federal Circuit made in *Gilead*.  They said, Look, if you're

8    telling me I ought to rely on issuance dates rather than

9    expiring dates, anomalies could occur.  This is slide 16.  "If

11:04 10   the double patenting inquiry was determined by issuance date

11   for post-URAA patents, there could be a significant difference

12   in the inventor's period of exclusivity over his invention and

13   its obviousness variants based on mere days' difference in the

14   issuance of several patents to the inventor."  So what they're

15   pointing out is there are a lot of problems with looking at

16   issuance dates rather than expiration dates, and these

17   anomalies could occur.

18        Janssen is arguing to Your Honor to rely on issuance

19   dates for the '471 patent and that would create the same kind

11:04 20   of anomalies.  Let me show you why.  Here is what they said.

21   Janssen says the '471 patent issued first and that is the end

22   of the matter.  Okay?  So just adjusting the dates a little bit

23   to make my point, my top graphic here, it has the '471 issued

24   first by one day.  So taking Janssen's rule, this seven years

25   of extra exclusivity doesn't amount to double patenting because

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 192 of 500 PageID: 1471
Case 1:15-cv-10698-MLW Document 252 Filed 03/25/16 Page 35 of 194

35

1    the '471 issues first by one day.

2             THE COURT:  You mean if it straddled the --

3             MR. HURST:  Well, it issued first before the '444

4    patent.  So let's say the '444 patent issues one day after the

5    '471 patent, just one day, according to Janssen, that's all

6    you've got to look at.  The '471 patent issued first, and that

7    is the end of the matter.

8             THE COURT:  I think it's fair to say that the '471

9    issued first and was applied for before 1995.

11:05 10         MR. HURST:  It doesn't matter when it was applied for

11    because, according to -- the '471 patent gets its terms based

12    on issuance date because it's pre-GATT.  Janssen has argued on

13    issuance dates under this particular circumstances.  So expiry

14    dates to pre-GATT, expiry dates to post-GATT, issuance dates,

15    that's their argument.  You ought to look at the issuance date

16    for the '471 patent.  That's their argument.  They're literally

17    saying the '471 patent issued first, and that ought to be to be

18    the end of the matter.

19             To say it issued first by just one day, according to

11:06 20    Janssen, no double patenting.  How about if it issues second by

21    one day?  According to Janssen, that argument would be gone,

22    and there would be double patenting.  The same anomalies that

23    the Federal Circuit was saying render it nonsensical or

24    unadvisable to focus on issuance dates would also apply here

25    because you see the same anomalies.

Case 2:16-cv-01925-JMV-MF  Document 69-1  Filed 04/13/17  Page 193 of 500 PageID: 1472
Case 1:15-cv-10698-MLW  Document 282  Filed 08/25/16  Page 36 of 194

36

1    Just the last few slides.  I know you've read the

2    opinion with care, so I'm not going to spend a lot of time on

3    this.

4         THE COURT:  That's okay.

5         MR. HURST:  One of the things Janssen is saying, it's

6    crystal clear from reading this opinion -- I'm not remembering

7    the exact quote, but they're saying it's super clear from

8    reading this opinion that the Federal Circuit was absolutely

9    limiting its decision to two post-GATT patents.  But when you

11:07 10    read through this decision, there's nothing in there that

11   supports that proposition.  They've decided the case on bigger

12   principles, principles that have been around for 150 years.

13   But look at some of the quotes that Janssen is relying on in

14   their sur-reply brief.  They quote this sentence.  You know

15   what, Your Honor?  I'm getting a little bit ahead of myself,

16   and I apologize.  So let me -- and I apologize for this, okay?

17        THE COURT:  It's okay.

18        MR. HURST:  Another argument is there was no

19   gamesmanship or abuse here.  That's one of the arguments.  No

11:08 20   gamesmanship or abuse.  I've said before that's not a relevant

21   inquiry, whether there was or was not gamesmanship or abuse,

22   but that's the argument that Janssen is making.  You should

23   find there's no gamesmanship and therefore no double patenting.

24   But that literally is what happened below in *Gilead*.

25        THE COURT:  I know.  In *Gilead* the District Court

 1    relied on the fact there was no gamesmanship.

 2         MR. HURST:  Right.

 3         THE COURT:  Although gamesmanship is not a --

 4    gamesmanship, the courts shouldn't endorse or abet something

 5    that's inequitable.  If somebody tries to -- I think this is

 6    what I had in the *Columbia MDL Litigation*, where an application

 7    was filed like the day before the effective date of the GATT

 8    and got 17 years on a patent that everybody thought was

 9    expired.

11:09 10         But here, as I say -- and I hope the plaintiff will

11    address it, and you address it.  You know, it seems to me they

12    took a foreseeable risk when they got the '444, which they knew

13    would expire in 2011, and that is that the '471 would be deemed

14    to expire in 2011, too.  And they evidently, you know, a big

15    sophisticated firm of good lawyers, you make a judgment that

16    it's worthwhile; it's worth the risk.

17         And I mean, it seems to me that in some respects the

18    risk has paid off because there's been five years of -- the

19    '444 expired in 2011.  We're arguing about the '471 in 2016.

11:10 20    That's five years, if you're right that they've had revenues of

21    $4 billion a year, that's $20 billion during this period of

22    uncertainty.

23         I don't know -- my understanding of patent law is it's

24    intended to give inventors clear notice of what they can do and

25    what they can't do.  Here is the invention.  You can invent

1    around it or license it.  Here is the expiration date, which I

2    thought the Federal Circuit in *Gilead* emphasized considerably.

3    We want a stable, clear expiration date.  I think it's your

4    argument that in view of the historic doctrine of double

5    patenting, people reasonably skilled in the art would know

6    after 2011 we can do what would have violated the patent,

7    infringed the patent before 2011.  Indeed, your client

8    evidently did that.  You might argue that that it's in the

9    public interest to do that because you have competition.

11:11 10         MR. HURST:  Yeah.  I think that's a probably a good

11   way to summarize it.  There was a foreseeable risk.  People

12   knew the law and people knew what the expiration dates would

13   be.

14        I just want to address, though, this notion that there

15   has to be some inquiry into whether there was -- what people's

16   motives were, what their intent was, whether they were gaming

17   the system, whether they weren't.  I think the *AbbVie* case

18   really puts this to bed a little bit.  I mentioned this before,

19   but this is the case where Centocor argued let's do away with

11:11 20   double patenting altogether, and they said -- they argued to

21   the Federal Circuit there was no gamesmanship here.  There's

22   less opportunity for gamesmanship post-GATT.  So do away with

23   double patenting.  They literally argued to do away with it

24   altogether.  And their main argument was there was no

25   gamesmanship here, and there's no opportunity for gamesmanship

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 196 of 500 PageID: 1475
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 39 of 194

39

1    or less opportunity for gamesmanship post-GATT.

2         *AbbVie* rejected that.  They said -- and this is slide

3    19, "but this argument about gamesmanship ignores another

4    crucial purpose of the doctrine.  It is designed to prevent an

5    inventor from securing a second, later-expiring patent for the

6    same invention.  That problem still exists."

7         So what they're saying is with or without

8    gamesmanship, you still face the problem of violating that

9    bargain, that bargain that when the first patent expires, you

11:12 10    can't use another patent to block the public's right to

11    practice the same or similar inventions.

12         Slide 21, I'm just getting to the point we talked

13    about before.  "Janssen argues that the '471 patent is

14    expressly guaranteed by statute a 17-year term from the date of

15    its issuance."  That's obviously not true.  That 17-year term

16    has been around since 1861 and patents have been following

17    regularly since then.

18         There's a terminal disclaimer argument, Your Honor.

19    Would you like me to address that?  It seems pretty

11:13 20    straightforward.

21         THE COURT:  You can, but I actually -- sure, you can.

22    I thought it didn't have any relevance in this case.  Go ahead,

23    address it, address it.

24         MR. HURST:  One of the things that Janssen has argued

25    is we filed this sort of funny terminal disclaimer in

```
 1   connection with the '444 patent.  What they said is as long as
 2   -- we will only enforce the '444 patent as long as it's
 3   commonly owned with the '471 patent.  That doesn't do away with
 4   double patenting problems.
 5        Double patenting -- the primary concern of double
 6   patenting is this artificial extension beyond the patent's
 7   expiry for the same or similar inventions.  That's what Gilead
 8   said.  "A terminal disclaimer should be permissible to overcome
 9   the prohibition of double patenting when it aligns the
10   expiration dates of an inventor's several patents that claim
11   mere obvious variations of the same invention to create a" --
12        THE COURT:  What slide are you looking at?
13        MR. HURST:  22.  The bottom line is you can avoid
14   double patenting simply by giving up on the extra patent term.
15        THE COURT:  Right.  The terminal disclaimer to be
16   effective, to have an impact in this case you argue, would have
17   had to provide that the '471 expire in 2011.
18        MR. HURST:  Exactly.  That's what Gilead, and many
19   cases recognize this; that in order to avoid a double patenting
20   problem you have to give your two patents the same expiration
21   date, such as, for all practical purposes, it creating a
22   situation where all the claims are in one patent.  So that's
23   what you have to do, and they did not do it, intentionally, of
24   course, when they made that decision.
25        So this was getting to my point that I got ahead of
```

1    myself on a little bit.  I think it's not -- Janssen, as they

2    argue that it's clear that this was only a case about two

3    post-GATT patents, they cite a bunch of snippets where the

4    Federal Circuit is referring to the URAA.  But when you

5    actually read those quotes, none of those quotes even suggest

6    in my mind this notion that *Gilead* was placing any importance

7    whatsoever on the fact that one of the patents was -- both of

8    the patents were post-GATT.

9        Here is one sentence that Janssen relies on.  "For

11:15 10   double patenting inquiries, looking to patent issue dates had

11   previously served as a reliable stand-in for the date it that

12   really mattered, patent expiration.  But as this case

13   illustrates, that tool does not necessarily work properly for

14   patents in which the URAA applies."

15       That sentence applies here, too.  Because here the

16   issue dates are not a reliable stand-in for patent expiration

17   dates.  So the same concept that *Gilead* was talking about there

18   also applies here.  Same thing.  Here is another one.  Janssen

19   relies on this quote.  "Using the expiration date as a

11:16 20   benchmark in post-URAA cases of obviousness-type double

21   patenting preserves the ability of inventors to use a terminal

22   disclaimer of a later expiring patent to create one expiration

23   date."

24       Your Honor, that same concept applies here.  If you

25   focus on expiration dates, it preserves the ability for

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 199 of 500 PageID: 1478
Case 1:15-cv-10698-MLW Document 262 Filed 03/25/16 Page 42 of 194

42

1   inventors to use terminal disclaimers to disclaim the later

2   term.  And each sentence can apply here.  So each sentence

3   they're relying on to say *Gilead* is different applies here 100

4   percent.

5       So let me summarize.  I believe that *Gilead* just said,

6   simple as this, We're going to apply that century-old bedrock

7   principle into the future.  That's the way I read *Gilead*.

8   That's the way I read *AbbVie*.  That's the way the Northern

9   District of California last week read *Gilead,* too.  To me,

11:17 10   there's no principled reason to draw an exception here,

11   particularly when Janssen invoked this bargain, this deal when

12   they took the '444 patent, and that deal, which has been around

13   forever, is that when it expires, they promise not to have

14   another patent or get another patent that would stand in the

15   way of the public's right to practice that '444 invention or an

16   obvious modification.

17       THE COURT:  All right.  Thank you.

18       MR. HURST:  Can I just mention one quick thing?  You

19   were asking for a cite for -- yes, you were asking for a cite

11:18 20   for where there's billions of sales.  I have one.  It's a

21   statement by Janssen, docket 200, and I believe it's paragraph

22   155.

23       THE COURT:  Is that on this motion or another related

24   motion?

25       MR. HURST:  It's on the related -- it's the reexam

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 200 of 500 PageID: 1479
Case 1:15-cv-10698-MLW Document 262 Filed 03/25/16 Page 43 of 194

43

```
     1   summary judgment motion.  "Billions in sales and most

     2   successful product," I believe the quotes were.

     3          THE COURT:  Has somebody told me somewhere that

     4   patients pay $20,000 a year for this?

     5          MR. HURST:  I believe I did, and I think that's the

     6   number I had at the forefront of my mind when we were last

     7   before you, but I believe that's correct.

     8          THE COURT:  All right.  We'll take a short break, and

     9   you'll --

11:19 10        MR. HURST:  Try to confirm.

    11          THE COURT:  One of the many lawyers here might look

    12   for it.  I don't know if that's in the record for the purposes

    13   of summary judgment either.

    14          Here, it's 11:20.  We're going to take about a

    15   five-minute break, maybe a few extra minutes, and then I'll

    16   hear from Janssen.

    17          Court is in recess.

    18          (Recess taken 11:19 a.m. to 11:30 a.m.)

    19          THE COURT:  You may proceed.

11:30 20        MR. DISKANT:  Thank you, Your Honor.  We're switching

    21   electronic systems, Judge.  Thank you.  We, too, have handouts.

    22          THE COURT:  I'll make the plaintiff Janssen's slides

    23   on this Exhibit B.

    24          MR. DISKANT:  Thank you, Judge.

    25          Let me start, if I may, with some general remarks in
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 201 of 500 PageID: 1480
Case 1:15-cv-10698-MLW Document 252 Filed 03/25/16 Page 44 of 194

44

<p style="margin-left: 2em;">1   light of some of Your Honor's general remarks and then turn to</p>

2   the argument.  First, I know from what you said just a few

3   moments ago and what you said at previous hearings that Your

4   Honor is quite interested, legitimately so, in low-cost

5   medicine to patients, and I completely understand that.

6         THE COURT:  It's not -- let me say something else and

7   then you can finish what you were saying.  It's not my -- I

8   don't have the power or the responsibility to decide what's

9   good policy.  However, in discerning legislative intent, I

11:31 10   think whether something makes sense may have some relevance.

11   Anyway, go ahead.  Say what you were going to say.

12         MR. DISKANT:  I'm not quarreling with that.  It is in

13   society's interest to make low-cost medicines available to

14   patients.  That is an interest.  But as Your Honor well knows,

15   the competing interest in the patent system is to encourage

16   innovation, risky innovation, and provide protection for it.

17         THE COURT:  In fact, that's something I meant to ask

18   all of you.  I'm going to ask it in the next motion.  In 2000

19   in *Biogen v. Berlex*, before I started the *Markman* analysis I

11:32 20   said, you know, these are the goals of the patent system, to

21   provide inventors with sufficient incentive to invest,

22   sometimes make expensive risky investments, so give them

23   sufficient protection and then to give clear notice of what the

24   invention is so potential competitors can know what's protected

25   and what's not.  And then after a reasonable period to give the

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 202 of 500 PageID: 1481
Case 1:15-cv-10698-MLW Document 282 Filed 03/25/16 Page 45 of 194

45

1   public the right to practice the invention and compete with the

2   inventor.

3          MR. DISKANT:  Right.

4          THE COURT:  Is that essentially still it?

5          MR. DISKANT:  That's it, that's exactly right.  The

6   only points I'd like to make with respect to that are that

7   developing drugs is extremely expensive.  The average cost

8   today is $2.3 billion.  Johnson & Johnson invests $9 billion

9   every year in R and D, most of which is wasted.  So there's a

11:33 10   lot on the other side of the ledger if you want these medicines

11   which are revolutionary.

12          And I should tell Your Honor, because it so impressed

13   me when I first saw it, Remicade is a novel biological.  I've

14   seen a video of the first patient with rheumatoid arthritis to

15   be treated with Remicade.  And in the video, the woman staggers

16   down a staircase, holding on.  She's so crippled, she can

17   barely move.  Three months later, she literally dances down the

18   stairs and does a pirouette.  That's what this drug can do.

19   That's why it's been so successful.

11:34 20          It's expensive because the R and D is expensive, but I

21   think Your Honor also needs to know, and it is in the record,

22   that when competition comes, the savings are not by and large

23   going to be felt by patients.  They're going to be felt by

24   insurance companies.  Because the co-pay isn't going to change,

25   the insurance companies will save the benefit, and for people

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 203 of 500 PageID: 1482
Case 1:15-cv-10698-MLW Document 252 Filed 08/25/16 Page 46 of 194

46

          1    who are uninsured, Johnson & Johnson has always made various

          2    programs available to get the drug to people who need it.  So I

          3    know that cost is a large number, but it's just not correct to

          4    think about this as a savings going to go to patients.  I know

          5    in the end that doesn't have any bearing --

          6              THE COURT:  Well, we live in a country that, you know,

          7    sort of generally believes in price competition ordinarily.

          8              MR. DISKANT:  Mm-hmm.  I completely agree.  I'm just

          9    commenting on --

11:35    10              THE COURT:  No.  Certainly as a citizen, I think also

         11    a judge, I'm very interested to hear and be reminded of some of

         12    it.  Thank you.

         13              MR. DISKANT:  That's just true.  A couple of other

         14    just introductory comments that bear on questions that Your

         15    Honor asked earlier today.  This is not a safe harbor case.  We

         16    are not arguing in this case that the '444 is patentably

         17    distinct from the '471.  So those issues aren't here.

         18              Lastly, Mr. Hurst said it, but I want to say it also,

         19    the Patent Office has not found the '471 patent invalid over

11:35    20    the '444 patent.  That issue has not been raised in the reexam.

         21    That has never been found.

         22              THE COURT:  What I understood was it so far found the

         23    '471 invalid as compared to the patents I'll be looking at in

         24    the reexam issue.  Is that correct?

         25              MR. DISKANT:  That's correct, but so far it shouldn't

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 204 of 500 PageID: 1483
Case 1:15-cv-10698-MLW Document 252 Filed 03/25/16 Page 47 of 194

47

|      |      |                                                                       |
|------|------|-----------------------------------------------------------------------|
|      | 1    | imply that the '444 is on its screen.  There is no '444 patent        |
|      | 2    | at issue in the Patent Office.  This issue exists only in this        |
|      | 3    | court.                                                                |
|      | 4    | So with that, let me begin.                                           |
|      | 5    | Woops.  Didn't work.  There we go.  Now it's working.                 |
|      | 6    | Okay.  Let me just do a primer on obviousness-type                    |
|      | 7    | double patenting.                                                     |
|      | 8    | Why isn't it working?  It's fallen asleep, I'm told.                  |
|      | 9    | I'm sorry.                                                            |
| 11:36| 10   | THE COURT:  I thought it was me.                                      |
|      | 11   | MR. DISKANT:  It's not working.  I'll try again.  Yes.               |
|      | 12   | Okay.                                                                 |
|      | 13   | So this is a quote from a pre-*Gilead* case.  "The                    |
|      | 14   | judicially created doctrine of obviousness-type double                |
|      | 15   | patenting prohibits a party from obtaining an extension of the        |
|      | 16   | right to exclude through claims in a later patent that are not        |
|      | 17   | patentably distinct from claims in a commonly owned earlier           |
|      | 18   | patent."  The words I want to emphasize there are "prohibits a        |
|      | 19   | party from obtaining an extension of the right to exclude."           |
| 11:37| 20   | Because before *Gilead* and after *Gilead*, that is the idea.         |
|      | 21   | And if you look, Your Honor, at the *Gilead* opinion                  |
|      | 22   | which you discussed with counsel earlier today, in the second        |
|      | 23   | paragraph, the next to last sentence reads, "Because the             |
|      | 24   | obviousness-type double patenting doctrine prohibits an               |
|      | 25   | inventor from extending his right to exclude through claims in        |

```
 1    a later-expiring patent, they're not patentably distinct from
 2    the claims of the inventor's earlier-expiring patent."
 3          We agree that the '375 patent is an obviousness-type
 4    double patenting reference.  Extending the right to exclude,
 5    that's the idea; and when you get into the cases, it's
 6    unjustifiably extending the right to exclude, and that's a
 7    fundamental problem with the entire argument over there,
 8    because you cannot craft a coherent sentence that says the '444
 9    patent extended the '471 patent.  It didn't extend it.  The
10    '471 patent already existed.  It expired later.  It didn't --
11    the '444 patent didn't extend it, and it certainly didn't
12    unjustifiably extend it because the difference in term was set
13    by Congress.
14          THE COURT:  But something that's come -- perhaps
15    you'll get to this.  Something that's come into sharper focus
16    as a result of the defendant's argument is Congress legislates
17    presumably in the context of a known body of law.  Part of that
18    law was, in 1995, obviousness double patenting.
19          MR. DISKANT:  Right.
20          THE COURT:  So I think the defendant is arguing
21    there's nothing in the legislation that manifests an intent to
22    alter that, and in Gilead, the Federal Circuit says that a
23    later-issued patent can be a reference for an earlier-issued
24    patent.
25          MR. DISKANT:  That's correct, Your Honor.  But the
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 206 of 500 PageID: 1485
Case 1:15-cv-10698-MLW Document 282 Filed 03/25/16 Page 49 of 194

49

```
 1    key -- and I will show this as we go through it -- before

 2    Gilead and after Gilead, the ultimate question is whether the

 3    '444 patent in our case is extending the right to exclude.  So

 4    that's what Congress legislated against.

 5              THE COURT:  I think the defendants will say it would.

 6              MR. DISKANT:  They don't talk about -- I'm sorry.

 7              THE COURT:  Anyway.  Go ahead.  Go ahead.

 8              MR. DISKANT:  They don't talk about extending.

 9    They're not going to utter a sentence that says the '444 patent
```
11:40
```
10    extends the term of the '471 patent.  It doesn't.  And so when

11    Congress legislates, yeah, that's what it legislated against,

12    and when Congress, not in the 1800s, but when it wrote the GATT

13    legislation, it has a special provision that talks about the

14    longer of two terms.  And that's essentially extending the

15    term.  Do we take the shorter term or longer term?  The

16    extension that Congress granted is the longer term.  So that is

17    the conflict.

18              THE COURT:  And you had that until 2004, I think, when

19    the '444 was issued.  If you had wanted, without any question
```
11:41
```
20    like this one, to have a term until 2018, you wouldn't have got

21    the '444.

22              MR. DISKANT:  Well, that's true, but it's

23    linguistically -- it doesn't scan to say that the '444 extended

24    the term of the '471.  And there's been argument about it and

25    Your Honor's been interested in why didn't we apply for the
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 207 of 500 PageID: 1486
Case 1:15-cv-10698-MLW Document 252 Filed 08/25/16 Page 50 of 194

50

'444.  I've got to tell you there's nothing in the record on

this subject.  If Your Honor thinks that matters, we're not

ready to talk about summary judgment.  I personally don't think

it matters, but I should at least say that big companies like

Johnson & Johnson and like Pfizer have teams and teams of

patent lawyers who write patents on variants of their

inventions, and they're subject -- in this case, the '444 was

subject to policing by the Patent Office.  It issued a double

patenting rejection of the '444 patent under existing law,

11:42 which is, it's going to be the later patent.  If there's a

problem it's with the '444.  You need a terminal disclaimer.

And we issued a terminal disclaimer.  And in terms of taking

risks, the body of law that we're talking about didn't exist

until 2010 when we applied for the --

THE COURT:  I'm sorry.  What body of law is that?

MR. DISKANT:  The body of law that is now the *Pfizer*

case, the two District Court cases from pre-*Gilead*, *Gilead*, all

these cases apply a different form of analysis.  Prior to 2010

the only analysis in double patenting law was which patent

11:42 issued later.  That was it.  And so because the '471 issued

first, there was no issue.  There was no risk being taken.  It

was an after developed body of law.  I understand bodies of law

can change, but it doesn't mean when we applied for the '444 we

were taking any sort of risk at all under existing doctrine.

Anyway, let me proceed, if I may.  There are two

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 208 of 500 PageID: 1487
Case 1:15-cv-10698-MLW Document 232 Filed 03/25/16 Page 51 of 194

51

1    justifications for double patenting.  One, unjustified

2    time-wise extension, unjustified extensions.  The second is

3    multiple infringement suits by the same inventor.  It's always

4    considered a secondary issue.  I agree with that.  It

5    doesn't -- it's not an issue in our case.  But it's the other

6    reason that these things exist.

7         And if you care, I'll just give you an example of why

8    the issue exists.  If you have two patents that are patentably

9    indistinct, I own them both, well, I can sue -- but what if I

11:44 10   sell one of them to my next-door neighbor?  So now two

11   patentably indistinct patents are owned by two separate people

12   and there could be vexatious litigation.  That's the other

13   reason for the doctrine.  And the terminal disclaimer that we

14   signed takes that out of play.  We agreed we would not separate

15   ownership.

16        So here we've got the issue in this case, which is how

17   to analyze these two justifications in double patenting

18   doctrine in light of this -- when the only difference in term

19   is the result of the change in the law and not something that

11:44 20   the patentee did to extend term.  So here are the -- I'd like

21   to just talk for a moment about before and after the URAA.

22   Before the URAA, going back as Mr. Hurst says 100 years or

23   more, 17-year term from issue; that was the law.

24        So this illustration shows what double patenting was

25   concerned about.  It was concerned about an applicant -- in

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 209 of 500 PageID: 1488
Case 1:15-cv-10698-MLW Document 252 Filed 03/25/16 Page 52 of 194

52

1    this illustration, patent B -- manipulating the issue date to

2    make the term longer, like this.  I don't know if the image

3    that we printed shows the change.  It may or may not.  But this

4    is manipulation.  You're in the Patent Office.  You have two

5    patents, and you stall one of them, and you stall it so that it

6    issues later.  And lo and behold, patent B has a longer term

7    than patent A even though they're indistinguishable.  That's

8    double patenting.  That's the problem that it's addressing, and

9    that's what the courts talk about, several sequential patents

11:46 10  on the same invention.

11        After the URAA, things changed because the issue date

12   didn't matter any longer for term.  After the URAA what

13   mattered for patent term was the priority date.  And the

14   priority date may be the date you file it, but it may relate

15   back to an even earlier patent.  So now I'm illustrating two

16   patents, patent A and B, and in this example, patent B issued

17   first, so there would be, under preexisting law, no worries

18   about double patenting.  But the *Gilead* court recognized that

19   there was a different kind of manipulation possible after the

11:46 20  URAA, and that was the priority date.

21        So now I'll illustrate here the later filing.  And by

22   manipulating the priority date, you got 20 years at the other

23   end.  Both of these illustrations show an improper extension of

24   term.  That's the issue in double patenting, extending the term

25   beyond what it should be.  That's what drives the

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 210 of 500 PageID: 1489
Case 1:15-cv-10698-MLW Document 252 Filed 08/25/16 Page 53 of 194

53

 1    judicially-created doctrine.

 2          THE COURT:  But let's pause for a minute here.

 3          MR. DISKANT:  Sure.

 4          THE COURT:  This overlaps a bit with the reexamination

 5    issue.  But in your view, does the subjective intent or motive

 6    for the conduct of the patentee make any difference?

 7          MR. DISKANT:  It doesn't under existing law.  And the

 8    reason is, basically, the law has essentially said this is a

 9    situation that is subject to manipulation.  That's good enough

11:47 10    for us.  We're not going to be concerned whether you did or

11    didn't do it.  So here, in this example, patent B is subject to

12    manipulation by adjusting the priority date, comparing it to

13    the other.  That's what the issue is.

14          And the *Gilead* court talks about this risk of

15    manipulation, and, you know, what a patentee could do now post-

16    URAA by altering priority dates.  Okay?  So these are just the

17    two different examples, both illustrating extending the term

18    through something the patentee does.  Winding up --

19          THE COURT:  The record won't reflect that really neat

11:48 20    moving slide that you have.  You have to give a disc to the

21    Federal Circuit.

22          MR. DISKANT:  Okay.  We'll get you a disc.

23          THE COURT:  I don't need it.

24          MR. DISKANT:  I'm teasing.  It's just an illustration.

25    I can draw it without --

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 211 of 500 PageID: 1490
Case 1:15-cv-10698-MLW Document 252 Filed 03/25/16 Page 54 of 194

54

1      THE COURT:  It's very nice.  Good advocacy.

2      MR. DISKANT:  Anyway, now we want to look at these two

3  patents, the patents-in-suit.  So now we're talking not about a

4  statute from 1860.  We're talking about the URAA, which

5  Congress recognized that there would be patents that

6  overlapped.  You know, patent gap kind of filling patents.

7      So the law chose to give patents like the '471 the

8  greater of the 20-year term or 17 years from grant, and that's

9  the law.  That's a choice.  Now, in making that choice, you

11:49 10  know, Congress certainly recognized that there would be patent

11  families like ours in which some patents were filed before and

12  some patents were filed after and is essentially saying, If you

13  file after, you're going to get 20 years from the priority

14  date.  If you file before, you may have a different term.  Even

15  though the essential point of GATT or URAA was to have all

16  these patents have the same term related to the priority date,

17  Congress is going to allow some patents to extend further, our

18  patent.

19      THE COURT:  Well, a couple of things.  What you argue,

11:50 20  that Congress knew that there would be -- you know, that there

21  often were and continue to be families of patents and some

22  related patents would be issued before 1995 and other related

23  patents after, and the calculation of their expiration date

24  would be different.

25      MR. DISKANT:  Yes.

1    THE COURT:  I don't think anybody's, to my knowledge,

2    cited to me any legislative history about that.

3    MR. DISKANT:  That's correct.  There is nothing that

4    says that.  I'm just saying that this is so widely known in the

5    world that I'm assuming Congress must have --

6    THE COURT:  And it seems to me the other side of the

7    coin from the argument the defendant was making, that Congress

8    also knew about this doctrine of obviousness double patenting.

9    MR. DISKANT:  Completely correct, but that's about

11:51 10   unjustifiably extending the term.  Congress is by law extending

11    the term.  That's the difference.

12    THE COURT:  Well, I mean, this is something I've been

13    wrestling with.  This has particularly engaged my interest.  It

14    may be that the '444 had the practical effect of extending the

15    term of the '471, because the '471 evidently was vulnerable to

16    being found -- this is why I'm saying it -- you're shaking your

17    head -- so you can address it -- vulnerable to being found

18    invalid in view of maybe the two patents involved in a

19    reexamination issue that we'll get to or for some other reason.

11:52 20   And maybe in the absence of the '444, somebody would have

21    developed an invention that arguably infringed the '471 with

22    some confidence that it could demonstrate the '471 was invalid

23    but were deterred from doing that by the existence of the '444.

24    MR. DISKANT:  Judge, I hate to say this.  This is the

25    wildest of speculation.  There is nothing in the record.  I'll

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 213 of 500 PageID: 1492
Case 1:15-cv-10698-MLW Document 252 Filed 03/25/16 Page 56 of 194

56

1    give you some objective facts that are true.  What's true is

2    these are both patents on a biological product.  It's true that

3    a biological version of Remicade could not be launched under

4    the BPCIA until after 2010.  It's true that these folks are out

5    there still not having launched a biological version of the

6    BPCIA.  I can't tell you why the '444 was applied for, but this

7    is just utterly routine in the patent prosecution business.

8    And let me just say, it's completely baseless to speculate that

9    someone thought there was some validity problem with the '471.

11:53 10   I don't know why they wanted this.  It expired in 2011.  There

11   was not a chance on the face of the Earth that there was going

12   to be a competitor of Remicade before 2011.  They didn't -- but

13   I don't think we can --

14        THE COURT:  Boy, if you've got a patent that's

15   generating billions of dollars of year and you've got a

16   doctrine of obviousness double patenting, why would you

17   jeopardize that by getting a second patent for something that

18   you already have a patent of?

19        MR. DISKANT:  Because the doctrine --

11:54 20        THE COURT:  Just because some scientist is sitting

21   there or some person is sitting there writing patents?

22        MR. DISKANT:  That is in fact what happens, but that's

23   outside the record, too.

24        THE COURT:  They may sit there and write patents, but

25   I doubt -- I suspect somebody's looking at this pretty

Case 2:16-cv-01925-JMV-MF  Document 69-1  Filed 04/13/17  Page 214 of 500 PageID: 1493
Case 1:15-cv-10698-MLW  Document 252  Filed 03/25/16  Page 57 of 194

57

```
  1    carefully and saying what are the implications going to be for
  2    the patents we already have?
  3          MR. DISKANT:  With all respect, Judge, it is
  4    inconceivable that anybody worried about double patenting with
  5    respect to these two patents.
  6          THE COURT:  I'm so impressed by you and your
  7    colleagues.  It seems to me inconceivable that this all
  8    happened by accident.
  9          MR. DISKANT:  Well, I'm not prepared to make up
11:55 10   reasons.  This is just what happened.  And again, if Your Honor
 11    thinks this is actually important, we need discovery on it.  I
 12    don't think it matters, but I don't think that it's a
 13    reasonable speculation that double patenting concerns about the
 14    '471 had anything to do with this.  The '471 was a 17-year
 15    patent.  This was just a little, you know, small patent that
 16    was during its term.
 17          THE COURT:  The '471 covers a genus, right, a group of
 18    antibodies?
 19          MR. DISKANT:  Yes, yes.
11:55 20        THE COURT:  And the '444 is for a specific antibody
 21    that's part of that group.
 22          MR. DISKANT:  I think that's not correct, but I'm not
 23    sure.  I'm getting -- I know that's true in the other part of
 24    the case, in the '195 and the '272.  No.  This is very similar.
 25    It includes both.  I think it includes both.
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 215 of 500 PageID: 1494
Case 1:15-cv-10698-MLW Document 262 Filed 03/25/16 Page 58 of 194

58

```
 1                THE COURT:  I'm right, correct?
 2                MR. DISKANT:  You're right, in part.  That is to say
 3      it includes a species and it also includes the genus.
 4                THE COURT:  Okay.  So the genus is the '471, correct?
 5                MR. DISKANT:  Yes.
 6                THE COURT:  A genus is a group?
 7                MR. DISKANT:  Yes.
 8                THE COURT:  It's a group of antibodies?
 9                MR. DISKANT:  Yes.
11:56 10          THE COURT:  And one of the antibodies is --
11                MR. DISKANT:  cA2.
12                THE COURT:  That's easier to say then --
13                MR. DISKANT:  Infliximab.  Definitely easier.
14                THE COURT:  Okay.  But it includes infliximab,
15      correct?
16                MR. DISKANT:  Mm-hmm.
17                THE COURT:  Then the '444 is a patent that's specific
18      to infliximab?
19                MR. DISKANT:  It has a claim that is specific to
11:56 20    infliximab, and it has another claim that's the same genus
21      claim as the -- frankly, if it just had species claims, we
22      would be having a different argument.
23                THE COURT:  All right.
24                MR. DISKANT:  It doesn't matter.
25                THE COURT:  But it's patentably indistinct?
```

Case 2:16-cv-01925-JAK-MLS Document 69-1 Filed 04/13/17 Page 216 of 500 PageID: 1495
Case 1:15-cv-10698-MLW Document 262 Filed 03/25/16 Page 59 of 194

59

1          MR. DISKANT:  They're patently indistinct because

2     they both have the genus claims.  I don't think any of this

3     matters for this purpose.

4          THE COURT:  That's okay.

5          MR. DISKANT:  But I urge you strongly to resist the

6     urge to speculate that some double patenting concern was behind

7     the '444 patent.  I just don't see a record basis for that.

8          THE COURT:  Well, is it in the record that the PTO has

9     found the '471 invalid in view of patents other than the '444?

11:57 10          MR. DISKANT:  It should be.

11          THE COURT:  Is it -- it's the next motion.

12          MR. DISKANT:  It's in the record in the other motion.

13          THE COURT:  Right.  So I don't know why it would be

14     wildly speculative.  It's occurred.  Look at all these lawyers.

15     One of you would have seen it.  Anyway.  Go ahead.

16          MR. DISKANT:  I'll say at the highest level, the

17     reasons to file multiple patents that are similar to one

18     another, the highest level are to protect against validity

19     risks and infringement risks.  I agree with that.  I'm just

11:58 20     reacting to what sounds like an unwarranted, very specific

21     speculation about what's going on here.  I don't know what's

22     going on here.

23          But let me just pause to talk about these two patents

24     before the URAA and after the URAA because there would be no

25     double patenting issue for either one under either regimen.

```
        1   Now we're looking at a slide that says if neither patent was
        2   subject to the URAA, if that was the case, the '471 patent
        3   would issue in 2018.
        4           THE COURT:  Sorry.  Which number?
        5           MR. DISKANT:  This is now number 18.  If that were the
        6   case, the '471 patent would issue 17 years later in 2018 and
        7   the '444 patent would issue 17 years later in 2021.  So that's
        8   if the URAA didn't apply.
        9           THE COURT:  The URAA didn't exist.
11:59  10           MR. DISKANT:  That's right.  I'm just setting up the
       11   markers.
       12           THE COURT:  If it didn't exist?
       13           MR. DISKANT:  Right, if it didn't exist, that's fine.
       14           THE COURT:  The old system.
       15           MR. DISKANT:  The old system.  I'm just trying to
       16   explain that under the old system, the issue would be with
       17   respect to the '444 patent, which expires later under the old
       18   system.  And so that PTO would enforce that as a terminal
       19   disclaimer, which is exactly what it did.  So under the old
12:00  20   system, both patents would expire in 2018.  And we filed for
       21   the '444 a couple of years earlier.
       22           Now, under the new system, the URAA system, both
       23   patents would expire on the same date, 20 years after the
       24   priority date.  So I guess what I'm saying is under the old
       25   system, there would be no double patenting issue.  And if both
```

1    patents were both under the new system, there would be no

2    double patenting issue.  And the dispute therefore is not the

3    result of double patenting issues.  This dispute that we're

4    having is solely the result of two different terms that were

5    set by Congress, one for the '444 and one for the '471.  And

6    likewise, there would be no conceivable manipulation under

7    either pre- or post-URAA law.  We did not cause the '471 patent

8    to issue later.  It issued earlier.  And we didn't cause the

9    '471 patent to have a later priority date.  It has the same

12:01 10   priority date.  So both of the concerns are actually identified

11   in the case law.  Shifting the issue date to get an extension,

12   we didn't do that.  Shifting the priority date to get an

13   extension, we didn't do that either.  It's just a matter of the

14   change in the law.  So now -- do you have a question?

15           THE COURT:  No.

16           MR. DISKANT:  Okay.  Sorry.  I wasn't sure.

17           THE COURT:  Well, okay.  Now I do have a question.

18           MR. DISKANT:  Yeah.

19           THE COURT:  But this may not be -- does the statute

12:02 20   expressly address what happens in view of double patenting law

21   in a situation like this where one patent was applied for

22   before 1995 and another patent was applied for after 1995?

23           MR. DISKANT:  No, which is why we have an issue.  I

24   would say, although the statute is silent on it, by expressly

25   articulating a longer term Congress is justifying a longer

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 219 of 500 PageID: 1498
Case 1:15-cv-10698-MLW Document 252 Filed 03/25/16 Page 62 of 194

62

 1    term.  Contrary --

 2              THE COURT:  But in terms of -- I think I understand

 3    that argument, but I just want to kind of go step by step to

 4    get there.  So the statute doesn't address the factual scenario

 5    in this case?

 6              MR. DISKANT:  Correct.

 7              THE COURT:  I view my task as essentially doing two

 8    things.  One, determining what Congress would have done if it

 9    had addressed this issue; and then two, predicting what the

12:03 10   Federal Circuit will say Congress would have done if it

 11   addressed this issue.  To me, that's the proper framework for

 12   analysis.

 13             MR. DISKANT:  That's a perfectly reasonable framework.

 14   My only quibble would be you would have the legal question --

 15   well, that's fine.  I think that's fine.

 16             Okay.  So *Gilead*, we're now looking at the *Gilead*

 17   issue.  Under pre-URAA law -- this is now slide 24 -- there was

 18   no double patenting issue because the '483 patent had issued

 19   first.  That's what *Gilead* argued.  But the *Gilead* court

12:04 20   identified a problem that is a real problem that exists

 21   post-URAA and not before, which I'm illustrating here on slide

 22   25, which is the manipulation of priority date.

 23             So essentially, these two patents, which were

 24   patentably indistinct, had different priority dates.  And as a

 25   result, the patentee could fairly be said to have extended the

 1    term of the '483 patent by its actions.  It filed first the

 2    priority application for the '375 and then later it did

 3    something else, extended the term of that patent by filing the

 4    later priority application for the '483.  I think that's why

 5    *Gilead* and the pre-*Gilead* law all talk about something that the

 6    patentee did to extend the term of a patent, not something it

 7    did as we did that they're arguing shortened the term of the

 8    patent.

 9            THE COURT:  In *Gilead* the District Court found there

10    was no gamesmanship.

11            MR. DISKANT:  Yes.

12            THE COURT:  Even though the effect was to extend the

13    term of the patent.

14            MR. DISKANT:  Yeah, mm-hmm.

15            THE COURT:  And the Federal Circuit said it's not

16    relevant whether there was gamesmanship or not.

17            MR. DISKANT:  Yes and no.  I think the Federal Circuit

18    was extremely interested in the potential for gamesmanship.  So

19    just as I said to you earlier, it doesn't matter why one patent

20    issued first.  It's the potential for gamesmanship that is the

21    heart of this inquiry, and we don't have to second-guess --

22            THE COURT:  But I don't know that the potential for

23    gamesmanship is the heart of the inquiry.  In *Gilead* the

24    Federal Circuit says repeatedly having stable dates for the

25    expiration of patent protection --

1          MR. DISKANT:  Yeah.

2          THE COURT:  -- and I think -- we can go up.  The

3    primary ill to be protected against is preventing the public

4    from practicing an invention when one patent on that invention

5    has expired.  So that to me, at the moment, seems to be the

6    thrust, the dominant principle of *Gilead*.

7          MR. DISKANT:  I understand why Your Honor may be

8    reading it that way.  I think that's not in the end the heart

9    of the matter, which I'd like to explain to you.  I think the

12:06  10   heart of the matter is the paragraph I just read you from the

11   second paragraph of *Gilead*, about "prohibits an inventor from

12   extending his right to exclude."  If there's nothing you can

13   point to that the inventor did to extend his term, then

14   *Gilead*'s not really interested.  And we will talk quite

15   extensively -- I will in a moment -- about the freedom of the

16   inventor of the public.  I'll get there in a few minutes.  But

17   the core rejoinder to that or understanding of that is that is

18   a generality and no more than a generality with numerous

19   exceptions, and therefore it simply sets up the question Your

12:07  20   Honor is to decide, it doesn't decide the question.

21          THE COURT:  Hold on just one second.

22          MR. DISKANT:  Sure.

23          THE COURT:  Go ahead.

24          MR. DISKANT:  Okay.  So in any event, these are the

25   facts of *Gilead*.  The priority date was extended, extending the

 1    term of the second patent.  And the court said, If we were to

 2    hold that the issue date is the determining factor, it would

 3    make this subject to significant gamesmanship.  And it repeated

 4    that.  Again, I don't need to read them all to you.  But such

 5    significant vacillations in an inventor's period of exclusivity

 6    is prone to gamesmanship.  So gamesmanship certainly runs

 7    through *Gilead* as a significant part of the concern about

 8    moving priority dates.

 9         THE COURT:  Is that the only form of possible

12:09 10   gamesmanship?

 11        MR. DISKANT:  Frankly, that's the only line to

 12   actually think of -- maybe there are some others.  I don't

 13   know.  Putting it differently, on the one hand the courts say

 14   however you do it.  On the other hand, the only two examples

 15   I've ever seen in any case are post-*Gilead*, sliding the

 16   priority date, and pre-*Gilead*, sliding the issue date.  Those

 17   are the only ways I've seen -- I'm sorry.

 18        THE COURT:  I'm just thinking out loud.  Does a form

 19   of gamesmanship -- the '471 exists, it would expire if it stood

12:09 20   alone in 2018.  There's a perception that it may be vulnerable

 21   for being held invalid.  So a narrower patent, the '444, is

 22   obtained.  So now you have one patent that expires in 2018 if

 23   it's valid and another patent that has a stronger case for

 24   validity that expires earlier.  But for at least that period to

 25   2011 it gives you protection and then it lets you argue that

 1    you should have that protection until 2018.  Is that

 2    gamesmanship?

 3              MR. DISKANT:  Two answers.  First -- well, three

 4    answers.  First, we're just making up that one has a stronger

 5    argument than the other.  I have no idea.  Just arguendo, I

 6    agree that the reason you apply for patents is to have more

 7    defenses.  I agree with that.

 8              THE COURT:  To have more defenses?

 9              MR. DISKANT:  Yeah, but that is not gamesmanship.

12:11 10    That is what the Patent Office allows you to do.  The

11    gamesmanship that is relevant, the only germane gamesmanship to

12    double patenting is improper extensions of term.  It's not

13    having multiple patents on the same subject that can be

14    attacked through different doctrines or not.  But that is not

15    double patenting.  Double patenting is only about unjustified

16    extensions of term.  And if you can't say how the '471

17    patent -- excuse me -- if you can't say how the '444 patent

18    extended the term of the '471 --

19              THE COURT:  No, it didn't.  If I'm persuaded by the

12:11 20    defendants, it will have reduced the term.

21              MR. DISKANT:  Right.  That's exactly right.  That's

22    exactly their argument.  Their argument is that there's a

23    double patenting violation because the '444 patent reduced the

24    term of the '471.  That's it.  That's got nothing to do with

25    double patenting.  That's, in the end, the point.

1      THE COURT:  Well, it does have to do with -- whatever

2   the purpose is, the Federal Circuit said that a later-issued

3   patent can be the reference for an earlier-issued patent, and

4   if obviousness double patenting exists, the second, the

5   first-issued patent is invalid.  That's the general holding.

6   They may have had -- the language is much broader than

7   gamesmanship.  And then *AbbVie* -- if I'm saying it right --

8   *AbbVie* confirms the durability of the doctrine of double

9   patenting.

12:12 10      MR. DISKANT:  I agree with all of that.  But I don't

11   agree that the doctrine has nothing to do with improper

12   extension of term.

13      THE COURT:  I didn't say it had nothing to do with it.

14      MR. DISKANT:  Well, that's all that the Federal

15   Circuit has ever upheld as a reason for double patenting

16   invalidity:  Improper extension of term.  And in *Gilead*, they

17   recognized that issue date wasn't determinative because you

18   could improperly extend the term by manipulating the priority

19   date.  And so that's what they did.

12:13 20      Now, Celltrion has two arguments:  First, that *Gilead*

21   has decided it, and secondly, that *Gilead*'s principles decide

22   it.  Your Honor has said you were not inclined to believe

23   *Gilead* decided it.

24      THE COURT:  Correct.

25      MR. DISKANT:  I'll go through that pretty quickly, but

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 225 of 500 PageID: 1504
Case 1:15-cv-10698-MLW Document 262 Filed 03/25/16 Page 68 of 194

68

1    I just want to make a couple of points.

2              THE COURT:  Okay.

3              MR. DISKANT:  First, the circumstances of this case

4    are referred to both at the beginning and the end of the

5    decision.  I'm now up to slide 32.

6              THE COURT:  32?

7              MR. DISKANT:  Yeah.  And I heard counsel's argument

8    the circumstances of this case are two URAA patents, and I

9    don't actually think that's subject to serious disagreement

12:14 10    notwithstanding the argument I just heard.  And they repeat the

11    circumstances of the case again at the end of the decision.  So

12    they've written -- you know, when courts say that, they're

13    intentionally singling something out.

14              THE COURT:  Well, essentially what it communicates --

15    I sit under portraits of Louis Brandeis in my office, which is

16    a humbling experience.  But, you know, you don't decide, at

17    least on constitutional issues, you don't decide more than is

18    necessary to resolve the case.

19              So the *Pfizer* footnote tells me they were aware,

12:14 20    foresaw the factual scenario of this case, and they told us

21    about it, us district judges.  Then, you know, the language

22    here I think can fairly be read to say what you're saying,

23    under the circumstances of this case.  So in my view at the

24    moment, Congress hasn't decided the issue.  The Federal Circuit

25    hasn't decided the issue.  But I have a duty to decide the

1    first instance how I think Congress would have decided the

2    issue if it had addressed it and to take guidance from *Gilead*

3    in answering that question.

4          MR. DISKANT:  I think that's correct.  But at the same

5    time, while it's true the courts should only decide the

6    question in front of them, we all know, because we've read so

7    many decisions that aren't so carefully written, and this is a

8    carefully written decision, obviously, it's carefully written

9    to signal what it's not deciding as well as what it is

12:15 10   deciding.

11         THE COURT:  So I think this issue that I have to

12   decide is not decided by *Gilead*.  It's not a precedent that I

13   have to follow because there's a factual difference.  There's a

14   factual distinction that may make a difference in the outcome.

15   But what about footnote 2 and the reference to *Pfizer*?  It

16   appears to me that they're signaling that the Patent Appeals

17   Board properly decided *Pfizer*.

18         MR. DISKANT:  I don't read it that way, although I can

19   understand why you might choose to disagree.  But the way I

12:16 20   read it is the District Court in *Gilead* had relied on the two

21   District Court cases that actually decided our issue our way.

22   And so the Federal Circuit was saying, Well, that's not

23   actually the issue here.  And then it cites *Pfizer*.  And I

24   don't know why you know why the District Court didn't cite --

25   it's not like *Pfizer* was a secret because *Pfizer* is actually

Case 2:16-cv-01925-JMV-MF  Document 69-1  Filed 04/13/17  Page 227 of 500 PageID: 1506
Case 1:15-cv-10698-MLW  Document 252  Filed 03/25/16  Page 70 of 194

70

1    expressly addressed in the two District Court cases, said that

2    that District Court relied on it.

3            But why is the Federal Circuit citing *Pfizer*?  My view

4    is to say, A, there's a disagreement; and B, the principle of

5    the *Pfizer* court is the one they are bound to rely upon for

6    their decision.

7            THE COURT:  Who is?

8            MR. DISKANT:  The Federal Circuit.

9            THE COURT:  The Federal Circuit is bound by something

12:17 10   the Patent Office decides?

11           MR. DISKANT:  No, it's not.  What I'm saying is that

12   the *Pfizer* PTAB decision, the Board of Appeals decision, said

13   language about the right, freedom to practice a patent, and the

14   Federal Circuit was about to say similar things, so it

15   liked it.  I don't view it as more than signaling there's a

16   dispute and that it's not deciding this issue, which I think is

17   the most important thing.

18           So let me -- obviously you've seen all the different

19   references to URAA.  Let me signal one that is particularly

12:18 20   important to me.  It's right here.  It's on slide 38.

21           THE COURT:  What page of *Gilead*?

22           MR. DISKANT:  Oh, from *Gilead*.  It's 1216.

23           THE COURT:  Let me just take a break.

24           MR. DISKANT:  Sure.

25           THE COURT:  Go ahead.

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 228 of 500 PageID: 1507
Case 1:15-cv-10698-MLW Document 252 Filed 03/25/16 Page 71 of 194

71

```
 1              MR. DISKANT:  Permitting -- and they don't come out

 2   anywhere and really expressly say a holding other than who

 3   wins.  But I think this is as close as they come to a holding.

 4   "Permitting any earlier-expiring patent to serve as a double

 5   patenting reference," so okay, that's the '444 patent.

 6              THE COURT:  Hold on just a second.  This is page 1216?

 7              MR. DISKANT:  Yeah.  It's headnote 7 in my copy.  I

 8   don't know if that's where you are.  It's four paragraphs above

 9   IV.

10              THE COURT:  I'm not finding it.

11              MR. DISKANT:  Let's see.  If you go to -- did I give

12   you the right page?  1216.  1216 begins "now" in the same

13   paragraph --

14              THE COURT:  "Now if the '375"?

15              MR. DISKANT:  Yeah, two paragraphs down, "looking

16   instead."

17              THE COURT:  "Looking instead," okay.

18              MR. DISKANT:  Then the last sentence in that

19   paragraph?

20              THE COURT:  "Permitting."

21              MR. DISKANT:  Yes, yes.  That's where it is.

22   "Permitting any earlier-expiring patent to serve as a double

23   patenting reference."  Okay?  The '444 patent is an

24   earlier-expiring patent.  For a patent subject to the URAA,

25   that is, for a patent in which the priority date is the
```

1    determinant of the expiration date.  The '471 patent is not a
2    patent subject to the URAA.  It's a pre-URAA patent.  So that's
3    what it's saying.  It says, "Permitting the '444 patent to
4    serve as a double patenting reference for URAA patents is
5    okay."  That's stable.  That preserves the public's right to
6    use the invention.
7         THE COURT:  But here.  Let me think along with you.
8         MR. DISKANT:  Sure.
9         THE COURT:  Because I underlined this, too.  But I
12:21 10   understand the '471 is a pre-URAA patent.  Let's leave that
11   out.
12        "Permitting an earlier-expiring patent," '444, "to
13   serve as a double patenting reference guarantees a stable
14   benchmark that preserves the public's right to use the
15   invention and its obvious variants that are claimed in a patent
16   when that patent expires."
17        See, this is something -- it's an open issue, I had
18   left out the pre-URAA because that's a factual distinction.
19   But here, the Federal Circuit is communicating to me that
12:22 20   preserving the public's right to use the invention and its
21   obvious variants is an important purpose and that the
22   plaintiff, having decided to get two patents, the Federal
23   Circuit is I think at the moment likely to give priority to the
24   public's right to practice the invention over the inventor's
25   right to have a monopoly for an extended period of time because

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 230 of 500 PageID: 1509
Case 1:15-cv-10698-MLW Document 232 Filed 03/25/16 Page 73 of 194

73

```
 1    it risked that monopoly when it got the second patent.

 2              MR. DISKANT:  I think that that doesn't grapple with

 3    the core proposition of double patenting going back to the

 4    1800s, which is improperly extending the term.  So there are

 5    many circumstances where a term may be extended properly.  And

 6    the Gilead court, we'll see in a moment, recognizes that.

 7              Let me skip ahead and show you one.  For example,

 8    slide 46, this is the one that comes probably closest of them

 9    all.  This is note 6 in Gilead.

12:23 10          THE COURT:  Note 6?

11              MR. DISKANT:  Yeah.

12              So this drafts from a sentence that says -- it's

13    talking about expiration dates versus issue dates.  And it

14    says, "There are exceptions to that rule, of course, such as

15    patents that qualify for term extensions, but none are relevant

16    to the facts of our discussion here."

17              So let me tell you what a term extension is.  Congress

18    decided that sometimes the FDA takes too long to approve a

19    drug, and the patent clock is ticking, and the patent owner may

12:24 20      wind up, you know, not getting any protection from his patent.

21    So Congress permits the FDA to allow the extension of one

22    patent.  The patent owner decides what it is.  And essentially

23    what that means is, if that were our case here -- well, let's

24    not make it our case.  It's too complicated.  Well, I can deal

25    with it, but it's something that became more complicated than I
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 231 of 500 PageID: 1510
Case 1:15-cv-10698-MLW Document 252 Filed 03/25/16 Page 74 of 194

74

1    wanted to make it.

2          If you have two patents that expire on the same day,

3    post-URAA, they have the same priority date, Congress allows

4    one of those to be extended.  And the Federal Circuit is

5    clearly saying, We're not saying there's anything wrong with

6    that.  We're not saying that extending it one term, even though

7    there's a previously expiring, indistinguishable patent is

8    going to present a problem.  And the reason for that is that's

9    a justified extension of term.

12:26 10         Now, in our case, we don't have an extension of term.

11   We have a shortening of term.  And the term of the '471 is

12   justified, it's set by Congress.  So I think when you get down

13   to the complicated smaller issues besides the

14   patents-want-to-be-free kind of argument or

15   inventions-want-to-be-free kind of argument, there's a lot of

16   complexity here, and you have to have an unjustified extension

17   of term before the Federal Circuit, before or after *Gilead*, is

18   going to invalidate a patent for double patenting.

19         THE COURT:  That footnote is to the sentence that

12:26 20   says, "As discussed above, the primary ill avoided by

21   enforcement of the double patent doctrine is restriction on the

22   public's freedom to use the invention claimed in a patent and

23   all obvious modifications of it after that patent expired."  At

24   least that's in the same paragraph.

25         MR. DISKANT:  Yeah, that's right.

```
 1              THE COURT:  So this so far has communicated -- I mean,
 2    this contributes to my tentative view, which you're
 3    challenging, that the Federal Circuit would fill in -- you
 4    know, say Congress would fill in the statutory gap by saying
 5    that Janssen had 17 years to 2018 for the '471 patent and then
 6    it made a choice and got the '444, with the 2011 expiration
 7    date.  And using the 2011 date would avoid the primary ill of
 8    giving patent protection beyond 2011 when one of the two
 9    patents it chose to get expired.  So how do you respond to
12:28 10    that?
11              MR. DISKANT:  I think it says just exactly the
12    opposite, so let me try.
13              THE COURT:  I hope it's really not laughable.
14              MR. DISKANT:  I'm sorry.  I've spent far too much time
15    with this.
16              THE COURT:  Well, go ahead.
17              MR. DISKANT:  I apologize.  It's not laughable.  But
18    it does say exactly the opposite to me.  And the reason it says
19    exactly the opposite to me is it's saying by and large the
12:28 20    public should have the right to practice a patent after it has
21    expired, but there are exceptions to that.  And the exception
22    would be -- so in this hypothetical, you have two patents that
23    expire on the same date and they're patentably
24    indistinguishable.  And maybe there had been a terminal
25    disclaimer.  These are two patents that are indistinguishable
```

Case 2:16-cv-01925-JMY-MS  Document 69-1  Filed 04/13/17  Page 233 of 500 PageID: 1512
Case 1:15-cv-10698-MLW  Document 262  Filed 03/25/16  Page 76 of 194

76

```
 1   and have expired, but FDA is permitted by Congress to extend

 2   one of the two terms.  And the footnote is saying to me that

 3   that's different, that it's okay if the FDA permits an

 4   extension of one of two patents and that may hamper the

 5   public's ability to practice the one that's expired, but that's

 6   permitted by statute, Congress has approved that, that's all

 7   right.  That's how I would read that.

 8            THE COURT:  Then your argument is Congress has said

 9   it's also our right to have 17 years on the '471?

12:30 10          MR. DISKANT:  Correct.  Rather than 20 years from the

11   priority date.  That's exactly right, Judge.  And I do

12   apologize.  I have spent way too much time with this.

13            THE COURT:  Well, there's a lot riding on it.

14            MR. DISKANT:  So let me just go back where I was.  I'm

15   now back on 38, so I think the this language is quite advertent

16   and you can't ellipsize out the four patents subject to the

17   URAA, that the stable benchmark comes in this post-URAA world.

18   In the pre-URAA world, the issue date was what mattered.

19   That's what people --

12:30 20          THE COURT:  I get that.  I understand that.

21            MR. DISKANT:  Okay.  In any event, *AbbVie*, same facts.

22   I'm just showing you the illustration of the priority date

23   shift in *AbbVie*.  Same facts.  Okay.

24            THE COURT:  Same facts as what?

25            MR. DISKANT:  As *Gilead*, sir.  The '444 priority
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 234 of 500 PageID: 1513
Case 1:15-cv-10698-MLW Document 282 Filed 03/25/16 Page 77 of 194

77

```
 1    application shifts the extension so you can fairly and

 2    accurately say that the patent date unjustifiably extended the

 3    term of the '442 patent by giving it a later priority date.

 4    Squarely within the norm of double patenting case law, okay?

 5    How do we think about these two patents, the '444 and '471?

 6    First they say Gilead decides the issue.  It doesn't.  So here

 7    is the issue.  And I've put on slide 42 what I think the

 8    conflict is.

 9         The conflict is between the principle the public

10    should be free to practice a patent after its term has expired

11    and the statute in which Congress gave the pre-URAA patents the

12    greater of 17 or 20 years.  And in the end, that's the entirety

13    of this dispute, because there is no argument that the priority

14    date was manipulated, and there's no argument that the issue

15    date was manipulated.  The only question is the effect, the

16    impact of the change in the law.  So Gilead's bedrock

17    principle, the public is free to use a patent after it expires.

18    And that is certain a principle of law.  But Gilead, to my

19    reading, somewhat overstates that principle because there are

20    many exceptions to it as well.

21         And here is a quote from another Federal Circuit case.

22    "The patent does not provide the patentee" --

23         THE COURT:  Which slide is this?

24         MR. DISKANT:  I'm sorry.  That's slide 45.

25         The patent does not give you the right to do anything.
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 235 of 500 PageID: 1514
Case 1:15-cv-10698-MLW Document 252 Filed 03/25/16 Page 78 of 194

78

1    Its expiration doesn't give you the right to do anything.

2    There may be other patents that interfere.  So a frequent

3    example is, you know, the black and white TV and the color TV

4    and you have a patent on both, and the black and white patent

5    expires.  Well, you still can't make a color TV because there's

6    still another patent in the way.  And so the Federal Circuit

7    acknowledges that this is a general principle that doesn't

8    always apply.  And on slide 46, we have the point we were just

9    talking about, that where there's a patent term extension, one

12:33 10   patent may expire and the other patent may be extended, and the

11   public isn't free.  The public is still bound by the extended

12   patent.  It's justifiably extended by Congress.

13          There's another note in *Gilead*.  This is footnote 5 of

14   *Gilead*.  It's on slide 47.  "The public's ability to practice

15   an invention may be further restricted by an improvement

16   patent."  That was the color TV and black and white example I

17   just gave you.  So I would say that while, as a generality, the

18   public should be free to practice a patent after it has

19   expired, is a generality with many exceptions and we should

12:34 20   consider how it applies here.

21          THE COURT:  Hold on for just a second.

22          MR. DISKANT:  Sure.

23          THE COURT:  Thank you.  Go ahead.

24          MR. DISKANT:  So the conflict is this other principle

25   of law, the statute.  And Your Honor knows of course Congress

           1    writes against a backdrop of the law, but the law as of the

           2    date of this statute was that double patenting has no

           3    application to later-issued patents.

           4            THE COURT:  Sorry.  Say that again.

           5            MR. DISKANT:  That you can't use a later-issued patent

           6    to invalidate an earlier-issued patent.

           7            THE COURT:  That was the state of the law in 1994?

           8            MR. DISKANT:  '95, yeah.  All of these cases, all of

           9    the double patenting cases --

12:35   10            THE COURT:  What case stands for that proposition?

          11            MR. DISKANT:  I would say every double patenting case

          12    we looked at.

          13            THE COURT:  So in 1994 and 1995, Federal Circuit --

          14            MR. DISKANT:  Slide 3.

          15            THE COURT:  Slide 3?

          16            MR. DISKANT:  That's just exemplary.  But the *Gilead*

          17    court says this --

          18            THE COURT:  Where?

          19            MR. DISKANT:  I'm sorry?

12:36   20            THE COURT:  Where?

          21            MR. DISKANT:  The *Gilead* court repeatedly says -- so

          22    I'm looking at page -- well, it's between footnote 5 and

          23    footnote 6.  *Gilead*'s response in that paragraph, *Gilead*'s

          24    response is simply that the '375 we should focus on -- excuse

          25    me -- that the '483 patent issued first.  "We see little import

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 237 of 500 PageID: 1516
Case 1:15-cv-10698-MLW Document 262 Filed 03/25/16 Page 80 of 194

80

1    of that fact here.  *Gilead* cites cases that describe the double

2    patenting bar as applicable to the second or later-issuing

3    patent."  I would say those are each and every Federal Circuit

4    case on this subject prior to *Gilead*.  And then *Gilead* says,

5    "but those cases dealt with patents to which the URAA did not

6    apply."  So the law against which the -- and that's -- for

7    example, can I go to slide 3?

8           THE COURT:  Actually, you may not have read all that

9    is helpful.  It says, "But those cases dealt with patents to

12:37 10  which the URAA did not apply, and critical to a double

11   patenting analysis to patents for which the expiration date was

12   inextricably intertwined with the issuance."

13          MR. DISKANT:  That's true.  But that's an argument, a

14   gloss in those cases added by the *Gilead* court.  The cases,

15   double patenting analysis, if you look at slide 3, is just an

16   example, "The judicially created doctrine of obviousness-type

17   double patenting prohibits a party from obtaining an extension

18   of the right to exclude claims in a later patent."  Every

19   single case is about later patents.

12:38 20         THE COURT:  Hold on just a second.

21          MR. DISKANT:  Sure.

22          THE COURT:  Interesting.  When I hear briefly from the

23   defendants, I'd like them to address this issue particularly,

24   but go ahead.

25          MR. DISKANT:  Sure.  So if we go to slide 48 again and

1    look at Congress's statute.  First they said, we, a pre-URAA
2    patent, is entitled to the greater of 20 years or 17 years from
3    the priority date, the greater.  And then you want to know
4    what's Congress legislating against?  I would say against two
5    principles.  First, double patenting does not apply to the
6    first of two issued patents, and secondly, that, you know,
7    these shorter -- these post-URAA patents are going to be later
8    ones.  They're not going to matter.  They're going to come out
9    afterwards.  And so, you know, there's nothing in this statute
12:40  10    that suggests anything other than that Congress intended a
11    patent such as ours to get 17 years from its issue date.
12    Again, as I said earlier, these patent families are
13    commonplace.
14        THE COURT:  Why shouldn't I infer from the gap in the
15    legislation and the fact that Congress didn't address this that
16    they left it to the courts, primarily the Federal Circuit, to
17    decide how double patenting law -- which is a judicial
18    doctrine, right, not statutory double patenting?
19        MR. DISKANT:  Yeah.
12:40  20        THE COURT:  -- how double patenting law would operate
21    in a post-GATT regime.
22        MR. DISKANT:  I think that's perfectly fair.  I think
23    you can infer that, or you can decide Congress -- I think those
24    two modes of analysis essentially wind up in similar places.
25    But, yeah, it is a judicially-created doctrine, and Congress

```
 1    was silent on it.  However, it seems to me that one of the key
 2    ideas of Gilead -- and this is on 1216 -- it's a simple idea.
 3    "Congress could not have intended to inject the potential to
 4    disturb the consistent application of the doctrine of double
 5    patenting by passing the URAA."  And I agree with that.
 6             THE COURT:  Where is this?
 7             MR. DISKANT:  It's on -- let me find it.  It's the
 8    paragraph that -- it's on 1610, I think.  Excuse me.  1216.  I
 9    misspoke.  The second paragraph from the top, second sentence.
12:42 10          THE COURT:  Where do you think this is on 1216?  Here,
11    I have it.
12             MR. DISKANT:  You have it?  "Congress could not have
13    intended to inject the potential to disturb the consistent
14    application."  Now, to me --
15             THE COURT:  Doesn't that support the defendant?
16             MR. DISKANT:  I think not.  I think the consistent
17    application is one has to look for unjustified extension of
18    term.  And if you don't see unjustified extension of term,
19    there's no double patenting issue.  And pre-URAA there was
12:42 20  unjustified extension of term related to issue dates.
21    Post-URAA there was unjustified extension of term based on
22    priority dates.  But there has to be -- you have to be able to
23    say that the '444 patent extended the term of the '471 before
24    you enter the world of double patenting, and it did not do
25    that.
```

```
 1              So for me, the question is resolving these two

 2      conflicting principles, and I would say the first principle is

 3      a generality, that is, the right to be free to practice patents

 4      that sometimes applies and sometimes doesn't apply, whereas the

 5      statute is quite specific.  I would say I would resolve them by

 6      finding in favor of the statute.  Because here is what -- the

 7      effect of Celltrion's argument is that -- I'm showing here the

 8      timeline of the two patents.  This is now on slide 52.  And

 9      essentially they're saying that the only way to preserve the

12:44 10     validity of the '471 patent, although it had already issued,

11      was to shorten its term.  And again, to me that just doesn't

12      scan as a sentence.  The '444 patent can't have extended the

13      term of the '471.  They're saying it shortened the term.

14              Now, here I think is where the Gilead court lays out

15      the real principle.  I'd like you to take a look at note 5,

16      please.

17              THE COURT:  Note 5?

18              MR. DISKANT:  Note 5.  We looked at the first two

19      sentences, but I want to go to the last idea there.  Because

12:45 20     after acknowledging that the public's right to be free to

21      practice an expired patent really is just a generality and is

22      not absolute, I think they say what the point of the whole

23      thing actually is in this footnote.  The point of double

24      patenting doctrine is to protect the public from attempts by

25      inventors to effectively extend their patent term.  So, you
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 241 of 500 PageID: 1520
Case 1:15-cv-10698-MLW Document 252 Filed 03/25/16 Page 84 of 194

84

1    know, that's their holding at the beginning, that the *Gilead*

2    plaintiffs have been properly extended their patent term.

3    That's the point of the analysis.

4            THE COURT:  But I think the defendants would argue

5    that this in effect improperly or this in effect extends the

6    term of the '444 because they're overlapping patents.

7            MR. DISKANT:  There's no way, I don't think, to craft

8    a sentence that says the '444 patent has extended the term of

9    the '471.

12:46 10         THE COURT:  No.  That the '471 has the practical

11   effect if your argument is adopted of extending the life of the

12   '444.

13           MR. DISKANT:  How did the -- what attempt by the

14   inventor was there to extend the term of the '471 patent?

15   That's what the point of the doctrine is about.  The inventor

16   did nothing to extend the term of the '471 patent.  That would

17   be how I would read this, and I think that's the right way to

18   analyze this doctrine.  These are the doctrinal underpinnings.

19   We go back to the doctrinal underpinnings of double patenting.

12:46 20  And they're not whether you got a patent because you were

21   worried about an infringement case.  And it's not because you

22   got a patent because you were worried about an obviousness case

23   one day.  It is two things:  to prevent unjustified time-wise

24   extension of the right to exclude and multiple litigation.

25   Those are the reasons.  Those are the only reasons.  And the

1    Federal Circuit acknowledges that in footnote 5.  The point of

2    the doctrine is about extensions of term.  That's the point.

3         So is there an unjustified extension of term?  Well,

4    here is a Federal Circuit case that makes it perfectly clear.

5    Now I'm up to slide 56.  "The fundamental reason for the rule

6    against double patenting is to prevent unjustified time-wise

7    extension of the right to exclude.  Only if the extension is

8    unjustified is a double patenting rejection appropriate."

9    They've got two problems here.  First, there's no extension.

12:47 10   The '444 patent doesn't extend the term of the '471.  And to

11   the extent there's a difference, it's a justified one.  That's

12   I think the right way to analyze these things.

13        Those are just the two points I made earlier.  Janssen

14   didn't cause the '471 patent to issue later and extend the term

15   under previous law.  It didn't cause the '471 to have a later

16   priority date and extend the term under the URAA.  And then

17   there are a handful of cases.  I'm not going to dwell on them,

18   except to say that -- cases that circle around this issue, I

19   would say.  There are three cases that I think analyze it the

12:48 20   way I think they should be.  There's this most recent case in

21   California that I would disagree with.  The cases that analyze

22   it I think correctly, District of Delaware case, *Brigham and*

23   *Women's Hospital*, similar factually to ours, before and after

24   patents, and essentially the later-issued earlier-expiring '244

25   patent in this picture here on slide 64.

1          THE COURT:  So here.  Let me have those two cases.

2   *Brigham and Women's*.  And the other one is --

3          MR. DISKANT:  *Abbott*.

4          THE COURT:  *Abbott*.  Those were factual scenarios

5   similar to the one we have here?

6          MR. DISKANT:  Yes.

7          THE COURT:  But the Federal Circuit criticized the

8   District Court in *Gilead* for relying on those decisions.

9          MR. DISKANT:  Well, it should have because it had a

12:49 10  different fact pattern before it.  It had two URAA patents.

11  But these cases analyze the problem we're talking about.

12         THE COURT:  The fact that -- I mean, the Federal

13  Circuit didn't write if we had the facts in *Abbott* or *Brigham*

14  *and Women's,* we would come out differently.  They would

15  criticize the District Court in *Gilead* for relying on them and

16  saying you didn't cite *Pfizer,* which comes out the other way.

17  So why shouldn't that signal to me how the Federal Circuit, at

18  least when it decided *Gilead* without the benefit of hearing

19  from you, would decide this case?

12:50 20         MR. DISKANT:  I think because it just wasn't the issue

21  before it.  We've been talking for quite a long time about

22  issues that are really unrelated to what it was thinking about,

23  and I don't ultimately see that discussion as anything more or

24  less than that's a different issue.  There are two ways to

25  think about that issue.  Maybe we'll face that one day.  But

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 244 of 500 PageID: 1523
Case 1:15-cv-10698-MLW Document 262 Filed 03/25/16 Page 87 of 194

87

1    we're going to write a very careful decision that doesn't

2    decide that issue.

3         So I think, to me at least, that's the way to think

4    about what *Gilead* did.  Because then, when you get into these

5    cases, they say things that I think are pretty wise and

6    unrelated to the issue in the *Gilead* case.  So in the *Brigham*

7    *and Women's Hospital* case, first the court rejects the Patent

8    Office reasoning and basically says it doesn't explain why --

9         THE COURT:  What page of this case?

12:51 10   MR. DISKANT:  Oh, my.  Let me see.  It's page 225 of

11   the *Brigham and Women's* case.  It's highlighted on the screen.

12   I don't know if you have the same printout that we have.  It

13   basically rejects the argument that a later-issued patent with

14   a shorter term should be used to abridge the term of a valid

15   earlier-granted patent with a longer term.

16        THE COURT:  There they're talking about *Pfizer*.

17        MR. DISKANT:  Yes.  It's not persuaded by *Pfizer*.

18        THE COURT:  I might answer that question by saying

19   Janssen made a choice.  It had the '471 with patent protection

12:52 20   until 2018.  As you said, at a high level of generality,

21   inventors get narrower patents to protect against the

22   contentions of invalidity or infringement.  So it made a

23   decision to do that.  And having made that decision, knowing

24   that under double patenting law the two would be compared to

25   each other, it should -- it's fair, it's appropriate, to say

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 245 of 500 PageID: 1524
Case 1:15-cv-10698-MLW Document 202 Filed 03/25/16 Page 88 of 194

88

```
 1    that the '444 is a reference to the '471 and therefore the '471

 2    is now invalid.

 3         MR. DISKANT:  The reason I think that's not correct

 4    is, basically -- and I apologize if I keep saying the same

 5    thing, but I think it is the outcome determinative observation,

 6    the '444 did not extend the term of the '471.  That's all that

 7    double patenting is about.  It's not about policing patents

 8    that have been obtained for multiple reasons.  It's not about

 9    whether you can or can't bring an infringement case after one

10    patent or another.  It's not about the reasons that patents

11    were applied for.  It's simply about, can you say that the '444

12    patent extended the term of the '471?  And it did not.

13    Therefore, there is no double patenting issue.

14         And the court more or less says the same -- this is on

15    now page 225.  And it says, you know, had the law not -- it's

16    focusing on the change in the law.  Had the patent law not been

17    changed, the later-issuing '444 patent could have extended

18    beyond.  So basically it's saying the only reason this one is

19    shorter, just like the only reason the '444 is shorter, is

20    because of the change in the law.  And so you can't say that

21    the shorter patent, in our case the '444, in this case the

22    '244, "The '244 patent's term could not extend the patent

23    protection to which the plaintiffs were already entitled,"

24    likewise, the '444 could not extend the protection to which we

25    were already entitled on the '471, and therefore there's no
```

 1    double patenting issue.

 2            THE COURT:  Okay.  Do you want to speak briefly to

 3    *Abbott?*  And then we may have to break for lunch.

 4            MR. DISKANT:  Sure.  *Abbott,* this is on slide 64, and

 5    this is similar facts, different District Court in Delaware.

 6    And likewise, the District Court does the same kind of analysis

 7    that I've urged is correct.  *Abbott* has obtained no time-wise

 8    extension of the earlier-issued but later-expiring patent.  The

 9    term of the patent," the '471 in our case, "is the same as it

12:55 10   would have been if the '444 had never issued."  And it goes on

 11   to make again the same point I keep making.  "Obviousness-type

 12   doctrine double patenting is intended to address unjustifiable

 13   extensions of patent term.  Here there's no undeserved,

 14   extended patent term resulting from the improper gamesmanship

 15   by the patentee."  All that has happened is an act of Congress

 16   implementing international trade negotiations yields an earlier

 17   expiration date.  "*Abbott* has received no undeserved benefit,"

 18   in its longer patent, just as we have received no undeserved

 19   benefit with the '471.

12:56 20          The *Phillips* case which they cite is more or less to

 21   the same effect.  I can just wrap this up with the MLC case

 22   that they gave us yesterday.  I think its analysis is slender.

 23   It has basically two sentences of analysis.  One, it says, "The

 24   fact that the patents in *Gilead* were governed by the URAA was

 25   not relevant to the court's reasoning."  I think that's

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 247 of 500 PageID: 1526
Case 1:15-cv-10698-MLW Document 282 Filed 03/25/16 Page 90 of 194

90

1    incorrect as we have seen.  And "*Gilead*'s holding was based on

2    the principle that when a patent expires, the public is free to

3    use it."  And that's correct but only a generality, and this

4    does not address, as the other courts do, whether there was or

5    wasn't an unjustified extension of term.

6            So I've gone on a long ways, and I've got a couple of

7    random points to make, but I'm happy to break now.

8            THE COURT:  Well, you've gone through 57 of the 80 --

9            MR. DISKANT:  I'm deep.

12:57 10        THE COURT:  -- slides you have.

11           MR. DISKANT:  I think I'm down to 70 or so.  I think,

12   by my count.

13           THE COURT:  You're on 70?

14           MR. DISKANT:  I've got just a little left.  If you

15   want me to wrap it up again I can in three minutes or less, or

16   we can save it.  There's not much here that I haven't already

17   said.  Should I wrap it up?

18           THE COURT:  Well, I want to try to think about how to

19   do this.

12:58 20        Mr. Hurst, are you going to want some time to respond?

21           MR. HURST:  I will if you have questions or -- I mean,

22   if you've already reached the decision you think you're going

23   to reach, obviously I don't need to, but I'd be happy to.

24           THE COURT:  I'll probably hear from you.

25           MR. HURST:  Sure.

1          THE COURT: All right. I think we're going to stop

2     now. I'd like you to come back at 2:15. I want to make sure I

3     give you enough time to eat. I may decide this motion this

4     afternoon, but I may not, because I'm very interested in

5     hearing the reexam argument today. As I say, I haven't been as

6     immersed in that. So try to get back by 2:00, but if it's just

7     not possible, don't worry about it. And I'll try to get back

8     by 2:00, too. We'll finish this, and then I think we'll go

9     into the other argument while I would rather -- that's probably

12:59 10   what we'll do. Please be prepared to argue the reexam motion

11    when we finish this one. All right. Court is in recess.

12          (Recess taken 12:58 p.m. to 2:05 p.m.)

13          THE COURT: Good afternoon. If you'd like to continue

14    and conclude.

15          MR. DISKANT: I will do both, Your Honor. Thank you.

16    May I have the screen back again?

17          THE COURT: What slide are we on?

18          MR. DISKANT: This is 70. So when we broke, we were

19    talking about unjustified extension of patent term. Your Honor

02:05 20   was questioning about the expectations of the public and the

21    patentee and stability in the patent system.

22          So if we just look at the timeline, in September 2001

23    the '471 patent issued. At that time there was not a single

24    Federal Circuit case that suggested that it could possibly be

25    subject to a double patenting problem with respect to any

 1    patent that issued afterwards.  The only double patenting issue

 2    relates to patents that issued before.  And when we move on to

 3    reexam issues this afternoon, those will be patents that are

 4    issued before.  Patients that issued after had nothing to do

 5    with double patenting analysis insofar as the court was

 6    concerned, the patentees, the public, anyone.  So when the '444

 7    patent was filed, it was going to issue later, and it did issue

 8    later.  As a consequence, it presented no double patenting

 9    issue to anyone with respect to invalidating the '471.  There

02:07 10    is and was a double patenting issue under then current law, and

11    it was the reverse issue.  The question was, since the '471

12    already existed, the '444 patent might pose a double patenting

13    problem with respect to itself.  And in terms of, you know, the

14    stable enforcement of the law and justified expectations of the

15    public, the Patent Office perceived that problem and enforced

16    it.  The Patent Office rejected the '444 patent because of the

17    existence of the '471 patent.  It's the opposite.

18         THE COURT:  Well, they rejected it.  Then what

19    happened?

02:07 20         MR. DISKANT:  Then, so they rejected it for double

21    patenting, obviousness-type double patenting.  Now, you ask why

22    would they do that when it's going to expire earlier?  And the

23    reason is --

24         THE COURT:  No, no.  It got issued.

25         MR. DISKANT:  It didn't get issued --

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 250 of 500 PageID: 1529
Case 1:15-cv-10698-MLW Document 252 Filed 03/25/16 Page 93 of 194

93

1          THE COURT:  The '444?

2          MR. DISKANT:  Yes, it did.

3          THE COURT:  You're saying it was rejected.  Something

4     happened and then it got issued.

5          MR. DISKANT:  That's correct.  That's what I'm going

6     to tell you.  What happened is it got rejected.  I'm addressing

7     why would it be rejected when it's going to expire earlier.

8     And the reason it gets rejected is because there's the other

9     double patenting problem, multiple lawsuits.

02:08 10          So in the record, and unfortunately I don't have a

11    slide, but it's docket 188, Exhibit A, you will see the

12    rejection of the '444 application in light of the '471 patent,

13    issued patent.  That's the stable application of double

14    patenting law.  The rejection goes to the problems with the

15    '444, not the '471.

16          Then Janssen responds to that rejection by filing a

17    terminal disclaimer.  And it basically says -- well, obviously

18    not going to run past the '471, but it also says in the

19    terminal disclaimer, "We agree that this patent will be

02:09 20    enforceable only so long as it's commonly owned with the '471

21    patent, avoiding the risk of multiple lawsuits."  And with that

22    terminal disclaimer, the '444 patent issues over the double

23    patenting objection.  Well, double patenting objections don't

24    go both ways.  One has a problem or the other one has the

25    problem.  The problem, if there's any problem --

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 251 of 500 PageID: 1530
Case 1:15-cv-10698-MLW Document 292 Filed 03/25/16 Page 94 of 194

94

        1        THE COURT:  I think that -- Well, anyway.  Go ahead.

        2        MR. DISKANT:  The problem, if there was a problem,

        3   under stable application of settled law was with the '444

        4   patent.  There was no basis for anyone, Celltrion, Pfizer,

        5   Hospira, any member of the public to look at the filing of the

        6   '444 patent and think, Oh, that's going to invalidate the '471.

        7   It couldn't possibly be under the law in 2001 or in 2004, and

        8   indeed the first time the Federal Circuit said that a

        9   later-issued patent could be used for double patenting

02:10  10   rejection was in *Gilead* in 2014.  So when one thinks about the

       11   stable -- that doesn't answer the question.  It's just part of

       12   the analysis.  But as part of the analysis when one thinks

       13   about the stable application of settled law and the justified

       14   application of the parties, that's what they were.

       15        THE COURT:  I mean, I've been thinking about this over

       16   lunch, too.  Here you have one company that owns both patents,

       17   and the patents overlap.  There's the more general '471 patent

       18   that includes the antibody that's specifically covered in the

       19   '444.  '444 expires in 2011.  Under your analysis, and you

02:11  20   could be right, the '471 essentially extends the life of the

       21   '444.

       22        MR. DISKANT:  No.

       23        THE COURT:  There's still a patent that covers the

       24   antibody.

       25        MR. DISKANT:  The '471 patent exists on its own.  It

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 252 of 500 PageID: 1531
Case 1:15-cv-10698-MLW Document 252 Filed 03/25/16 Page 95 of 194

95

1    issued in 2001.  The entire world understood it would have 17

2    years of life.  It has 17 years of life.  The '444 patent is

3    gone.  Their claims are not identical.  They're patentably

4    indistinguishable, but they aren't identical.  For all I know,

5    some hypothetical infringement case, we could win one and lose

6    the other.  I'm not saying that's true.  I don't know.

7             THE COURT:  But *Gilead* talks about not extending the

8    life of patentably indistinguishable alternatives.

9             MR. DISKANT:  That's correct.

02:12 10          THE COURT:  This may -- I mean, this may be too

11   commonsensical -- well, anyway, keep going.  This is useful.

12            MR. DISKANT:  To me, that's the right question, but

13   the question is -- and before you can invalidate the '471 for

14   double patenting, we ask whether the patentee has done

15   something to extend its life unjustifiably.

16            THE COURT:  But that's not the ultimate holding in

17   *Gilead*.  The ultimate holding in *Gilead* is that a later-filed

18   patent can -- and I guess they don't say "always," but "can" in

19   the circumstances of that case -- be the reference for an

02:13 20   earlier-obtained patent, earlier-filed patent.

21            MR. DISKANT:  Yeah, but *Gilead* also says in its

22   summary, "Because the obviousness-type double patenting

23   doctrine prohibits an inventor from extending his right to

24   exclude."  And that's exactly what -- that's in the bottom of

25   the second paragraph of the opinion.  That's exactly what

1    happened in *Gilead*.  The right to exclude was extended because

2    the priority date was moved.  And that extended --

3              THE COURT:  All right.  I think I understand.

4              MR. DISKANT:  I'm repeating myself.  Let me just wrap

5    up then.

6              Okay.  Our argument is it doesn't extend.  It's

7    reversing Congress's grant of a longer term.  They've got to

8    engage on unjustified extension of patent term.  I don't think

9    they do that.  They have arguments about Janssen's possible

02:13 10   motivation in seeking the '444 patent.  The only issue is

11   whether Janssen sought the '444 patent in some way that would

12   extend the term of the '471 and it didn't.  And lastly, through

13   the terminal disclaimer, there's no risk of multiple

14   litigation.

15             So that's how we would analyze the case, Your Honor.

16   Thank you.

17             THE COURT:  Thank you.

18             Would you like to respond?

19             MR. HURST:  Yes, Your Honor.  Can we put up our slide,

02:14 20   slide 3.  The arguments that counsel made are familiar

21   arguments that were actually -- most of which were addressed

22   head on in *Gilead*, head on, including the argument that counsel

23   made about this extending the right to exclude.  Counsel said

24   the question you should be considering, Your Honor, is whether

25   the '444 patent extended the life of the '471 patent.  That's

1    not the issue.  The issue is whether the '471 extends the life

2    of the '444 patent.  That's the issue.

3         And literally, the argument that counsel made is

4    addressed right in the opinion.  *Gilead* made the same argument

5    about looking at it in the reverse way, and the court declined

6    to do so.

7         Can I take just a little bit of time to walk through a

8    couple of points in *Gilead* I wanted to go to?

9         THE COURT:  Okay.  But actually, here.  Just pause for

02:15 10   a second.

11        MR. HURST:  Sure.

12        THE COURT:  When you say the issue is whether the '471

13   impermissibly extends the life of the '444 -- that's somewhat

14   the way I began to think about it more over lunch -- why do you

15   say that's the proper way to frame the issue?

16        MR. HURST:  Because under this bedrock principle that

17   has existed forever, the question you are asking is when a

18   patent expires, the public has the right to expect -- by the

19   way, it's the public's expectations that are critical here.

02:16 20   When a patent expires, under long-held principles, the public

21   has a right to practice that claimed invention and any obvious

22   modifications.  And a patent owned by the same patent owner

23   that stands in the way of that right has been invalid for

24   double patenting since forever.  And that's a situation we face

25   here.  I wanted to show you --

```
 1          THE COURT:  The plaintiff says, No, we're not trying
 2   to extend the '444.  We're trying to, you know, get the
 3   additional years we have a right to under the '471.  Why is
 4   that incorrect?  Because the inventions are patentably
 5   indistinct.
 6          MR. HURST:  Patentably indistinct and because the way
 7   the principle has always worked is you look at the earlier-
 8   expiring patent and you say to yourself, at that point in time
 9   the public has the right to say, Okay, when that patent
02:17 10   expires -- it was part of the bargain, it was part of the deal
11   that the patent owner made.  When that patent expires, I, at
12   the public level, have a right to practice that invention or
13   any obvious modifications.  And the key for double patenting is
14   a commonly owned patent can't stand in the way.  And if it
15   does, it's invalid for double patenting.  I think it's extra
16   clear.  Some of your discussion with opposing counsel I thought
17   was really helpful --
18          THE COURT:  Thank you.
19          MR. HURST:  -- because I started to focus on some of
02:17 20   the concerns you were raising and some of the points that
21   counsel was making.  And if you go to -- there's a chart, Your
22   Honor, just to show you how indistinguishable these cases are
23   in principle, in principle.  It's on page 1210.
24          THE COURT:  I have the chart on 1211.
25          MR. HURST:  Okay.  I have a Westlaw printout.  I'm
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 256 of 500 PageID: 1535
Case 1:15-cv-10698-MLW Document 262 Filed 03/25/16 Page 99 of 194

99

1    trying to match up my numbers.

2          But if you look at this chart, you'll see the '483 was

3    the later-expiring patent, that was the one that was challenged

4    and invalidated.  It's a longer patent, 18-year patent.  It

5    issued earlier.  The '375 patent issued later, expired earlier.

6    It was only a 16-year patent.  Okay?  So for our purposes, the

7    '375 is akin to the '444, and the '483 is akin to the '471.

8          Now look at the Court's reasoning.  If you go to --

9    and this is where *Gilead*'s counsel makes the same argument as

02:18 10    Janssen's counsel is making here.  If you go to -- I hope this

11    is the right page, Your Honor -- 1214.  Towards the bottom of

12    the paragraph that begins with "In that principle."

13          THE COURT:  I'm sorry?

14          MR. HURST:  There's a paragraph that says "*Gilead*'s

15    response."  It's right above that.

16          THE COURT:  Okay.

17          MR. HURST:  It says, "The '483 patent," that's the

18    later-expiring patent, "therefore extends the inventor's term

19    of exclusivity" --

02:19 20          THE COURT:  Hold on a second.  It's above the --

21          MR. HURST:  There's two headnotes, 6 and 7.

22          THE COURT:  Yes.

23          MR. HURST:  It's at the bottom of that paragraph about

24    two sentences from the beginning.

25          THE COURT:  Okay.

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 257 of 500 PageID: 1536
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/18 Page 100 of 194

100

1      MR. HURST:  So it says, "The '483 patent," that's

2    equivalent to our '471, "therefore extends the inventor's term

3    of exclusivity on obvious variants of the claimed invention in

4    the '375," that's equivalent to our '444, "for an additional 22

5    months past the expiration of the '375."  That plainly violates

6    the public's right -- this is the public's expectation -- the

7    public's right to use the invention claimed in the '375 patent

8    and all obvious variants of it after the '375 patent expires.

9    You can replace '444 for '375 and '471 for '483, and it would

02:20 10   apply directly.

11      Here is the point I wanted to emphasize.  The argument

12   Janssen is making, Your Honor, is exactly the exact argument

13   that *Gilead* made in the next paragraph.  *Gilead*'s response is

14   simply that the '375 patent -- now they go in reverse -- "the

15   '375 patent in no way extends the terms of exclusivity for the

16   '483 patent."  That's literally the argument that Janssen's

17   counsel made.  He said in no way does the '444 patent extend

18   the life of the '471 patent.  The Federal Circuit goes on to

19   reject that argument.  It recognizes that *Gilead* argues that we

02:21 20   should focus on the potential term extension for the '483

21   patent instead of the '375 patent because the '483 patent

22   issued first.  Again, that's the argument that Janssen just

23   made.  And the court says, "We see little import here to the

24   fact that the '483 patent issued first."  Then you go on to the

25   part of the opinion that you read earlier and you asked some

Case 2:16-cv-01925-JMV-JBC Document 69-1 Filed 04/13/17 Page 258 of 500 PageID: 1537
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/18 Page 101 of 194

101

1    questions about, Your Honor.

2         THE COURT:  What about the line a little further?  It

3    says, "Those cases dealt with patents to which the URAA did not

4    apply."

5         MR. HURST:  Right.  So what they're saying here is

6    pre-URAA, the rules weren't different, but the courts often

7    talked about earlier-issued and later-issued as proxies for

8    earlier-expired, later-expired.  And that's clear to me, Your

9    Honor.  If you go to the next -- they cite a series of cases,

02:22 10    right?  Then if you go to the bottom of that paragraph, it

11    says, "As discussed above, the primary ill avoided by

12    enforcement of the double patenting doctrine is restriction on

13    the public's use, the public's rights, freedom to use the

14    invention claimed in a patent and all obvious modifications of

15    it after that patent expired," with italics.  Therefore, they

16    say the focus on controlling the patent term of a later-issued

17    patent in those cases, it makes perfect sense because before

18    the URAA issuance dates and expiration dates matched up.  I

19    just want to go to the bedrock principle.  They say, "As

02:22 20    discussed above," Your Honor, you know what's discussed above?

21    It's that bedrock principle we just talked about.  And if you

22    want to take a look at it, it's page 1214, headnote 5.

23         "It's a bedrock principle of our patent system" --

24         THE COURT:  I have that.

25         MR. HURST:  My point is that principle is the

Case 2:16-cv-01925-JAK-AFM Document 69-1 Filed 04/13/17 Page 259 of 500 Page ID: 1538
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/18 Page 102 of 194

102

 1    principle that controlled in *Gilead* to invalidate the
 2    later-expiring patent.  That bedrock principle is the principle
 3    that should control here to invalidate the '471 patent.  And
 4    one thing that counsel said a number of times is nobody could
 5    have ever envisioned this circumstance when they took the '444
 6    patent.  Who could have ever thought, right?  That bedrock
 7    principle existed for 100 years, over.  And it is literally the
 8    principle that *Gilead* relied on.  So I hear counsel saying
 9    that, but any time two patents are issued that have patentably
02:24 10   indistinct inventions, you have to recognize that the later
11    patent, later-expiring patent is in jeopardy unless you can
12    rely on something like a safe harbor.  And here they can't.
13            THE COURT:  Okay.
14            MR. HURST:  The last thing I just want to say real
15    quickly, Your Honor, is in terms of what Congress had in mind.
16    You talked a little bit about what did Congress have in mind
17    when they issued this statute.  Congress issued a statute that
18    didn't say one word about comparing patents or the validity of
19    patents when compared.  It literally is a mechanical,
02:24 20   Here-is-your-patent term.
21            Double patenting, Your Honor, it is a judicially
22    created doctrine.  It was created by the Supreme Court.  It's
23    been enforced by the courts.  It has nothing to do with
24    Congress.  Congress never -- as far as I know, Congress has
25    never spoken to double patenting, and it didn't do so in this

 1    case through GATT.  It was silent on it, I think counsel

 2    correctly acknowledged.  And therefore the longstanding

 3    principles of double patenting ought to control this case.

 4            Unless you have questions --

 5            THE COURT:  No, I don't think so.  I do want to move

 6    to the reexamination rather than try to decide this now.  I

 7    want to take a brief break so I can get reorganized, and then

 8    we'll go.  Thank you.

 9            (Recess taken 2:24 p.m. to 2:37 p.m.)

02:36 10            THE COURT:  All right.  Now we'll move to the

11    reexamination motion for summary judgment that the defendants

12    have brought.  I haven't -- I've studied this one but not as

13    deeply as the first.

14            My very tentative view is that the defendant is

15    entitled to prevail on this motion.  I have some questions --

16    well, generally, just to be as transparent as possible so you

17    can address it, it's my tentative view that because the

18    application at issue is a continuation-in-part and not a

19    divisional application on its face, it's not entitled to the

02:38 20    protection of the Section 121 safe harbor.

21            I think it's not disputed that if a one-way

22    obviousness test applies, the plaintiff flunks.  With regard to

23    the two-way obviousness test, I have some questions.  As I

24    understand it, the two-way obviousness test applies when a

25    patent for a basic invention is filed first and later there's

Case 2:16-cv-01925-JMV-MF  Document 69-1  Filed 04/13/17  Page 261 of 500 PageID: 1540
Case 1:15-cv-10698-MLW  Document 232  Filed 08/25/16  Page 104 of 194
104

1    an application for an improvement that's issued first.  I

2    believe that here the inventor filed for the three patents

3    involved in this on the very same day, or at least two out of

4    the three, the '471 and the '272.  So I wonder in these

5    circumstances whether the two-way double patenting issue is

6    implicated.  Unlike the Patent Office at the moment, I don't

7    think *Berg* decided that issue.  I think *Berg* was decided on

8    other grounds.  But that's one question.

9          Then I actually have a question of whether the

02:39 10   two-way -- you know, whether the two-way test should be applied

11   as ripe for decision on a motion for summary judgment.  I know

12   that under *Hubbell*, 709 F.3d at 1149, the two-way test is

13   ultimately a question of law.  However, as I understand it, or

14   possibly misunderstand it, the issue under the two-way test is

15   whether the PTO was solely responsible for deciding -- for the

16   fact that the second-filed application was issued first or

17   whether the applicant caused or contributed to the delay.

18          That's a question of fact, I believe.  And as my

19   friend and colleague Judge Bennett wrote in Iowa, in *Engineered*

02:40 20   *Products*, 225 F. Supp. 2d 1069 at 1089, it's possible that a

21   material fact with regard to the applicability of the two-way

22   test is implicated.  This type of issue may be more familiar to

23   me than to you.  It's what judges confront when we have to

24   decide whether a police officer has qualified immunity in a

25   section 1983 case.  And if there are material facts in

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 262 of 500 PageID: 1541
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/18 Page 105 of 194

105

1    dispute -- qualified immunity is an issue of law, but if there

2    are material facts in dispute, I have the jury decide the

3    facts, and then relying on those facts, I make the decision of

4    law.  So that's a question I have here that I don't think the

5    parties have addressed.

6          The issue may be material to whether the two-way test

7    applies, although there are also -- although I usually don't

8    give advisory opinions, if that is a disputed material fact, it

9    could perhaps be leapfrogged, imprudently be leapfrogged for me

02:42 10    to decide if the plaintiff fails the two-way test even if it's

11    involved.  I mean, my general sense of this, and it's part of

12    the reason we're spending so much time on it and why I want to

13    decide it orally, is that a prompt decision is important to

14    you.  Its certainty is important.  And somebody's probably

15    going to appeal this if you don't settle your disputes.  So

16    maybe I would tell you how I would decide the two-way

17    obviousness issue if it were ripe to be decided.

18          Then I want to know whether the parties agree the

19    two-way test is an objective test, not a subjective test.

02:43 20    That's how I read, at the moment, the Federal Circuit's

21    decision in *Fallaux*, 564 F.3d 1313 at 1317.  The Federal

22    Circuit there says, "Nefarious intent is not required."  It

23    looks like it's focusing on what happened as a result of the

24    inventor's, the patentee's conduct, not what the motive for the

25    conduct was.

Case 2:16-cv-01925-JMV-MF   Document 69-1   Filed 04/13/17   Page 263 of 500 PageID: 1542
Case 1:15-cv-10698-MLW   Document 232   Filed 08/25/16   Page 106 of 194

106

1          And then, the defendant says it's undisputed that the

2     plaintiff -- and the plaintiff would agree -- that the '471 is

3     invalid under a one-way test.  I would be interested in

4     clarification or confirmation concerning that.  So that's my

5     present state of mind.

6          MR. HURST:  Thank you.

7          THE COURT:  Would you like to go first again?

8          MR. HURST:  Sure.  Thank you, Your Honor.

9          THE COURT:  We have another set of slides that we'll

02:45 10    make Exhibit C.

11          MR. HURST:  Just to start, I think we've already

12    confirmed this, at least currently the '471 patent is before

13    the Patent Office and declared or deemed to be invalid over the

14    '195 and '272 patents.

15          There's three questions.  We think they're all

16    questions of law.  I have them up here on the screen.  One is

17    does the safe harbor apply; two, one-way versus two-way; and

18    three, if two-way applies, can you consider the specification

19    of the '471 patent.  And that we think is dispositive as well.

02:45 20    So you outlined it correctly, I believe, Your Honor, as I heard

21    it.

22          The way it would work is if we prevail on issue one,

23    safe harbor, then if we prevail on either issue two or issue

24    three, we would prevail.

25          THE COURT:  On either issue?

Case 2:16-cv-01925-JMV-MF  Document 69-1  Filed 04/13/17  Page 264 of 500 PageID: 1543
Case 1:15-cv-10698-MLW  Document 232  Filed 08/25/18  Page 107 of 194
107

```
 1            MR. HURST:  Yeah, because say the safe harbor doesn't

 2    apply.  Then you go to question two.  If the one-way test

 3    applies to either --

 4            THE COURT:  Hold on a second.  What slide is that?

 5            MR. HURST:  I'm sorry, slide 3.

 6            THE COURT:  All right.

 7            MR. HURST:  So if the one-way test applies to either

 8    of the referenced patents, including the one filed on the same

 9    day, we would prevail.  We wouldn't have to go any further.  If

02:46 10    you decide that the two-way test must be applied to both

11    referenced patents, we could still prevail if we prevailed

12    under the two-way test.

13            Now I'm going to talk about how we think we'd do.

14            THE COURT:  What are the two -- hold on a second.  The

15    two patents you say were filed on the same day are what?

16            MR. HURST:  '272 and '471.

17            THE COURT:  They were filed February 4, 1994?

18            MR. HURST:  That's correct.

19            THE COURT:  When was the '452 filed?

02:47 20            MR. HURST:  I believe September of '94, although I'm

21    not absolutely certain.

22            THE COURT:  I think in your opening brief at page 13

23    you tell me that the '452 is also filed February 4.  I don't

24    know whether this makes any difference.

25            MR. HURST:  It might have been a mistake.  It wouldn't
```

Case 2:16-cv-01925-JMV-MF  Document 69-1  Filed 04/13/17  Page 265 of 500 PageID: 1544
Case 1:15-cv-10698-MLW  Document 232  Filed 08/25/16  Page 109 of 194
108

 1    make a difference, right, because we only need one patent filed

 2    on the same day for us to prevail.  If we said that, Your

 3    Honor, it was a mistake.  It's October of '94.

 4            THE COURT:  So the '452 is October.

 5            MR. HURST:  You said '452?  There are two patents.

 6            THE COURT:  Let me see the brief I just cited.

 7            I see.  Maybe I was looking at the '452 instead of the

 8    '195.  I see.  Is it the '195 that's --

 9            MR. HURST:  The '195 was filed in October of 1994,

02:48 10   October 18, and the '272 patent was filed on February 4, 1994,

11    same day as the '471 patent.

12            THE COURT:  All right.

13            MR. HURST:  Should I proceed?

14            THE COURT:  Go ahead.

15            MR. HURST:  That's the way we think it will shake out.

16    If we prevail on issue one and either issue two or three, we

17    should prevail on summary judgment.  So let's just start at

18    issue one.  You tell me if I'm giving you too much background,

19    but I was going to give a little bit of context.

02:49 20           THE COURT:  Go ahead.

21            MR. HURST:  In terms of the basics of patent

22    prosecution, '471 was filed as a continuation-in-part.  There's

23    four possible applications you can file in the Patent Office,

24    the original one, continuation, continuation-in-part,

25    divisional.  A continuation-in-part adds new matter, as I'm

1    sure you know.  You take the original application, you amend

2    it, you add new stuff, then you have to call it a

3    continuation-in-part.  Both the continuation and a divisional

4    are just copies of the original.  But they're labeled

5    differently.  But in neither case is there any new matter.

6            So why do you have two types of applications?  Your

7    Honor, the divisional is specially designed to deal with this

8    restriction requirement situation, where you get a restriction

9    requirement, and you file a divisional in order to take

02:50 10   advantage of the safe harbor.

11           Am I getting too basic here?

12           THE COURT:  No, not at all.

13           MR. HURST:  All right.  So here is part of the text of

14   Section 121, on its face, it says it only applies with respect

15   to the original -- so here is how it happens.  You go to the

16   Patent Office.  You file one application.  Patent Office says

17   to you, as a patent holder, You know something, guys?  You have

18   more than one invention here.  So you have to break them off.

19           THE COURT:  More than one invention that might or

02:50 20   might not be patentable?

21           MR. HURST:  That's true.

22           THE COURT:  I'm just trying to make sure I understand

23   it.

24           MR. HURST:  Totally, right.  You have more than one

25   subject matter for invention analysis.  So here is one example.

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 267 of 500 PageID: 1546
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 110 of 194
110

1    One example might be you file a patent that says, I came up

2    with a brand new chemical compound, and you say, My new

3    chemical compound can be used to treat the common cold.  Patent

4    Office might say, That's two inventions, new chemical compound,

5    new way to use, so divide them up.  The way you're supposed to

6    proceed once you get that restriction requirement is you can

7    keep your common chemical compound and original application,

8    but then you have to file a divisional to take advantage of 121

9    on using your new chemical compound to treat the common cold.

02:51  10          THE COURT:  And a divisional would add no new

11    material?

12          MR. HURST:  No.  Divisional should add no new

13    material.  It cannot.

14          THE COURT:  If you add the new material it's a

15    continuation-in-part?

16          MR. HURST:  That's right, that's right.  Now, this

17    issue, Your Honor -- this is a statute issued by Congress.  So

18    I understand you don't have a big load of patent cases, but

19    this is actually a statutory interpretation issue:  Does

02:52  20    divisional application under the statute mean divisional

21    application.

22          THE COURT:  Okay.  Go ahead.

23          MR. HURST:  I don't want to interrupt.

24          THE COURT:  No.  Go ahead.

25          MR. HURST:  There's three cases, *Pfizer*, *Amgen* and

Case 2:16-cv-01925-JMV-MF   Document 69-1   Filed 04/13/17   Page 268 of 500 PageID: 1547
Case 1:15-cv-10698-MLW   Document 232   Filed 08/25/16   Page 111 of 194

111

1    *G.D. Searle.*  All three cases, Your Honor, treat this as a

2    traditional matter of statutory interpretation.  They say,

3    What's the plain language of the statute?  They literally look

4    at the legislative history.  They literally say, What were the

5    circumstances when Congress enacted the statute?  Did they know

6    there were these four different kinds of applications?  And if

7    so, the plain meaning has to control.  That's what *Pfizer* said

8    in 2008.  The same argument that Janssen is making here, *Pfizer*

9    argued that the terms "divisional" and "continuation-in-

02:53 10   part" -- this is slide 7, that the terms "divisional" and

11   "continuation-in-part" are merely labels used for

12   administrative convenience and that accordingly, although after

13   the restriction requirement they filed a CIP, they said it's in

14   effect a divisional because it was filed in response to a

15   restriction requirement.

16        How did *Pfizer* resolve the issue?  Legislative

17   history, circumstances when the statute was enacted, and they

18   relied on the plain language.  Section 121 explicitly refers to

19   divisional applications.  That safe harbor, by its literal

02:53 20   terms, protects only divisional applications.  So they treated

21   it as a straightforward statutory interpretation exercise.

22        So with respect to *Pfizer*, one of the things that

23   Janssen is arguing to try to distinguish *Pfizer* is to say that

24   in the *Pfizer* case, the new matter that was added to the CIP in

25   *Pfizer* was important.  Here they say the new matter that was

Case 2:16-cv-01925-JAK-AFM   Document 69-1   Filed 04/13/17   Page 269 of 500  Page ID: 1548
Case 1:15-cv-10698-MLW   Document 232   Filed 08/25/16   Page 112 of 194

112

1    included in their CIP was unimportant.  So in *Pfizer*, you

2    couldn't ignore the new matter because it was important, and

3    therefore it had to be treated as a CIP.  Here, in this case,

4    they're saying the new matter was unimportant, and therefore

5    you can treat that CIP as a divisional.  That's the argument

6    that they made.

7         But *Pfizer* rejected -- *Pfizer*'s rationale and

8    rejection of treating a CIP as a divisional had nothing to do

9    with the importance of the new matter.  It literally had to do

02:54 10  with when Congress said "divisional application," did Congress

11   mean divisional application?  And the answer was yes.

12        THE COURT:  Let's see.  What page of --

13        MR. HURST:  1362.

14        THE COURT:  1362.  Okay.

15        MR. HURST:  They say.  "We conclude that the

16   protection afforded by Section 121 to applications filed as a

17   result of a restriction requirement is limited to divisional

18   applications," and their analysis was as simple as this one

19   was.  It was a CIP, not a divisional application.  The decision

02:56 20  did not in turn turn on the importance of the new matter.

21   That's even more clear, though, from *Amgen*, which was decided a

22   year later.  This is slide 9.

23        THE COURT:  Just one second.

24        MR. HURST:  Take your time, Your Honor.

25        THE COURT:  *Amgen* at 1353?

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 270 of 500 PageID: 1549
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 119 of 194

113

```
 1          MR. HURST:  Yes.

 2          THE COURT:  Go ahead.

 3          MR. HURST:  So the reason Amgen we believe refutes

 4  this argument about a need to focus on the importance of the

 5  new matter is because Amgen dealt with a continuation.  There

 6  wasn't new matter.  So Amgen is really close to a divisional in

 7  the sense that both the continuation application and a

 8  divisional application had no new matter.  It's literally just

 9  the title.  And in this case in response to restriction

02:58 10  requirement, the patent owner filed a continuation rather than

11  a divisional.

12          THE COURT:  And what did Janssen file, a continuation

13  or continuation-in-part?

14          MR. HURST:  Continuation-in-part.

15          THE COURT:  That's what I thought.

16          MR. HURST:  So once removed.  And how did Amgen -- if

17  equities were to control here, right?  This seems like it's not

18  even -- there's no change to the application.  They literally

19  could have just said "divisional" rather than "continuation,"

02:58 20  and they could have taken advantage of Section 121.  How did

21  the court decide it?  They read the statute.  The statute on

22  its face applies only to divisional applications, and a

23  continuation application, like a continuation application in

24  part, like Pfizer, is not a divisional.  It was really that

25  simple and straightforward.
```

Case 2:16-cv-01925-JMV-MF   Document 69-1   Filed 04/13/17   Page 271 of 500 PageID: 1550
Case 1:15-cv-10698-MLW   Document 232   Filed 08/25/16   Page 114 of 194

114

1      They address the argument -- they went on to address

2  the argument that Janssen is making here about, even though it

3  was labeled as a continuation, you ought to treat it as a

4  divisional.  This is *Amgen* at 1354.  That's the argument *Amgen*

5  made.  They said, Look, we could have filed these continuation

6  applications as divisional applications, so you should treat

7  them as such.  And the court said, "We decline to construe, in

8  'divisional application' in Section 121 to encompass *Amgen*'s

9  properly filed, properly designated continuation application."

02:59 10  This is slide 10.  That's what we have here.

11      Janssen filed a properly filed and a properly

12  designated continuation application in part.  *Amgen* filed a

13  properly filed and properly designated continuation

14  application, and in neither instance does that meet the plain

15  language of Section 121, which says "divisional application."

16  The court in *Amgen* goes on to explain how close divisionals and

17  continuation applications are, at slide 10.  And they talk

18  about this.  They say, "Unlike a continuation-in-part

19  application, a continuation application can satisfy the

03:00 20  definition of divisional application in MPEP 201."  Why?

21  Because it does not add new matter.  So whereas a continuation

22  and divisional applications are limited to subject matter

23  disclosed in the earlier application, CIP adds matter.

24      What did the court say?  This is the last line there.

25  They say, "This distinction, however, does not justify

Case 2:16-cv-01925-JMV-MF   Document 69-1   Filed 04/13/17   Page 272 of 500 PageID: 1551
Case 1:15-cv-10698-MLW   Document 232   Filed 08/25/18   Page 115 of 194

115

1    departing from a strict application of the plain language of

2    Section 121, which affords its benefit to divisional

3    applications."  So they consider this whole analysis of plain

4    language analysis under the statute, and that ought to control.

5         Now, so there's -- what else does Janssen say?

6    Janssen, Your Honor, as you know, they went to the Patent

7    Office during this reexam.  So, well after patent issuance, the

8    public was entitled to rely on the fact that the '471 was not

9    entitled to safe harbor protection because it didn't have a

03:01 10    continuation -- it wasn't filed as a divisional, right?  But

11   they altered the application during the reexamination.  They

12   got an amendment.  And the amendment was to delete all the new

13   matter and change the label from a CIP to a divisional.  So

14   right now, in the Patent Office proceedings, they amended the

15   original application well after patent issuance on the '471

16   patent.

17        That doesn't matter for a variety of reasons, but one

18   particular reason for Your Honor's benefit is that amendment on

19   slide 11, it can't take effect until the reexamination is over.

03:02 20    So for this proceeding here, your assumption, you should treat

21   the '471 patent as something that was issued off a CIP, because

22   the amendment that Janssen has tried in the Patent Office --

23   tried to get in the Patent Office does not take effect until

24   that reexamination is over, and who knows when that will be.

25   There's a CFR regulation on that that we cite at page 11.  I

Case 2:16-cv-01925-JMV-MF   Document 69-1   Filed 04/13/17   Page 273 of 500 PageID: 1552
Case 1:15-cv-10698-MLW   Document 232   Filed 08/25/16   Page 116 of 194

116

1    don't think there's any dispute about that.  Both parties have

2    talked about this fact.

3          But even if you were to consider the amendment that

4    has now occurred in the Patent Office, it wouldn't make any

5    difference because of the *Searle* case.  The *Searle* case which

6    was just decided in 2015, it was the same circumstance.  What

7    happened is, the patent was issued off a CIP.  It was actually

8    the same patent issue in the *Pfizer* case.  The patent was

9    issued off of a CIP.  The patent owner goes back to the Patent

03:03 10   Office and says, Let me amend my patent application.  I'm going

11   to amend it by deleting new matter, so it goes from a CIP, and

12   I'm going to change the label from CIP to divisional.  So they

13   amend it back to what it would have if they had done it right

14   the first time, giving them the benefit of 121.  And the

15   Federal Circuit said no.  They said -- there's a new litigation

16   of the patent, the Federal Circuit said, "Despite being

17   designated as such in the reissue patent," as a divisional it

18   doesn't change anything because, "Simply deleting that new

19   matter from the reissue patent does not retroactively alter the

03:03 20   nature," of the original application, which was filed as a CIP.

21   "Because neither of the '068 patent's application is a division

22   of the original '594 application, Section 121 does not apply."

23          THE COURT:  There's also a fairness issue here.

24          Go ahead.

25          MR. HURST:  There's also a fairness issue here because

Case 2:16-cv-01925-JMV-MF   Document 69-1   Filed 04/13/17   Page 274 of 500 PageID: 1553
Case 1:15-cv-10698-MLW   Document 232   Filed 08/25/16   Page 117 of 194

117

1    the public, when making decisions, business decisions about

2    which products to pursue and not pursue, are entitled to look

3    at issued patents for what they are, and the '471 patent did

4    not have safe harbor protection.  And to try to somehow give it

5    safe harbor protection not only well after the fact but like

6    years after the fact, years after the '471 patent has already

7    been in existence for quite some time would be unfair, so I

8    think the *Searle* case got it right.

9         Moreover, a future, a change, belated change to the

03:05 10   application, switching it from a CIP to a divisional, cannot

11   change historical facts, and because you can't change those

12   historical facts, you can never get yourself under 121.  Here

13   is why I say that.  In response to a restriction requirement,

14   you have to file the divisional application.  They didn't do

15   that.  They filed a CIP.  That's an historical fact you can't

16   change after the fact, number one.

17        Number two, that divisional application has to be

18   filed before the issuance of the patent on the other

19   application.  This would be the '272 one in '95.  They didn't

03:05 20   do that either.  Temporally under the statute doing it now here

21   in 2016 would be too late.

22        Now, one last thing, in some of the briefs, Your

23   Honor, Janssen has suggested that you ought not decide this

24   issue.  You should wait until the Patent Office proceedings

25   move forward.

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 275 of 500 PageID: 1554
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/18 Page 119 of 194

118

1          THE COURT:  I already denied the stay.

2          MR. HURST:  I believe that's correct.  Janssen -- I

3    know that's correct.  Janssen said that, Well, if your decision

4    could be mooted by what happens in the Patent Office.  That's

5    not true.  If you were to invalidate the '471 patent based on

6    the existing record, this dispute is over.  We cited a case on

7    that to send you.  That case is a case where they lost the

8    case, then a new patent emerged from reexamination.  The

9    Federal Circuit says you can't start over.  You can't have a

03:06 10   second bite at the apple.  You've lost, so the new patent out

11   of the reexamination can't change anything.

12          THE COURT:  Will the reexamination continue if I find

13   this invalid?

14          MR. HURST:  I believe that it would not.  I believe

15   that it would not because once you declare -- here is what I

16   think.  If you were to declare the patent invalid, that

17   information would have to go to the Patent Office.  So it would

18   stand invalidated.  I believe what they could do is stay those

19   proceedings until your case inevitably is going to go up to the

03:07 20   Federal Circuit.  I think they can do that, but there would be

21   no reason for them to continue because the patent would stand

22   invalid.

23          You had a conversation with Mr. Diskant about this

24   earlier, and we just thought it was helpful to put this

25   exchange in the record.  It's on page 15.  You asked this

Case 2:16-cv-01925-JMV-JMF Document 69-1 Filed 04/13/17 Page 276 of 500 PageID: 1555
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 119 of 194

119

 1    question to Mr. Diskant.  You said, Let's say I denied the stay
 2    and granted summary judgment and then the PTO finds that the
 3    amended patent is valid, then I suppose you could get -- you
 4    could bring a new suit, a prospective suit at a minimum.  And
 5    Mr. Diskant says correctly, We believe under the case law, no,
 6    we would completely lose.  If Your Honor invalidated the patent
 7    based on the earlier prosecution history without considering
 8    the new change approved by the PTO to call the patent invalid,
 9    the PTO proceedings would end, and we would lose our patent.  I
03:08 10    believe that to be true.  I think he had it right.
11              THE COURT:  There's one thing I should have asked at
12    the threshold, which I think I know the answer to.  If you
13    prevail on the *Gilead* motion and the Federal Circuit agrees
14    with me, the reexamination motion is moot, isn't it?  You have
15    two grounds, and the other way around, too.
16              MR. HURST:  We have two grounds.  That's true, yeah,
17    that's true.  So it's not uncommon in patent cases where a
18    patent gets appealed and it's declared invalid on multiple
19    different grounds.  And the Federal Circuit typically addresses
03:08 20    all the grounds, but you only need one to win.
21              Okay.  So one last thing that I probably should
22    address.  Janssen has suggested that during the 1990s, the
23    practice in the Patent Office was that you didn't really need
24    to file a divisional application to take advantage of safe
25    harbor.  They said it was the practice back in the '90s -- they

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 277 of 500 PageID: 1556
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/18 Page 120 of 194

120

1  have an affidavit on this -- you could do a CIP if you wanted a

2  continuation and people didn't really care which application

3  was filed.  We don't agree with that.  We think the *Pfizer* case

4  actually references a bunch of Patent Office decisions agreeing

5  with their decision, so we don't agree with that.  But it also

6  doesn't matter.

7         So what the practice was in the '90s is not relevant

8  to Your Honor's decision for sort of fundamental jurisprudence

9  issues.  It's a principle -- we have a couple of cases up here

03:09  10  on slide 17.  But the principle that judicial decisions operate

11  retrospectively is familiar to every law student.  Once *Pfizer*

12  decided that 121 means what it says, it's got to be a

13  divisional application, that's the rule.  And even if *Pfizer*

14  had changed the law, which we do not believe they did, but even

15  if *Pfizer* had changed the law, that's the law that controls in

16  this case.  So it does not matter at all what people thought

17  the law might have been in the 1990s.

18         And then we have a Supreme Court case here, a quote

19  from Harper, which it really is a fundamental jurisprudence.

03:10  20  "When this court applies a rule of federal law to the parties

21  before it, that rule is the controlling interpretation of

22  federal law and must be given full retroactive effect in all

23  cases still open or on direct review as to all events

24  regardless whether such events predate or post-date our

25  announcement of the rule."  So applied here, the *Pfizer* rule

Case 2:16-cv-01925-JAK-MF Document 69-1 Filed 04/13/17 Page 278 of 500 Page ID: 1557
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 121 of 194
121

1    applies even if it was a change in the law, even if it was

2    different from what people thought in the '90s, and we really

3    don't think it was.

4         So that brings us to, if you were to agree on the safe

5    harbor, then you get to the one whether to apply one-way versus

6    two-way.  So I'm at slide 18.  Okay.  So I was going to sort of

7    explain why one-way versus two-way makes a difference.  Let

8    me -- maybe it just helps, real briefly.

9         The way this normally comes up, Your Honor, is where

03:11 10   you have your basic invention.  You know, say you invent a new

11   car engine where you get 60 miles a gallon.  So you file an

12   application.  You keep working on your car engine, and you end

13   up creating a new one with a new invention that gets you 100

14   miles per gallon.  When you go to the Patent Office, your new

15   invention is going to be patentable over your old one, right?

16        But what if they reverse, right?  Your new

17   100-mile-an-hour engine is going to be patentable over

18   60-mile-an-hour -- I'm assuming it's a new invention to get the

19   extra 40 miles.

03:12 20        But what happens if it gets reversed in the Patent

21   Office, right, and even though you filed for your improvement

22   patent a year after your basic patent, what if it gets

23   reversed?  Well, then the later-expiring patent would be the

24   basic patent, so your 60-mile-an-hour would end up being the

25   later-expiring patent, and it would actually, through a one-way

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 279 of 500 PageID: 1558
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 122 of 194

122

```
        1    test, be invalid, right?  Because the 60-mile-an-hour-engine

        2    would be obvious from the 100-mile-an-hour invention, right?

        3    So that's when this all comes up.

        4         But the key is, the key point is it's when you're

        5    applying for basic patents before your improvement patents and

        6    there's a reversal in the Patent Office.

        7         Here, if you were to decide -- that didn't happen for

        8    one of the two patents here, which is why I say that.  Here

        9    there's no dispute; Janssen admits that they're not contesting

03:13  10    that if you were to decide the one-way test applies, the '471

       11    patent is invalid.  The two-way test, Your Honor, is

       12    extraordinarily rare.  We have a bunch of cases that call it a

       13    narrow exception, applies in a narrow set of circumstances.

       14         THE COURT:  Okay.  So ordinarily the one-way test

       15    applies.

       16         MR. HURST:  Not only ordinarily but, like,

       17    extraordinarily --

       18         THE COURT:  Almost always you say.  What is the

       19    one-way test?

03:14  20         MR. HURST:  The one-way test would only ask, would

       21    only ask, whether the '471 invention is patentably distinct

       22    from the '272 or the '195.  So that only asks that question.

       23         THE COURT:  And the answer to that is?

       24         MR. HURST:  It's not patentably distinct.  It's not

       25    disputed.
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 280 of 500 PageID: 1559
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/18 Page 129 of 194

123

1          THE COURT:  And the plaintiff concedes that?

2          MR. HURST:  That's right.

3          That's my 100-miles-per-gallon engine versus --

4    one-way versus the 60-mile-an-hour, it's going to survive, but

5    if you reversed it, it wouldn't.  So it can make a difference

6    sometimes.  We don't think it makes a difference here, because

7    here, you have to ask the reverse question as well if you get

8    the two-way test, and we think you do not.

9          Okay.  The Federal Circuit has applied this only once

03:15 10   about 25 years ago.

11         THE COURT:  It's only been applied once?

12         MR. HURST:  Only once since its existence, right?

13   There used to be the CCP before the Federal Circuit.  So I

14   believe since the Federal Circuit was created in 1983, it

15   has -- I believe it has once -- if it's been more than once,

16   it's only going to be once or twice, but I believe it's only

17   been once.

18         But here is the test, and there's really two parts to

19   it.  The two-way test is only appropriate -- and this is from

03:16 20   -- you can find the same quote in many different cases, but

21   it's slide 22.  It's "only appropriate in the unusual

22   circumstance where the PTO is solely responsible" -- solely

23   responsible -- "for the delay in causing the second-filed

24   application to issue prior to the first."

25         So one key thing is, Your Honor, you don't get out of

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 281 of 500 PageID: 1560
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 124 of 194

124

        1    the starting gates unless you have a second-filed application

        2    that issued prior to a first-filed application.  So they have

        3    to come out of the Patent Office in the reverse order.  That's

        4    where, in our view, Your Honor, Janssen doesn't get out of the

        5    starting gates with respect to the '272 patent because there's

        6    been no reversal.  They filed them on the same day.

        7              THE COURT:  They filed two of them the same day.

        8              MR. HURST:  That's right.  They filed the '471 and the

        9    '272 on the same day.  So you don't really -- you do not get

03:17  10    into a question of whether two-way or one-way applies because

       11    you don't have the reversal that's required for you to get into

       12    the two-way test.

       13              THE COURT:  Why isn't that too mechanical or

       14    formulaic?

       15              MR. HURST:  Well, I would say it this way.  The

       16    two-way test only arose to address these reversals where your

       17    later-filed improvement patent ends up getting issued before

       18    your earlier-filed basic patent.  So if you have that reversal,

       19    in rare circumstances, if it's all the PTO's fault, then you

03:17  20    get to take advantage of the two-way test.

       21              But every case, I think every case that talks about

       22    the two-way test will refer temporally to the first-filed

       23    application versus the second-filed application.  We have not

       24    found -- and we did look.  We looked exhaustively for cases

       25    that applied the two-way test or even considered whether to

Case 2:16-cv-01925-JMV-MF  Document 69-1  Filed 04/13/17  Page 282 of 500 PageID: 1561
Case 1:15-cv-10698-MLW  Document 232  Filed 08/25/16  Page 125 of 194
125

 1     apply the two-test where two applications were filed on the

 2     same day, and we haven't found any.  The closest is *Berg,* and

 3     *Berg* obviously declined to apply.

 4              THE COURT:  What were the facts of *Berg*?

 5              MR. HURST:  It was a situation in *Berg* where the

 6     applicant filed two applications on the same day, and there

 7     were two components to the decision.  One is the court said,

 8     Well, you made the decision to file separate applications, so

 9     you took the risk of doing so.  But secondly, they pointed out

03:18 10   that they were filed on the same day.  So there had been no

 11    reversal.  And I have the quote from the case.

 12             THE COURT:  Where is that?

 13             You have the quote in --

 14             MR. HURST:  In my deck.  Can I quickly go to the MPEP

 15    and then go to *Berg*?  Because I think it's important.

 16             THE COURT:  Hold on a second.

 17             MR. HURST:  Sure.

 18             THE COURT:  What slide are you on now?

 19             MR. HURST:  24, *Berg*.

03:19 20         THE COURT:  Go ahead.

 21             MR. HURST:  So this is the Manual of Patent Examining

 22    Procedures.  It's the bible for how to examine patents in a

 23    Patent Office, and it's updated regularly.  There's extensive

 24    citation to Federal Circuit cases, how they're interpreted, how

 25    they're to be applied.  So this is a government agency, the

Case 2:16-cv-01925-JAK-AFM   Document 69-1   Filed 04/13/17   Page 283 of 500   Page ID: 1562
Case 1:15-cv-10698-MLW   Document 232   Filed 08/25/18   Page 126 of 194
126

1   Patent Office's work product here, deciding what *Berg* means.

2   And here is what it says.  Issued July 1998, so shortly after

3   *Berg* came out.  It cites *Berg*.  It says, "If both applications

4   are filed on the same day, only a one-way determination of

5   distinctiveness is needed."  You don't even have to get to

6   trying to decide whether or not it was appropriate to do the

7   unusual two-way test.  You stop there.

8          THE COURT:  Hold on just a second.

9          Let's see.  So the Patent Office document, the MPEP,

03:22 10   section 804, cites *Berg* for the proposition that you don't use

11   the two-way test if the applications were filed on the same

12   day, right?

13          MR. HURST:  That's correct, Your Honor.

14          THE COURT:  But *Berg* at 1433 appears not to have

15   relied on the fact that they filed -- two applications were

16   filed the same day.  It says, "Although the decision of the

17   Board affirming the application of the one-way test rather than

18   the two-way test to *Berg*'s application is correct, we hold,

19   however, that this case is not appropriate for application of a

03:23 20   control prosecution rates analysis to determine whether *Berg* is

21   entitled to the two-way test.  Rather we base our affirmance on

22   the second stated rationale of the Board:  because *Berg* could

23   have filed the claims of its second application in a single

24   application and it simply chose to file two applications

25   despite nearly identical disclosures, *Berg* is not entitled to

Case 2:16-cv-01925-JAK-MRW Document 69-1 Filed 04/13/17 Page 284 of 500 PageID: 1563
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/18 Page 12 of 194
127

1     the two-way test."

2          MR. HURST:  No question about it.  Important to this

3     decision was the fact that *Berg* could have filed in a single

4     application but they instead filed them in separate

5     applications.  Take a look at 1434.

6          THE COURT:  1434.

7          MR. HURST:  Actually, why don't you go to the bottom

8     of 1433.

9          THE COURT:  Go ahead.

03:24 10          MR. HURST:  *Braat* I believe is the case I know of

11     where the Federal Circuit applied the two-way test, and they

12     say, "its factual situation is not likely to be repeated."

13          THE COURT:  Hold on a second.  I think that's not --

14          MR. HURST:  There was a heading special circumstances

15     triggering the two-way --

16          THE COURT:  Yes.  Okay.  Go ahead.

17          MR. HURST:  So *Berg* relies on *Braat*.  There's very

18     little discussion in terms of what the facts were.  The Federal

19     Circuit ended up following the two-way.  This case said it "was

03:25 20     an unusual case; moreover its factual situation is not likely

21     to be repeated since the 1984 Act went into effect.  Even

22     assuming *that Braat* retains some vitality," this case "is

23     nevertheless indistinguishable."  Here is the point -- I don't

24     want to quibble.  There's no question in the world they -- in

25     *Berg* you didn't have to file these in separate applications, so

```
 1    therefore you're out of luck.  But there's also discussion
 2    about the additional requirements.  If you go to the second
 3    line of 1434.
 4              THE COURT:  Go ahead.
 5              MR. HURST:  "The court in Braat, however, emphasized
 6    the more typical scenario in which, despite common inventive
 7    entities, the two-way test applied," italics, "when a later
 8    filed improvement patent issues before an earlier filed basic
 9    invention."  So that's the temporal requirement as well.
10    There's other quotes in the case that say that.
11              Here is one on the slide.  "Berg should be viewed as
12    having taken a calculated risk by simultaneously filing two
13    separate applications.  It might gain the advantage of a
14    quickly issued narrow patent and also the advantage of a
15    broader application which took longer to issue."  So the
16    simultaneous filing was part of the decision.  That's how the
17    Patent Office understood it.
18              Then I collected a few quotes.  I don't know if it's
19    all of them, to tell you the truth.  But on slide 26, where
20    this temporal requirement is repeated in Berg, one, two, three
21    different times, and there might be more.  "When a later filed
22    improvement patent issues before an" --
23              THE COURT:  What's the rationale of making a
24    distinction between two applications filed, say, a day apart
25    and two applications filed the same day?
```

Case 2:16-cv-01925-JMA-MLW   Document 69-1   Filed 04/13/17   Page 286 of 500 PageID: 1565
Case 1:15-cv-10698-MLW   Document 232   Filed 08/25/18   Page 129 of 194

129

```
 1              MR. HURST:  Because in order to get yourself

 2    potentially to the two-way test, there has to be an unfairness

 3    that was brought upon you by the Patent Office.

 4              THE COURT:  Solely by the Patent Office?

 5              MR. HURST:  Solely by the Patent Office, where you did

 6    things in the right order, you sought your basic invention

 7    patent first, and you later sought your improvement

 8    application.  And the Patent Office, despite you doing those

 9    things in the right order, the Patent Office reverses them.  If

10    there's no reversal either because you filed your improvement

11    patent first or you filed them at the same time without a

12    reversal, nobody could ever say it was the Patent Office's

13    fault.  That's the reason.  Here is a good quote from *Berg*.

14    And this is between 34 and 35.

15              "The two-way test exception" -- and this is where it

16    actually highlights both requirements, Your Honor.  Here is

17    what they say.  "The two-way test exception can only apply when

18    the application could not avoid separate filings," so that's

19    the separate filing requirement but then it goes, "and even

20    then," even then, "only if PTO controlled the rates of

21    prosecution to cause the later filed species claims to issue

22    before the claims for a genus in an earlier application."  So

23    there's the temporal requirement, separate requirement, and it

24    does make logical sense, I believe.

25              That temporal requirement, I could tell you, every
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 287 of 500 PageID: 1566
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 130 of 194
130

1   case that talks about the two-way test talks about this

2   temporal requirement.  I'm not saying they deal with it

3   directly, but they recite the test, the general standard in

4   this way, this temporal requirement, later-filed/earlier-filed.

5   Okay?  So that's for the '195 patent that was issued on the

6   same day.  The '272 patent, as we've discussed before, was

7   issued later in time.  So you have to get -- if you reach that

8   patent, you have to get to the question of did the PTO -- was

9   the PTO solely responsible for the delay in causing the second-

03:29 10   filed application to issue prior to the first.  And here, Your

11   Honor asked whether this could be a factual issue.

12       And there are cases, lots of cases out there that say

13   one-way versus two-way is a matter of law, but as you point

14   out, if there are factual issues to be decided underlying that

15   legal issue, then there could be an issue of material fact that

16   has to be resolved by a factfinder.  But here there isn't

17   because it is undisputed that Janssen supplied at least a year

18   of the delay or more, at least a year of the delay or more.

19   They sought extensions of time, three extensions of time.  They

03:30 20   declined to accept the patent when it was offered to them.

21   This extension -- we have a timeline here.

22       THE COURT:  What number is that?

23       MR. HURST:  This is slide 23 -- sorry, 28, Your Honor.

24       There was an Office action.  The Patent Office issued

25   a decision on the pending claims in May of 1996.  Janssen

Case 2:16-cv-01925-JMV-MF  Document 69-1  Filed 04/13/17  Page 288 of 500 PageID: 1567
Case 1:15-cv-10698-MLW  Document 232  Filed 08/25/16  Page 131 of 194
131

1    sought a three-month extension to file a notice of appeal.

2    Then they didn't file a brief.  Then they said, "Give me

3    another four months to respond to the Office action."  The

4    result was a year of no prosecution from May of 1996 to when

5    they responded in May of 1997.

6            The problem here is every day, every day of delay by

7    Janssen, every day extends the life of the '471 patent beyond

8    the earlier-expiring indistinguishable patent, a patent it did

9    not cover.  So that delay, when the PTO is not solely

03:31 10    responsible for it, meaning -- you know, there is a four-year

11    difference here.  Janssen at least contributed to a year of it,

12    at least a year of it.  The result was -- at least a year of

13    it.  The result was that extends the life of the '471 patent.

14    It artificially extends the life of the patent that everybody

15    agrees does not claim a distinguishable invention from the

16    earlier-expiring '195 and '272 patents.

17            THE COURT:  '272?

18            MR. HURST:  '195 and '272.  So that's why the rule is

19    so rarely applied.  It's hard for anyone to show they weren't

03:32 20    responsible for any portion of the delay.  Here it's no

21    dispute, at least a year.  And literally every day that they

22    delayed the issuance of the '471 patent, every day artificially

23    extended the hurdle or obstacle to the public's ability to

24    practice the '195, '272 patents.

25            THE COURT:  Okay.

Case 2:16-cv-01925-JMV-MF  Document 69-1  Filed 04/13/17  Page 289 of 500 PageID: 1568
Case 1:15-cv-10698-MLW  Document 232  Filed 08/25/16  Page 132 of 194

132

1          MR. HURST:  Now, what does Janssen propose?  The way
2     they're arguing this is you should go through and count the
3     days that they contributed to the delay, count the days that
4     the PTO contributed, add and subtract and see -- well, what
5     happens if you subtracted my delays at Janssen, would the
6     patents still have issued in the same order if we just count
7     the PTO's delays.  There's no case that does the analysis that
8     way.  There is no case that does the analysis that way.  And it
9     would defy the purpose of the doctrine.  Because any delay that
03:33 10     Janssen contributed is part of artificially and therefore
11     unjustifiably extending the life of the '471 patent, which
12     artificially extends the lives of the '271, '195 patents.

13          You mentioned this case, the *Hubbell* case.  It's a
14     similar circumstance.  The argument was made, *Hubbell* said, I'm
15     entitled to two-way analysis because, on balance, it was really
16     the PTO's responsibility for the claims of the '685 patent
17     issuing before the present claims.  And the Patent Office said,
18     Look, we understand, yes, we were partially responsible, but so
19     were you.  You didn't have completely clean hands.  We both
03:34 20     delayed here and there.  And the court said that was enough.
21     It was a shared responsibility.  The two-way test does not
22     apply.  It's a really, really hard test to meet.

23          Another thing that Janssen says is you ought not
24     penalize us for routine extensions of time.  That argument has
25     been tried and failed before the Patent Office.  Here is one

1      example.  In the *Fallaux* case, Dr. Fallaux says, Hey, listen.

2      I didn't mean nefarious intent.  I just applied the rules that

3      I normally would apply when prosecuting, including getting

4      extensions of time.  And the Federal Circuit said, That doesn't

5      matter.  If you were partially responsible for the delay, you

6      cannot get access to the two-way test.

7           We haven't actually found a case -- and maybe I have

8      to reread the one you that you cited, Your Honor, but I don't

9      think I found a case where summary judgment was denied based on

03:35 10     factual issues over one-way versus two-way.

11          THE COURT:  I don't think it was in Judge Bennett's

12     case, but I was just pointing out that this could be an issue

13     conceptually.

14          MR. HURST:  Conceptually, I understand your point.

15     Your point is that even though it's an issue of law, there

16     might be underlying factual issues that need to be resolved.  I

17     agree with that.  That's the correct way to look at it.  But I

18     think it would be hard to find such issues in a case where

19     there's a prosecution record.  What happened happened, and

03:35 20     there's a record of it.  I don't think anybody disputes, for

21     instance, our timeline.

22          Now, before I move on to the -- there's two ways to

23     get to the one-way test.  The simultaneous filing dates --

24          THE COURT:  One-way test?

25          MR. HURST:  Yes.  I would say that there's two

Case 2:16-cv-01925-JMV-JBC Document 69-1 Filed 04/13/17 Page 291 of 500 PageID: 1570
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/18 Page 134 of 194

134

```
 1    different ways to agree with us on the second issue.  One is

 2    the simultaneous filing dates between the '471 patent and the

 3    '272.  And even if you get past that, I think Janssen has to

 4    agree that they were at least partially responsible for the

 5    delay in the issuance date of the '471.

 6              That brings me to my final topic, which is if the

 7    two-way test applies, should the court consider the '471 patent

 8    specification in the comparison.  This issue we believe is

 9    dispositive, too.  So here's what normally happens for double

10    patenting.  I think this is something you probably know, Your

11    Honor.  You just compare a claim to a claim.  You don't compare

12    the specifications.  And that rule has been around for a long

13    time.  So you don't read the spec.  You just look for -- you

14    compare one claim against another claim.

15              THE COURT:  You look at the spec to interpret the

16    meaning of the claim, we're going to be talking about this on

17    the '083.

18              MR. HURST:  Yes, exactly.  But you compare the claims.

19    But there's an exception.  It just so happens to be a case that

20    I argued, and it's when there's a compound claim, when you

21    claim --

22              THE COURT:  Where is --

23              MR. HURST:  Slide 35.  This is the *Sun Pharma* case.

24              THE COURT:  Go ahead.

25              MR. HURST:  Here is what *Sun Pharma* holds.
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 292 of 500 PageID: 1571
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/18 Page 135 of 194
135

```
 1              THE COURT:  Actually, don't go ahead yet.  I think I
 2    have -- go ahead.
 3              MR. HURST:  I want to just read the holding, then I'll
 4    explain what the rationale is.  So Sun Pharma relied on two
 5    earlier cases, Geneva and Pfizer, and held that they made clear
 6    that, "Where a patent features a claim directed to a compound,
 7    a court must consider the specification," must consider the
 8    specification.
 9              THE COURT:  What page are you on?
03:38 10          MR. HURST:  Page 35.  Did I say 34?
11              THE COURT:  1835.
12              MR. HURST:  You're looking at the case.  1387.  My
13    apologies.  I was giving you my deck slide.
14              THE COURT:  Just a minute.  All right.  Here it is.
15    Okay.
16              MR. HURST:  "Where a patent features a claim directed
17    to a compound, a court must consider the specification because
18    the disclosed uses of the compound affect the scope of the
19    claims for obviousness-type double patenting purposes."
03:39 20              Here is the rationale for that, Your Honor.  It's
21    actually a constitutional issue.  You don't actually have a
22    patentable invention unless it's useful.  It has to be useful.
23    So if your claim just says, Here is my chemical compound,
24    without telling you how it's going to be used, it's not an
25    invention.  So the rationale in all these cases is, Hey, look.
```

1    If you're just claiming this compound, you have to read the

2    spec to make it a complete invention.  How will you use that

3    compound, what will you do with it to make it useful and

4    therefore a patentable invention under the Constitution of the

5    United States.

6         And so that's what they say.  *Sun Pharma* again.

7    "Obviousness-type double patenting encompasses any use for a

8    compound that is disclosed in the specification of an earlier

9    patent claiming the compound and is later claimed as a method

03:40 10    of using that compound."  So in *Sun Pharma*, the later claims,

11    later patents talked about methods of using the compound itself

12    called Gemzar to treat various cancers.  And the argument from

13    Eli Lilly was, Hey, that's different from the compound itself.

14    The compound is one invention.  Using that compound to treat

15    cancer is a new and different invention.

16         What the Federal Circuit said is no, when you read the

17    compound patent, the compound by itself doesn't do anything,

18    you have to tell me how you're going to use it.  You read the

19    spec, and lo and behold, the spec said it used the compound to

03:41 20    treat the same cancers as the later patent.  So that's how the

21    patents got invalidated here.  And that's here as well.  When

22    you go to the '471 patent, you look at this antibody claim, and

23    it tells you what you're going to do with it.  The same things

24    that the '195 and '272 patents say.  Use it to treat rheumatoid

25    arthritis.  Use it to treat Crohn's disease.

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 294 of 500 PageID: 1573
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 137 of 194
137

1          THE COURT:  This is from the spec?

2          MR. HURST:  Yes.  The '471 spec recites the very same

3     uses, very same uses as the '195 and '272 patents.  This is

4     what you do with our antibody.  You treat Crohn's, and you

5     treat RA, rheumatoid arthritis.  It's as if, when you do the

6     comparison, Judge, if you look at slide 38, it's as if when

7     you're doing the claim comparison -- this is claim 6 of the

8     '471 patent -- you add language to it.  I added red language to

9     it.  "Wherein the antibody is used to treat rheumatoid

03:42 10   arthritis and Crohn's disease," when you do that and you

11    compare this claim, the '471 patent to the claims in '272 and

12    '195, same thing.  So if you follow *Sun*, there's no

13    distinction.

14         So what is Janssen's argument here?  They're saying

15    that you only follow *Sun,* only follow *Sun* -- this is their

16    quote, this exception that *Sun* created -- I guess a series of

17    cases, *Gemzar*, *Pfizer*, *Sun*.

18         THE COURT:  What --

19         MR. HURST:  Slide 39.  I'm quoting from their

03:42 20   sur-reply.

21         THE COURT:  Go ahead.

22         MR. HURST:  So they're saying that the "exception"

23    that we're relying on "has only been applied in cases, unlike

24    this one, where the relevant claim recites a chemical compound

25    by its formula or chemical name without identifying any utility

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 295 of 500 PageID: 1574
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/18 Page 139 of 194

138

1    for the compound.  In those circumstances, only in those

2    circumstances, the specification must be consulted to ascertain

3    utility."

4         So what they're saying here is, if you look at slide

5    40, they're saying, Hey, look.  When you look at the '471

6    slide, '471 claims, they call themselves anti-TNF antibodies,

7    so there's a utility there.  Our antibody binds to TNF.

8    They're saying when you have that circumstance, you don't look

9    at the specification like you did in *Sun* and *Pfizer*.  But

03:43 10   that's not true, Your Honor.  This is the property of the

11   compound.  The fact that the compound binds to TNF is not a use

12   for the compound.  If you gave me this compound, it would in my

13   body bind TNF, but it would have no use.  I do not have RA.  I

14   do not have Crohn's.  It's just a property of the compound.

15   That's all it is.

16        Bristol Myers, "From the standpoint of patent law, a

17   compound and all of its properties are inseparable; they are

18   one and the same thing."  You don't have to look very far to

19   get confirmation of this, Your Honor.  This is the *Centocor v.*

03:44 20   *Abbott* case from 2011.  And it's literally -- it's at slide 41.

21   It's literally talking about the patents in the same chain --

22   in the same family as the '471.

23        Now, they're not talking about this issue, but they

24   are talking about the fact that binding to TNF is a property of

25   the compound.  "The asserted claims constitute a wish list of

Case 2:16-cv-01925-JMV-MF  Document 69-1  Filed 04/13/17  Page 296 of 500 PageID: 1575
Case 1:15-cv-10698-MLW  Document 232  Filed 08/25/16  Page 139 of 194
139

```
 1    properties that a fully-human, therapeutic TNF antibody should
 2    have, and that includes the ability to bind in the same place
 3    as an equivalent mouse antibody."  But they call it, the
 4    anti-TNF binding, a property of the compound, and it makes
 5    sense.  It's not a use of the compound.  It only becomes a use
 6    of the compound when you use that property to accomplish
 7    something, like treating a patient who has Crohn's or RA.
 8            And that leads me to my final slide, Your Honor.  So
 9    just, for me, I mean, the easiest path in my mind is safe
 10   harbor and the two patents that were filed, the two patents
 11   that were filed in the same day.  It seems like that's an easy
 12   path to avoid any further complications beyond question two.
 13   But obviously, we do believe that we prevail on each and every
 14   one of those issues.  Unless you have questions --
 15           THE COURT:  Not right now.
 16           MR. HURST:  Thank you, Your Honor.
 17           THE COURT:  We're going to take a ten-minute break.
 18   We'll resume at five to 4:00.  Court is in recess.
 19           (Recess taken 3:45 p.m. to 4:00 p.m.)
 20           THE COURT:  Okay.  You're up.
 21           MR. DISKANT:  Thank you, Judge.  We have a collection
 22   of slides as well.  And I know it's been a long day.  Always
 23   excited to find a group of people here that want to talk about
 24   double patenting, but I apologize if it bogs down.  I'll try to
 25   move through it reasonably expeditiously with the
```

Case 2:16-cv-01925-JMV-JMF Document 69-1 Filed 04/13/17 Page 297 of 500 PageID: 1576
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 140 of 194
140

1    understanding, as I'm sure Your Honor knows, that this is very

2    important.

3              THE COURT:  Oh, I know.  I was here all weekend.

4              MR. DISKANT:  So let's talk about --

5              THE COURT:  Or most of it.

6              MR. DISKANT:  -- the so-called reexamination.

7              THE COURT:  So we're going to make this Exhibit D.

8    Okay.

9              MR. DISKANT:  Okay.  I thought it would be useful to

04:00 10    begin just by taking a look at the patents themselves because,

11   while we've been talking about them, I think it helps the

12   analysis to take a look at them.  And this was not prolonged.

13             Basically the '471 patent, as Your Honor has said many

14   times, there are several asserted claims, but claim one is

15   exemplary.  It claims a chimeric antibody that's capable of

16   binding the TNF-a, and it's selected from a group of

17   antibodies.  So it is a genus claim, a collection of

18   antibodies.  So you would call it a compound patent or a

19   generic patent.

04:01 20             The '195 patent is a method of treating rheumatoid

21   arthritis by administering in particular anti-TNF antibody cA2.

22   And the one -- and this is the reference claim, so while there

23   are more than one claim in the patent, this double patenting

24   analysis is entirely about claim 6 of the '195 patent,

25   sometimes called the asserted claim -- excuse me -- sometimes

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 298 of 500 PageID: 1577
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 141 of 194

141

1    called the reference claim.  And then in the '272 patent, it's

2    a method of treating Crohn's disease by administering again

3    anti-TNF antibody cA2.

4           Now, the three patents were all filed in 1994.  Two of

5    them, the '471 and the '272, were filed on February 4, and the

6    '195 was filed in October.  Now you see the reverse of what we

7    were talking about this morning in *Gilead*.  The '195 and '272

8    issued first.  So under classic double patenting analysis, the

9    question is whether the issuance of the later patent, the '471,

04:03 10   improperly extended the term of those earlier-filed patents.

11   That's classic double patenting analysis.  That has nothing to

12   do with *Gilead*.  And these are all pre-URAA patents.  They also

13   share the same priority date.  And as I just described, they

14   have three different issue dates.

15          So here is the summary of our argument.  First, we

16   contend the safe harbor protects the '471 patent from double

17   patenting.

18          THE COURT:  Hold on just a second.

19          MR. DISKANT:  Sure.

04:03 20        THE COURT:  What slide are you on?

21          MR. DISKANT:  What I'm up to right now is slide 8.

22          THE COURT:  Okay.

23          MR. DISKANT:  So first we have a safe harbor argument,

24   and then secondly we say, in any event, there's no double

25   patenting under the two-way test.  And either one of those is

Case 2:16-cv-01925-JAK-MF Document 69-1 Filed 04/13/17 Page 299 of 500 Page ID: 1578
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 142 of 194
142

1   sufficient to protect our patent from double patenting.  We

2   then say, or relatedly we say there are many fact disputes on

3   both of these issues which preclude summary judgment.  And

4   lastly, I know Your Honor has denied the stay.  I'm not going

5   to belabor this.  We think as a matter of judicial prudence you

6   should take a pass.

7            And there are two components of that.  One is if you

8   choose to rule against us on the *Gilead* issue, we don't think

9   it's necessary to address this.  And secondly, on the very

04:04 10  point that you had colloquy with counsel about what happens if

11  you rule against us on this reexam issue and what happens in

12  the reexam, he quoted me accurately but incompletely, which is

13  to say that if Your Honor rules against us on the reexam and

14  Your Honor's ruling is affirmed by the Federal Circuit on

15  appeal, then --

16            THE COURT:  I think I said that today.

17            MR. DISKANT:  Oh, that's correct.  That's the right

18  way to think about it.  I think as a practical matter -- well,

19  who knows what's going to happen?  But there is the reexam.

04:05 20  It's going to have oral argument at some point.  It will be

21  decided at some point.  Maybe all these cases will be in the

22  Federal Circuit at the same time.  We have no way of knowing.

23  But yes, the reexam comes to a close -- is closed out only if

24  the Federal Circuit affirms an invalidity ruling.

25            Okay.  So the safe harbor.  Now, there are three

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 300 of 500 PageID: 1579
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/18 Page 149 of 194
143

1    cases.  We'll talk about the three cases.  And the essence of

2    the argument that I'd like to make to you is the three cases do

3    not stand for a per se rule that a safe harbor is unavailable

4    unless it's literally filed as a divisional.  There is room in

5    that body of case law for equity to be considered and for the

6    facts to be considered, and so I'd like to spend some time on

7    the facts and then address the case law on why I think they

8    leave room for Your Honor to consider the facts.

9           So we start with, you know, how did this all come

04:06 10   about.  The restriction requirement.  The restriction

11   requirement, basically it's in 121.  If the director believes

12   there are two or more independent inventions in an application,

13   he may order them separated.  And that's not a rule of patent

14   law.  There's nothing that says you can't have them all

15   together.  But for administrative convenience, the director may

16   order them separated.

17          Before the safe harbor, there was a gotcha quality to

18   this.  And the gotcha quality was, during prosecution, you're

19   in the Patent Office, the Patent Office says, Hey, your two

04:07 20   inventions are patentably distinct, separate them.  You filed a

21   single application for a widget and using the widget.  And the

22   Patent Office says, Those are two inventions, separate them.

23   Okay.  You separate them.  Now you've taken your single

24   application and you've turned it into two applications, one for

25   the widget and one for the method of using the widget.  Then

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 301 of 500 PageID: 1580
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 144 of 194

144

1   you get patents.  Then you start to enforce them in litigation.

2   And your adversary says, essentially, the Patent Office was

3   wrong.  Those aren't patentably distinct inventions.  They're

4   obvious variants.  You should have filed one application, but

5   since you filed two, one of those is invalid for double

6   patenting.

7           That is unfair.  That was recognized to be unfair for

8   many, many years.  And as the Federal Circuit said in *Pfizer*,

9   the inequity of this practice was well known by 1952 and that's

04:08 10   what led to the safe harbor, eliminating that gotcha.  If you

11   file a single application and you're forced to separate it,

12   you're not going to lose your patents as a result.  The purpose

13   was to eliminate the inequity and allow applicants to

14   reasonably rely on restriction requirements.  I emphasize that

15   because at the heart of this doctrine, it's not technicalities.

16   It's equity.  Is what happened fair?

17           THE COURT:  Well, let's see.  What year did you file

18   the different --

19           MR. DISKANT:  '94.

04:09 20           THE COURT:  '94.  That was before --

21           MR. DISKANT:  All of these cases.

22           THE COURT:  -- before the cases interpreting the safe

23   harbor?

24           MR. DISKANT:  That's right.  Long before.

25           THE COURT:  But you could have filed divisional

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 202 of 500 PageID: 1581
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 145 of 194
145

1    applications, all divisional applications, right?

2              MR. DISKANT:  Yes.

3              THE COURT:  And you chose instead to file for the

4    '471, a continuation-in-part.

5              MR. DISKANT:  That's right.

6              THE COURT:  So why is it inequitable to hold you to

7    what the law now says are the consequences of that decision?

8              MR. DISKANT:  Well, I'm going to tell you that, but

9    actually that's a very good point, because Celltrion somewhat

04:09 10    misrepresents our point.  I know when the law is declared it

11   has retroactive effect.  I'm not suggesting that if there's

12   black letter law that you can't do X, then the fact that I made

13   a mistake 20 years ago just doesn't matter.  I get that.  We're

14   not arguing that.

15             What we are arguing is the law is not so black letter,

16   it's not so rigid, and the law leaves room for considering the

17   circumstances of the matter and the equities.  And I'd like to

18   explain to you why we think it's equitable to do what we did.

19             THE COURT:  First, I think you need to explain to me

04:10 20    why I have that discretion, because the language that was

21   decided from, I think, the trilogy of cases seems unequivocal.

22             MR. DISKANT:  Okay.  I can jump ahead.  I'll do that

23   and then I'll come back to the facts if you're interested.

24             THE COURT:  I'm sorry.  You can go to the facts if you

25   want, but I thought you were going to start talking about the

Case 2:16-cv-01925-JAK-AMF Document 69-1 Filed 04/13/17 Page 303 of 500 Page ID: 1582
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/18 Page 146 of 194

146

1    equities.

2          MR. DISKANT:  I am, but I'm going to do that through

3    the facts and I'm going to talk about why the cases don't

4    preclude that.

5          THE COURT:  You do it your way.  You do it your way.

6          MR. DISKANT:  Okay.  13.  In any event, "The purpose

7    of 121," says the Federal Circuit, "assures that technicalities

8    of restriction practice are not elevated to create a potential

9    taint on the validity of patents."  As the reports explained,

04:11 10   it means --

11          THE COURT:  I'm sorry.  Which number is this?

12          MR. DISKANT:  I'm now on slide 13, Judge.  This is

13   quoting from *Applied Materials*.  The consequence of Section 121

14   is that "neither of the resulting patents can be held invalid

15   merely because they were divided into several patents."  That's

16   the equities that led to 121.  And I have here the text of 121

17   just so we can see it.  Your Honor has probably studied it, but

18   let me just focus on the first sentence.

19          "If two or more independent and distinct inventions

04:11 20   are claimed in one application, the director may require the

21   application to be restricted to one of the inventions," and

22   then it continues, and this is the safe harbor, "A patent

23   issuing on an application with respect to which a requirement

24   for restriction has been made," and those will be the '195 and

25   '272, "shall not be used as a reference in the courts against a

Case 2:16-cv-01925-JAK-MF Document 69-1 Filed 04/13/17 Page 304 of 500 Page ID: 1583
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 147 of 194
147

1    divisional application or against the original application or

2    any patent issued on either of them."

3            THE COURT:  Can we go back to 14?

4            MR. DISKANT:  Yes.

5            THE COURT:  Because you read the highlighted part, but

6    the next bullet says, "If the other invention is made the

7    subject of a divisional application, which complies with

8    certain requirements, it's entitled to the benefit of the

9    earlier filing date."  So it says "divisional application."

04:12  10            MR. DISKANT:  It does.  It says it also in the

11    sentence that I read to you, which is I think the applicable

12    sentence.  We're not talking about a filing date issue.  We're

13    talking here in the highlighted portion of the second page, "It

14    shall not be used as a reference in the courts against a

15    divisional application or a resulting patent."  That's the

16    language that creates the issue in this case.

17            THE COURT:  Did this statute exist in 1994?

18            MR. DISKANT:  Yes.  It existed in 1952.

19            So how should an applicant proceed knowing that there

04:13  20    is a safe harbor out there and not knowing what to do?  The

21    *Berg* case actually has very clear advice.  "If a potential

22    applicant is unsure whether it has more than one patentably

23    distinct set of claims, the PTO advises that it file all the

24    claims as one application.  Then, if the PTO determines that

25    more than one distinct invention was claimed, then Section 121

Case 2:16-cv-01925-JMV-MF  Document 69-1  Filed 04/13/17  Page 305 of 500 PageID: 1584
Case 1:15-cv-10698-MLW  Document 232  Filed 08/25/16  Page 149 of 194

148

1    authorizes the commissioner to restrict the claims to a single

2    invention, and then because they filed the related claims in

3    one application, the applicant is protected from an

4    obviousness-type double patenting rejection if the PTO later

5    determines that the applicant is submitting claims to more than

6    one patentable invention."

7         Essentially what the *Berg* court is saying is to do

8    exactly what Janssen in fact did.  Janssen filed a single

9    application.  Now I'm up to slide 18.  Janssen filed a single

04:14 10   application for its infliximab invention.  The PTO issued a

11   restriction requirement saying that there were five groups of

12   inventions.  Janssen continued prosecution in one group in one

13   patent, filed separate applications in the remaining groups,

14   including the '471, in the belief that it was entitled to the

15   safe harbor, and the PTO confirmed during prosecution that it

16   was entitled to the safe harbor.

17        THE COURT:  Hold on just one second.

18        MR. DISKANT:  Sure.

19        THE COURT:  So this is page?

04:15 20        MR. DISKANT:  Now I'm on 18.  Sorry.  You're back on

21   *Berg*.

22        THE COURT:  I'm on 16.

23        MR. DISKANT:  *Berg*, sure.

24        THE COURT:  I'm trying to find this in context.  I see

25   at the top of page 1436 there's discussion of one or more

Case 2:16-cv-01925-JAK-MRW  Document 69-1  Filed 04/13/17  Page 306 of 500 Page ID: 1585
Case 1:15-cv-10698-MLW  Document 232  Filed 08/25/16  Page 149 of 194
149

1    divisional applications.

2            MR. DISKANT:  Wait a second.  Here we go.  Sorry.  My

3    copy is hard to find the page numbers on.

4            THE COURT:  Do you know where this language is?

5            MR. DISKANT:  Let me find it.  I'm on 1435 under the

6    section that says C, "The options available in *Berg* were

7    reasonable."  It begins there.  "A potential applicant is

8    unsure."

9            THE COURT:  Okay.  Your slide says that's on 1436.

04:16 10         MR. DISKANT:  I'm so sorry, Judge.  I apologize.

11            THE COURT:  1436 says in the same paragraph on page

12    1436, it says, "If claims are so restricted, one or more

13    divisional applications can be filed."

14            MR. DISKANT:  Then it says, "When such a divisional

15    application is filed, the PTO is prohibited from using the

16    claims of the patent issuing on the application and as a

17    reference against the claims of any divisional application,"

18    and it continues.

19            THE COURT:  Okay.

04:17 20         MR. DISKANT:  I'm not saying the words aren't there,

21    Judge.  I know the words are there.  The question is what's the

22    -- well, the question from our perspective is what are the

23    facts of what we did, and is there room under the case law to

24    deem -- "deem" is the word I'd like to use, because it's the

25    word the *Amgen* court uses.  Are there reasons under the case

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 307 of 500 PageID: 1586
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 150 of 194
150

1    law to deem the CIP that we in fact filed is a divisional.

2    That's our argument, and that's what it is.

3        So anyway, so let me go to slide 20 now, going through

4    what happened.  So in the PTO, this is October '93, the PTO

5    says, "Because these inventions are distinct, restriction for

6    examination purposes is proper."  That is the restriction

7    requirement.

8        THE COURT:  Go ahead.

9        MR. DISKANT:  Sorry.  So the restriction requirement

04:19 10   is in October '93.  And then Janssen separates the applications

11   as directed by the PTO.  The '471 is group one and the other

12   two come from group four.

13       So then we file -- in October '94 we file the '471 as

14   a continuation-in-part.  And we explained to the PTO that we're

15   filing the preliminary amendment pursuant to the restriction

16   requirement.  And as we'll see in a moment, the reason it's a

17   CIP is because it adds some new information, although it's

18   unrelated to the claims that we're seeking.

19       Now, a couple of years later, the PTO rejects the '471

04:19 20   for double patenting.  That's what we're looking at on slide

21   23.  And that application '799 is what becomes the '195 patent.

22   So essentially it's the same argument that Celltrion's making

23   here.  There's a double patenting problem with the '471 patent

24   over the '195 patent.  And Janssen responds by saying, among

25   other things, that Section 121 precludes obviousness-type

Case 2:16-cv-01925-JAK-AFM Document 69-1 Filed 04/13/17 Page 308 of 500 Page ID: 1587
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/18 Page 151 of 194
151

1    double patenting; see out restriction requirement.  That's the

2    defense we're making right now.  That's what we argued to the

3    PTO in May of 1997.  And the PTO then withdrew the double

4    patenting objection in light of our claim to the safe harbor

5    and it never asserted it again throughout prosecution.

6            Now, what's this happening, what's happening now?  I

7    would say what's happening now is Celltrion is exploiting the

8    same inequity that led to the safe harbor.  We were told by the

9    PTO to separate these because they're distinct, and now

04:21 10    Celltrion's arguing, Well, they're not really distinct so you

11    lose.  And that's the equity point.  That is the equity point.

12            Now, the question then is does the CIP matter.  And of

13    course that's what the case law talks about and what I'd like

14    to persuade Your Honor to view with an open mind.  So first --

15            THE COURT:  I always deal with it with an open mind.

16            MR. DISKANT:  I'm sorry.

17            THE COURT:  I always deal with it with an open mind.

18    When it comes to patent cases, it's with an empty mind, and you

19    need to fill it up.

04:21 20            (Laughter)

21            MR. DISKANT:  I'm sure your mind and mine are both

22    quite full by now.  In any event, I say that just in light of

23    your preliminary observations that I'd like you consider --

24            THE COURT:  That's why I said they're tentative views,

25    and with regard to this motion they're particularly tentative.

Case 2:16-cv-01925-JMV-JMF Document 69-1 Filed 04/13/17 Page 309 of 500 PageID: 1588
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/18 Page 152 of 194

152

1          MR. DISKANT:  As Your Honor knows, there are fact

2     questions and there are law questions.  And what makes this

3     different so far as I can tell from the other cases is they're

4     fact disputes supported by sworn testimony from declarants.  We

5     have Carolyn Elmore.

6          THE COURT:  What slide is that?

7          MR. DISKANT:  Now I'm up to slide 30.

8          THE COURT:  Go ahead.

9          MR. DISKANT:  Carolyn Elmore was a U.S. patent

04:22 10    examiner for eight years and then she went into private

11    practice.  And she was the principal patent prosecutor for the

12    '471 patent.  And she has put in a declaration explaining to

13    you what happened.  And Steven Kunin is an expert witness.  He

14    was the deputy commissioner for patent examiner policy during

15    all these years and knows in more detail probably than anyone

16    living exactly what many Patent Office policies and procedures

17    were for examining patents like this.

18          So counsel mentioned the different kinds of

19    applications, continuation, divisional and

04:23 20    continuation-in-part.  As germane here, these are the

21    definitions -- now on I'm slide 32 -- the definitions from

22    1994.

23          The essential difference between the divisional and

24    the CIP or continuation-in-part is the continuation-in-part has

25    added matter that's not disclosed previously.  Now, there's a

1    lot to that concept and because they're two completely

2    different directions that can head in.  I would say most

3    commonly, new matter supports new claims.  My original

4    application says I invented the widget.  Then my

5    continuation-in-part says I've discovered the widget can be

6    used for A, B and C, and I want a patent claim to using the

7    widget for A, B and C.  That's, I would say, the most common

8    use of new matter.

9         But you can have new material in a patent that's just

04:24 10   there that's not part of any claims.  It's not there to note

11   claims that limit the public's ability to use your invention.

12   But rather you add matter that informs the public of more

13   information about your invention without restricting their

14   ability.  That's what we have.  And that's, to me, one of the

15   single most relevant facts in thinking about the equities here.

16        So here is, from Ms. Elmore's declaration -- now we're

17   on 33.  "At the time the application was filed, it was not

18   unusual for an applicant to add material as it became

19   available."  We were doing ongoing research, and we added

04:24 20   material about our research.  And as soon as you do that, you

21   cannot call it a divisional.  You have to call it a CIP, even

22   though it makes no difference in terms of the claims you're

23   looking for.  Mr. Kunin --

24        THE COURT:  You define the claims, but it may

25   strengthen your argument that the patent should be issued.

Case 2:16-cv-01925-JAK-AS Document 69-1 Filed 04/13/17 Page 311 of 500 Page ID: 1590
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/18 Page 154 of 194
154

1    MR. DISKANT:  It becomes a fact question, Judge.  The

2  facts that we've alleged, and frankly the facts that we've

3  proved to the Patent Office in the reexam are that this new

4  matter made no difference.  So it's a disputed fact issue, but

5  that is our declarant's sworn contention, and it's true.  We've

6  proved it's true.

7    Mr. Kunin says, "The designation as a CIP was required

8  under the specific naming nomenclature because additional

9  material had been added."  So here we have Section 121 enacted

04:26 10  to be fair, not to tangle people up in the niceties of patent

11  procedure, but to be fair.  We add new material.  You can't

12  call it a divisional because there's new material in there, but

13  it's irrelevant to the claims.

14    THE COURT:  But you -- well, "but it's irrelevant to

15  the claims" is I don't think something I can accept on this

16  record.

17    MR. DISKANT:  No, you can't.

18    THE COURT:  It just seems to me that, like, if *Amgen*

19  means what it says, continuation-in-part is not a divisional,

04:26 20  then, you know, you have a choice.  You could have filed a

21  divisional and not added any information, or you could have

22  made it a continuation-in-part, adding information for some

23  reason, unknown, I would say, for present purposes, and the

24  question is whether I have discretion to -- whether you have to

25  be held to the consequences of that decision or whether there's

Case 2:16-cv-01925-JAK-MF Document 69-1 Filed 04/13/17 Page 312 of 500 Page ID: 1591
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 155 of 194
155

1    some discretion to deem CIP a divisional.

2          MR. DISKANT:  That's exactly the issue, Judge.  That's

3    exactly the issue.  We agree that if Your Honor's view of the

4    case law is there's no discretion, then we lose.

5          THE COURT:  What about the statement at *Amgen* at 1353?

6    "We are persuaded by the reasoning in *Pfizer* that the 121 safe

7    harbor provision does not protect continuation applications for

8    patents descending from only continuation applications.  The

9    statute on its face applies only to divisional applications,

04:28 10   and a continuation application like the continuation-in-part

11   application is not a divisional application."

12         MR. DISKANT:  Well, then you have to read that in

13   light of the paragraph on -- I think -- I'm sorry.  I'm trying

14   to find the page number, Your Honor.  The paragraph begins,

15   "Furthermore."  It's on 1354.  Is that what you were on, Judge?

16         THE COURT:  No.  I was on 1353.

17         MR. DISKANT:  So the next page, 1354, the paragraph

18   says, "Furthermore, Amgen has not presented us with any

19   persuasive reason as to why we should deem the '178 and '179

04:28 20   continuation applications divisional applications for purposes

21   of Section 121."  So I'm going to discuss the facts in just a

22   second.  But to me what that is saying is the court is open to

23   the argument that on the right set of facts, it will deem an --

24         THE COURT:  No.  I'm a little concerned that if I

25   accept that argument the Federal Circuit will say, "I think

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 313 of 500 PageID: 1592
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 156 of 194
156

1    Judge Wolf can't read anymore."  It says, "*Amgen* argues that

2    because the '178 and '179 continuation applications could have

3    been filed as divisional applications, we should treat them as

4    such for the purpose of Section 121."

5            MR. DISKANT:  Mm-hmm.

6            THE COURT:  "While this argument convinced the

7    District Court to regard the '178 and '179 continuation

8    applications as divisional applications, we are not likewise

9    convinced.  We decline to construe 'divisional application' in

04:30 10   Section 121 to encompass Amgen's properly filed, properly

11   designated continuation applications."

12           How is this case different than that?  It sounds to me

13   like you're asking me to do what the Federal Circuit said it

14   wouldn't do in *Amgen*.

15           MR. DISKANT:  I think not.  The reason I think is not

16   is because, in *Amgen*, this is all they had, which is to say the

17   facts were, just as the court says, check the continuation box,

18   et cetera.  The facts are what are recited here.  What is

19   missing in *Amgen* is there's no proof in the prosecution history

04:30 20   that the continuation was filed as the result of a restriction

21   requirement, whereas in our prosecution we said so explicitly.

22   There's nothing in the prosecution history that says we believe

23   we were entitled to the safe harbor, and ours says so

24   explicitly.  In *Amgen* --

25           THE COURT:  In the prosecution history?

Case 2:16-cv-01925-JMV-MF   Document 69-1   Filed 04/13/17   Page 314 of 500 PageID: 1593
Case 1:15-cv-10698-MLW   Document 232   Filed 08/25/16   Page 15 of 194

157

 1              MR. DISKANT:  Yeah.  Our prosecution history

 2     explicitly says we believe we're entitled to the safe harbor.

 3              THE COURT:  You said that in 1994?

 4              MR. DISKANT:  Yeah.  I just showed it to you.  I'll go

 5     back.

 6              Right here, slide 24.  This is 1997.  In 1997, the PTO

 7     rejected our application for obviousness-type double patenting

 8     over the -- patent, exactly the argument these folks are making

 9     right now.  We said no, we're protected by 121.

04:31 10         THE COURT:  What did the Patent Office say then?

11              MR. DISKANT:  It said, "The following rejections are

12     withdrawn, obviousness-type double patenting."  And they didn't

13     mention it again.  So that's what happened.  And Ms. Elmore and

14     Mr. Kunin says we relied on that.  So these facts --

15              THE COURT:  And Janssen relied on it.

16              MR. DISKANT:  Yeah, Janssen relied on it.  So these

17     facts are, to me, you know, unusual, explicit, and *Amgen*

18     doesn't have anything like that.  So, you know, I think, Judge

19     Wolf, you can read this paragraph very well, and it says

04:32 20    exactly what you say it says.  But to me, if I had to focus on

21     what words I thought were important in this paragraph, I would

22     focus on the first sentence, "Amgen has not presented us with

23     any persuasive reason to deem it a divisional," and the last

24     sentence, "We decline to construe 'divisional application' in

25     121 to encompass Amgen's continuation application."

1          THE COURT:  But they don't say, "In the circumstances

2    of this case we don't."  It seems to me more categorical.

3          MR. DISKANT:  If Your Honor wants to read it that way,

4    I agree we lose.  I believe, in reading these cases, that there

5    is room in the case law for a factual record to be made that is

6    different than the factual record in the three cases and that

7    is persuasive that this is fair under the circumstances to deem

8    our application a divisional for purposes of the safe harbor.

9          THE COURT:  Is there any case in which the Federal

04:33 10   Circuit has deemed a continuation or continuation-in-part a

11   divisional for the purposes of the safe harbor?

12         MR. DISKANT:  These are the three cases, Judge.

13         THE COURT:  There's no case where the Federal Circuit

14   has reached that result?

15         MR. DISKANT:  No.  So to go back to the story,

16   Mr. Kunin continues that, "In accordance with practice at the

17   time, the fact that the application was denominated as CIP did

18   not necessarily take it outside of the safe harbor."

19         THE COURT:  That's not something -- that's a question

04:34 20   of law.  That's not something any expert would be permitted to

21   testify on in court.

22         MR. DISKANT:  I'll tell you why I disagree.

23         THE COURT:  He can testify to custom and practice if

24   we're having a trial, but he's not going to tell the jury that.

25         MR. DISKANT:  Well, custom and practice is I think

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 316 of 500 PageID: 1595
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 159 of 194
159

1    what he was referring to.  I'm fine either way.  To me, the

2    relevance of this is if there's room for discretion -- and if

3    there's no room for discretion, it doesn't matter what the

4    practice was.  But if there's room for discretion, then it

5    does.  And that's the purpose of Mr. Kunin's declaration.  And

6    he continues on slide 35:  "It was accepted practice at the PTO

7    to allow CIPs safe harbor protection if claim consonance was

8    maintained consistent with the restriction requirement."  Claim

9    consonance is an issue that's not in the case.  They don't

04:35 10  challenge that.  So basically this is saying it was accepted

11   practice to allow this to be a safe harbor on our facts.

12        THE COURT:  Excuse me.  You have somebody talking over

13   your right shoulder.  It's distracting.

14        MR. DISKANT:  I'm sorry, Judge.

15        In any event, Ms. Elmore, the patent prosecutor, more

16   or less says the same thing.  "At the time it was being

17   prosecuted, the fact that additional material was included and

18   thus it had to be identified as a CIP didn't take it

19   necessarily outside the safe harbor."  And Kunin reviews the

04:35 20  MPEP at the time, and his understanding of the MPEP at the time

21   was again so long as consonance is maintained and the claims

22   were filed as the result of a restriction requirement, the safe

23   harbor applies, even if it's designated as a CIP based on a

24   naming nomenclature.  The naming nomenclature is mostly a rule

25   of convenience.  It's just what bucket to put it in as

Case 2:16-cv-01925-JMV-JBC Document 69-1 Filed 04/13/17 Page 317 of 500 PageID: 1596
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 160 of 194
160

1    Mr. Elmore -- excuse me -- as Mr. Kunin understood the facts

2    then.

3            He also reports that the new material that was added

4    didn't benefit us because it wasn't needed to support the

5    antibody claims, which the PTO has also found.  And Ms. Elmore

6    explains that amending -- that had the PTO rejected our

7    statement that the safe harbor applies and says, No, this has

8    to be a divisional, it would have been easy to make it a

9    divisional.  Just yank out the new material which was

04:37 10  unnecessary.  Mr. Kunin agrees.  The '093 application could

11    have been amended to delete the new material, making it a

12    divisional.

13            And then this Office action I just took you through in

14    which we expressly cited the safe harbor and said we were

15    relying upon it, 41 and 42, Ms. Elmore says she relied on that

16    in her patent prosecution decisions at a time when it could

17    have been turned into a divisional without consequence.  And

18    Mr. Kunin says, "If the PTO required that it be denominated

19    divisional, it would not have withdrawn the objection."

04:37 20        THE COURT:  I'm sorry.  Say that again.

21        MR. DISKANT:  If the PTO required that it be in the

22    form of a divisional, it would not have withdrawn the

23    obviousness-type double patenting rejection.  That is what he

24    concludes from the prosecution history, namely that Janssen was

25    reasonable in relying upon the PTO action in believing it was

Case 2:16-cv-01925-JMV-MF  Document 69-1  Filed 04/13/17  Page 318 of 500 PageID: 1597
Case 1:15-cv-10698-MLW  Document 232  Filed 08/25/16  Page 161 of 194

161

 1    entitled to the safe harbor.  So Mr. Kunin's view is that the

 2    patent is a divisional insofar as its claims are concerned and

 3    it's a CIP insofar as it has new matter in it.  That's the

 4    essence of our argument, that it's appropriate on our facts

 5    proven through sworn testimony to deem --

 6              THE COURT:  Well, I doubt I could find they're proven

 7    now.  I might find at best -- I might find a genuine disputed

 8    fact, and then I have to decide whether it's material.  And if

 9    I have no discretion, because *Amgen* means what it seems to say,

04:39 10    then the dispute is not material.

11              MR. DISKANT:  I understand that, Judge.  I'm not

12    asking you to rule in our favor.  We didn't cross-move for

13    summary judgment.

14              THE COURT:  Okay.  We understand each other.

15              MR. DISKANT:  We understand.  Anyway, all I'm saying

16    is all these facts are disputed.  These are on 46.  And if they

17    don't matter, well, then they don't matter.  To us, this makes

18    this case very different than any of the three cases.  And then

19    the question is do the three cases leave room for equity, or

04:39 20    are we -- is it just going to be a per se rule, you lose.

21              So let me talk about the three cases.  The first of

22    them is *Pfizer*.  *Pfizer* was a CIP.  Now I'm on slide 49.  And

23    you can't tell this easily from the opinion, but if you go

24    through the cases and get to the *Searle* opinion and work

25    backwards, you learn that the CIP in *Pfizer* was almost entirely

Case 2:16-cv-01925-JMV-MF   Document 69-1   Filed 04/13/17   Page 319 of 500 PageID: 1598
Case 1:15-cv-10698-MLW   Document 232   Filed 08/25/16   Page 162 of 194
162

1    based on new matter.  We've crossed out all the claims that are

2    based on new matter, and I think there are about four that are

3    not.

4         So the *Pfizer* court had in front of it this CIP, a

5    classic CIP in which many, and in this case almost all of the

6    claims were in fact based on new matter.  And so what did it

7    say?  First, it repeated what I started with earlier, which is

8    there was this unfair gotcha in the law before the safe harbor

9    in which the PTO would say the claims were patentably distinct,

04:41  10   and then in litigation they would say no, they're not, and it

11   just didn't seem fair when you separated the claims only

12   because of the restriction requirement.  And the *Pfizer* court

13   says that was inequitable, and it says the purpose of the safe

14   harbor is to allow applicants to reasonably rely on restriction

15   requirements.  And I think at the very core that's what we say

16   we did.  We got a restriction requirement.  We relied on it.

17   We added some new matter that was not material to the claims,

18   which at the time seemed innocuous enough.  We discussed the

19   safe harbor entitlement with the PTO.  The PTO withdrew a

04:41  20   double patenting objection, and so this was -- we feel like

21   we're in a gotcha.

22        I mean, that's basically how, you know, my client

23   views what happened.  What it did was reasonable under the

24   circumstances, at the time, in compliance with direction, and

25   now it's being faced with the argument that these claims that

 1    were separated only because the PTO told them to separate them

 2    are invalid.

 3         So the *Pfizer* court talks about why the section is

 4    limited to divisionals as best it can speculate from the

 5    Congressional record.  And it says, "If the section had

 6    included CIPs, which by definition contain new matter, the

 7    section might be read as providing an earlier priority date

 8    even as to the new matter" -- I'm on slide 51, Judge --

 9    "contrary to the usual rule that the new matter is not entitled

04:42 10   to the priority date of the original application," and to me

11    this is the key, "there was no possible reason for protecting

12    the new matter from double patenting rejections."

13         Well, I agree with that.  There's no reason to protect

14    new matter from double patenting rejections.  But we don't have

15    any new matter in our claims.  Our claims aren't based on new

16    matter.

17         THE COURT:  Wait.  This is 1361.

18         MR. DISKANT:  Yes, sir, 1361 on *Pfizer*.  It's the big

19    paragraph that begins, "There's no suggestion in the

04:43 20   legislative history."

21         THE COURT:  Which paragraph is it in?  "There was no

22    possible reason for protecting the" --

23         MR. DISKANT:  It's the last sentence of the paragraph.

24    The paragraph begins, "There's no suggestion, however, in the

25    legislative history."

Case 2:16-cv-01925-JAK-AS Document 69-1 Filed 04/13/17 Page 321 of 500 Page ID: 1600
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/18 Page 164 of 194

164

1          THE COURT:  All right.  Yeah, that goes over to 1362.

2     Just a second, please.

3          MR. DISKANT:  Sure.

4          THE COURT:  But there was new matter, that's what made

5     it a continuation-in-part.  There may not have been new claims.

6          MR. DISKANT:  Right.

7          THE COURT:  But there was new matter, wasn't there?

8          MR. DISKANT:  There was new matter, but what this is

9     talking about, there's no possible reason for protecting the

04:44 10     new matter from double patenting rejections.  To my reading at

11     least it's talking about claims based on new matter.  It's not

12     saying that in hoc verba, but when you're talking about

13     priority dates and rejections, you're talking about claims.

14          THE COURT:  Just a second.

15          What about the new next paragraph?  It says, "The

16     difference between divisional applications and CIPs moreover

17     was well known at the time that Congress enacted the 1952

18     Patent Act.  The Manual of Patent Examining Procedure in use at

19     the time included definitions of the different types of

04:45 20     applications.  A divisional was defined as a later application

21     for a distinct or independent invention carved out of a pending

22     application and disclosing and claiming" -- disclosing and

23     claiming -- "nothing not disclosed in the earlier or parent

24     application.  A CIP was defined as an application filed during

25     the lifetime of an earlier application by the same applicant

1    repeating some substantial portion of all of the earlier

2    application and adding matter not disclosed in said earlier

3    case."

4           So "matter," this seems to say to me, includes either

5    new claims or new disclosed information about the preexisting

6    claims.

7           MR. DISKANT:  Well, new matter is anything that's not

8    disclosed.  It certainly is intended to be broad, and these are

9    the definitions.  And those are the ones I quoted to you

04:46 10    earlier.  However, Mr. Kunin reads other provisions of the MPEP

11    as allowing CIPs to be entitled to the safe harbor.  This is

12    silent on the safe harbor.  This is just definitional.

13           THE COURT:  I don't think it's silent on the safe

14    harbor.  They're talking about the safe harbor.

15           MR. DISKANT:  No.  These are just the definitions --

16           THE COURT:  No.  It's in the paragraph that says

17    there's no suggestion that Section 21 was directed at anything

18    but divisional applications.

19           MR. DISKANT:  Oh, yeah.  I'm sorry.  I was following

04:47 20    you.  I agree with you this paragraph that says there's no

21    suggestion is talking about the safe harbor.  I'm saying the

22    next paragraph you were reading to me, the definitions, the

23    definitions are standalone.  They're not tied to the safe

24    harbor in the definitional sections of the MPEP.

25           But stay with *Pfizer* with me because I think it's

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 323 of 500 PageID: 1602
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/18 Page 166 of 194

166

```
 1    useful.  In the next paragraph in Pfizer, it says "Pfizer's
 2    only claimed authority are three cases in which the court may
 3    have assumed that 121 did apply to CIPs."  And, you know,
 4    essentially they go through them and say, Well, it wasn't
 5    decided.  They're not denying it may have assumed that, but
 6    it's not decisional, so we can keep on --
 7              THE COURT:  Yeah.  But the holding -- the paragraph
 8    after that, "We conclude that the protection afforded by
 9    Section 121 to applications or patents issued therefrom filed
10    as a result of a restriction requirement is limited to
11    divisional applications."  That seems pretty clear, unqualified
12    and applicable.
13              MR. DISKANT:  Your Honor, if you read it that way, we
14    lose.
15              THE COURT:  Then I think -- it's ten minutes of 5:00.
16    I think you should move to the next argument.
17              MR. DISKANT:  Okay.  Before I move on, let me just say
18    one more thing, which is this, which is I'd respectfully
19    suggest to Your Honor that if you think you should rule against
20    us on this, it will be far better to do so on a well-developed
21    factual record in which we're able to prove all of these
22    things.  That's my suggestion, which you're obviously free to
23    reject.
24              Turning to the two-way test --
25              THE COURT:  I wouldn't let an expert tell me what the
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 324 of 500 PageID: 1603
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 16 of 194

167

 1    law is.  *Marx v. Diners Club*, there's a whole line of cases.

 2    They can talk about custom and practice if it's relevant to an

 3    issue like was somebody's conduct reasonable.  But I'm not

 4    going to take expert evidence, let a jury hear expert evidence

 5    or I wouldn't hear expert evidence on what the law is, unless

 6    you were talking about foreign law or something.

 7          MR. DISKANT:  I agree with that, Judge.  Our evidence

 8    would be that the --

 9          THE COURT:  I understand.  I think I understand.

04:50 10   Anyway, why don't you move to the other -- why you win anyway

11    even if you're not protected by the safe harbor.

12          MR. DISKANT:  Exactly, why we win anyway.  We win

13    anyway under the two-way test.

14          THE COURT:  You acknowledge you would fail the one-way

15    test?

16          MR. DISKANT:  To be most precise, we are not

17    challenging that in this proceeding.  Yes.

18          In any event, "The two-way test must be used" -- this

19    is this court, not Your Honor, I think it's Judge Young -- I'm

04:50 20   now on slide 66 -- "if the applicant could not have filed both

21    claims together in the earlier-filed application and the

22    applicant did not cause the later-filed claim to issue first by

23    delaying examination of the earlier-filed claim during the

24    period when both applications were pending."

25          So their first argument, which counsel spent some time

Case 2:16-cv-01925-JAK-MF Document 69-1 Filed 04/13/17 Page 325 of 500 Page ID: 1604
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/18 Page 169 of 194

168

1    on this afternoon, is the fact that the '471 and the '272 were

2    filed on exactly the same day rather than a day apart.  And I

3    think Your Honor wanted to know why that small difference could

4    possibly matter.

5        In our view, it doesn't, and there's no law that says

6    that it does.  They rely on *Berg*, and I think Your Honor knows

7    *Berg*, but *Berg* holds that "simultaneously filed applications

8    are ineligible when they could have been filed in a single

9    application."  And it says that loud and clear and repeatedly.

04:51 10   "Because *Berg* could have filed the claims of its separate

11   application in a single application and it simply chose to file

12   two applications despite nearly identical disclosures, *Berg* is

13   not entitled to the two-way test."

14       THE COURT:  What slide is that?

15       MR. DISKANT:  That's slide 68.  That's from *Berg* 1434.

16   "The two-way exception can only apply when the applicant could

17   not avoid separate filings."

18       THE COURT:  So here you couldn't avoid separate

19   filings because you were told by the PTO you had to separate

04:52 20   them.  So you get that far.

21       MR. DISKANT:  We get that far.  And indeed, the true

22   first filing had everything in it.  And if the PTO hadn't

23   issued the restriction requirement, you know, presumably it

24   would have issued as a patent one day and we wouldn't be here.

25       So I think that, you know, having filed a single

1    application and being told to separate them, it is not a

2    decisional consequence that we filed two of those on one day

3    and another a day or so -- actually a couple of months later.

4    And there's no case that says that.  Because we did just what

5    *Berg* said to do, which we looked at earlier.  If we're unsure

6    what to do, we should file them all together and let the PTO

7    tell us what to do.  That's what we did.

8            So we have this restriction requirement.  And from our

9    perspective, by complying with the restrictional requirement we

04:53 10   should have been entitled to the safe harbor.  You never get to

11   the two-way test.  But, you know, I think we're squarely what

12   *Berg* is talking about, "Two-way exception can only apply when

13   the applicant could not avoid separate filings."  So here we

14   are.

15           So then the question is is the PTO solely responsible

16   for the delay in causing the second-filed application to issue

17   prior to the first.  And their arguments, as I understand it,

18   are basically, we sought extensions of time and we discontinued

19   an appeal -- this is on slide 72 now -- and that we failed to

04:54 20   accept an allowed claim in prosecuting the '471 patent.  And

21   what Celltrion doesn't grapple with is why these events -- and

22   these are facts, they're facts we sought the extensions of

23   time, and we didn't accept this allowed claim, but why did they

24   cause the '471 patent to issue later?  That's what the question

25   is.  So let's take them one at a time.  We sought four

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 327 of 500 PageID: 1606
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/18 Page 170 of 194

170

1    extensions of time.  That's true.  They were permitted by

2    Congress.  Extensions of time all by themselves don't excuse

3    the PTO from its delays.

4             THE COURT:  But you said something a moment ago that I

5    don't think I've seen in the slides yet.  And, you know,

6    defining the question with precision, the relevant question

7    with precision, is I think particularly important here.  You

8    just said, I think, was the PTO solely responsible for the

9    delay?

04:55  10             MR. DISKANT:  Sorry.

11             THE COURT:  Is that the right test?

12             MR. DISKANT:  I would say the right test is, is the

13   PTO solely responsible for the fact that the '471 patent issued

14   after the '195 and '272 patents.  Because that's what we're

15   talking about.  If it issued earlier, it would be a different

16   test.

17             THE COURT:  Does any case use that formulation?

18   *Fallaux* I think says solely responsible for the delay.

19             MR. DISKANT:  Usually they say solely responsible for

04:55  20   issuance of one patent rather than the other.  The two-way --

21   this is *Berg* --

22             THE COURT:  So I mean, is there a case that uses that

23   test?

24             MR. DISKANT:  *Berg* says, "The PTO is solely

25   responsible for the delay in causing the second-filed

Case 2:16-cv-01925-JMV-MF  Document 69-1  Filed 04/13/17  Page 328 of 500 PageID: 1607
Case 1:15-cv-10698-MLW  Document 232  Filed 08/25/18  Page 171 of 194

171

 1    application to issue prior to the first."  So to me, the right

 2    question isn't whether --

 3            THE COURT:  Hold on just a second.  What slide is

 4    that?

 5            MR. DISKANT:  71.  To me, that's focusing on the right

 6    question, because otherwise, you know, what's the question?

 7    You have three months to file something, and you took three

 8    months instead of two months and two weeks.  I mean, if

 9    anything you do other than instantaneous action is delay, then

04:57 10   there's no point to this test.  To me the only point to the

11    test is comparative.

12            THE COURT:  Hold on just one second.  I want to find

13    that in *Berg*.

14            MR. DISKANT:  That's on 1434.

15            THE COURT:  I don't see it.

16            MR. DISKANT:  Let me look.  Well, I mean, is a similar

17    quote I can see right away, the court in *Braat*.  That's in

18    heading A, the first full paragraph, "The Court in *Braat*

19    emphasized the more typical scenario in which despite common

04:58 20   inventive entities the two-way test applied when a later" --

21            THE COURT:  I don't see that.

22            MR. DISKANT:  You don't see that either?

23            THE COURT:  I'm sorry.  I'm looking at 1433.  That's

24    the problem.

25            MR. DISKANT:  Let me see if I can find the other

Case 2:16-cv-01925-JMV-MF   Document 69-1   Filed 04/13/17   Page 329 of 500 PageID: 1608
Case 1:15-cv-10698-MLW   Document 232   Filed 08/25/16   Page 172 of 194

172

1    quote.

2                THE COURT:  If I look on 1434, I probably will find

3    it.

4                MR. DISKANT:  I unfortunately don't have it

5    highlighted here.  I'm having trouble.  Let me have somebody

6    look for it.  Can somebody find that quote, the two-way test

7    may be appropriate.  We'll get back to you, Judge.

8                THE COURT:  All right.

9                MR. DISKANT:  I've seen similar formulations.  I was

04:59 10    about to read you one.  I'll read you the one I did find.  I'm

11    sorry.  The one I did find was under section A, first

12    paragraph.  That's not as clear.  Anyway, to me this is the

13    only way this concept even makes sense.  I mean, you shouldn't

14    be, you know, asking what people did every day.  So, you know,

15    Ms. Elmore says she didn't delay.  Here is the real nub of it.

16    The extensions of time didn't matter.  Now I'm on slide 75.

17    What we've done is mark all the extensions of time in the

18    patents.

19                So let's assume there were no extensions of time.

05:00 20    Let's just take all the extensions of time out.  Well, '471

21    still -- it doesn't make any difference.  It's solely the PTO's

22    fault that the '471 issued later.  The extension of time had

23    nothing to do with it.  They have another argument that we took

24    an appeal, abandoned an appeal.  Again, if we want to go into

25    the facts and bring in witnesses, these kinds of things

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 330 of 500 PageID: 1609
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/18 Page 179 of 194
173

1    happened because strategies changed.

2         THE COURT:  If the defendants say the extensions of

3    time did matter, would that be a genuinely disputed fact that

4    would have to be decided by the jury before this issue -- the

5    question of whether the two-way test applies could be decided

6    properly?

7         MR. DISKANT:  I don't know what they would say.  These

8    are just numbers.  It seems to me if the question we're posing

9    is correct and we're correct on this -- although we haven't

05:01 10   moved for summary judgment on it, but it doesn't seem to me

11   it's possible to say the extensions of time are the reason the

12   '471 issued later.  They just aren't.  But, you know, we'll

13   hear what they have to say, and they'll say whatever they think

14   is appropriate.

15        But in any event, now the appeal is -- so we'll just

16   add the appeal.  So now the period that's blanked in light blue

17   and green is the period during which prosecution was delayed by

18   taking and then discontinuing an appeal, which is a nine-month

19   period.

05:02 20        THE COURT:  What slide that?

21        MR. DISKANT:  Now we're at slide 78.  And, you know,

22   once again, it just doesn't matter.  I mean, the problem is

23   that the genus application for the '471 took too darn long

24   because of the PTO's fault, not because of the things they're

25   blaming us for.

Case 2:16-cv-01925-JAK-AFM Document 69-1 Filed 04/13/17 Page 331 of 500 Page ID: 1610
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 174 of 194
174

1    And then their last point is, while the PTO said in

2    August 1997 that some claims were allowable and they seem to

3    think that we were obligated to grab those, and, you know, I

4    would say the right way to think about that is the PTO is

5    solely responsible for not realizing you're entitled to all

6    these claims.  Why is it our fault that we want to keep going

7    to get claims we get that we're suing these guys for.  So they

8    cited one case on this, this *Hubbell* case, which is so

9    different it's staggering.  And in *Hubbell*, the examiner

05:03 10    actually allowed claims, the difference between allowable and

11    allowed.

12          THE COURT:  What --

13          MR. DISKANT:  I'm now at slide 82.  You should know

14    that sometimes the PTO says a claim is allowable, which doesn't

15    allow you to get a patent but it allows you to come back and

16    re-write them.  And so the difference between an allowable

17    claim and allowed claim is if they say it's allowed, you just

18    pay the fee and you get your patent.

19          In *Hubbell,* the examiner allowed claims, similar to

05:03 20    ones it wound up getting.  He didn't pay his issue fee.  He

21    abandoned the application.  He later filed a new application.

22    The PTO is not responsible for that.  In our case, the examiner

23    indicated some but not all claims would be allowable if

24    rewritten, and we continued to prosecute to get the claims we

25    were entitled to.

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 332 of 500 PageID: 1611
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 175 of 194
175

1          Again, Ms. Elmore testifies that the examiner never

2    suggested there was any impropriety in that.  And again, just

3    look at the timeline.  The PTO said some claims were allowable,

4    really as the other patents are about to issue.  It didn't say

5    all the claims were allowable until a couple of years later.

6    That's PTO's problem, not ours.  They're solely responsible for

7    taking all those years to say our claims were allowable.

8          And then just take a look at what I view is the real

9    problem, which is strangely inconsistent positions by the PTO

05:04 10   on these three patents.  Now we're at slide 57.

11          THE COURT:  57?

12          MR. DISKANT:  Excuse me.  87.  I'm trying to get to

13   the end.  Oh, we found the quote.  Sorry.  That's okay.  It's

14   in *Hubbell*.  But it's citing -- yes.  Maybe it's the wrong page

15   on *Berg*.  Try 1437.

16          Judge, we found the quote in *Hubbell,* most recent

17   case, and it cites *Berg*, and maybe we've got the wrong page

18   number.  But this cites *Hubbell*, which is a 2013 case.

19          THE COURT:  I have it.

05:05 20          MR. DISKANT:  Okay.  And what page is this?  It's

21   right after heading C, "Two-Way Obviousness Analysis."  And

22   there's a block quote.

23          THE COURT:  Heading C.

24          MR. DISKANT:  Heading C, then there's a block quote,

25   and right after the block quote, it says, "We have explained

Case 2:16-cv-01925-JAK-AFM   Document 69-1   Filed 04/13/17   Page 333 of 500   Page ID: 1612
Case 1:15-cv-10698-MLW   Document 232   Filed 08/25/16   Page 176 of 194

176

1    that the two-way test is appropriate only in the unusual

2    circumstance where the PTO is solely responsible for the delay

3    in causing the second-filed application to issue before the

4    first."  It cites *Berg* at 1437 for the same quote.

5            THE COURT:  So that's a different page.

6            MR. DISKANT:  I think we had the wrong page on our

7    slide.  I apologize.

8            THE COURT:  Hold on a second.  Here it is.  It's on

9    1437 at the end of the paragraph that starts at the top of the

05:06 10   page.

11           MR. DISKANT:  Right.  Sorry.  Anyway, here is what's

12   happening in these three patents.

13           THE COURT:  Okay.

14           MR. DISKANT:  So as Your Honor has observed, we have

15   genus claims in the '471 and species claims in the two other

16   patents.  For reasons that are inexplicable, the cA2 claims

17   slid through on the first two patents.  Here is the '272.  The

18   claims are submitted, they're rejected, and they're allowed in

19   the space of a year.

05:07 20        On the '195, again, they're submitted with the white

21   dot.  They're rejected with the red dot.  And then they're

22   allowed.  And meanwhile, what happened on the '471, well, they

23   were submitted earlier, so we got an earlier application for a

24   cA2 claim, maybe a year or more earlier.

25           THE COURT:  All right.  I think I have this argument.

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 334 of 500 PageID: 1613
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/18 Page 177 of 194

177

 1    You didn't cause the -- I mean, your argument is that at least

 2    looked at in the light most favorable to you the evidence

 3    indicates that you, plaintiff, didn't cause any delay that

 4    resulted in the '471 being issued after the other patents.

 5            MR. DISKANT:  Correct.

 6            THE COURT:  Okay.  So let's assume -- although I

 7    haven't found anything yet -- that you're entitled to the

 8    two-way test.  Then what?

 9            MR. DISKANT:  Well, then they lose, because their

05:09 10    obviousness argument under the two-way test is --

 11            THE COURT:  Well, okay.  Go ahead.

 12            MR. DISKANT:  Their obviousness argument on the

 13    two-way test fails.  It quite readily fails.  The relevant

 14    question is -- I'll make it easier.  Everyone agrees that in

 15    the ordinary course --

 16            THE COURT:  What slide is that?

 17            MR. DISKANT:  This is 93.  Double patenting is a

 18    matter of what is claimed, and the specification cannot be used

 19    as prior art in an obviousness-type double patenting analysis.

05:09 20    So that is the general or ordinary rule.  And they don't

 21    actually have an argument if that's correct in our case.  In

 22    fact, they don't even have an argument if it's not correct, as

 23    I'll demonstrate.  The asserted claims we looked at

 24    previously -- now we're up to slide 94.  "The '471 is an

 25    antibody capable of binding TNF-a" --

Case 2:16-cv-01925-JMV-MF   Document 69-1   Filed 04/13/17   Page 335 of 500 PageID: 1614
Case 1:15-cv-10698-MLW   Document 232   Filed 08/25/16   Page 179 of 194

178

                1            THE COURT:  Hold on a second.  Let me ask Mr. Hurst,

                2     remind me what the authority is for looking at the

                3     specification.

                4            MR. HURST:  *Sun*, *Gemzar* and *Pfizer*.

                5            THE COURT:  So how do you respond to that?

                6            MR. DISKANT:  That's what I'm going to do.

                7            THE COURT:  What's that?

                8            MR. DISKANT:  Yes.  How I respond to that -- let me

                9     just do that quickly.  Again, we have all the science.  We have

05:10    10     evidence.  So we have two non-obviousness arguments.

               11            THE COURT:  No.  What I'm talking about now is you

               12     cite *AbbVie* here.  "Specification cannot be used as prior art

               13     in an obviousness-type double patenting analysis."  Is this on

               14     the two-way test?

               15            MR. DISKANT:  Yes.  It's on any test.  They agree with

               16     that.  That's not their argument.  They agree that ordinary

               17     double patenting you don't look at patent spec.  You only look

               18     at the claims.  Here is their argument.  Let me go back.

               19            Okay.  It's based on a case called *Sun,* which

05:11    20     Mr. Hurst argued.  What you see here is a compound standing

               21     alone.  And this is a claim to a nuclear side of the formula,

               22     whatever.  And if you look at a compound standing alone, you

               23     have no idea what it is useful for.  It could be car polish, it

               24     could be laundry detergent, it could be a pharmaceutical, it

               25     could be anything.  Because giving the chemical formula for

Case 2:16-cv-01925-JMV-MF  Document 69-1  Filed 04/13/17  Page 336 of 500 PageID: 1615
Case 1:15-cv-10698-MLW  Document 232  Filed 08/25/16  Page 179 of 194
179

1    something doesn't tell you what it's useful for.  And so the

2    *Sun* case says, "We acknowledge the general rule that an earlier

3    patent specification is not available for obviousness-type

4    double patenting.  However, a court considering a claim to a

5    compound must examine the patent specification to ascertain the

6    coverage of a claim because a claim to a compound standing

7    alone does not adequately disclose the patentable bounds of the

8    invention."

9            THE COURT:  What slide is that?

10           MR. DISKANT:  This is slide 103.  It doesn't have a

11   cite.  I'm so sorry.  It's 1389.

12           THE COURT:  Just one second.

13           MR. DISKANT:  Sure.

14           THE COURT:  I don't see it on 1389.

15           MR. DISKANT:  It's not.  It's on 1387.  I apologize.

16   It's at the end of paragraph --

17           THE COURT:  Okay.  So I think Mr. Hurst emphasized

18   this.

19           MR. DISKANT:  Yes, he did, but he didn't emphasize the

20   words "standing alone."

21           THE COURT:  Let me find that.

22           MR. DISKANT:  Sure.  It's at the end of the paragraph.

23   "Furthermore, we reject."

24           THE COURT:  Okay.  It says, "As we recognize in

25   *Geneva*, a court considering a claim to a compound must examine

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 337 of 500 PageID: 1616
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 180 of 194
180

        1   the patent specification to ascertain the coverage of the claim

        2   because a claim to a compound standing alone does not

        3   adequately disclose the patentable bounds of the invention."

        4        Is the '471 a patent for a compound?

        5        MR. DISKANT:  Not a compound standing alone, no.

        6        THE COURT:  I'm going to get to that.  Is it a patent

        7   for a compound?

        8        MR. DISKANT:  Sure, yes.

        9        THE COURT:  Then here it says -- okay.  "Compound

05:15  10   standing alone," but it says "the court," me, "has to examine

       11   the patent specification."

       12        MR. DISKANT:  If it is a claim to a compound standing

       13   alone.  This body of cases, Judge, is all about claims like

       14   that.

       15        THE COURT:  Is that graphic in *Sun*?

       16        MR. DISKANT:  The graphic isn't in *Sun*, but that's

       17   what they were discussing.

       18        THE COURT:  Well, how do I know that?

       19        MR. DISKANT:  You can read, "The compound standing

05:15  20   alone."

       21        THE COURT:  So the belief --

       22        MR. DISKANT:  With all respect, Judge --

       23        THE COURT:  This may be very obvious to you.  It says

       24   I "must consider the specification to ascertain the coverage of

       25   a claim because a claim to a compound," then it quotes *Geneva*,

1    "standing alone."  It seems to be saying -- what number is that

2    slide?

3                MR. DISKANT:  The slide is 101.

4                THE COURT:  101, which you say depicts a compound all

5    by itself.  It seems to me that what it's telling me in that

6    sentence is I have to look at the specification.  Otherwise,

7    the compound stands alone.

8                MR. DISKANT:  Respectfully, Judge, there are three

9    cases in this line of cases.  They're all claims to compounds

05:16 10    standing alone, namely, bare formulas, in which a reader would

11    have no idea what they were to be used for, what their utility

12    was.

13                THE COURT:  So in the claim term here --

14                MR. DISKANT:  In the claim term here, we have "a

15    chimeric antibody capable of binding the TNF-a."  That is a

16    very important utility.  TNF-a is known to cause inflammation.

17    TNF-a is related to a whole variety of diseases, and an

18    antibody that's capable of binding to TNF-a is useful.

19                Mr. Hurst said this related to the patent law that a

05:17 20    patent must have some use.  The compound we just saw in *Sun* has

21    no use.  I mean, it's just a collection of molecules.  This is

22    a compound with a use of great interest to the scientific

23    community.  So it just isn't what those cases are about.

24                THE COURT:  Okay.

25                MR. DISKANT:  There's a second reason, though.  I'm

```
 1    sorry.  Did I interrupt you?

 2              THE COURT:  Go ahead.

 3              MR. DISKANT:  There's a second reason.  Sorry.

 4              THE COURT:  No.  Go ahead.

 5              MR. DISKANT:  Which is, even if Mr. Hurst was right,

 6    and respectfully he's not, this has a utility.  But even if he

 7    were right, the Sun exception doesn't apply to the other

 8    non-obviousness issue here.  There are two issues on

 9    obviousness, at least for purposes of this discussion.

10              One is, are the methods of use obvious.  That is, the

11    methods of using it to treat Crohn's and rheumatoid arthritis.

12    They're not obvious from the claim.  Counsel argues that they

13    are disclosed in the specification.  And we say you don't look

14    at them because Sun doesn't allow you to.

15              Okay.  Let's say we're wrong.  Separate and apart from

16    that, there are claims to a genus in the '471 and species in

17    the two other patents.  So the broad claims and the narrow

18    claims.  Sun's got nothing to do with that.  That's not a

19    utility question anymore.  That's a specific claiming issue.

20    We claimed in the '471 -- in the '471 we claim a group of

21    antibodies, and in the other claims we have a cA2 antibody.  So

22    they have --

23              THE COURT:  What number is that one?

24              MR. DISKANT:  This is 107 and 108 and 109.

25              THE COURT:  When you do your slides in the future, if
```

Case 2:16-cv-01925-JAK-AFM Document 69-1 Filed 04/13/17 Page 340 of 500 Page ID: 1619
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/18 Page 189 of 194
183

1    you do them again, you'll try to get the numbers on them.  I

2    can't see the numbers.

3              MR. DISKANT:  I can't see them either, but they're

4    there.

5              THE COURT:  It just helps, because this is all so

6    good.

7              MR. DISKANT:  I apologize, Judge.  I'm squinting each

8    time.  That's 107, 108 and 109.

9              THE COURT:  I can't see them.

05:19  10              MR. DISKANT:  Sadly, they're faded.  But in any event,

11    this is completely unrelated to, you know, looking at the spec

12    to see utility.  This is, "I have a patent on a group of

13    antibodies, and there are other patents on specific antibodies.

14    Why are the specific antibodies obvious in light of the genus

15    claim?"  There's a whole body of law on this subject.

16              The fact that a claim species is encompassed by a

17    prior art genus is not sufficient to establish a case of

18    obviousness.  They've got no evidence on this.  They didn't put

19    in an expert.  They have nothing.  So I frankly think their *Sun*

05:20  20    argument is wrong on the facts, and even if it were right, it

21    doesn't get to a declaration as a matter of that these two

22    patents are obvious in light of the '471.  You just can't get

23    there from here.  That's my argument.

24              THE COURT:  It's 5:20.  We've been at this for a long

25    time.  But if there's a general genus patent that includes the

Case 2:16-cv-01925-JMV-MF   Document 69-1   Filed 04/13/17   Page 341 of 500 PageID: 1620
Case 1:15-cv-10698-MLW   Document 232   Filed 08/25/16   Page 184 of 194

184

```
 1    particular -- for a group of antibodies to treat rheumatoid
 2    arthritis and then there's another patent for a specific
 3    antibody that treats rheumatoid arthritis, why isn't the second
 4    more specific one obvious in light of the first more general
 5    one that references the same use?
 6              MR. DISKANT:  Well, the more general one, as I just
 7    said, references binding TNF-a.  It doesn't reference the
 8    method of treatment.  But separate and apart from that, there
 9    is just a wide body of developed law that you need to have a
10    scientific inquiry into whether a particular embodiment of a
11    genus is obvious in light of the genus.
12              It may be, you know, human beings are good runners.
13    Does that mean, you know, some Olympic champion -- that I can't
14    name because I've been doing this -- is a good runner?  The
15    species claims are just different in kind, and you certainly
16    can't just invalidate them on no evidence whatsoever.
17              THE COURT:  So you're saying there needs to be a trial
18    on this motion for summary judgment with regard to
19    reexamination?
20              MR. DISKANT:  With regard to the obviousness issues.
21    So to just sort through what I just said.  There is the safe
22    harbor argument.  If you reject it, then you have to address
23    the two-way test issue.  And I say that the two-way test raises
24    fact issues both about whether it applies, and if it applies,
25    whether the patents are obvious.
```

1          THE COURT:  Is *Braat* the only case that's ever applied

2     the two-way test?

3          MR. DISKANT:  I can't answer that question.  It may

4     be.  I'm not quarreling with the observation that it's

5     infrequent.  It's more frequently applied by the PTAB, and we

6     cited it in the Patent Office, and we cited a bunch of cases to

7     that effect.  But yes, it's unusual.  But I can't imagine why

8     it took so long for the PTO to issue our '471 patent when they

9     did the other ones quickly, and it wasn't because of anything

05:23 10    we did.

11          THE COURT:  Okay.  All right.  Mr. Hurst, is there

12     anything you'd like to say of a relatively piffy nature in

13     response to this?

14          MR. HURST:  I think I have five minutes.  Would you

15     prefer to do it in the morning?

16          THE COURT:  No.  I'm going to decide these matters

17     tomorrow.

18          MR. HURST:  Let me take them one at a time.  I'm going

19     to be really brief on the safe harbor, Your Honor.  You asked

05:23 20    do I have the discretion to depart from the statutory language,

21     which requires the filing of a divisional.  And I would

22     suggest, respectfully, Your Honor, you don't, because Congress

23     took that discretion away from you.

24          *Pfizer*, *Amgen*, *Searle*, they all treat it as a matter

25     of statutory construction.  They said ultimately, essentially,

 1    divisional means divisional.  The '471 was a CIP.

 2          In terms of just the equities -- and you don't need to

 3    get there.  But that statute has said divisional since 1952.

 4          THE COURT:  I think I got this.

 5          MR. HURST:  I understand.  Just a really quick point

 6    is, it wasn't like Janssen didn't have options.  They said,

 7    Well, we wanted to add matter to this, new matter to this.

 8    Therefore we had to call it a CIP.  All they had to do was file

 9    the divisional because that's what the statute says, and then

05:24 10    they could file a new application off the divisional to add the

11    new matter.  There were options for them to avoid not complying

12    with Section 121.

13          Next, if you have no questions on the safe harbor -- I

14    didn't hear very much at all on the '272 patent, which was

15    filed on the same day as the '471 patent.  Your Honor, that is

16    an independent basis to reject the two-way test in favor of the

17    one-way test.  And I just wanted to point out that the --

18          THE COURT:  They say -- plaintiff says that the Patent

19    Office instructed them to break up the -- you know, to file

05:25 20    multiple applications.  So it was natural to file them on the

21    same day.

22          MR. HURST:  And when you do file them on the same day,

23    the very fundamental reason to even consider the two-way test

24    is gone.  They directed you -- the quote that everybody was

25    having trouble finding in *Berg*, this is the test, the one that

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 344 of 500 PageID: 1623
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 187 of 194

187

1  they cited to Your Honor.  The two-way test may be appropriate.

2  However, in the unusual circumstance that the PTO is solely

3  responsible for the delay in causing the second-filed

4  application to issue prior to the first application, every

5  single formulation that I'm aware of the two-way test has that

6  formulation where they're comparing temporally the first-filed

7  versus the second-filed.  And when you file on the same day --

8  and *Berg* I think does make this clear.  I know it focuses on a

9  different issue.  But it makes it clear that's also one of the

05:26  10  requirements and that when you simultaneously file, they said,

11  you're taking a risk.  The MPEP says the same thing.  If you

12  file on the same day, you don't even get out of the starting

13  blocks on a two-way test and you just stick to the one-way

14  test.

15      Now, on the two-way test itself, the way -- and I

16  understand the argument, and I understand the logic of the

17  argument, too.  What they're saying is if you subtract all of

18  the things we're responsible for, not taking an appeal, taking

19  all the extensions of time, the '471 patent still would have

05:27  20  issued later in time as compared to the earlier patents.

21  That's the argument, right?  The problem with the argument is

22  it ignores that no case has ever done the math like that.  All

23  they ask is, Were you responsible in part for the delay in the

24  ultimate issuance of the patent.

25      THE COURT:  That doesn't seem to be the language that

Case 2:16-cv-01925-JMV-MF   Document 69-1   Filed 04/13/17   Page 345 of 500 PageID: 1624
Case 1:15-cv-10698-MLW   Document 232   Filed 08/25/18   Page 189 of 194

188

         1    Mr. Diskant was pointing me to in *Berg* and the other cases.

         2    It's in the delay that caused the first-filed to be issued

         3    second.

         4             MR. HURST:  Right.  And I agree with that.  When

         5    you're calculating that delay, up until the time it gets issued

         6    later in time, if both parties contributed something to that

         7    process, the two-way test doesn't apply.  That's why, Your

         8    Honor, it's so rarely applied.

         9             Imagine if Janssen was right that you did the math

05:27   10    they did, it wouldn't be really applied because there's always

        11    going to be competing contributions.  Here is why it's so

        12    critically important.  When they did -- slide 76.  You don't

        13    have to look at it because it's quick.  They did a hypothetical

        14    where they removed all of their extensions of time, and they

        15    said the '471 patent still would have issued later in time, but

        16    it would have issued two years earlier.  And therefore, the

        17    extension of time that's created by the later-expiring patent

        18    would have been shorter, and that's why any delay that the

        19    patentee --

05:28   20             THE COURT:  Let me see if I understand this because it

        21    is important that this doesn't get lost in technicality.  So

        22    the argument you're making now is, if I look at slide 76, which

        23    I'm not going to do, and accept the assumptions, assertions,

        24    the '471 still would have issued after the other two patents

        25    but two years earlier than it did, and because it actually

Case 2:16-cv-01925-JMV-JBC Document 69-1 Filed 04/13/17 Page 346 of 500 PageID: 1625
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 189 of 194
189

1    issued two years later, Janssen gets two more years of patent

2    protection at $4 billion a year.

3              MR. HURST:  That's right.

4              THE COURT:  So it's an $8 billion issue.

5              MR. HURST:  It's an $8 billion issue.  The current

6    expiration date, absent invalidation, is September of '18.  If

7    you just subtract the extensions of time, it would have been

8    October of 2016.

9              THE COURT:  Just when you want to sell.

05:29 10            MR. HURST:  Exactly, it would be perfect.  But I guess

11   the point is this.  You don't segregate it that way.  You look

12   at, was it delayed and was there a contribution in the delay

13   from both parties?  If the answer to that is yes, the two-way

14   test, which is so rarely applied, should not apply.

15             Finally, on *Sun* -- I guess just to frame the issue,

16   the compound -- it's a compound claim.  It says, We claim an

17   antibody, and it describes that antibody as an antibody capable

18   of binding to TNF.  That, Your Honor, is not a utility under

19   the law.  It's a property of the compound.  It's something

05:30 20   that's capable of binding to TNF.

21             To actually make it useful, you actually have to give

22   the drug to somebody who actually needs TNF binding.  Giving it

23   to me would do nothing.  So it is a compound patent, and it

24   does not disclose a use for that compound.  And what *Sun* tells

25   you to do, what *Pfizer* tells you to do is read the

Case 2:16-cv-01925-JMV-MF   Document 69-1   Filed 04/13/17   Page 347 of 500 PageID: 1626
Case 1:15-cv-10698-MLW   Document 232   Filed 08/25/16   Page 190 of 194

190

 1    specification.  What does the specification say?  You use that

 2    compound to treat RA and to treat Crohn's.

 3          He had a separate argument.  Just really brief.  He

 4    had a separate argument, species, genus.  Your Honor, I don't

 5    think that's a serious argument.  The '471 patent claims a

 6    group of antibodies.  Under *Sun* and *Pfizer* you read the

 7    specification.  The specification says, Use these antibodies

 8    that I'm claiming to treat Crohn's and also to treat RA.  One

 9    of those antibodies in that group is infliximab, which is the

05:31 10    very antibody in the '192 patent and the '272 patent that is

11    claimed for use to treat Crohn's and RA.

12          Thank you, Your Honor.

13          THE COURT:  All right.  It's 5:30.  Here is how I

14    intend to proceed.  I had ordered you to be available today,

15    tomorrow and Thursday for these hearings, since my goal is to

16    decide all the pending matters orally.

17          Today has been very helpful, but it's taken longer

18    than I thought and you thought.  But it's okay.  I don't think

19    the Federal Circuit will give you this much time.  No, but this

05:31 20    is good.

21          I want you to come back tomorrow at 1:00.  I will use

22    tomorrow morning to, at a minimum, further develop my thoughts

23    with regard to the *Gilead* motion, and hopefully I'll have a

24    ruling at 1:00 on the reexamination motion as well.  That has

25    more parts.  Then I want to hear your argument on the '083.

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 348 of 500 PageID: 1627
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 191 of 194
191

1          And just so the defendants don't get too excited and

2     the plaintiffs too depressed, I ordinarily wouldn't do this,

3     but I think there's a good reason to do it here.  My tentative

4     view is that the plaintiffs are right.  "Cell culture media"

5     just means cell culture media.  It's defined in the technical

6     dictionaries.  It's unmodified.  It means what it says.

7          So if that's my ruling tomorrow or Thursday morning,

8     the '083 will survive even if the '471 doesn't.  And I tell you

9     that -- I've suggested this when we were in the lobby last time

05:33 10     I saw you.  But as I recall, I didn't order it.  But you

11     brought your business people here.  And now you have tomorrow

12     morning.  And, you know, this is business.  And I do feel both

13     because of the statute that contemplates that these issues will

14     be decided and that six months after approval, you know, to try

15     to do what my friend Lamar Smith thought we were going to do if

16     he had a role in this, to try to make this work.

17          I know it's very consequential.  And you know, I'd

18     like to take time and write a long and elegant decision, but

19     I'm immersed in this.  I think the most appropriate thing for

05:34 20     me to do is to decide orally anything I can decide orally.

21     But, you know, I could order it, but I hope you use tomorrow

22     morning to continue your discussions.  And that's why I tell

23     you what my tentative view on the '083 is.

24          My tentative view to expedite the trial, I'm inclined

25     to deny that.  We set a schedule that the defendants would have

1    reasonably relied on and the plaintiff decided not to move for

2    a preliminary injunction -- you can change your mind -- but

3    that's in effect what an expedited trial appears to me to be at

4    the moment.  So that if the '083 survives, I would consolidate

5    the second case with the first one.  Does that have '083 claims

6    in it, too?

7         MS. ROYZMAN:  Yeah.

8         THE COURT:  It does.  And you seem to think both can

9    be prepared for trial in February?

05:35 10         MR. DISKANT:  Right.

11         THE COURT:  I wrote about this when I denied the stay

12    in the *Columbia* multidistrict litigation in 2004.  I probably

13    said it when I denied the stay of this case.  You know, my

14    sense in these patent cases is that each of your first choices

15    is to win.  But, you know, if you can't get a decisive,

16    definitive final answer, then certainty is very important.

17         So you're getting more information, and you'll have

18    more before you go home on Thursday, but at some point the

19    defendant is going to be able to sell its product.  Whether

05:36 20    it's in 2016 or 2018 is the issue.  It's a matter of money,

21    it's business.  You told me you've been talking, and if you

22    want, I'll seal this portion of the discussion.  Perhaps I'll

23    refer you to settlement discussions we had in the lobby, or at

24    least about the process.

25         Are you willing to talk to each other tomorrow

1    morning?

2        MR. HURST:  I think the answer is absolutely yes.

3        MR. DISKANT:  Yes, Your Honor.

4        THE COURT:  All right.  And if somehow you settle the

5    case before 1:00, let me know.

6        (Laughter)

7        But I'll see you at 1:00.  We'll keep going.  You'll

8    have my best answer on I think all three of the motions before

9    you go home on Thursday.  If for some reason I can't decide the

05:37 10   reexamination motion tomorrow, if I haven't worked through it

11   sufficiently, we'll do the '083 because the reexamination

12   motion is an alternative basis.  If I decide the *Gilead* motion

13   in favor of the defendants, in another case I might just say

14   the reexamination motion is moot.  I'm not inclined to do that

15   in this case because this is just all so consequential to you

16   and ultimately to the public.

17       All right.  I'm ordering you to do what you would do

18   anyway, which is order the transcript, although the court

19   reporter doesn't need to prepare it by tomorrow.  And I'll

05:38 20   thank my staff for their dedication in staying here almost

21   until 6:00, and I'll see you at 1:00 tomorrow.

22       Court is in recess.

23       (Adjourned, 5:38 p.m.)

24

25

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 351 of 500 PageID: 1630
Case 1:15-cv-10698-MLW Document 232 Filed 08/25/16 Page 194 of 194

194

1

2              CERTIFICATE OF OFFICIAL REPORTER

3

4         I, Kelly Mortellite, Registered Merit Reporter

5   and Certified Realtime Reporter, in and for the United States

6   District Court for the District of Massachusetts, do hereby

7   certify that pursuant to Section 753, Title 28, United States

8   Code that the foregoing is a true and correct transcript of the

9   stenographically reported proceedings held in the

10  above-entitled matter and that the transcript page format is in

11  conformance with the regulations of the Judicial Conference of

12  the United States.

13             Dated this 23rd day of August, 2016.

14

15             /s/ Kelly Mortellite

16             _____

17             Kelly Mortellite, RMR, CRR

18             Official Court Reporter

19

10:33 20

21

22

23

24

25

# EXHIBIT 9

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **JANSSEN BIOTECH, INC. and**<br>**NEW YORK UNIVERSITY**<br><br>Plaintiffs,<br><br>v.<br><br>**CELLTRION HEALTHCARE CO., LTD.,**<br>**CELLTRION, INC., and**<br>**HOSPIRA, INC.**<br>Defendants. | **Civil Action No. 1:15-cv-10698** |

# MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 6,284,471 FOR OBVIOUSNESS-TYPE DOUBLE-PATENTING

# <u>TABLE OF CONTENTS</u>

<div align="right"><u>Page</u></div>

INTRODUCTION ................................................................................................................. 1

I.    THE COURT SHOULD GRANT SUMMARY JUDGMENT OF INVALIDITY
OF THE '471 PATENT FOR DOUBLE PATENTING USING EITHER THE
'444, '195 OR '272  REFERENCE PATENTS.................................................. 2

II.    LEGAL STANDARDS ................................................................................... 4

     A.    Summary Judgment ................................................................................ 4

     B.    Obviousness-Type Double Patenting.................................................... 5

III.    THE '471 PATENT IS INVALID IN VIEW OF THE '444 PATENT UNDER
THE DOCTRINE OF OBVIOUSNESS-TYPE DOUBLE-PATENTING........................ 5

     A.    The Claims Of The '471 Patent Are Not Patentably Distinct From The
Claims Of The '444 Patent ................................................................... 6

     B.    Under Gilead, The Earlier-Expiring '444 Patent Can Be Used As A
Double-Patenting Reference To Invalidate The Later-Expiring '471 Patent ......... 9

     C.    Janssen Cannot Claim Refuge In The Safe Harbor Of § 121 .............................. 12

IV.    THE '471 PATENT IS ALSO INVALID IN VIEW OF THE '195 AND '272
PATENTS UNDER THE DOCTRINE OF OBVIOUSNESS-TYPE DOUBLE
PATENTING .......................................................................................... 14

CONCLUSION..................................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amgen Inc. v. F. Hoffman-La Roche Ltd.*,
    580 F.3d 1340 (Fed. Cir. 2009) ........................................................................... 5, 13

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................................................ 5

*Eli Lilly & Co. v. Barr Labs., Inc.*,
    251 F.3d 955 (Fed. Cir. 2001) ............................................................................... 6

*G.D. Searle LLC v. Lupin Pharms., Inc.*,
    790 F.3d 1349 (Fed. Cir. 2015) ............................................................................. 13

*Geneva Pharm., Inc. v. GlaxoSmithKline PLC*,
    349 F.3d 1373 (Fed. Cir. 2003) ............................................................................. 13

*Gerber Garment Tech, Inc. v. Lectra Sys., Inc.*,
    916 F.2d 683 (Fed. Cir. 1990) ............................................................................. 13, 14

*Gilead Sci., Inc. v. Natco Pharma Ltd.*,
    753 F.3d 1208 (Fed. Cir. 2014) ......................................................................... passim

*In re Basell Poliolefine Italia S.P.A.*,
    547 F.3d 1371 (Fed. Cir. 2008) ........................................................................... 5, 15

*In re Fallaux*,
    564 F.3d 1313 (Fed. Cir. 2009) ............................................................................. 15

*In re Gosteli*,
    872 F.2d 1008 (Fed. Cir. 1989) ............................................................................. 6, 7

*In re Hubbell*,
    709 F.3d 1140 (Fed. Cir. 2013) ........................................................................... 5, 15

*In re Longi*,
    759 F.2d 887 (Fed. Cir. 1985) ............................................................................... 6

*In re Slayter*,
    276 F.2d 408 (C.C.P.A. 1960) ............................................................................... 6, 7

*In re Wallach*,
    378 F.3d 1330 (Fed. Cir. 2004) ............................................................................. 9

*Mendes v. Medtronic, Inc.*,
    18 F.3d 13 (1st Cir. 1994) ..................................................................................... 5

*Merck & Co. v. Kessler*,
   80 F.3d 1543 (Fed. Cir. 1996) ...................................................................... 3

*Morris v. Gov't Dev. Bank*,
   27 F.3d 746 (1st Cir. 1994) ........................................................................... 4

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*,
   518 F.3d 1353 (Fed. Cir. 2008) ............................................................... 5, 13

*St. Jude Med., Inc. v. Access Closure, Inc.*,
   729 F.3d 1369 (Fed. Cir. 2013) ............................................................. 13, 14

*Sun Pharma. Indus. v. Eli Lilly & Co.*,
   611 F.3d 1381 (Fed. Cir. 2010) ............................................................... 5, 16

**Statutes**

35 U.S.C. § 121 ...................................................................... 5, 12, 13, 17

35 U.S.C. § 154(c)(1) ........................................................................... 3

35 U.S.C. § 154(a)(2) ........................................................................... 3

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................ 4

Manual of Patent Examining Procedure § 804.01 ....................................... 17

**Other Authorities**

Federico, P. J., *Commentary on the New Patent Act*
   75 *J. Pat. & Trademark Off. Soc'y* 161 (1993) ......................................... 17

Defendants Celltrion Healthcare Co., Ltd., Celltrion, Inc. (together, "Celltrion") and Hospira, Inc., respectfully submit this memorandum in support of their Motion for Summary Judgment of Invalidity of asserted claims 1, 3 and 5–7 of U.S. Patent No. 6,284,471 ("the '471 patent") for obviousness-type double-patenting over any one of U.S. Patent Nos. 6,790,444 ("the '444 patent"), 5,656,272 ("the '272 patent"), or 5,698,195 ("the '195 patent").

## INTRODUCTION

Straightforward application of a "bedrock principle of our patent system" compels this Court to find the asserted claims of the '471 patent invalid as a matter of law. This "bedrock principle" holds that "when a patent expires, the public is free to use not only the same invention claimed in the expired patent but also obvious or patentably indistinct modifications of that invention." *Gilead Sci., Inc. v. Natco Pharma Ltd.*, 753 F.3d 1208, 1214 (Fed. Cir. 2014). That "principle is violated when a patent expires and the public is nevertheless barred from practicing obvious modifications of the invention . . . because the inventor holds another later-expiring patent" on those "obvious modifications." *Id.* The doctrine of double patenting thus forbids a patent owner from obtaining more than one patent on the same or obvious variants of the same invention if those patents have different expiration dates. But Janssen has done just that— asserting a later-expiring patent that claims the same invention as its already-expired patents— which mandates a finding of invalidity of the later-expiring patent for double patenting.

Janssen's expired '444 patent claims the same antibodies covered by the claims of Janssen's presently-asserted '471 patent. The pertinent claims in those two patents are nearly word-for-word identical. And whatever trivial textual differences exist, there is no possible dispute that the later-expiring '471 patent claims either the same or an obvious variant of the inventions claimed in the '444 patent. Indeed, when faced with Celltrion's obviousness-type

double patenting defense as part of the pre-litigation exchange of positions under the Biologics Price Competition and Innovation Act (BPCIA) statute, Janssen did not argue otherwise.

Instead, Janssen argued that the '444 patent could not qualify as an invalidating "reference patent" because it happened to *issue* after—even though it *expired* before—the '471 patent. But the Federal Circuit already rejected that very argument in its 2014 *Gilead* decision, holding that courts should "look[] to the expiration date instead of issuance date" to assess double patenting. *Id.* at 1216. Under *Gilead,* Janssen's patent monopoly on this invention should have ended with the expiration of the '444 patent in 2011. The Court should thus find the '471 patent invalid for double patenting.

In fact, the Patent Office has *already* held the '471 patent invalid during reexamination for double patenting over *other* expired patents that Janssen owns: the '195 and '272 patents. In a pending Patent Office proceeding—which could take years to resolve—Janssen is relying on various inapplicable technicalities to attempt to overturn the Patent Office's decision. But none of those arguments have any merit, and the same grounds on which the Patent Office has rightfully relied provide further independent bases for finding that the '471 patent is invalid for double patenting. The asserted claims of the '471 patent should be declared invalid.

## I. The Court Should Grant Summary Judgment Of Invalidity Of The '471 Patent For Double Patenting Using Either The '444, '195 Or '272 Reference Patents

Janssen is asserting its '471 patent against Defendants in this litigation. Facts 1, 2. Janssen is also the owner of the expired '444 patent. Fact 3. Both patents list the same set of inventors, relate back to several of the same priority patent applications, and share the same earliest effective filing date of March 18, 1991. Fact 4. The '471 patent resulted from U.S. Patent Application No. 08/192,093, filed on February 4, 1994, whereas the '444 patent resulted from U.S. Patent Application No. 09/756,301, filed on January 8, 2001. Facts 5, 6.

The two patents' different filing dates result in different expiration dates. Facts 5, 6. Patents resulting from applications filed before 1995, such as the '471 patent, have a term of seventeen years from the patent issue date or twenty years from the earliest effective filing date, whichever is longer. *See* 35 U.S.C. § 154(a)(2), (c)(1); *Merck & Co. v. Kessler*, 80 F.3d 1543, 1547–1548 (Fed. Cir. 1996). In 1995 the law changed, such that patents resulting from applications filed after 1995, such as the '444 patent, have a term of twenty years from the patent's earliest effective filing date regardless of issue date. *Id.*

The Patent Office issued the '471 patent on September 4, 2001. Fact 5. It issued the '444 patent on September 14, 2004. Fact 6. Because of their filing dates, the '444 and '471 patents are governed by different means for calculating patent terms, resulting in the later-issued '444 patent having expired twenty years after its 1991 effective filing date in <u>2011</u>, while the earlier-issued '471 patent does not expire until seventeen years after its 2001 issue date in <u>2018</u>. Facts 5, 6. The timeline below shows the different patent terms:



Both the '444 reference patent and the '471 patent-in-suit claim the same "chimeric antibody," i.e., infliximab. Facts 18–20. An antibody is a large, Y-shaped protein (i.e., a polypeptide) used by the immune system that recognizes unique molecules; a chimeric antibody is an antibody designed by man to contain non-naturally occurring protein sequences. Facts 21, 22. The chimeric antibody of the '471 and '444 patents is known as infliximab or "cA2," and it

recognizes a protein involved in inflammation known as tumor necrosis factor alpha (TNF-α).

Fact 23. By binding to this protein, infliximab is used to treat autoimmune disorders. Fact 24.

Both the '471 and the '444 patents claim infliximab—in some claims by reciting the corresponding nucleic acid sequences, and in other claims, by reciting the corresponding amino acid sequences (i.e., the chains of amino acids forming the polypeptide), but they are two ways of saying the same thing. Fact 25. The '444 patent includes claims that are nearly verbatim to those of the '471 patent. *See* Appendix 1 (claim chart); Facts 13, 14. The only difference is that the '444 patent claims recite a single antibody, infliximab, rather than the group of antibodies claimed by the '471 patent. The group of antibodies claimed by the '471 patent includes infliximab. Fact 20. In other words, the '471 patent recites a genus of antibodies, and the '444 patent recites a single species (infliximab) contained within that genus.

The '195 and '272 patents, which share the same effective filing date of March 18, 1991 as the '471 patent, claim methods of treatment using infliximab. Facts 4, 16, 17. Both the '195 and '272 patents expired in 2014. Facts 7, 8. During reexamination of the '471 patent, the examiner at the Patent Office rejected the claims of the '471 patent under the doctrine of obviousness-type double patenting in view of both the '195 and '272 patents. Fact 27. Janssen has appealed that determination. Fact 27.

## II.    Legal Standards

### A.    Summary Judgment

Summary judgment should be granted when "there is no genuine dispute as to any material fact" and "the movant party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" when a reasonable fact-finder could find for the non-moving party; a fact is "material" when it might affect the outcome of the suit under the applicable law. *Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st Cir. 1994). The non-moving party bears the burden of

placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (discussing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

### B. Obviousness-Type Double Patenting

Double patenting is a question of law. *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 518 F.3d 1353, 1363 (Fed. Cir. 2008); *Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1352 (Fed. Cir. 2009). It is "intended to prevent a patentee from obtaining a timewise extension of [a] patent for the same invention or an obvious modification thereof." *Sun Pharma. Indus. v. Eli Lilly & Co.*, 611 F.3d 1381, 1384 (Fed. Cir. 2010) (quoting *In re Basell Poliolefine Italia S.P.A.*, 547 F.3d 1371, 1375 (Fed. Cir. 2008)). "It is based on the core principle that, in exchange for a patent, an inventor must fully disclose his invention and promise to permit free use of it [to the public] at the end of his patent term." *Gilead Sci.*, 753 F.3d at 1212. By "limiting a patentee to one patent term per invention or improvement," the doctrine of double patenting "preserve[s] the public's right to use not only the exact invention claimed by an inventor when his patent expires, but also obvious modifications of that invention that are not patentably distinct improvements." *Id.* The doctrine applies so long as the earlier and later expiring patents have at least one common inventor, subject to a narrowly-construed safe harbor in 35 U.S.C. § 121 (discussed below). *In re Hubbell*, 709 F.3d 1140, 1145–46 (Fed. Cir. 2013).

### III. The '471 Patent Is Invalid In View Of The '444 Patent Under The Doctrine Of Obviousness-Type Double-Patenting

In response to Defendants' pre-suit explanation that the '471 patent is invalid for double patenting over the '444 patent, Janssen failed to assert that the '471 patent was patentably distinct from the '444 patent. Fact 40. That leaves the only issue that Janssen has ever raised— whether the later-issuing, earlier-expiring '444 patent can serve as an invalidating double-

patenting reference against the earlier-issuing, later-expiring '471 patent. Because as a legal matter the answer to that question is clearly yes under the Federal Circuit's decision in *Gilead*, this Court should enter summary judgment of invalidity.

### A. The Claims Of The '471 Patent Are Not Patentably Distinct From The Claims Of The '444 Patent

Under the doctrine of obviousness-type double patenting, a claim in a second patent is invalid if it is "not patentably distinct from the claims of [a] first patent," *In re Longi*, 759 F.2d 887, 892 (Fed. Cir. 1985), such that "the later patent claim is obvious over, or anticipated by, the earlier claim." *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 968 (Fed. Cir. 2001) (citations omitted). The analysis may "tak[e] into account the skill of the art and prior art other than the invention claimed in the [earlier] patent." *Longi*, 759 F.2d at 892.

Here, it is beyond dispute that at least claims 1 and 2 of the '444 patent anticipate all of the asserted claims of the '471 patent. It is black letter law that "a generic claim cannot be allowed to an applicant if the prior art discloses a species falling within the claimed genus." *In re Slayter*, 276 F.2d 408, 411 (C.C.P.A. 1960); *In re Gosteli*, 872 F.2d 1008, 1010 (Fed. Cir. 1989). That is precisely the case here. Claim 1 of the '444 patent claims infliximab, also known as cA2: "The chimeric antibody cA2." Fact 19. Each of the asserted claims of the '471 patent-in-suit (claims 1, 3 and 5–7) covers a genus that includes cA2—otherwise, there could be no allegation of infringement. Fact 20. Because the species of '444 patent claim 1 anticipates the asserted claims of the '471 patent, those genus claims are not patentably distinct.

Claim 2 of the '444 patent provides an independent basis for finding no patentable distinction, because it likewise anticipates the asserted claims of the '471 patent. Indeed, the asserted claims of the '471 patent are recited nearly *verbatim* in claim 2 of the '444 patent. *See*

Appendix 1 (claim chart); Facts 13, 14.  There are only three textual differences, none of which makes any possible *patentable* difference.  The first is highlighted below:

| '444 Patent (Expired 2011) | '471 Patent (Expires 2018) |
|---|---|
| **Claim 2** | **Claim 1** |
| A chimeric antibody comprising at least part of a human IgG1 constant region and | A chimeric antibody comprising at least part of a human immunoglobulin constant region and |
| at least part of a non-human immunoglobulin variable region, | at least part of a non-human immunoglobulin variable region, |
| said antibody capable of binding an epitope specific for human [tumor necrosis factor] TNFα, | said antibody capable of binding an epitope specific for human tumor necrosis factor TNFα, |
| wherein the non-human immunoglobulin variable region comprises an amino acid sequence selected from the group consisting of SEQ ID NO: 3 and SEQ ID NO: 5. | wherein the non-human immunoglobulin variable region comprises an amino acid sequence selected from the group consisting of SEQ ID NO: 3 and SEQ ID NO: 5. |

The "human immunoglobulin constant region" is a genus as shown by dependent claim 6 of the '471 patent, which further recites that the "IgGl" is one of the species within the "the human immunoglobulin constant region."  Fact 13.  Thus, the '444 patent recites a species of the genus recited by the '471 patent, which is not a patentable distinction as a matter of law.  *Slayter*, 276 F.2d at 411; *Gosteli*, 872 F.2d at 1010.

The second textual difference is found in claims 5 and 6 of the '471 patent:

| '444 Patent (Expired 2011) | '471 Patent (Expires 2018) |
|---|---|
| **Claim 2** | **Claim 5** |
| A chimeric antibody | A chimeric antibody |
| comprising at least part of a human IgG1 constant region and | comprising two light chains and two heavy chains, each of said chains comprising at least part of a human immunoglobulin constant region |
| at least part of a non-human immunoglobulin variable region, | and at least part of a non-human immunoglobulin variable region, |
| said antibody capable of binding an epitope specific for human [tumor necrosis factor] TNFα, | said variable region capable of binding an epitope of human tumor necrosis factor hTNFα, |

| '444 Patent (Expired 2011) | '471 Patent (Expires 2018) |
|---|---|
| wherein the non-human immunoglobulin variable region comprises an amino acid sequence selected from the group consisting of SEQ ID NO: 3 and SEQ ID NO: 5. | wherein said light chains comprise variable regions comprising SEQ ID NO: 3 and said heavy chains comprise variable regions comprising SEQ ID NO: 5. |
| | **Claim 6** |
| | A chimeric antibody according to claim 5, wherein the human immunoglobulin constant region is an IgG1. |

Claim 2 of the '444 patent states that the chimeric antibody comprises "at least part of a human IgGl constant region," particularly identifying the immunoglobulin as an IgG1. Fact 14. Claim 5 of the '471 patent more broadly recites that the chimeric antibody contains a human immunoglobulin constant region. Fact 13. Thus, the subject matter of claim 5 of the '471 patent is broader than claim 2 of the '444 patent, but the subject matter of claim 2 falls squarely within the scope of claim 5.[1] Claim 2 of the '444 patent thus anticipates claim 5 of the '471 patent (and by extension claim 6). Indeed, claim 6 of the '471 patent more particularly specifies that the "human immunoglobulin constant region" of claim 5 "is an IgG1," and claim 2 of the '444 patent specifically recites "a human IgG1 constant region." Facts 13, 14. There is thus no patentable distinction here either.

The third and final insignificant textual difference is found in claims 3 and 7 of the '471 patent. *See* Appendix 1; Fact 13. Both claims 3 and 7 refer to a "polypeptide *encoded by* a nucleic acid sequence selected from the group consisting of SEQ ID NO: 2 and SEQ ID NO: 4," while claim 1 of the '471 patent refers to "an amino acid sequence selected from the group consisting of SEQ ID NO: 3 and SEQ ID NO: 5." Fact 13. Those are just different ways of saying the same thing. Fact 25. SEQ ID NOS: 2 and 4 are nucleic acids (DNA) that serve as a

---

[1] Moreover, the "non-human immunoglobulin variable region" is defined as comprising the same amino acid sequences (SEQ ID NOS: 3 and 5) as the "light" and "heavy chains" of the '471 patent. Fact 15.

template for a corresponding polypeptide (amino acid sequence).[2]  And the polypeptide encoded by SEQ ID NO: 2 is the same as the polypeptide of SEQ ID NO: 3; the polypeptide encoded by SEQ ID NO: 4 is the same as the polypeptide of SEQ ID NO: 5.  Fact 26.  Claims 3 and 7 of the '471 patent thus recite *exactly* the same chimeric antibody as claims 1 and 2 of the '444 patent, just using different words.  Fact 25.

Accordingly, at least claims 1 and 2 of the '444 patent anticipate each of the asserted claims of the '471 patent, which is presumably why Janssen has never before made any attempt to argue any patentable distinctions between the '444 and '471 patent claims.  *See* Fact 40.

**B.      Under *Gilead*, The Earlier-Expiring '444 Patent Can Be Used As A Double-Patenting Reference To Invalidate The Later-Expiring '471 Patent**

Janssen cannot escape double patenting based on the relative *issue* dates of the '444 and '471 patents, because only *expiration* dates matter.  In a typical double-patenting scenario, an earlier-issuing and earlier-expiring patent (the red line below) invalidates a later-issuing and later-expiring patent (blue line):



Here, however, an intervening change in the law governing patent terms resulted in the earlier-expiring '444 patent (the red line below) issuing *after* the later-expiring '471 patent (blue line):

---

[2]  A polypeptide can be specified either by its amino acid sequence or by the nucleic acid sequence that results in the same polypeptide. *See In re Wallach*, 378 F.3d 1330, 1334 (Fed. Cir. 2004) (stating it is "a routine matter to convert back and forth between an amino acid sequence and the sequences of the nucleic acid molecules that can encode it.").



After the change in the law governing patent term, there was some uncertainty whether an earlier

expiring patent could serve as a reference patent for double patenting if it was later-issuing.  The

Federal Circuit's 2014 *Gilead* decision put any uncertainty to rest.  753 F.3d at 1217.

Under *Gilead*, what matters for a double-patenting reference is whether it *expires* before

the second patent, not whether it *issued* before the second patent. The Federal Circuit addressed

the precise issue before this Court—that is, "whether a later-issued patent can serve as a double

patenting reference for an earlier-issued patent if the later [issued] one expires first." *Id.* at 1214.

To answer that question, the court relied heavily on the "bedrock principle of our patent system

that when a patent expires, the public is free to use not only the same invention claimed in the

expired patent but also obvious or patentably indistinct modifications of that invention." *Id.*  It

observed: "that principle is violated when a patent *expires* and the public is nevertheless barred

from practicing obvious modifications of the invention." *Id.* (emphasis added).  From there, the

Court looked solely to the relative *expiration* dates of the two patents to conclude that the

"bedrock" principle was being violated:

> The '375 patent expires on February 27, 2015. Thus, come February 28, 2015, the
> public should have the right to use the invention claimed in the patent and all
> obvious variants of that invention. That was the condition upon which the '375
> patent was issued to the inventors. But the public will not be free to do so. The
> '483 patent does not expire until December 27, 2016, and it … covers obvious
> modifications of the invention claimed in the '375 patent. The '483 patent,
> therefore, extends the inventors' term of exclusivity on obvious variants of the
> invention claimed in the '375 patent for an additional twenty-two months past the
> expiration of the '375 patent. That plainly violates the public's right to use the

> invention claimed in the '375 patent and all obvious variants of it after the '375
> patent expires.

*Id.* (internal citations omitted).  That is enough to resolve the key issue before the Court here.

 *Gilead* went further, however, specifically refusing the argument that the *issue* date has any bearing on the analysis.  The Court saw "little import . . . in the fact that the '483 patent issued first."  *Id.*  It reviewed earlier case law referring to the *issue* date, and noted that in those cases the issue date merely served "as a reliable stand-in for the date *that really mattered—patent expiration.*"  *Id.* at 1215 (emphasis added).  In cases, such as this one, "in which a patent that issues first does not expire first," the *Gilead* Court made clear "it is the comparison of [the] patent expiration dates that should control."[3]  *Id.*  The Court also discussed why reliance "on issuance date" would "have several shortcomings," including that patent terms could be subject to gamesmanship, and that patents with filing dates only days apart could have widely-varying expiration dates.  *Id.*  Thus, "[l]ooking instead to the earliest expiration date of all the patents an inventor has on his invention and its obvious variants best fits and serves the purpose of the doctrine of double patenting."  *Id.* at 1216.  Such a rule "guarantees a stable benchmark that preserves the public's right to use the invention (and its obvious variants) that are claimed in a patent when that patent expires."  *Id.*

 In view of the reasoning and holding of *Gilead*, summary judgment is unavoidable here.  Although the patents at issue in *Gilead*, unlike here, were not technically part of the same patent family, the Federal Circuit placed no significance on that fact, which was irrelevant to its reasoning.  *Id.* at 1214–17.  Nor did the court make any finding that the manner in which the

---

[3] Because patent term was typically determined by issue date prior to the changes effecting patent term enacted in 1994, issue date once served as a stand-in for a patent's expiration date. *Gilead,* 753 F.3d at 1215; *see also id.* at 1211 (discussing changes to patent term that became effective June 8, 1995).  Because the '444 patent was filed after those changes to patent term became effective, its issue date cannot serve as a stand-in for its expiration date, which controls.

*Gilead* patentee had obtained its patents was improper, or that it had engaged in any "gamesmanship" in crafting a separate chain of applications. *Id.* Put simply, under *Gilead* it makes no difference *why* the patents have different expiration dates—so long as one patent survives the expiration of the other. Ultimately, the court concluded that "[i]n cases where such obviousness-type double patenting is present, a terminal disclaimer"—which officially abandons the extra patent term otherwise provided by the later-expiring patent—"can preserve the validity of the later-expiring patent by aligning its expiration date with that of the earlier-expiring patent. That disclaimer will most effectively enforce the fundamental right of the public to use the invention claimed in the earlier-expiring patent and all obvious modifications of it after that patent's term expires." *Id.* at 1217. So too here. To hold otherwise in this case would "violate[] the public's right to use the invention claimed in the ['444] patent and all obvious variants of it after the ['444] patent expire[d]." *Id.* at 1214.

*Gilead* is indistinguishable. The '444 patent expired in 2011, but the '471 patent expires in 2018. Facts 5, 6. Thus, the '444 patent is a proper double-patenting reference against, and serves to render invalid, the '471 patent as a matter of law.

## C. Janssen Cannot Claim Refuge In The Safe Harbor Of § 121

There is a limited safe harbor when double-patenting occurs as a result of the Patent Office's requirements, but that safe harbor is inapplicable here and cannot save the '471 patent. The third sentence of 35 U.S.C. § 121 provides:

> A patent issuing on an application with respect to which a requirement for restriction under this section has been made, or on an application filed as a result of such a requirement, shall not be used as a reference either in the Patent and Trademark Office or in the courts against a divisional application or against the original application or any patent issued on either of them, if the divisional application is filed before the issuance of the patent on the other application.

35 U.S.C. § 121; *see also Amgen*, 580 F.3d at 1353. "In effect, the third sentence of § 121 shields patents that issue on applications filed as a result of a restriction requirement from double patenting invalidation." *Id.* at 1350. The courts apply "a strict test" for application of section 121, "[g]iven the potential windfall [a] patent term extension could provide to a patentee." *G.D. Searle LLC v. Lupin Pharms., Inc.*, 790 F.3d 1349, 1354 (Fed. Cir. 2015) (citing *Geneva Pharm., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1382 (Fed. Cir. 2003)). Janssen is not entitled to the protection of § 121's safe harbor provision as a matter of law.

As a threshold matter, Janssen's '471 patent simply fails to meet the express requirement to invoke § 121. In Patent Office practice, there are different types of continuing applications, including "divisional," "continuation," and "continuation-in-part" applications, each having different legal requirements and effects. By its express terms, § 121 is available only to applications filed as "divisional" applications, and is unavailable for applications filed as "continuation" or "continuation-in-part" applications. *G.D. Searle*, 790 F.3d at 1355; *Amgen*, 580 F.3d at 1352–53; *Pfizer*, 518 F.3d at 1362. Janssen filed the '471 patent application as a "continuation-in-part" application on February 4, 1994, and filed the '444 patent application as a "divisional" application on January 8, 2001. Facts 5, 6. As discussed further below, that fact alone prohibits Janssen from now seeking protection under the safe harbor.

Even if Janssen could satisfy the statutory threshold, the safe harbor cannot apply for a second substantive reason—Janssen cannot establish the requisite "consonance" to the restriction requirement that resulted in the issuance of separate patents. *Gerber Garment Tech, Inc. v. Lectra Sys., Inc.*, 916 F.2d 683, 688 (Fed. Cir. 1990); *St. Jude Med., Inc. v. Access Closure, Inc.*, 729 F.3d 1369, 1377 (Fed. Cir. 2013). If the Patent Office believes that an application contains claims to independent, distinct inventions, it will issue what is known as a "restriction"

–13–

requirement requiring the patent applicant to elect one group of claims to one of the inventions, leaving the other group or groups of claims to the other inventions to be further prosecuted in separate applications. "Consonance requires that the line of demarcation between the 'independent and distinct inventions' that prompted the restriction requirement be maintained." *Gerber Garment*, 916 F.2d at 688. As such, the divisional "may not contain claims drawn to the invention set forth in the claims elected and prosecuted to patent in the parent application." *Id.*; *see also St. Jude Medical*, 729 F.3d at 1377.

In 1993, during the prosecution of one of Janssen's early parent applications to the '471 and '444 patents, the Patent Office issued a restriction requirement, forcing Janssen to elect to prosecute in that particular application only one group of claims out of several groups. Fact 10. The first group identified by the examiner, so-called "Group I," was drawn to claims reciting "chimeric antibodies." Janssen could (and did) prosecute the non-elected groups of claims in separate, continuing patent applications. Facts 10, 11. In particular, the '471 patent claims "chimeric antibodies," the subject of Group I of the restriction requirement of the parent application; but, the '444 patent *also* claims "chimeric antibodies" and is therefore directed to the same subject matter of Group I. Facts 10–12. Because Janssen has claims to the same restricted invention in the two patents, it has not maintained the line of demarcation of the restriction requirement and thus fails the "consonance" test. Thus, for this additional reason, the safe harbor of § 121 is unavailable to Janssen.

## IV. The '471 Patent Is Also Invalid In View Of The '195 And '272 Patents Under The Doctrine Of Obviousness-Type Double Patenting

As an independent ground for summary judgment, the '471 patent is also invalid under the doctrine of obviousness-type double patenting in view of two other already-expired patents that Janssen owns. The '195 patent expired on December 16, 2014, and the '272 patent expired

on August 12, 2014.  Facts 7, 8.  Both recite claims that are not patentably distinct from the '471 claims as a matter of law.  Summary judgment of invalidity could be granted on either of these alternative grounds as well.

Claim 6 of the '195 patent recites a "method for treating rheumatoid arthritis" by administering infliximab, i.e., the "chimeric anti-TNF anti[b]ody cA2."  Fact 16.  Claim 7 of the '272 patent recites a "method for treating TNFα-mediated Crohn's disease," an autoimmune disorder, by administering infliximab: "chimeric anti-TNF antibody cA2."  Fact 17.  Because the earlier-expiring '272 and '195 patents' method claims disclose the use of the infliximab composition, they anticipate (or at the very least render obvious) the '471 patent's later-expiring claims to the infliximab antibody itself.

In the Patent Office, Janssen is attempting to avoid invalidity through the rarely-applied "two-way" test for obviousness-type double patenting.  But there is a strong presumption in favor of the "one-way" test, in which the validity of *only* the *asserted claims* are evaluated against the reference patent claims.  *In re Fallaux*, 564 F.3d 1313, 1316 (Fed. Cir. 2009).  Under the two-way test, by contrast, the validity of the *reference patent claims* are *also* evaluated against the asserted claims—that is, the obviousness of *both* sets of claims are evaluated against each other.  But a two-way test applies "*only* in the 'unusual circumstance' where 'the PTO is *solely responsible* for the delay in causing the second-filed application to issue prior to the first.'"  *Hubbell*, 709 F.3d at 1149 (emphasis added, internal citation omitted).  "The determination of whether a one-way or two-way analysis applies is . . . a question of law . . . ."  *Bassell Poliolefine*, 547 F.3d at 1375–76.

Janssen cannot overcome the presumption favoring the one-way test—as the PTO examiner found—because the Patent Office plainly was not "solely" responsible for the timing

producing the double-patenting problems. Fact 30. Janssen was at least *partially* responsible for the massive delay in the issuance of the '471 patent. *See id.* For example, Janssen requested and received at least *six* extensions of time. Fact 38. Moreover, although the Patent Office repeatedly indicated that there was allowable subject matter—which could have resulted in immediate issuance—Janssen further delayed prosecution by submitting amendments and even new claims drawn to non-elected subject matter, resulting in years and years of delay. Facts 31–37; *see also* Fact 30.

In any event, even if the two-way test applies, Janssen cannot avoid double patenting. A "claim to a method of using a composition is not patentably distinct from an earlier claim to the identical composition in a patent disclosing the identical use." *Sun Pharm.*, 611 F.3d at 1387 (citation omitted). That is the case here. The '471 patent claims recite the composition infliximab, and the specification of the '471, '195 and '272 patents all disclose the utility of infliximab to treat various conditions including rheumatoid arthritis and Crohn's disease. Fact 29. Thus, the claims of the '195 and '272 patents (methods of using infliximab) are not patentably distinct over the claims of the '471 patent (infliximab antibody) and the express disclosure of the utility of infliximab to treat rheumatoid arthritis and Crohn's disease.

Finally, Janssen cannot rely on the safe harbor, because (as discussed above) it filed its '471 application as a "continuation-in-part" application on February 4, 1994, rather than a "divisional" application filed as a result of a restriction requirement as required to invoke the safe harbor. Recognizing this problem, Janssen is attempting to convert its "continuation-in-part" application into a "divisional" through maneuverings before the Patent Office. But as of now, the application remains a "continuation-in-part." Even Janssen in its papers filed with this

Court acknowledges that the amendments to the specification of the '471 patent "will not take effect outside of the PTO until the reexamination proceedings are complete." Fact 39.

In any event, even if that amendment were to take effect in the *future*, it would not save the '471 patent. The safe harbor statute not only requires a divisional (as opposed to a continuation-in-part) application to be filed as a result of a restriction requirement, it further requires that this "divisional application [be] filed *before* the issuance of the patent on the other application." 35 U.S.C. § 121 (emphasis added). As an historical fact, the '471 application was not filed as a "divisional" as a result of a restriction requirement, not did Janssen amend its continuation-in-part to a divisional "*before*" the issuance of the '195 and '272 patents.[4] Facts 5, 7, 8. *See id.*; Manual of Patent Examining Procedure § 804.01 (noting § 121 requires that "the *divisional application* is filed before the issuance of the patent." (emphasis added)); Federico, P. J., *Commentary on the New Patent Act* in 75 *J. Pat. & Trademark Off. Soc'y* 161, 196 (1993) (commenting that "if two or more *divisional applications* are filed as a result of a multiple requirement for restriction, they each must be filed before the original application is patented in order to obtain the benefit of this provision [35 U.S.C. § 121].")). Accordingly, the safe harbor protection of § 121 does not apply.

## CONCLUSION

For the reasons above, the asserted claims of the '471 patent are invalid under the doctrine of obviousness-type double patenting in view of any one of the '444, '195 and '272 patents, and the Court should grant summary judgment to the Defendants.

\*       \*       \*

---

[4] The '471 patent application was filed as a "continuation-in-part" and remained a continuation-in-part when it issued, years after the '195 and '272 patents issued. Fact 5, 7, 8. Therefore, even if the '471 patent is called a divisional sometime in the future, it would still not have been filed as a divisional prior to the issuance of the reference patents.

Dated:  February 19, 2016

Respectfully submitted,

Celltrion Healthcare Co., Ltd.,  Celltrion, Inc. and Hospira Inc.

By their attorneys,

/s/Andrea L. Martin
Dennis J. Kelly (BBO # 266340)
dkelly@burnslev.com
Andrea L. Martin (BBO #666117)
amartin@burnslev.com
BURNS & LEVINSON LLP
125 Summer Street
Boston, MA 02110-1624
Telephone: 617-345-3000
Facsimile: 617-345-3299

*Of Counsel:*

| | |
|---|---|
| Charles B. Klein (admitted *pro hac vice*) | James Hurst (admitted *pro hac vice*) |
| Steffen N. Johnson (admitted *pro hac vice*) | Dennis Abdelnour (*pro hac vice* to be filed) |
| WINSTON & STRAWN LLP | Marcus E. Sernel, P.C. (*pro hac vice* to be filed) |
| 1700 K Street, N.W. | KIRKLAND & ELLIS LLP |
| Washington, D.C. 20006-3817 | 300 North LaSalle |
| Tel: (202) 282-5000 | Chicago, IL 60654 |
| Fax: (202) 282-5100 | Tel: (312) 862-2000 |
| Email: cklein@winston.com | Fax: (312) 862-2200 |
| Email: sjohnson@winston.com | Email: james.hurst@kirkland.com |
| | Email: dennis.abdelnour@kirkland.com |
| Samuel S. Park (admitted *pro hac vice*) | Email: marc.sernel@kirkland.com |
| Dan H. Hoang (admitted *pro hac vice*) | |
| WINSTON & STRAWN LLP | Jeanna M. Wacker (*pro hac vice* to be filed) |
| 35 West Wacker Drive | Stefan M. Miller (*pro hac vice* to be filed) |
| Chicago, IL 60601 | KIRKLAND & ELLIS LLP |
| Tel: (312) 558-5600 | 601 Lexington Avenue |
| Fax: (312) 558-5700 | New York, NY 10022 |
| Email: spark@winston.com | Tel: (212) 446-4800 |
| Email: dhoang@winston.com | Fax: (212) 446-4900 |
| | Email: jeanna.wacker@kirkland.com |
| | Email: stefan.miller@kirkland.com |

*Attorneys for Defendants Celltrion Healthcare Co., Ltd., Celltrion, Inc., and Hospira, Inc.*

## CERTIFICATE OF SERVICE

I, Andrea L. Martin, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 19, 2016.

/s/Andrea L. Martin, Esq.
Andrea L. Martin, Esq.

# EXHIBIT 10

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 377 of 500 PageID: 1656
Case 1:15-cv-10698-MLW Document 233 Filed 08/25/16 Page 1 of 119

1

1                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
2

3                                      )
    JANSSEN BIOTECH, INC.,             )
4   and NEW YORK UNIVERSITY,           )
                                       )
5           Plaintiffs,                )
                                       )   Civil Action
6   v.                                 )   No. 15-CV-10698-MLW
                                       )
7   CELLTRION HEALTHCARE CO.,          )
    LTD, CELLTRION, INC., and          )
8   HOSPIRA, INC.,                     )
                                       )
9           Defendants.                )
                                       )
10

11

12            BEFORE THE HONORABLE MARK L. WOLF
                 UNITED STATES DISTRICT JUDGE
13

14                     MOTION HEARING

15
                      August 17, 2016
16                      1:05 p.m.

17

18       John J. Moakley United States Courthouse
                   Courtroom No. 10
19                 One Courthouse Way
              Boston, Massachusetts  02210
20

21

22
                Kelly Mortellite, RMR, CRR
23               Official Court Reporter
       John J. Moakley United States Courthouse
24          One Courthouse Way, Room 5200
              Boston, Massachusetts  02210
25                mortellite@gmail.com

Case 2:16-cv-01925-JMV-JXG Document 69-1 Filed 04/13/17 Page 378 of 500 PageID: 1657
Case 1:15-cv-10058-MLW Document 233 Filed 08/25/16 Page 2 of 119

2

```
 1    APPEARANCES:

 2    On behalf of Plaintiffs:
      Barbara L. Mullin, Esq.
 3    Akin Gump Strauss Hauer & Feld LLP
      Suite 4100
 4    Two Commerce Square
      2001 Market Street
 5    Philadelphia, PA 19103-7013
      215-965-1200
 6    bmullin@akingump.com

 7    Gregory L. Diskant, Esq.
      Irena Royzman, Esq.
 8    Nathan Monroe-Yavneh, Esq.
      Patterson, Belknap, Webb & Tyler LLP
 9    1133 Avenue of the Americas
      New York, NY 10036
10    212-336-2710
      gldiskant@pbwt.com
11    iroyzman@pbwt.com

12    Heather Repicky
      Nutter McLennen & Fish LLP
13    Seaport West
      155 Seaport Boulevard
14    Boston, MA 02210
      617-439-2747
15    arepicky@nutter.com

16    On Behalf of Defendants:
      Charles B. Klein, Esq.
17    Winston & Strawn, LLP
      1700 K Street, N.W.
18    Washington, DC 20006
      202-282-5000
19    cklein@winston.com

20    James F. Hurst, Esq.
      Elizabeth Cutri, Esq.
21    Kirkland & Ellis LLP
      300 North LaSalle
22    Chicago, IL 60654
      (312) 862-2000
23    james.hurst@kirkland.com
      elizabeth.cutri&kirkland.com
24
      (Continued on next page)
25
```

```
 1     APPEARANCES:  (continued)

 2     Dan H. Hoang
       Winston & Strawn LLP
 3     35 W. Wacker Drive
       Chicago, IL 60601
 4     (312) 558-9509
       dhoang@winston.com
 5
       Andrea L. Martin, Esq.
 6     Dennis J. Kelly, Esq.
       Burns & Levinson LLP
 7     125 Summer Street
       Boston, MA 02110
 8     617-345-3000
       amartin@burnslev.com
 9     dkelly@burnslev.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:16-cv-01925-JMV-MF5 Document 69-1 Filed 04/13/17 Page 380 of 500 PageID: 1659
Case 1:15-cv-10698-MLW Document 263 Filed 08/25/16 Page 4 of 119

4

P R O C E E D I N G S

1

2          THE COURT:  Good afternoon.  Would counsel please

3     identify themselves for the Court and for the record.

4          MR. DISKANT:  Greg Diskant for the plaintiffs, along

5     with Irena Royzman, Barbara Mullin.  We've got a substitute

6     back here, Nathan Monroe-Yavneh, and our tech guy.

7          THE COURT:  Okay.

8          MR. HURST:  Jim Hurst on behalf of defendants.  Client

9     representatives are here as well, Jeff Myers and David Kim.

01:05 10   And I'll let the others introduce themselves.

11          MS. CUTRI:  Good morning, Your Honor.  Elizabeth Cutri

12     of Kirkland & Ellis.

13          MR. KLEIN:  Good morning, Your Honor.  Chuck Klein of

14     Winston & Strawn.

15          MR. HOANG:  Good afternoon.  Dan Hoang, Winston

16     Strawn.

17          MS. MARTIN:  Good afternoon, Your Honor.  Andrea

18     Martin from Burns & Levinson.

19          MR. KELLY:  Good afternoon, Your Honor.  Dennis Kelly

01:05 20   Burns & Levinson.

21          THE COURT:  Okay.  I have not heard from you since we

22     recessed yesterday.  So I assume there's -- maybe the two

23     people in the front row there would go out of the courtroom.

24     Right there, the two who were just talking.  I can't do this.

25     I've got a dozen lawyers here.  You're welcome to talk in the

1    hallway.  You're not welcome to talk in the courtroom.  You're

2    sitting right in front of me.  It's extremely distracting.  You

3    can stay if you'll heed that admonition, please.

4         I'm sorry.  Counsel were rising.

5         MR. HURST:  Discussions did occur.  I know both

6    parties were doing their best to see if they could reach some

7    common agreement here, and it was, unfortunately, unsuccessful.

8    That's my understanding, Your Honor.

9         MR. DISKANT:  That's my understanding as well, Your

01:06 10  Honor.  I know the parties are committed to continuing to talk

11   to each other, and I'm sure they will do that.

12        THE COURT:  Okay.  I am prepared to give you my

13   decision on the '471 patent obviousness double patenting motion

14   for summary judgment.  I'm not yet prepared to give you my

15   decision with regard to the reexamination motion.  I expect

16   I'll do that tomorrow.  After I explain my reasoning for

17   allowing the defendants' motion based on obviousness double

18   patenting, we'll move to the argument on the '083 patent.

19        All right.  I'm deciding this matter orally, as I said

01:08 20  yesterday.  There's urgency to it under this new statutory

21   regime for biosimilar drugs.  I am immersed in this and have

22   your arguments vividly in mind.  Although I'm deciding this

23   orally, I hope it will be evident that I'm not deciding it

24   casually.  The transcript will be the immediate record of the

25   decision.  I may, very well may convert the transcript at some

Case 2:16-cv-01925-JMV-JBC Document 69-1 Filed 04/13/17 Page 382 of 500 PageID: 1661
Case 1:15-cv-10698-MLW Document 253 Filed 08/25/16 Page 6 of 119

6

1     point into a more formal memorandum and order.

2          As I said, the defendants' motion for summary judgment

3     on the '471 patent based on obviousness double patenting,

4     docket number 127, is hereby allowed.  The parties agree that

5     no material facts are in dispute.  The issue is solely a

6     question of law.  Therefore, this issue is ripe for resolution

7     on the defendants' motion for summary judgment.

8          With regard to background, the plaintiffs, Janssen

9     Biotech, Inc. and New York University, who are sometimes

01:09 10     collectively called Janssen, are the holders of patents related

11     to a biologic medication called Remicade, which is based on an

12     antibody called infliximab.

13          Plaintiffs allege that defendants Celltrion and

14     Hospira have infringed these patents by filing an abbreviated

15     Biologic License Application for a product that is "biosimilar"

16     to Remicade.  Two patents are at issue in this motion for

17     summary judgment based on obviousness-type double patenting.

18     They are U.S. Patent Number 6,284,471, which I'll refer to as

19     the '471 patent or the '471, and U.S. Patent Number 6,790,444,

01:10 20     to which I will refer as the '444 patent or the '444.  The '471

21     patent covers a genus, or group, of compounds that includes

22     infliximab.  The '444 patent is for the infliximab antibody

23     specifically.

24          Plaintiffs concede that the '444 patent claims are not

25     patentably distinct from the '471 patent claims.  Both patents

 1    are based on an application filed in 1991, which is sometimes

 2    called the "priority application."  The priority date for each

 3    patent is 1991.

 4         The '471 patent was filed in 1994 and issued on

 5    September 4, 2001.  If it stood alone, it would expire on

 6    September 4, 2018 because it was filed before the 1995

 7    effective date of the law altering patent terms, the Uruguay

 8    Round Agreements Act, or URAA, which the defendant at least

 9    sometimes called the GATT.

01:12 10         The statute is codified at 35 U.S.C. Section 154, most

11    pertinently at Section 154(c)(1).  The URAA provides protection

12    for 20 years from the date of the original, priority

13    application or 17 years after issuance, whichever is longer,

14    for applications filed before 1995.  Therefore, if the '471

15    patent stood alone, it would expire in 2018.  However, for

16    applications filed after 1995, patent protection extends for 20

17    years after the date the original, priority application was

18    filed.  The application for the '444 patent was filed in 2001,

19    after the 1995 effective date of the URAA, and was issued in

01:12 20    2004.  As it was based on a 1991 priority application, it

21    expired 20 years later, in 2011.

22         In what the parties call the defendants' *Gilead*

23    motion, the defendants seek summary judgment of invalidity on

24    Claims 1, 3, 5, 6 and 7 of the '471 patent for obviousness-type

25    double patenting based on the '444 patent.  The only question

Case 2:16-cv-01925-JMV-MF5 Document 69-1 Filed 04/13/17 Page 384 of 500 PageID: 1663
Case 1:15-cv-10698-MLW Document 253 Filed 08/25/16 Page 8 of 119

8

1    presented by the motion is whether, in view of the Federal

2    Circuit's decision in *Gilead Sciences, Inc. v. Natco Pharma*

3    *Limited,* 753 F.3d 1278, a 2014 decision, the earlier-expiring

4    '444 patent should be held to be a double patenting reference

5    that invalidates the '471 patent.  I find that it is such a

6    reference, and therefore the '471 patent is invalid.

7         *Gilead* involved two patents based on applications

8    filed after 1995.  Therefore, it did not implicate the

9    provision of the URAA that provides patent protection for at

01:14 10    least 17 years after issuance if the application for a patent

11    at issue was filed before 1995.  As this case is factually

12    different than *Gilead*, *Gilead* is not binding precedent for the

13    purpose of deciding this case.  I find, however, that in

14    enacting the URAA, Congress and the President did not intend to

15    alter the judicially-created doctrine of obviousness double

16    patenting or restrict the power of the courts to apply it to

17    patents resulting from applications filed before 1995.

18         I also find that the Federal Circuit would apply the

19    *Gilead* ruling to the circumstances of this case and again find

01:15 20    that a later-issued but earlier-expiring patent can serve as a

21    reference that renders an earlier-issued but later-expiring

22    patent invalid for obviousness double patenting.  In *Gilead*,

23    253 F.3d at 1214, the Federal Circuit wrote, "It is a bedrock

24    principle of our patent system that when a patent expires, the

25    public is free to use not only the same invention claimed in

Case 2:16-cv-01925-JMV-JBC Document 69-1 Filed 04/13/17 Page 385 of 500 PageID: 1664
Case 1:15-cv-10698-MLW Document 233 Filed 08/25/16 Page 9 of 119

9

1    the expired patent but also obvious or patentably indistinct

2    modifications of that invention."  It then cites *In re Longi*

3    for the proposition that the public should be able to act on

4    the assumption that upon the expiration of a patent, it will be

5    free to use not only the invention claimed in the patent but

6    also any modifications or variants thereof which would have

7    been obvious to those of ordinary skill in the art at the time

8    the invention was made.

9         "The double patenting doctrine has always been

10   implemented to effectively uphold that principle," said the

11   Federal Circuit.  The plaintiff acknowledges that the invention

12   claimed in the '471 patent is obvious or patentably

13   indistinct -- I'm sorry -- is an obvious or patentably

14   indistinct modification of the invention claimed in the '444

15   patent.

16        In *Gilead* at 1210, the Federal Circuit explained that

17   the obviousness-type double patenting doctrine prohibits an

18   inventor from extending his right to exclude through claims in

19   a later-expiring patent that are not patentably distinct from

20   claims of the inventor's earlier-expiring patent.  The Federal

21   Circuit noted at page 1212 that Federal Courts had applied this

22   principle for over a century.

23        In *Gilead*, at 1216, the Federal Circuit essentially

24   rejected plaintiffs' argument here that the URAA manifests a

25   statutory intent to provide patents emerging from applications

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 386 of 500 PageID: 1665
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 10 of 119

10

filed before 1995 with at least 17 years' protection despite
the otherwise applicable judicial doctrine of obviousness
double patenting.  The URAA is silent on this issue.  It does
not state that pre-URAA patents will always have 17 years'
protection, nor does it reference the doctrine of obviousness
double patenting.

Generally, the Supreme Court "presumes that
legislatures act with case law in mind," as the Supreme Court
wrote in *Abuelhawa v. United States*, 129 Supreme Court 2102 at
2106, a 2009 decision.  The Supreme Court made a similar
statement in *Miles v. Apex*, 111 Supreme Court 317 at 325.
Consistent with this well-established canon, the Federal
Circuit wrote in *Gilead* at 1216, "Congress could not have
intended to inject the potential to disturb the consistent
application of the doctrine of double patenting by passing the
URAA."

In *Gilead* at 1215, the Federal Circuit stated that,
"The primary ill avoided by enforcement of the double patenting
doctrine is a restriction on the public's freedom to use the
invention claimed in a patent and all obvious modifications
after that patent expired."  Therefore, the Federal Circuit
held, at 1217, that an earlier-expiring patent can qualify as
an obviousness-type double patenting reference for a
later-expiring patent under the circumstances here.  In
reaching this conclusion in reversing the decision of the

District Court, the Federal Circuit at 1211 stated that the District Court had mistakenly relied on the reasoning of two pre-*Gilead* decisions involving, as this case does, pre- and post-URAA patents. There are two cases on which the plaintiff relies here. *Abbott Labs*, 2011 Westlaw 1897322, a 2011 Delaware decision, and *Brigham and Women's Hospital*, 761 F. Supp. 2d 210, another 2011 District of Delaware decision.

In *Gilead*, the Court noted at 1211 in footnote 2, that in *Ex-Parte Pfizer*, the Board of Patent Appeals, on facts analogous to the facts of the instant case, found that the later-issued but earlier-expiring patent invalidated an earlier-issued later-expiring patent under the doctrine of obviousness double patenting because the later-expiring patent, in the Board's opinion, would impermissibly block the public from practicing the invention and obvious derivations thereof disclosed in the patents that expired first.

This reference to *Pfizer*, among all of the reasoning in *Gilead*, indicates to me that the Federal Circuit would in this case find the '471 patent obvious and invalid in view of the expired '444 patent. If the plaintiffs' position were correct, the public would be prevented from practicing the expired '444 patent and an obvious patentably indistinct variation of it. This would violate the bedrock principle that when a patent expires, the public is free to use the invention claimed and obvious variations of it, which is at the heart of

the obviousness double patenting doctrine, which the Federal

Circuit has found to be unaltered by the URAA.

The obviousness double patenting document was well

established when plaintiff applied for and accepted the '444

patent, which it knew would expire in 2011.  The plaintiff

decided to take at least the risk that the '471 would be deemed

invalid when the '444 expired.

Infliximab was covered by the '471 genus patent, which

plaintiff obtained, and by the '444 specious patent that

specifically claimed that antibody.  As plaintiffs' counsel

acknowledged at the August 16, 2016 hearing, such narrower

patents are generally acquired to protect against claims of

invalidity or infringement.  That risk was real here as the PTO

has, in the pending reexamination, found that the '471 is

obvious and invalid in view of two other patents plaintiffs

held, the '195 and the '272.

Although not material to the analysis, I note that the

plaintiff had a significant incentive to try to avoid the risk

of invalidity of the '471 patent by obtaining the '444 patent

as the parties have agreed in informing the court that Remicade

has generated sales of more than $4 billion a year.

In *AbbVie*, 764 F.3d 1366 at 1374, a 2014 Federal

Circuit case, the Federal Circuit confirmed that the doctrine

of obviousness-type double patenting continues to apply where

two patents that claim the same invention have different

1    expiration dates.  It reiterated the ruling of *Gilead* at page

2    1379 of *AbbVie*, that if the later-expiring patent is merely an

3    obvious variation of the invention disclosed and claimed in the

4    reference patent, the later-expiring patent is invalid for

5    obviousness-type double patenting.

6         I find that this reasoning is equally applicable to

7    the facts of this case.  More specifically, I hold that the

8    expired '444 patent is a reference for the '471 patent.  The

9    '471 patent is not patentably distinct from the '444 patent,

01:26 10   therefore the '471 patent is invalid.

11        I note that this conclusion is consistent with what is

12   evidently the only other decision on comparable facts.  *MLC*

13   *Intellectual Property*, 2016 Westlaw, 41920009, a Northern

14   District of California case, decided on August 9, 2006, in

15   addressing the issues presented here, briefly on page 3 in note

16   4.

17        Accordingly, as I said, the defendants' motion for

18   summary judgment finding the '471 patent invalid, docket number

19   127, is hereby allowed.

01:27 20        So have the parties discussed who should go first with

21   regard to the claim construction of the '083?

22        MR. DISKANT:  Yes, Your Honor.  We agreed that, since

23   we are the plaintiffs, we would go first on claim construction.

24   And my colleague Irena Royzman will present our argument.

25        THE COURT:  Okay.

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 390 of 500 PageID: 1669
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 14 of 119

14

```
 1          MS. ROYZMAN:  Your Honor --

 2          THE COURT:  Hold on for just a second.  I'm waiting

 3     for your audience to go.

 4          Many people just left the courtroom.  Somebody should

 5     watch what happens to the stock of whoever's stock is affected

 6     by this.

 7          Go ahead.  Here, I have some questions.  You don't

 8     have to answer them necessarily in this order, but you should

 9     address them at some point.  In 2000 in Biogen v. Berlex, 113

10     F. Supp. 2d 77 at 95 to 96, I stated what were then at least

11     the standards for Markman hearings and proper procedures.  I

12     wonder if the parties have them in mind, whether you agree that

13     that's still a reliable statement of the standards.

14          MR. HURST:  Can you say that page number again, Your

15     Honor?

16          THE COURT:  Sure.  95 to 96.  Maybe that will take you

17     a while to get.  But there are some cases that I found

18     particularly significant with regard to claim construction.

19     Phillips, 415 F.3d 1303 at 1312 to 19, Renishaw, 158 F.3d 1243

20     to 1248 to 50.  Comark, 156 F.3d 1182 at 1186 to 87, and

21     Thorner, 669 F.3d 1362 at 1365 to 67.

22          Those are cases that the parties cited.  Are they

23     still good law?

24          MS. ROYZMAN:  Thorner is good law.

25          THE COURT:  You want to stand up.
```

```
 1          MS. ROYZMAN:  I'm sorry, Your Honor.  I'm actually
 2   going to do the presentation from the podium, not to have to
 3   bend over the microphone.  But Thorner is good law, Renishaw is
 4   good law.  I think Your Honor cited Phillips.  Phillips is an
 5   en banc decision that sets forth the principles for claim
 6   construction.  Those are still good law.  You start with the
 7   claims.  You look at the spec, prosecution history.
 8          THE COURT:  Okay.  What about Comark?
 9          MS. ROYZMAN:  I believe Comark is as well, but I would
10   have to check back.
11          THE COURT:  Mr. Hurst?
12          MR. HURST:  I would have to check as well, Your Honor.
13   I believe that I agree with Thorner, Phillips and Renishaw.
14   And I just looked at the Renishaw quote, for instance.  I
15   believe that to still be the law, and they probably still say
16   the same type of thing.
17          THE COURT:  All right.  Comark, one of the legions on
18   each side can look at in the course of the argument.
19          Then this is of some significance to me.  As I
20   understand it, in this Markman motion, I'm asked to construe a
21   term in Claim 1, "cell culture media."  I'm not asked to define
22   the scope of the invention defined by all of Claim 1, which
23   includes language in addition to the term "cell culture media."
24   Is that right, Mr. Hurst?
25          MR. HURST:  That is correct, Your Honor.
```

```
 1              THE COURT:  Is that also the plaintiffs'

 2     understanding?

 3              MS. ROYZMAN:  Yes, it is, Your Honor.

 4              MR. HURST:  May I just qualify just a little bit?  I

 5     think maybe I answered too quickly.  By defining the meaning of

 6     that term "cell culture media," you help to define the scope of

 7     the invention.

 8              THE COURT:  It helps to define it.  I'm just being

 9     asked to define the term, not the scope of the invention

10     claimed in Claim 1.

11              MR. HURST:  They are related, but what you say is

12     correct.

13              THE COURT:  All right.  Then as far as I can tell,

14     there was one technical dictionary submitted by the plaintiff

15     as docket number 149-3, it's Exhibit 2, that defines "culture

16     medium" as any medium that is designed to support the growth or

17     maintenance of a culture.  That's the Oxford Dictionary of

18     Biochemistry and Molecular Biology, revised edition.  Are there

19     any other technical dictionaries in the record that I should

20     look at, or are there any other technical dictionaries in the

21     record?

22              MS. ROYZMAN:  Your Honor, I'd have to look back.  I am

23     not sure there are other technical dictionaries, but I think

24     the ordinary and plain meaning --

25              THE COURT:  Okay.  I'm going to get to that because
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 393 of 500 PageID: 1672
Case 1:15-cv-10698-MLW Document 203 Filed 03/25/16 Page 17 of 119

17

1    you did give me some dictionaries.

2              MS. ROYZMAN:  Yes.  But I think the ordinary and plain

3    meaning isn't disputed here.

4              THE COURT:  Well, we'll see, but I'm asking you, are

5    there any other technical dictionaries?

6              MS. ROYZMAN:  I have to check back.

7              THE COURT:  All right.  Did the defendant give me any

8    technical dictionaries?

9              MR. HURST:  I do not think that we did.

01:34 10            THE COURT:  All right.  And then there's a whole set

11   of exhibits the plaintiff gave me as part of 149.  Some of them

12   are treatises.  But it wasn't clear to me what the pertinent

13   parts of the treatises were.

14             Are you going to address that, or should I just ignore

15   them in my analysis?

16             MS. ROYZMAN:  I think, to the extent it's significant,

17   I'll address them in the presentation, Your Honor.

18             THE COURT:  And then I have extrinsic expert testimony

19   from the defendant.  I think not from the plaintiff, right?

01:35 20            MS. ROYZMAN:  Not exactly, Your Honor.  So what

21   happened was we didn't think extrinsic testimony was necessary

22   but then in the opening brief, as Your Honor just noted,

23   defendants put in a declaration from a Dr. Nikos Panayotatos.

24   And now in our answering brief, we put in a responsive

25   declaration.  We still don't think expert testimony is truly

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 394 of 500 PageID: 1673
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 18 of 119

18

1    needed here, given the issues.

2        THE COURT:  Thank you for that clarification, because

3    I'll tell you, I'm skeptical about whether I should give much

4    or any weight to the extrinsic expert testimony.  *Phillips*

5    cautions, 415, F.3d at 1318, that such testimony may be biased

6    because it was prepared for litigation, and it wasn't available

7    to persons skilled in the art previously.

8        So in any event, that kind of expert testimony can't

9    alter the construction that comes -- that's communicated

01:36  10  clearly by the intrinsic record, the claims, the specification,

11   the prosecution history.  So you might want to keep that in

12   mind when you make your argument.  I'm skeptical about the

13   expert testimony, and there's a Federal Judicial Center

14   publication, Anatomy of a Patent Case, second edition in 2012

15   at pages 101 to 102, essentially, recapitulates the admonitions

16   in *Phillips*.

17       All right.  Then I expect you have this in your

18   slides, but I want to make sure I've got it clearly.  Just one

19   minute, please.  As I understand it, Janssen's proposed

01:38  20  construction of the term "cell culture media" is that I should

21   give it its plain and ordinary meaning or construe it to mean a

22   nutritive media for culturing cells.  Is that right?

23       MS. ROYZMAN:  Yes, which is its plain and ordinary

24   meaning, so no construction, or just the plain and ordinary

25   meaning.

Case 2:16-cv-01925-JMV-MF  Document 69-1  Filed 04/13/17  Page 395 of 500 PageID: 1674
Case 1:15-cv-10698-MLW  Document 233  Filed 03/25/16  Page 19 of 119

19

```
 1          THE COURT:  All right.  As I understand it, the

 2   defendants' proposed construction is "Chemically defined media,

 3   i.e. media compositions containing only known chemical

 4   compounds and are free of all proteins, even those not of

 5   animal origin, such as recombinant proteins, optimized for

 6   biopharmaceutical production."  Is that correct?

 7          MR. HURST:  That's correct, Your Honor.

 8          THE COURT:  Mr. Hurst, maybe this is a preview of

 9   coming attractions, but is it the defendants' position that the

01:39 10  plaintiff was either its own lexicographer or disavowed the

11   ordinary meaning of "cell culture media"?

12          MR. HURST:  Both, Your Honor.

13          THE COURT:  Both?  My understanding from the *Genentech*

14   decision as well as the pertinent part of *Chisum* is that

15   "'Comprising' means in effect that the invention necessarily

16   includes but is not limited to."  Is that the plaintiffs'

17   position?

18          MS. ROYZMAN:  Yes, it is, Your Honor.

19          THE COURT:  Does the defendant disagree with that?

01:40 20   MR. HURST:  That is normally how you would construe

21   the word comprising, but there are obviously cases out there

22   that give it a more limited scope.

23          THE COURT:  What cases are those?

24          MR. HURST:  For instance, *Gillette*.

25          THE COURT:  Is this cited in your brief?
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 396 of 500 PageID: 1675
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 20 of 119

20

```
 1              MR. HURST:  It is, Your Honor.  405 F.3d 1367.

 2              THE COURT:  Hold on a second.  Is there another one?

 3              MR. HURST:  Gillette cites Spectrum International at

 4    164 F.3d 1379.  That's an "at" cite, at 1379.

 5              THE COURT:  Okay.  Thank you.  Just out of curiosity,

 6    when does the '083 expire?

 7              MS. ROYZMAN:  I don't remember the exact date, Your

 8    Honor.  It's sometime in the 2020s.

 9              THE COURT:  All right.  You can tell me later.  Maybe

01:42 10   Mr. Hurst knows.

11              MR. HURST:  I don't, Your Honor.

12              THE COURT:  I think this has some practical

13    significance.  It's $4 billion a year.  I want to know what the

14    stakes are in the decision I'm going to make, and I would think

15    if you're talking to each other about a businesslike

16    resolution, you'd want to know what turns on this issue.

17              MR. HURST:  I should, and I know it's way off to the

18    future into the 2020s.  I'm sure somebody told me the date.

19    I'm sure I read it and knew it.  It's not coming to me.

01:43 20              THE COURT:  Well, again, somebody can find it, I'm

21    sure.  Ms. Royzman, about how long do you think you want for

22    your presentation?

23              MS. ROYZMAN:  Little over an hour or about an hour.

24              THE COURT:  All right.  I'm pretty familiar with this.

25    Well, I'm very familiar with this and accept your arguments.
```

1    All of your arguments are very helpful.  They're very good,

2    very helpful.  I told you I'm inclined to rule in your favor.

3    So why don't you present this as efficiently as you can, and

4    then I'll give you a chance to respond, if necessary.

5              MS. ROYZMAN:  Okay.  May I finish?

6              MR. HURST:  2027, Your Honor.

7              MS. ROYZMAN:  Thank you very much.

8              THE COURT:  So 11 years, $4 billion a year, at present

9    rates --

01:44 10            MR. HURST:  Not a small amount of money.

11             THE COURT:  $44 billion.

12             MS. ROYZMAN:  Okay.  Your Honor, so I will definitely

13   try to be as efficient as possible, and to the extent certain

14   material is already familiar, just move me along.

15             THE COURT:  Okay.

16             MS. ROYZMAN:  Thank you.

17             THE COURT:  Do you have some slides for me?

18             MS. ROYZMAN:  I sure do.

19             THE COURT:  What are we on, E?  We'll make these

01:44 20   Exhibit E of these hearings.

21             You may proceed.

22             MS. ROYZMAN:  Thank you, Your Honor.  So with

23   recombinant DNA technology, in the '70s it became possible to

24   produce biopharmaceuticals in cells.  But in order to produce

25   biopharmaceuticals in cells, you of course need to be able to

1    grow and maintain cells in vitro, and that's where cell culture

2    comes in.  So cell culture media makes it possible to grow and

3    maintain cells.  It's a nutritive media, and that's what cell

4    culture media is, and that's what the '083 patent is about.

5         And cell culture media is essential to the drug.

6    Without cell culture media, there is no drug, and the cell

7    culture media is also important in that it influences the

8    property of the drug and its physical characteristics as a

9    result of what -- the nutrients that the cells are taking in.

01:46 10         Okay.  So what's the claim construction issue here?

11   It's the definition of the term "cell culture media" as used in

12   the claims of the '083 patent.  And Janssen relies on the plain

13   and ordinary meaning.  Celltrion first argued that the term

14   includes only a specific subset of cell culture media,

15   chemically defined media.  And they provided the definition of

16   that that Your Honor read.

17        And during briefing, Celltrion recognized that their

18   initial construction was truly untenable because it

19   contradicted the intrinsic evidence, it contradicted the

01:47 20   claims, it contradicted the specification, and so Celltrion

21   proposed an alternative construction, a different subset of

22   cell culture media, media that's free of all proteins.

23        THE COURT:  As well as being chemically defined?

24        MS. ROYZMAN:  No, no.  So the alternative construction

25   is just "free of all proteins," so they abandoned "chemically

```
 1   defined" in the alternative construction just because it is

 2   truly untenable in view of the intrinsic evidence.

 3              THE COURT:  Wait, wait, wait.

 4              MS. ROYZMAN:  Your Honor, it's in the answering brief.

 5              THE COURT:  Hold on just one second.

 6              MS. ROYZMAN:  Absolutely.

 7              THE COURT:  All right.  I had just asked Mr. Hurst if

 8   the defendants' proposed construction was "Chemically defined

 9   media, i.e. media compositions containing only chemical

10   compounds and are free of all proteins even those not of animal

11   origin such as recombinant proteins optimized for

12   biopharmaceutical production deduction."  I think he said that

13   was it.

14              MR. HURST:  That's our primary position, there's an

15   alternative way to get to the end zone.  Although our primary

16   position is "chemically defined," Your Honor.

17              THE COURT:  Doesn't sound like they've abandoned it.

18              MR. HURST:  We have not, Your Honor.

19              MS. ROYZMAN:  Well, through the alternative

20   construction, they've abandoned "chemically defined."  Neither

21   of Celltrion's construction has any support in the intrinsic

22   evidence.

23              THE COURT:  Hold on just a second.  So the defendant

24   has two proposed constructions?

25              MR. HURST:  We have an alternative proposal to
```

```
 1    address.  One of the arguments that Janssen has raised, Your

 2    Honor --

 3              THE COURT:  And the alternative is what.

 4              MR. HURST:  The alternative is "nutritive media free

 5    of all proteins for culturing eukaryotic cells."  It's on page

 6    4 of our reply brief.

 7              THE COURT:  Say it again, please.

 8              MR. HURST:  Sure.  "Nutritive media free of all

 9    proteins for culturing eukaryotic cells."  Essentially "free of

10    all proteins."  That's the key point.

11              THE COURT:  Okay.

12              MS. ROYZMAN:  Your Honor, so turning to the '083

13    patent, so the '083 patent is assigned to Centocor, which is

14    now Janssen.  And Centocor and Janssen are leaders in the

15    production of biopharmaceuticals of antibodies.  The relevant

16    date for this work is 2004, and that's highlighted here.  Dr.

17    Epstein is the lead inventor, and he's dedicated decades to

18    developing cell culture media.  And the title of the patent is,

19    "Chemically defined media compositions," and we'll discuss what

20    that is.

21              So the backdrop for the invention is that there was a

22    concern at the time about the contamination of conventional

23    eukaryotic cell culture media, a type of cell culture media,

24    with adventitious particles, and such particles, basically

25    adventitious particles, particles that go along for the ride,
```

1    can be bacteria, viruses or prion particles.

2         THE COURT:  And can give you mad cow disease or

3    something like that.

4         MS. ROYZMAN:  Exactly.  Prion particles are what do

5    that.  And that's what this says.  It says, "Such contaminants

6    in a biopharmaceutical are capable of causing patient

7    infections and disease, such as mad cow."

8         And still in the background, the patent explains that

9    adventitious particle contamination --

01:53 10        THE COURT:  What does "adventitious" mean?

11        MS. ROYZMAN:  The way I understand it is basically

12   particles that go along for the ride.  And so adventitious

13   particle contamination can be avoided by culturing eukaryotic

14   cells in animal component free cell culture media.  That's

15   again a type of cell culture media, and it's animal component

16   free.  And what that means is exactly what it sounds like.

17   It's free of animal components.

18        THE COURT:  Means there's nothing there to go along

19   for the ride?

01:53 20        MS. ROYZMAN:  Yes, yes.  Then the patent states again

21   in the background that, "Ideally, such media are chemically

22   defined such that the media compositions contain only known

23   chemical compounds and are free of all proteins, even those not

24   of animal origin, such as recombinant proteins."

25        So why does it say that or why does it express this

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 402 of 500 PageID: 1681
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 26 of 119

26

```
 1   ideal?  So chemically defined media, media where the media
 2   composition contains only known chemical compounds, that's
 3   advantageous because you basically reduce variability from
 4   batch to batch because you know exactly what you're putting in.
 5   So there's an advantage to that, and that represents an ideal.
 6   Then it's also ideally free of all proteins, even those not of
 7   animal origin, such as recombinant proteins.
 8        So "free of all proteins" means no proteins of any
 9   kind, no plant proteins, no animal proteins, no proteins that
10   are recombinant, meaning made by man in a dish.  And why is
11   that advantageous?  That has benefits in terms of -- well,
12   proteins can be expensive.  It's also advantageous because, you
13   know, if you're trying to purify your antibody and you've got
14   other proteins in there, it's a little more complicated, so
15   there are advantages.  The patent says this represents an
16   ideal, so an ideal media is both chemically defined and protein
17   free.  And in this patent --
18        THE COURT:  "Ideal," what do you contend "ideal"
19   means?
20        MS. ROYZMAN:  A preferred embodiment, aspirational.
21        THE COURT:  It's perfect and therefore preferred?
22        MS. ROYZMAN:  Exactly, exactly.  So the inventors in
23   this patent actually achieve that ideal.  They disclose 61
24   known chemical compounds that don't include proteins.  Proteins
25   are also chemical compounds, they're known.  And they show in
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 403 of 500 PageID: 1682
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 27 of 119

27

1    examples 1 and 2 that that media works great.  The cells grow

2    well.  You make lots of antibody.  And so they achieve their

3    ideal, and they're very proud of that.  But in addition, they

4    recognize, just as everyone recognizes, that, you know, ideal

5    and preferred is great, but then there are lots of other

6    things.  So they disclose in their embodiments here about using

7    their 61 ingredients with other things, with known supplements,

8    with chemically undefined components, such as --

9             THE COURT:  Where is that in the specification?

01:57  10             MS. ROYZMAN:  I will get to that in a second, Your

11    Honor.  I jumped a bit with this.

12             So in addition to describing the ideal, in the summary

13    of the invention, the inventors make very clear that they're

14    not limiting themselves to the ideal and they're talking about

15    one aspect of the invention.  They're just talking about a

16    composition for making a cell culture media which comprises,

17    includes the following list of 61 ingredients, among other

18    things.

19             They explain that the present invention -- and

01:57  20    Celltrion likes this statement very much -- provides chemically

21    defined --

22             THE COURT:  Where is it in the patent, what column?

23             MS. ROYZMAN:  It's column 4, Your Honor, lines 30 to

24    40, I believe, it's slide 9.  It's the first sentence of that.

25             And the invention does provide chemically defined

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 404 of 500 PageID: 1683
Case 1:15-cv-10698-MLW Document 283 Filed 08/25/16 Page 28 of 119

28

1    compositions useful in the culture of eukaryotic cells because

2    they disclose 61 ingredients that are a unique combination and

3    extremely useful, and you can use them to make cell culture

4    media that either includes just those ingredients or more

5    ingredients.

6            THE COURT:  You say that's the meaning of "comprise"?

7            MS. ROYZMAN:  Yes.

8            THE COURT:  That the chemicals, 61 chemicals listed

9    have to be in the invention, but "comprise" means that it's not

01:58 10   required that they be the only things in the compound?

11           MS. ROYZMAN:  Precisely, Your Honor.  And the patent

12   says this repeatedly.  It says -- and here are two more quotes

13   from the patent.  These are from the detailed description.  One

14   is in column 5, lines 4 through 7, another from column 6.

15           THE COURT:  I'm sorry.  Column 5.

16           MS. ROYZMAN:  Just making clear that the invention

17   provides a composition for producing a cell culture media.  And

18   just like Your Honor explained a second ago, it's got to have

19   this list of 61 ingredients.  And it sets forth amounts for

02:00 20   them, concentrations.  And then it can have additional things,

21   wherein the media comprises.  And then the other quote on slide

22   10 again is very similar.  This is repeated.

23           THE COURT:  I have it.

24           MS. ROYZMAN:  Okay.  Thank you.

25           Okay.  So Your Honor asked where are these other

```
 1  embodiments about chemically undefined components.  And here is
 2  an example in the detailed description.  There are actually two
 3  examples.  This is one of them.  This is column 8, Your Honor,
 4  lines 4 to 21.  And it states, in another embodiment of the
 5  invention provides a composition comprising a cell culture
 6  media, and that media is made by providing a soluble MET 1.5
 7  composition, which has those 61 ingredients among potentially
 8  other things.  And in this embodiment, also optionally adding
 9  at least --
10           THE COURT:  What line is that "optionally"?
11           MS. ROYZMAN:  Oh, let me see, Your Honor.
12           THE COURT:  I've got it.  Looks like 13.
13           MS. ROYZMAN:  Yes, exactly.  Thank you.
14           THE COURT:  Let me see if I understand this.  It says,
15  "Optionally adding at least one substance selected from the
16  group consisting of micro phenolic acid," and three other
17  things.  What's the import of that language from your
18  perspective?
19           MS. ROYZMAN:  Okay.  So what I'd like to bring your
20  attention to is the one that I have underlined in red, which is
21  soy hydrolysate.  So this is an embodiment of the invention
22  where you're optionally adding soy hydrolysate as one of the
23  additional ingredients.  And soy hydrolysate, it's basically --
24  a hydrolysate is basically a digest, and this is a digest of
25  soy beans.  It's a breakdown product.  And as you'll see as we
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 406 of 500 PageID: 1685
Case 1:15-cv-10698-MLW Document 253 Filed 08/25/16 Page 30 of 119

30

1    go forward, soy hydrolysates are chemically undefined.

2         So this is an embodiment of the invention comprising a

3    cell culture media that includes adding a chemically undefined

4    ingredient.  And hydrolysates, just to give some life to them,

5    they're basically nutritional supplements.  It turns out that

6    they're very useful in sports medicine, bodybuilders like them,

7    cells love them, and so they're also routinely added to media,

8    and they are undefined ingredients.

9         THE COURT:  "Undefined" means what?

02:03 10       MS. ROYZMAN:  It means chemically undefined.  It's

11   just full of -- it's a functional definition.  And they just

12   think the soybeans, and it's full of unknown chemicals, so

13   unlike the list of 61 ingredients where you know you're putting

14   in this and this and that amount, for soy hydrolysates, you're

15   just basically putting in a lot of stuff.  You're putting in

16   peptides of different lengths.  You're putting in chemicals of

17   different varieties.  And to this day -- and there's testimony

18   in the record on that, and it's undisputed, that to this day

19   hydrolysates are this undefined thing that cells like and

02:04 20   that's routinely added to media and useful for other purposes,

21   too.

22         THE COURT:  Okay.

23         MS. ROYZMAN:  So you also asked about where is this

24   mention of supplements.  And here it is, Your Honor.  It's

25   again the detailed description.  And this is slide 12.  And in

1    the patent it's -- the paragraph that I have here is in column

2    4, line 64, running through column 5, line 3.  And what it says

3    is --

4              THE COURT:  Hold on a second.  Column 4, line what?

5              MS. ROYZMAN:  64, I believe, Your Honor.

6              THE COURT:  I don't think so.

7              MS. ROYZMAN:  It starts -- that's the first sentence.

8    Then if you go to -- I think it may be 67.  "Those skilled in

9    the art."  Then it goes over to the completion of that

02:05 10   paragraph on the next page.

11             And it was well understood at the time that people

12   were adding supplements of all sorts to media.  And again, cell

13   culture media is something that people have been working on

14   because it's essential for biopharmaceutical production and for

15   growing cells in vitro.  And the patent is making clear that

16   people are going to know what supplements to add.  And that of

17   course doesn't take them out of the claim.  And proteins are

18   examples of known supplements.

19             Okay.  So what's Claim 1?  There are two claims, Your

02:06 20   Honor, that are asserted in this patent.  Claims 1 and 2.

21   Claim 2 depends on, from Claim 1.  And Claim 1 is very much

22   like the various disclosure that we've been looking at.  It's

23   to a soluble composition suitable for producing a final volume

24   of cell culture media, wherein the composition comprises,

25   includes the following components in the following amounts per

```
 1    liter of the final volume of cell culture media.  And then

 2    there's the list of 61 ingredients in various ranges.  And I

 3    didn't replicate that because it's long.

 4          Okay.  So what are the constructions?  So here is

 5    Janssen's construction, Your Honor.  No construction necessary,

 6    or plain and ordinary meaning, nutritive media for culturing

 7    cells.  I'm at slide 14.  Then I have Celltrion's original

 8    construction, which was focused on chemically defined media as

 9    well as Celltrion's alternative construction, which is more

10    focused on free of all proteins.  So it picks up a lot of the

11    language of the ordinary and plain meaning, such as nutritive

12    media for culturing cells.  But it puts -- it adds in the

13    limitation of free of all proteins.

14          Okay.  As we discussed, just as Your Honor started the

15    discussion, there are very established claim construction

16    principles.  You start with the claims and then the

17    specification.  The prosecution history can be incredibly

18    important if there's a disclaimer of some kind or an argument

19    of some kind that limits the claims.

20          THE COURT:  It can be, but are you relying on the

21    prosecution history?

22          MS. ROYZMAN:  There's no disclaim er of any kind, and

23    Celltrion is not relying on anything here.

24          THE COURT:  That's what I thought.  So the intrinsic

25    evidence as a practical matter for the purpose of this *Markman*
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 409 of 500 PageID: 1688
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 33 of 119

33

1    issue is the claim and the specification.

2         MS. ROYZMAN:  Yes.  And the prosecution history, I

3    would say, confirms it because it doesn't limit it in any way.

4         THE COURT:  Okay.

5         MS. ROYZMAN:  Okay.  And then as Your Honor stated,

6    and we agree, extrinsic evidence is way down the totem pole.

7         So let's start with the claims.  And the place to

8    start is the words of the claim, so let's start there.  And the

9    law makes crystal that that's just where you start.  First we

02:09  10   look to the words of the claims.  And here, Your Honor, we have

11   another bedrock principle of patent law, and the bedrock

12   principle is that the claims of a patent define the invention,

13   the claims have primacy.

14        So let's look at the claims.  Here is Claim 1.  And

15   the words of the claim are "cell culture media."  Here is Claim

16   4 --

17        THE COURT:  I don't need -- do I need to look at

18   anything more than Claim 1?

19        MS. ROYZMAN:  I think, Your Honor, you do, because the

02:10  20   asserted and non-asserted claims inform the meaning.

21        THE COURT:  Here.  Let me put it differently.  Do I

22   need to construe anything other than "cell culture media" in

23   Claim 1?

24        MS. ROYZMAN:  No, but cell culture media should be

25   construed consistently.

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 10 of 500 PageID: 1689
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 34 of 115

34

         1              THE COURT:  That's my point.  If I construe it, say,
         2     your way in Claim 1, it would apply throughout the patent,
         3     right?
         4              MS. ROYZMAN:  Exactly.
         5              THE COURT:  The other claims descend from Claim 1?
         6              MS. ROYZMAN:  Yes -- they don't all descend from Claim
         7     1, but they use the same term, they use "cell culture media."
         8              THE COURT:  Okay.  Because I've been focusing on Claim
         9     1.
02:11   10              MS. ROYZMAN:  I understand.
        11              THE COURT:  Is that okay?
        12              MS. ROYZMAN:  Yes, it's absolutely okay.  But I think,
        13     as you'll see, Claims 4 and 10 are particularly relevant
        14     because they expressly claim optionally adding the soy
        15     hydrolysate, so they further confirm that there is no chance
        16     that the media can be chemically defined, and that's just a
        17     construction that's absolutely wrong because it contradicts the
        18     claims.  It's something that's just truly impossible.  So in
        19     that context, it's relevant.
02:11   20              THE COURT:  Okay.
        21              MS. ROYZMAN:  Okay.  So what's the point of the
        22     claims?  They all use the term "cell culture media."  None of
        23     them say "chemically defined."  None of them say "free of all
        24     proteins."
        25              "Comprising," we discussed.  It means including but

        1    not limited to.  And that's precisely what it means here.  And

        2    "comprising" serves a very important function here because it

        3    allows the claims to cover embodiments that are expressly

        4    disclosed in the patent that include other things.  So

        5    "comprising" is absolutely essential.

        6            What's the plain and ordinary meaning?

        7            THE COURT:  This is part of what I was getting at when

        8    I said am I being asked to construe the term or define the

        9    invention claimed in Claim 1?  Because there's the term "cell

02:12  10    culture media," then it says "comprising," and it lists a

       11    number of chemicals, right?

       12            MS. ROYZMAN:  Yeah.

       13            THE COURT:  So to the extent that something is

       14    chemically defined, is it defined not by the term "cell culture

       15    medium" but by what comes after "comprising"?  Is that an

       16    appropriate way to look at this?

       17            MS. ROYZMAN:  Well, I guess I'm not -- "cell culture

       18    media" covers all types of cell culture media.  And so for

       19    example, if -- I'll just go back to the claim for a second.  If

02:13  20    the claim "cell culture media" was construed in our view

       21    contrary to all legal principles and the intrinsic evidence as

       22    "chemically defined" or "free of all proteins," "comprising"

       23    wouldn't help and save the day because --

       24            THE COURT:  Save the day for whom?

       25            MS. ROYZMAN:  Well, for plaintiffs.  Because if "cell

         1    culture media" was construed in this narrow way, then you

         2    can't, through "comprising," add additional --

         3              THE COURT:  No.  I'm probably not asking my question

         4    well.  I'm making the opposite point, that it appears to me

         5    that the invention has to include chemicals, right?

         6              MS. ROYZMAN:  Oh, yeah.  And they're --

         7              THE COURT:  Let me finish.

         8              MS. ROYZMAN:  Yeah.

         9              THE COURT:  Chemicals.  But that requirement, you

02:14   10    argue -- at the moment I think it's right -- is not imposed by

        11    the term "cell culture media."  It's imposed by the word

        12    "comprising" and the 61 chemicals that follow it.  Do you agree

        13    with what I just said?

        14              MS. ROYZMAN:  I do, Your Honor, because of course

        15    those 61 ingredients are limitations of the claim.

        16              THE COURT:  And they're chemicals.

        17              MS. ROYZMAN:  They're all chemicals, 61 chemicals.

        18              THE COURT:  Does that make the invention chemically

        19    defined?

02:15   20              MS. ROYZMAN:  No, because the -- well, it depends.

        21              THE COURT:  The invention.

        22              MS. ROYZMAN:  It depends on -- you have a choice.  So

        23    if a media that is made that includes only these 61 ingredients

        24    and no others, it's going to be chemically defined and protein

        25    free.  On the other hand, if it includes soy hydrolysate, it's

1    going to be chemically undefined.

2         THE COURT:  So "chemically defined" means having only

3    chemicals.

4         MS. ROYZMAN:  Having only known chemical compounds,

5    yes.

6         THE COURT:  All right.

7         MS. ROYZMAN:  So what's the plain and ordinary meaning

8    here.  One, there is a heavy presumption that the language in

9    the claim carries its ordinary and customary meaning.  And it's

02:16 10   also -- and this is the *Thorner* case that Your Honor referred

11   to, in which we rely on extensively, is that the patentee is

12   free to choose a broad term and expect to obtain the full scope

13   of its plain and ordinary meaning.  And here, the term that was

14   selected in the claims is "cell culture media."

15        And in terms of its plain and ordinary meaning, I

16   don't believe there's any dispute among the parties what it is.

17   So here is the Oxford Dictionary that Your Honor referred to

18   earlier, and here is what it says, "Any nutritive media that's

19   designed to support the growth or maintenance of a culture."

02:17 20       In a case that we cited to Your Honor from the Federal

21   Circuit in 2013, "cell culture media" was a claim term, and the

22   Federal Circuit didn't construe it.  It just set forth the

23   plain and ordinary definition.  And here it is.  And Your Honor

24   actually also defined a culture medium in the *Biogen* case, and

25   that's in slide 31.  Your Honor said that, "A culture medium is

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 14 of 500 PageID: 1693
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 38 of 119

38

1   a solution that contains the nutrients required for maintenance

2   and growth of the cell," and it didn't cite anything in

3   connection with that.  That's because this is its plain and

4   ordinary meaning; that's what everybody agrees it is.  And

5   that's what we're relying on here.

6           It's also corroborated by the intrinsic evidence.

7   This is an exhibit that we cited in our opening brief.  It's

8   intrinsic evidence.  It's cited by the '083 patent.  And it

9   defines -- and it's in the right timeframe, and it defines

02:18 10   "cell culture media" consistent with its plain and ordinary

11   meaning, "a nutritive solution for cultivating cells."

12          THE COURT:  Where does the language in slide 32 come

13   from?

14          MS. ROYZMAN:  So it comes from --

15          THE COURT:  Is it in the patent?

16          MS. ROYZMAN:  No.  So it's in this patent.  So the way

17   this works is the '083 patent cites this one.  This is

18   W09808934.  It's cited on the face of the '083 patent, and it

19   was part of the record for the patent.  And we provided an

02:19 20   excerpt from that to Your Honor, and it's at docket number

21   149 --

22          THE COURT:  That's okay.  You're on slide 32 of about

23   90, so you want to decide what's important.

24          MS. ROYZMAN:  Okay.  The unasserted Claims 4 and 10,

25   Your Honor, are important.  And that's, as I mentioned and as

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 415 of 500 PageID: 1694
Case 1:15-cv-10698-MLW Document 253 Filed 08/25/16 Page 39 of 119

39

1    you said, claims are construed consistently across the board.

2    And Claim 4 is to a cell culture media.  And optionally adding

3    soy hydrolysate, just as we saw in the specification a second

4    ago, and this is just expressly claiming that.  So this is

5    expressly claiming a chemically undefined media.  Claim 10 does

6    exactly the same thing.

7         And in this case, it's undisputed, but as a

8    generality, hydrolysates are undefined.  And here again in the

9    intrinsic evidence, it makes clear that a chemically defined

02:20 10   medium is distinguished from hydrolysates which contain unknown

11   components.  As I was telling Your Honor, cells love them, but

12   they're just full of unknown stuff.

13        And Celltrion, in its reply brief, stated correctly,

14   "To be sure, soy hydrolysate typically" -- and we quibble with

15   "typically," but "soy hydrolysate is not chemically defined."

16        Okay.  Let's turn to the specification because it's

17   important here as well.

18        THE COURT:  I'm sorry.  Okay.  So Celltrion

19   acknowledges that?

02:21 20        MS. ROYZMAN:  Yes, they do.  That's at page 11 of

21   their reply brief.

22        THE COURT:  Go ahead.

23        MS. ROYZMAN:  Okay.  So the specification is relevant.

24   And as we discussed in looking through the patent a bit, the

25   summary of the invention never says, you know, the invention is

1    a chemically defined cell culture media or anything like that.

2    It says the invention is a cell culture media.  It says it

3    three times.

4         It's said throughout the patent that the invention is

5    a cell culture media.  And in fact, cell culture media is

6    discussed in the patent, consistent with understanding that

7    "cell culture media" is a broader term than "chemically

8    defined" or anything like that.  So there are references in

9    examples 1 and 2 to chemically defined "cell culture media,"

02:22 10   again, using both sets of terms, because "chemically defined"

11   is a subset of "cell culture media."

12        And then there are references to conventional

13   eukaryotic cell culture media.  There are references, as we

14   discussed, to animal component-free cell culture media.  "Cell

15   culture media" is a broad term.  And it's the specification

16   most commonly, and it's all over the place, Your Honor, just

17   uses the term "cell culture media."

18        As we started discussing, "cell culture media" is not

19   limited to "chemically defined."  "Chemically defined" is a

02:23 20   preferred embodiment.  That's what "ideally" means.

21        THE COURT:  Here.  I encouraged you to speed up, but

22   now you're going a little too fast.

23        MS. ROYZMAN:  Sorry.

24        THE COURT:  Okay.

25        MS. ROYZMAN:  Here is the definition of chemically

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 17 of 500 PageID: 1696
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 41 of 119

41

         1    defined.  It says, "Ideally, such media are chemically defined

         2    such that the media compositions contain only known chemical

         3    compounds."  And that's preferred.

         4          And the law is very clear, and here we cited *Kara Tech*

         5    and *Silicon Graphics* that the patentee is entitled to the full

         6    scope of his claims, and we will not limit him to his preferred

         7    embodiment or import a limitation from the specification into

         8    the claims.

         9          And Mr. Hurst mentioned lexicography and disclaimer.

02:24   10    There's no such thing.  "Cell culture media" is not redefined

        11    ever in the specification.  It's used broadly as the examples

        12    that I illustrate it show.  It is never redefined whatsoever,

        13    and there is no disclaimer of any kind.  No disavowal, not in

        14    the specification and not in the prosecution history.

        15          So here are the two statements that Celltrion relies

        16    on and which they somehow describe as limiting, and it's these

        17    two statements on slides 54.  One, the first statement is from

        18    the field of the invention, and it states, "The present

        19    invention relates to chemically defined media compositions for

02:25   20    the culture of eukaryotic cells."  That's just true; it does.

        21    But that doesn't limit the invention to chemically defined

        22    media.  You can add all sorts of other things.  It does

        23    disclose --

        24          THE COURT:  Well, here.  Let's pause here.  This is

        25    why I was asking about the distinction between the terms "cell

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 418 of 500 PageID: 1697
Case 1:15-cv-10698-MLW Document 253 Filed 08/25/16 Page 42 of 119

42

culture media" and "the invention."  Here they're talking about

the invention, the complete thing described in Claim and Count

1, as I read it, not the cell culture media.

    Is that an appropriate way to think about this?

    MS. ROYZMAN:  Well, I guess I just read the statement

as saying, "The present invention relates to chemically defined

compositions."  It actually nowhere mentions "cell culture

media" at all.  And "cell culture media" is used much more

broadly in the patent.  You can use -- it can be chemically

defined or it can be chemically undefined, depending on what

you put in it.  It just has its much broader meaning of a

nutritive media for culturing cells.

    THE COURT:  Is it still the case that a court can

change its claim construction at any time essentially up until

the point it instructs the jury?

    MS. ROYZMAN:  Yes, Your Honor.

    THE COURT:  Go ahead.

    MS. ROYZMAN:  Here are many other statements about the

invention, and these statements actually use the term "cell

culture media," and they make very clear, you know, one aspect

of the invention is a soluble composition suitable for

producing a cell culture media.  Cell culture media is the

invention here.  And where the reference is -- and I don't

think actually there are any problematic references in the

specification of any kind.  But where the reference is to a

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page #19 of 500 PageID: 1698
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 43 of 119

43

1    certain limitation as being the invention are not uniform where

2    other portions of the intrinsic evidence do not support

3    applying the limitation to the entire patent, it's just

4    improper to limit it.  And that's *Absolute Software*.  And

5    that's the law.

6            Celltrion also relies on the title, "Chemically

7    Defined Media Compositions."  And again, the patent relates to

8    chemically defined media compositions.  It provides 61

9    components that are useful for making cell culture media.  The

02:28 10    title is not problematic in any way, but it also has no import

11   on claim construction.  Even if it did, the bar on importing

12   limitations from the written description into the claims

13   applies no less forcefully to a title.  And the Federal Circuit

14   has made clear that if they're not going to read in limitations

15   from the specification, they're certainly not going to read

16   limitations into the claims from the patent title.  And Your

17   Honor pointed out the same principle.  In the *Biogen* case, you

18   stated, "The Federal Circuit has noted the near relevancy of

19   the patent title to claim construction."

02:29 20            And also, as we discussed and as dispositive here,

21   there are chemically undefined embodiments in the

22   specification, and they're described as embodiments of the

23   invention, optionally adding the soy hydrolysate.  And there

24   are two such embodiments.  There's the one we discussed, which

25   comes after this, that's MET 1.5 media.  Then there's this one

1    in column 7, line 53 through column 8, line 3.  And then at the

2    very end of this paragraph, it states, "In this embodiment of

3    the invention, the media composition that is the product of

4    this process" --

5            THE COURT:  Where are you reading in the patent?

6            MS. ROYZMAN:  Let's see.  Your Honor, this paragraph

7    begins on column 7, line 53 in one embodiment of the invention.

8    And soy hydrolysate is mentioned in column 7, line 63.  And

9    then a name is given to this embodiment, and that starts at

02:31 10   line 67.  "In this embodiment of the invention, the media

11   composition has been named MET media."

12           THE COURT:  What's the import of it being named MET

13   media?

14           MS. ROYZMAN:  I think at various places in its brief

15   Celltrion tried to imply that MET media is just limited to the

16   61 ingredients and doesn't include other things and is

17   necessarily chemically defined, and this is defining an

18   embodiment of the invention that's necessarily chemically

19   undefined because it includes soy hydrolysate as MET media.

02:32 20           THE COURT:  That's the invention.  This isn't talking

21   about cell culture media.

22           MS. ROYZMAN:  It is, Your Honor.  If you look at the

23   top.

24           THE COURT:  I see, "In one embodiment, the invention

25   provides a composition comprising a cell culture media made

Case 2:16-cv-01925-JAK-MRW Document 69-1 Filed 04/13/17 Page 421 of 500 Page ID: 1700
Case 1:15-cv-10698-MLW Document 233 Filed 03/25/16 Page 45 of 119

45

from the steps comprising" --

MS. ROYZMAN:  Then it says, "providing a soluble MET composition."  And that's described earlier.  And that soluble MET composition includes 61 ingredients, plus potentially others.  And then it says you do certain things, and you can also optionally add at least one substance selected from this group, including soy hydrolysate.  And then it says, "In this embodiment of the invention, the media composition is referred to as 'MET media.'"

02:33 10
THE COURT:  Okay.

MS. ROYZMAN:  But it's an embodiment of the invention that directly relates to cell culture media.

Your Honor, I'm just going to move along, but it's exactly the same thing with MET 1.5 media in that paragraph, in column 8, this is another chemically undefined embodiment in the specification.

And this is -- I don't believe we cited this case in our brief, but it stands for the very important principle where claims are interpreted to include a specific embodiment.  It's
02:33 20 incorrect to construe the claims to exclude that embodiment. That just makes sense.  And here, chemically undefined embodiments are being claimed in Claims 4 and 10, and they're being specifically expressly disclosed in the specification in column 7 and 8.

Okay.  So now we turn from the "chemically defined"

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 422 of 500 PageID: 1701
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 46 of 119

46

1    discussion to "not limited to protein free."  Celltrion's -- so

2    here is Celltrion's original construction.  I have it on top.

3    I have all the constructions.  And they basically defined

4    "chemically defined media," which is, as the construction for

5    cell culture media, that's not its ordinary and plain meaning

6    and is incorrect for that reason.  It contradicts the

7    specification.  It contradicts the claims.  But in addition --

8             THE COURT:  Actually -- all right.  Now you're on 65

9    of 89?

02:35 10             MS. ROYZMAN:  Yes.

11             THE COURT:  I want to take a very brief break, not

12   more than five minutes right here, and then you'll finish.  And

13   I'll take another break, and we'll go to the defendant.  Okay?

14   Court is in recess.

15             (Recess taken 2:35 p.m. to 2:41 p.m.)

16             THE COURT:  Ms. Royzman, you may proceed.

17             MS. ROYZMAN:  Thank you, Your Honor.  So going back to

18   slide 65, Celltrion's original construction and what they

19   described still as their primary construction, which is

02:41 20   completely inconsistent with their alternative construction,

21   was focused on "chemically defined media" and tried to shoehorn

22   "free of all proteins" into that, and that was based on the

23   misreading of that "ideally" sentence, which I'll get to in a

24   second, because as a matter of science and as a matter of

25   reading that sentence, this doesn't make any sense.  Proteins

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 423 of 500 PageID: 1702
Case 1:15-cv-10698-MLW Document 253 Filed 08/25/16 Page 47 of 119

47

```
      1    are chemically defined.  You know they're amino acids.  You

      2    know they're a structure, they're known chemical compounds.  So

      3    this definition of "chemically defined media" is not supported

      4    by the specification and just really also doesn't make sense

      5    for this additional reason.

      6            Here is an example from the intrinsic evidence, and

      7    again it's cited in the '083 patent, and we had provided an

      8    excerpt of this to Your Honor, though we didn't provide this

      9    particular page, and I can.  But it makes very clear that

02:43 10    defined media contain no undefined supplements, such as

     11    hydrolysates, and instead incorporate defined qualities of

     12    known things such as proteins.

     13            In our brief we had cited the molecular biology of the

     14    cell, which makes the same point that the basically defined

     15    media contain one or more specific proteins because proteins

     16    are just defined.  You know, they're amino acids, and you know

     17    exactly what you're putting in.  So that didn't make any sense.

     18    In addition, "protein free" is a preferred embodiment.

     19            THE COURT:  Is it even -- sorry.  "Protein free,"

02:44 20    you're looking at the "ideally" language in the background of

     21    invention?

     22            MS. ROYZMAN:  Yeah.

     23            THE COURT:  Does the background of invention describe

     24    embodiments?

     25            MS. ROYZMAN:  It doesn't -- it sets forth an ideal,
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page #34 of 500 PageID: 1703
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 48 of 119

48

```
 1   but those 61 --

 2            THE COURT:  No.  That's not -- I know you're very

 3   close to this.  But look, this the background of invention

 4   doesn't -- is this where you find embodiments in the background

 5   of invention section of a patent?

 6            MS. ROYZMAN:  No.  You find them later.

 7            THE COURT:  Right.  Okay.  But this is not -- it

 8   seemed to me that this statement is not even specific to the

 9   invention claimed in Claim 1 or in the patent.  It's talking

02:45 10   about, you know, sort of the general universe of things.

11            MS. ROYZMAN:  That's exactly right, Your Honor.

12            THE COURT:  I thought you might say that eventually.

13   Go ahead.

14            MS. ROYZMAN:  I needed your help.  But the 61

15   ingredients -- okay.  In any case, the construction that the

16   defendants were advocating of "chemically defined" was based on

17   a misreading of this sentence in the background.

18            And listen, why do they pay attention to this -- so

19   much attention to this one sentence, right?  I think that's an

02:45 20   interesting question.  And that's because this is the only

21   sentence in the patent, anywhere in the patent, that mentions

22   "free of all proteins."  It's the only one.  And why are they

23   interested in that?  Because that's the basis of their

24   noninfringement position.  So they would like to read in,

25   through claim construction, one way or another, put in "free of
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 425 of 500 PageID: 1704
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 49 of 119

49

```
 1    all proteins" because then they can say, Oh, I don't have cell

 2    culture media; I'm done.  That's what this dispute is about.

 3    And cell culture media is just not -- in this patent is not

 4    free of all proteins.

 5            THE COURT:  It's not free of all proteins.  And I

 6    think it's your argument -- or is it your argument that the

 7    invention doesn't require free of all proteins because there's

 8    comprising language in Claim 1?

 9            MS. ROYZMAN:  Absolutely.  And it describes the
02:46 10    addition of supplements.  That was all well known and made a

11    lot of sense.

12            THE COURT:  Okay.  Go ahead.

13            MS. ROYZMAN:  Okay.  So again, any particular

14    embodiments are not limiting.  We've already gone through this

15    law.  This is more of the same.

16            And the specification, as we discussed --

17            THE COURT:  But -- okay.  Go ahead.  Go ahead.

18            MS. ROYZMAN:  So we looked at this passage, Your

19    Honor.  It's talking about the addition --
02:47 20            THE COURT:  Which passage?

21            MS. ROYZMAN:  It's the one in column 4 at the very

22    bottom of column 4, and it goes on to line 5 through -- column

23    5, line 3.  It talks about, basically those skilled in the art,

24    they're going to know the supplements to add to make this

25    culture successful.
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 426 of 500 PageID: 1705
Case 1:15-cv-10698-MLW Document 263 Filed 03/25/16 Page 50 of 119

50

1      THE COURT:  And you say supplements can be something

2  other than the 61 chemicals?

3      MS. ROYZMAN:  Absolutely, and they can be proteins.

4      THE COURT:  And could be proteins.

5      MS. ROYZMAN:  And I took the deposition of Celltrion's

6  expert, and I asked him that question.  I said at the time in

7  2004, were persons of ordinary skill in the art supplementing

8  cell culture media with proteins for successful culture, and he

9  agreed, and he gave an example.

02:48 10      And those other things that we looked at both from the

11  intrinsic evidence and the textbook also talked about

12  supplementing media with proteins.  This is just something that

13  people were doing and that people do to this day.

14      Okay.  As Your Honor said, we look through the

15  prosecution history.  Celltrion looked through the prosecution

16  history.  Prosecution history is often very important in claim

17  construction.  Here it confirms that "cell culture media,"

18  "cell culture media."  Those terms were never amended.  They

19  weren't changed in any way so there's nothing here, no

02:49 20  limitation of any kind on cell culture media based on the

21  prosecution history.  The prosecution history doesn't limit the

22  meaning of "cell culture media" in any way and is not at issue

23  here.

24      THE COURT:  Okay.

25      MS. ROYZMAN:  Okay.  Extrinsic evidence.  So as Your

```
  1   Honor said, it's at the bottom, and it can't contradict.  And
  2   opinion testimony on claim construction has to be treated with
  3   utmost caution, and you only look at it in instances where you
  4   otherwise can't construe, and such instances will rarely, if
  5   ever, occur.  And why is this important?
  6        And Your Honor at the very beginning cited exactly
  7   this language.  It is because testimony generated at the time
  8   of litigation for the purpose of arguing noninfringement or
  9   invalidity suffers from bias that's not present in the public
02:50 10  record.
 11        So here is Celltrion's expert.  It's Dr. Panayotatos.
 12   This is -- as he describes himself and we had cited this in our
 13   answering brief.  He basically hasn't done science for the last
 14   20 years.  He's been a patent litigation consultant.  He
 15   describes himself as a nontestifying technical expert, hands-on
 16   experience.
 17        THE COURT:  Nontestifying?
 18        MS. ROYZMAN:  What?
 19        THE COURT:  Nontestifying?
02:50 20      MS. ROYZMAN:  Nontestifying technical expert.  Also
 21   describes himself --
 22        THE COURT:  So if I thought this was sufficiently
 23   important, which I don't, and wanted to hear his testimony
 24   subject to cross-examination, he wouldn't -- that's not what he
 25   does?
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 428 of 500 PageID: 1707
Case 1:15-cv-10698-MLW Document 253 Filed 08/25/16 Page 52 of 119

52

```
           1          MS. ROYZMAN:  Your Honor, he does both.  I'm just
           2   listing how he describes himself.
           3          THE COURT:  All right.  It doesn't matter.  That's a
           4   digression.  Go ahead.
           5          MS. ROYZMAN:  Okay.  So in any case, he provides claim
           6   construction assistance, as he did here.
           7          THE COURT:  How much does he get paid an hour?
           8          MS. ROYZMAN:  I don't recall, Your Honor.  It's in the
           9   deposition transcript.
02:51     10          THE COURT:  If we ever try this case, the jury will be
          11   very interested in that question, if he gets to testify.
          12          MS. ROYZMAN:  Yes.
          13          THE COURT:  Anyway, he wouldn't get to testify on the
          14   claim meaning, if he ever got to testify on anything.  That's
          15   the main thing jurors pay attention to.  Anyway.
          16          MS. ROYZMAN:  Yeah.  Well, his primary source of
          17   income for the last 20 years has been litigation consulting.
          18   We filed, as I mentioned, as part of our answering brief in
          19   response to the declaration from Dr. Florian Wurm, who was a
02:52     20   full professor and is now honorary professor meritus at the
          21   Swiss Federal Institute.
          22          THE COURT:  It's fine.  It's fine.
          23          MS. ROYZMAN:  As I said, we don't really think this
          24   should play any role.
          25          THE COURT:  Okay.
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 429 of 500 PageID: 1708
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 53 of 119

53

1          MS. ROYZMAN:  And I took the deposition of Celltrion's

2     expert, and here is what he had to say ultimately.  He agreed

3     with Janssen on ordinary meaning of cell culture media because

4     that's just indisputable, just as Your Honor stated it in your

5     *Biogen* decision.  He agreed that hydrolysates are chemically

6     undefined.  Are all the chemical compounds in the soy

7     hydrolysate defined?  No.  In fact, he said, because it's true

8     to this day, I think it's impossible to characterize all of the

9     agreed ingredients in soy hydrolysate.  This just makes the

02:53 10     chemically defined media construction impossible.  He agreed,

11     as we saw, that proteins are known supplements.

12          And Celltrion, the day prior to his deposition, and as

13     I said, after our opening brief, supplied us with their

14     alternative construction, "nutritive media free of all proteins

15     for culturing eukaryotic cells," and so I put that construction

16     in front of him and asked him what he thought of it.  And he

17     said it was incorrect, and he marked up the construction

18     accordingly.  So Celltrion's expert agrees with us that the

19     alternative construction is wrong.  That exhibit is cited in

02:54 20     our brief, and it's provided to Your Honor, and it's here on

21     slide 88.

22          THE COURT:  Okay.

23          MS. ROYZMAN:  But that's the end of my presentation,

24     Your Honor.  I think this is a uniquely simple claim

25     construction.

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 430 of 500 PageID: 1709
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 54 of 119

54

 1          THE COURT:  Wait a minute.  88, you say is the

 2   defendants' expert saying that the defendants' alternative

 3   construction is wrong?

 4          MS. ROYZMAN:  Well, there's testimony on that, but in

 5   addition, I gave him the -- I gave him the piece of paper.  I

 6   gave him an exhibit with the primary construction and the

 7   alternative construction.  And after he testified that the

 8   alternative construction is incorrect, I asked him to reflect

 9   it on the exhibit.  And he did.  He wrote that it's wrong, and

02:55 10   he signed it on May 13, the day after that construction was

11   provided to us, and that's before Your Honor.

12          THE COURT:  That was fun, wasn't it?

13          (Laughter)

14          MS. ROYZMAN:  It really was.  I was surprised that I

15   enjoyed it.

16          THE COURT:  You get to take a deposition.  All right.

17          MS. ROYZMAN:  That's it, Your Honor.

18          THE COURT:  All right.  We'll take a ten-minute break

19   and resume at 3:05.  Court is in recess.

03:14 20          (Recess taken 2:55 p.m. to 3:05 p.m.)

21          THE COURT:  Mr. Hurst, do you have some more slides

22   for me, too?

23          MR. HURST:  I do, Your Honor.

24          THE COURT:  This booklet will be Exhibit F.  Go ahead.

25          MR. HURST:  Your Honor, I guess I want to start out in

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 431 of 500 PageID: 1710
Case 1:15-cv-10698-MLW Document 283 Filed 03/25/16 Page 55 of 119

55

1   an area of agreement.  There is no question -- and I agree --

2   that normally, the ordinary meaning of a term should control,

3   unless it's been disavowed or the patentee acted as a

4   lexicographer.  And I do think both of those things occurred

5   here.  Let me explain why as I walk through my presentation.

6         One key thing here is, the ordinary meaning of a term,

7   it obviously has to be considered in the context of all the

8   intrinsic evidence, and particularly the specification which

9   *Phillips* describes as the single most important piece of

03:15 10   evidence for construing claims, the specification itself.  One

11   of the things that I think that Janssen is doing that the

12   Federal Circuit says you shouldn't be doing -- and this is from

13   the *Retractable* case --

14         THE COURT:  Which --

15         MR. HURST:  Sorry.  Slide 3.  You asked a question

16   earlier.  You said, Am I supposed to construe the actual

17   invention or the term itself.  I said, You're construing the

18   term, but you have to consider the scope of the actual

19   invention.  And that's what the Federal Circuit teaches, for

03:16 20   instance, in *Retractable*.  When construing claims, we strive to

21   capture the scope of the actual invention rather than strictly

22   limit the scope of claims to disclosed embodiments or -- and

23   this is what I really think that Janssen is doing here -- or

24   allow the claim language to become divorced from what the

25   specification conveys is the invention.  The core dispute here

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 432 of 500 PageID: 1711
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 56 of 119

56

1  is whether the claimed cell culture media must be chemically

2  defined.

3        THE COURT:  The claim is not "cell culture media.  The

4  term is cell culture media, but that's only part of the

5  definition of the claim.

6        MR. HURST:  The claim describes a cell culture media

7  for sure, and the question is whether that cell culture media

8  has to be chemically defined.  Just to be clear on something --

9  I think counsel was clear, but I want to make sure we're all on

03:17 10  the same page.  Even if you have 61 chemically defined

11  ingredients, if you add one ingredient that's not chemically

12  defined, you can no longer describe that cell culture media as

13  a chemically defined cell culture media.  So adding one --

14        THE COURT:  Right.  So is soy hydrolysate chemically

15  defined?

16        MR. HURST:  Typically, it can be.

17        THE COURT:  Is it necessarily chemically defined?

18        MR. HURST:  No.

19        THE COURT:  All right.  So they point to an embodiment

03:17 20  that includes "soy hydrolysate," if I'm pronouncing it right.

21        MR. HURST:  I'll get to this.

22        THE COURT:  Why don't you tell me now.

23        MR. HURST:  No.  I'm going to answer your question.

24  Yeah.  So they cite an article in their patent specification

25  among the list of art, and that article talks about soy

1   hydrolysates, and it talks about effort to make them defined.

2        So Claim 4 says, Optionally, you can add all

3   chemically defined things, and they include in the list "soy

4   hydrolysate." When you're writing a claim, Your Honor, you're

5   writing for the future. You're saying, you know, I want to

6   make sure that I capture my intention. And they're literally

7   citing an article talking about efforts and progress towards

8   making the components of a soy hydrolysate.

9        THE COURT: But it's not -- and I think you just told

03:18 10  me and I think they pointed out your expert said -- what's the

11  soy called, "soy" what?

12       MR. HURST: "Hydrolysate," "hydrolysate."

13       THE COURT: "Soy hydrolysate." I think you just told

14  me it's not always chemically defined.

15       MR. HURST: It's true it's not always chemically

16  defined.

17       THE COURT: So would a person ordinarily skilled in

18  the art in 2004 or now know that?

19       MR. HURST: What they would know if they read the

03:19 20  article that's cited right on the patent is that there were

21  efforts being made to try to turn it into something that is

22  chemically defined.

23       THE COURT: So there's an effort being made to try to

24  turn it into something chemically defined, but at that time it

25  wasn't chemically defined. I mean, people have been making

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page #34 of 500 PageID: 1713
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 58 of 119

58

1    efforts forever to turn iron into gold or something.

2         MR. HURST:  Yeah.  But think of it this way.  All that

3    means, though, if we're right about the claim construction,

4    chemically defined, which I think we are, I'm going to show you

5    pieces of the case law.

6         THE COURT:  Go ahead.

7         MR. HURST:  But if we were right -- just to make sure

8    I finish my thought -- if the soy hydrolysate is -- if we're

9    right, if you add soy hydrolysate and it's not chemically

03:20 10   defined, it would fall outside the scope of the claims.  If you

11   and add soy hydrolysate and it is chemically defined, it would

12   fall within the claims.

13        THE COURT:  No.  All right.  I'm construing "cell

14   culture media."  I'm not construing right now the invention.

15   And I mean, I think -- I didn't spell this out, but just so you

16   can keep it in mind, and then you go ahead.  It seems to me

17   that "cell culture media" had a plain and ordinary meaning.

18   I'm reminded, without any controversy, I used it in *Biogen* in

19   2000.  And then there's the comprising language that tells you

03:20 20   you need certain chemically defined ingredients in certain

21   proportions.  But in my view, "comprising" means you have to

22   have these things in these proportions, but the compound

23   doesn't have to be limited to those things.

24        MR. HURST:  I'm afraid to get deep into everything all

25   at once, but a couple of problems with that.  One is if you

1    construe "comprising" to allow chemically undefined elements,

2    you're literally saying that the claimed invention can cover

3    things the specs never put in there.

4        THE COURT:  You can get to that, but that's not the

5    way I read the spec so far.  Go, do your way.

6        MR. HURST:  Okay.  The core issue here is whether the

7    cell culture media that's claimed in Claim 1 has to be

8    chemically defined.  That's the core issue.  Your Honor, I'm

9    going to walk through, from top to bottom, this patent.  Title

03:21 10    abstract, description of the present invention, need in the

11    art, examples, claims, every single one supports, in our view,

12    the limited scope of the cell culture media that's being

13    claimed, which is that it's chemically defined and not

14    chemically undefined.

15        If we're right that cell culture media is chemically

16    defined, then it follows from the definition -- this is where

17    they became a lexicographer -- they defined "chemically

18    defined."  They have a definition of it, and it includes "free

19    of all proteins."  So the core, the main issue, does the term,

03:22 20    does the term that's claimed in Claim 1, does it have to be

21    chemically defined?

22        THE COURT:  If they wanted it to be chemically

23    defined, why didn't they say "a chemically defined cell culture

24    media"?  Because it's unmodified --

25        MR. HURST:  It's a fair point.

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 436 of 500 PageID: 1715
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 60 of 119

60

1          THE COURT:  *Thorner* talks about unmodified.

2          MR. HURST:  It's a fair point, except if that was the

3    way you resolved claim construction issues, they would never,

4    no claim term would ever take on a meaning other than its

5    ordinary meaning.

6          THE COURT:  But that is one thing I'm supposed to look

7    at, isn't it?  Didn't *Thorner* tell me to look to see whether

8    it's modified?

9          MR. HURST:  You look at the ordinary meaning.  I'm

03:23 10   hearing you.

11         THE COURT:  I don't know if we're -- I think that's

12   what the -- anyway.  Here.  Let me check.  Why don't you go

13   ahead.

14         MR. HURST:  Sure.  Before I start walking through the

15   patent, though, I just wanted to make one sort of global point,

16   which we think is a core problem with Janssen's proposed claim

17   construction, Your Honor.  This is from the *SciMed* case from

18   2001.

19         THE COURT:  What slide are you on?

03:24 20         MR. HURST:  I'm on slide 8.  *SciMed* is probably one of

21   the most widely --

22         THE COURT:  8?

23         MR. HURST:  Slide 8, yes.  It says *SciMed*.  Are you

24   using their slides?

25         THE COURT:  Right.  So *SciMed*?

1          MR. HURST:  *SciMed*.

2          THE COURT:  I see it.

3          MR. HURST:  Here is one of the core problems we see

4    with Janssen's construction.  *SciMed* is one of the most widely

5    cited Federal Circuit cases on claim construction, probably

6    outside of *Phillips* itself.  It's certainly in the top handful.

7    But what it says, it teaches, is where the specification makes

8    clear that the invention does not include a particular feature,

9    that feature is deemed to be outside the reach of the claims of

03:25 10   the patent, even though the language of the claims read without

11   reference to the specification might be considered broad enough

12   to encompass the feature in question.  Okay?  That's the rule.

13          Their specification, Your Honor, in vigorous terms is

14   explaining the problem they're trying to solve.  They're trying

15   to solve the problem of having adventitious particles.  These

16   are particles that just find their way in -- they're not

17   intended.  They're undefined.  They can be bacterial.  They can

18   be virus.  They can be prion particles.  Prion particles have

19   proton material that can cause problems.  They're telling you

03:26 20   keep these things out.  That's what they're saying.  They're

21   animal-derived components, protein growth factors, which can

22   slide in with bovine serum, they're saying all these things

23   keep them out.

24          THE COURT:  I assume you're going to take me through

25   it column by column.

1      MR. HURST:  I will.  I just wanted to make my global

2  point here.  So all these things they say keep out, if you

3  construe the claims the way they're suggesting, they all can be

4  included in the claims, and that's what *SciMed* teaches you you

5  should not do.

6      THE COURT:  But then you have to persuade me that all

7  these things say, "Keep it out."

8      MR. HURST:  And I will, I'm going to do my best at

9  least.  And there's other cases like *Lizard Tech* from 2005.

03:26 10      THE COURT:  That's okay.  There's also principle that

11  you don't import limitations from the specification into the

12  claims unless, essentially, the specification communicates that

13  it's required.

14      MR. HURST:  Yeah.  Well, I would say it differently.

15  I would say, unless the specification says this is one of our

16  goals, to overcome this shortcoming, that's my invention.

17  You're disavowing the shortcoming as being part of your

18  invention.

19      THE COURT:  They didn't say that in the prosecution

03:27 20  history, did they?

21      MR. HURST:  The prosecution history doesn't help

22  either side.  If there was a piece of prosecution history that

23  helped Janssen, you would have heard about it.  It doesn't help

24  either side.

25      Okay.  So let's walk through it.  The title and the

Case 2:16-cv-01925-JAK-KS Document 69-1 Filed 04/13/17 Page 439 of 500 PageID: 1718
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 63 of 119

63

1    abstract, Your Honor, title and the abstract, I wouldn't say

2    the title itself is anything other than a chip on my side.

3    When they decided, Hey, what's the title of my patent?  They

4    said, "Chemically defined media compositions."

5         THE COURT:  No, but that's -- again, that may be -- I

6    don't know.  Maybe I'm not thinking about this right.  Even if

7    that were the invention, it doesn't, to me, mean that cell

8    culture media includes the term "chemically defined."  Because

9    even if the invention had to be chemically defined, if all of

03:28 10   that were in the term "cell culture media," some of the

11   language, additional language in the claim might be

12   superfluous.  Anyway.  But go ahead, keep going.

13        MR. HURST:  I think I know what you're getting at.

14   Let me pick a spot to hopefully elaborate on that point.

15        Just really quickly, the Federal Circuit does look at

16   the title of the invention to help.  In this case, for

17   instance, the *Nintendo* case we cite here, 2016 from the Federal

18   Circuit.  The question was whether "handheld device," should it

19   be any handheld device, or should it be limited to a "handheld

03:29 20   direct-pointing device."  And the title said, "Easily

21   deployable interactive direct-pointing system."  That was one

22   of the things.  So they limited the broader scope of the

23   ordinary meaning.  Same with the abstract.  Federal Circuit

24   2000.  "We have frequently looked to the abstract to determine

25   the scope of the invention," and they cite a series of cases.

Case 2:16-cv-01925-JMV-MF  Document 69-1  Filed 04/13/17  Page 440 of 500 PageID: 1719
Case 1:15-cv-10698-MLW  Document 253  Filed 08/25/16  Page 64 of 119

64

 1    What does their abstract say?  The title says, "Chemically

 2    defined media compositions."

 3              THE COURT:  What number is that one, please?

 4              MR. HURST:  Slide 16.

 5              THE COURT:  Okay.

 6              MR. HURST:  So I think this is where -- just because I

 7    wanted something in front of me.  See where the abstract says,

 8    "Chemically defined media compositions for the culture of

 9    eukaryotic cells are disclosed."  The abstracts here, you're

03:30 10   telling people, "Here is my invention."

 11             So just to be clear, under Janssen's construction,

 12   they're saying all of their claims cover both chemically

 13   defined media compositions and chemically undefined media

 14   compositions.  They're saying they cover both.  And yet the

 15   title and the abstract both point to only, only, chemically

 16   defined media compositions.  So that's the title in the

 17   abstract.

 18             So if you keep going along, I want to focus first on

 19   present invention.  Your Honor, "present invention," it's a

03:30 20   meaning that carries a lot of weight in claim construction.

 21             THE COURT:  "Present invention" is where?

 22             MR. HURST:  It's where in the patent?

 23             THE COURT:  Right.

 24             MR. HURST:  I was going to go through the case law

 25   first, but let's go through the patent.  If you look at "Field

Case 2:16-cv-01925-JMV-MF  Document 69-1  Filed 04/13/17  Page 441 of 500 PageID: 1720
Case 1:15-cv-10698-MLW  Document 233  Filed 03/25/16  Page 65 of 119

65

```
 1    of Invention," it's in column 1.
 2            THE COURT:  "Field of Invention."
 3            MR. HURST:  "The present invention relates to
 4    chemically defined media compositions."  They don't say, "Our
 5    present invention also includes chemically undefined media
 6    compositions."  They only say "chemically defined media
 7    compositions."  It's in other places as well.  Remember, their
 8    claim construction is trying to include chemically undefined
 9    media compositions.  For whatever reason -- not for whatever.
03:31 10    I think the reason is because they think that's what their
11    invention is, only chemically defined.
12            THE COURT:  Then why would they use the word
13    "comprising" instead of -- I mean, what you're arguing would be
14    pretty easy to say clearly.
15            MR. HURST:  That is always true in any claim
16    construction hearing, Your Honor.  It's always, always, always
17    true, whatever shortcoming --
18            THE COURT:  No, but what does "comprising" mean?
19            MR. HURST:  "Comprising" means you can add
03:32 20    additionally chemically defined ingredients.  That's what it
21    means.  Take a look at column 4 -- I'm going to give you
22    another example of present invention.  And it's line --
23            THE COURT:  No, no.  Okay.
24            MR. HURST:  Line 30.
25            THE COURT:  Okay.  "Field of Invention.  The present
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 442 of 500 PageID: 1721
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 66 of 119

66

1    invention relates to chemically defined immediate media

2    compositions for the culture of eukaryotic cells."  Remind me

3    what "eukaryotic" means.

4         MR. HURST:  It's a particular kind of cell.  There's

5    eukaryotic and -- I know what the answer is.

6         THE COURT:  It's not material to this.

7         MR. HURST:  Prokaryotic.

8         THE COURT:  Okay.  Go ahead.

9         MR. HURST:  If you go to column 4, you'll see another

03:32 10   present invention.  Line 30, "The present invention provides

11   chemically defined compositions useful in the culture of

12   eukaryotic cells."

13        This comes up a lot in claim construction.  If you

14   take a look at slide 19, Your Honor, "We have found disavowed

15   or disclaimer based on clear and unmistakable questions by the

16   patentee that limit the claims such as 'the present invention

17   includes' or 'the present invention is,' or 'all embodiments of

18   the present invention are.'"  Here we have language that's

19   equivalent to "the present invention is."  "The present

03:33 20   invention provides chemically defined compositions useful in

21   the culture of eukaryotic cells."  So to construe the claims to

22   include "chemically undefined compositions" would be contrary

23   to, we believe, to this case law.

24        THE COURT:  Let me see *Luminara*.

25        Okay.  I've read *Luminara*.  It reiterates and perhaps

1    amplifies *Thorner*.

2              MR. HURST:  Also, we have a string cite of cases that

3    rely on presentation invention language to help construe

4    claims.  It's page 6 of our reply brief, our last brief.

5              THE COURT:  Okay.

6              MR. HURST:  It's footnote 2, there's a long string

7    cite.  Fairly famous one is *Verizon Services,* which I have on

8    slide 18, "When a patent describes the features of the present

9    invention as a whole, this description limits the scope of the

03:36 10   invention."  Lots of cases say essentially that.

11             THE COURT:  What's the slide you have up?

12             MR. HURST:  Sorry.  Slide 18 has *Verizon* as another

13   example.  And in our brief we had many more examples of that

14   same concept.

15             THE COURT:  Go ahead.

16             MR. HURST:  It's not just that they say it's their

17   present invention in those words, Your Honor.  It's when they

18   describe what they came up with to solve the problems in the

19   priority art.  It's called "need in the prior art" at this

03:37 20   point.  Slide 21.  I go through it a step at a time.  Maybe it

21   would be easier just to go through the patent itself.  But the

22   point here is, when you read through this patent, they're

23   literally saying, you know what the art needs?  Chemically

24   defined cell culture media.  That's what the art needs.  And

25   they move over to the invention and they describe chemically

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 444 of 500 PageID: 1723
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 68 of 119

68

         1    defined cell culture media in two examples.

         2            If I can walk through the patent --

         3            THE COURT:  That would be good.

         4            MR. HURST:  Let's go to column 1, lines 32 through 38.

         5            THE COURT:  This is in the background of the

         6    invention?

         7            MR. HURST:  It is.  And this is important.  What it's

         8    showing here is this is the shortcoming that existed in the

         9    prior art.  Here is why my invention solved that problem and

03:38   10    why they call it their present invention.

        11            We went through this.  I think you went through this

        12    in the earlier presentation.  "Adventitious particle

        13    contamination of conventional eukaryotic cell culture media can

        14    result from the incorporation of animal-derived components and

        15    protein growth factors into conventional media."  And

        16    conventional media had a lot of undefined components.

        17            It has a couple key problems, Your Honor.  One is

        18    totally inconsistent.  When you're randomly putting things in

        19    your cell culture media, you don't know from batch to batch

03:39   20    whether it's going to be a good media for growing cells.  But

        21    secondly, it can cause infections.  That's what they say here.

        22    "Such contaminations can occur when animal-derived components

        23    are harvested from an animal harboring disease, causing

        24    bacteria, viruses or prions."  A prion is a material that can

        25    cause problems and it's unpredictable.

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 445 of 500 PageID: 1724
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 69 of 119

69

                    1          If you go to column 1 at 17 through 24, they say when

                    2    you add these undefined chemical compounds, pieces of proteins,

                    3    if it's undefined, it can cause a serious potential problem.

                    4          They talk about the fact, you'll see the sentence that

                    5    begins, "Such contaminants."  "Such contaminants in a

                    6    biopharmaceutical are capable of causing patient infections and

                    7    disease and may limit yields due to increased metabolic burdens

                    8    on the host production cell line."  These are what I talked

                    9    about before.  Two problems, unpredictability and how good your

03:40    10    cell culture media is going to be.  When you're putting things

                   11    that are undefined into the body, it can cause problems.

                   12          They talk about -- if you look at lines 25 through 43,

                   13    they talk about the fact that for instance, unbeknownst to the

                   14    company making the cell culture media, the animal could have a

                   15    disease that's not apparent, like mad cow disease, and that's

                   16    happened.  The disease from the animal, even through normal

                   17    processing, doesn't end up working its way into the human

                   18    being.  That's what happened with mad cow disease.  So that's a

                   19    risk that people knew about.  They talk about it here.  So when

03:40    20    you're putting undefined things in your cell culture media,

                   21    there can be problems.

                   22          Now if you take a look at slide -- I'm sorry.  If you

                   23    look at lines 50 through 67, this is where they start talking

                   24    about what they're going to do about it.

                   25          THE COURT:  Did you skip 46 deliberately, the

1    "ideally"?

2            MR. HURST:  No, no.  I want to get to that, too.  We

3    like that.  We can do it now.

4            So they say, "Adventitious particle contamination can

5    be avoided by culturing eukaryotic cells in animal component

6    free cell culture media."  Then they say, "Ideally, such media

7    are 'chemically defined,'" they then define that phrase.  "Such

8    that the media composition contains only known chemical

9    compounds and are free of all proteins, even those not of

03:41 10    animal origin such as recombinant proteins."  So that you see

11    where they define that.

12            THE COURT:  Well, a couple of things.  One, this is in

13    the background of the invention, so it doesn't directly address

14    what the invention is correct.

15            MR. HURST:  Can I push back on that a little bit?

16    It's in the background.  I agree with that.  But they define

17    the term "chemically defined," which they use in the

18    description of their present invention.  So that definition

19    gets taken up into the field of the invention.

03:42 20            THE COURT:  But here it says, "Ideally," and "ideally"

21    to me -- and I mean, I think it has a conventional meaning.  It

22    means preferably; it would be perfect if you can achieve this.

23    It doesn't itself in isolation say necessarily, and also, as I

24    said, it's not directly speaking of the claimed invention.

25    It's sort of the goal.

1          MR. HURST:  It is absolutely true.  They're saying in

2     the background, they're saying all these problems could be

3     avoided ideally, right, if you use -- and they define it -- if

4     you use a chemically defined cell culture media.  But then take

5     it to the logical conclusion, Your Honor.  Then they say, By

6     the way what's any present invention?"  The present invention

7     relates to a chemically defined media cell culture."  So

8     they're saying they have now accomplished what in their

9     background they're saying is the goal.  The goal, what's ideal.

03:43 10     Chemically defined is what's ideal.  They say it in the

11     presentation invention, they say it in the title and abstract.

12     That definition carries over beyond the background, is my

13     point.

14          THE COURT:  Okay.

15          MR. HURST:  So then, the very last paragraph before

16     they get to describing the invention, summary of the invention,

17     right after they say, Hey what's the ideal?  What's the goal?

18     What are we hoping to achieve here in the world to obviate all

19     these problems with the prior art?  Chemically defined.  What's

03:44 20     the first line say?  "Chemically defined media compositions

21     optimal for production of" --

22          THE COURT:  Sorry.  I don't know where you're reading.

23          MR. HURST:  Sorry, Your Honor.  Second to last

24     paragraph, starting line 50, column 1.

25          THE COURT:  Go ahead.

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 448 of 500 PageID: 1727
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 72 of 119

72

1           MR. HURST:  So again, now they say, Here is the ideal.

2     Chemically defined media compositions.  Then they say, Okay, if

3     you wanted to do that, if you wanted to do a chemically defined

4     media composition, what would you have to accomplish?  And they

5     say, "Chemically defined media compositions optimal for

6     production of biopharmaceuticals, such as antibodies, must

7     satisfy several different criteria."  Then they go through the

8     criteria.  So they say, Here is the goal, chemically defined.

9     Here is what you need to meet that goal.  And look at the last

03:45 10     sentence of that column, "Thus, a need exists" -- not for

11     chemically undefined, but -- "a need exists for chemically

12     defined media compositions."

13           THE COURT:  What slide are you looking at?

14           MR. HURST:  Slide 27.  So they're setting up the

15     problem that they solved as chemically defined, a good

16     chemically defined media composition.  "The need exists for a

17     chemically defined."  Not "chemically undefined."  "Chemically

18     defined."

19           Okay.  Then you'll see right in the next column, it

03:46 20     says "Summary of the Invention," right?  They end up giving two

21     examples.

22           THE COURT:  Where?

23           MR. HURST:  Examples 1 and 2.  Let me get to them.

24     You know, my cites here just say examples 1 and 2.  So if you

25     page through, you'll see -- columns 9 and 10.

```
 1              THE COURT:  Column 9?

 2              MR. HURST:  And 10, yeah.

 3              THE COURT:  Before you get to column 9, please --

 4              MR. HURST:  Sure.

 5              THE COURT:  -- I thought you were going to show me

 6      column 4, line 30.

 7              MR. HURST:  Yeah.  I thought I should do that.

 8              THE COURT:  That says, "The present invention provides

 9      chemically defined compositions useful in the culture of

03:47 10      eukaryotic cells."  Does that have any significance?

11              MR. HURST:  It does.  It's another -- I gave you two

12      examples.  There's only two here.  One is the field of

13      invention, and one is line 30.  They both say the same thing.

14      Chemically defined is what they're telling you is their present

15      invention.

16              THE COURT:  Then you just heard Janssen argue that at

17      the end of column 4, line 67, going over to the next page,

18      "Those skilled in the art will recognize other myeloma cell

19      lines and myeloma-derived cell lines as well as any supplements

03:48 20      required for the successful culture of such cells."

21              Are myeloma -- is this saying that -- well, the

22      plaintiff says this would tell one ordinarily skilled in the

23      art that in addition to the 61 chemicals that comprise the

24      invention, there can be other supplements.

25              Are myeloma cell lines chemically defined?  It's in
```

Case 2:16-cv-01925-JMV-MS Document 69-1 Filed 04/13/17 Page 450 of 500 PageID: 1729
Case 1:15-cv-10698-MLW Document 233 Filed 03/25/16 Page 74 of 119

74

1    column 5, line 1.

2           MR. HURST:  I think the cell line is what you use to

3    create the culture itself.  That's not something you put into

4    the cell culture media.  But the supplements, though, the

5    supplements, it doesn't shade anything on the question, right,

6    because the supplements can be either defined chemicals or

7    undefined chemicals.

8           THE COURT:  But here it doesn't say, "any chemically

9    defined supplement."  It says, "Any supplement required for the

03:49 10   successful culture of such cells."

11          MR. HURST:  True.  And if I'm right, how the

12   presentation invention is described, and how the problem is

13   described and how the need is described, title, abstract, that

14   would just mean you ought to be using supplements that are

15   chemically defined to carry out the claimed invention.

16          THE COURT:  Okay.  That, I think somewhat turns the

17   inquiry on its head.  Now, where is the reference to soy that

18   was --

19          MR. HURST:  It's an optional ingredient in claims 47

03:50 20   and 10.

21          THE COURT:  Where is it -- it's mentioned in the

22   specification I think.

23          MR. HURST:  I'm not going to have that handy.

24          MS. ROYZMAN:  I can help.

25          THE COURT:  It's in column 8, line 14.

```
 1          MS. ROYZMAN:  Yeah.  And Your Honor, it's also in

 2    column 7, line 63 because it occurs in connection with two

 3    embodiments of the invention.

 4          THE COURT:  Is soy hydrolysate -- would a person

 5    ordinarily skilled in the art in 2004 understand soy

 6    hydrolysate to be chemically defined?

 7          MR. HURST:  They would absolutely understand that

 8    people were working on accomplishing just that.

 9          THE COURT:  But it wasn't then?

10          MR. HURST:  Remember --

11          THE COURT:  Just here --

12          MR. HURST:  The answer is at that point in time it

13    hadn't been done.

14          THE COURT:  Okay.

15          MR. HURST:  So while we're looking at column 8, and

16    the four ingredients there listed as optional, just optional,

17    three of those are chemically defined, and they can be

18    supplements.  And so the reference to supplements, to me,

19    doesn't shed any light on -- doesn't shed by itself any light

20    on "chemically defined" or "chemically undefined," but when you

21    read the patent specification as a whole, the whole goal here

22    is to make a chemically defined media, cultured, cultured

23    media.  That's the whole goal.  You're not going to put

24    supplements in there to defeat the goal.

25          So you've got two examples, both examples 1 and 2,
```

|  | 1 | it's undisputed between the parties that those examples are |
|---|---|---|
|  | 2 | chemically defined medium. |
|  | 3 | THE COURT:  It says so. |
|  | 4 | MR. HURST:  Yeah. |
|  | 5 | THE COURT:  What about example 3? |
|  | 6 | MR. HURST:  Example 3, I think works if I remember |
|  | 7 | correctly, example 3 takes one of the prior examples and adds |
|  | 8 | to it, yeah.  So it would also be chemically defined. |
|  | 9 | THE COURT:  Where does it do that? |
| 03:52 | 10 | MR. HURST:  It takes the MET 1, it says, "Lactate |
|  | 11 | concentrations at MET 1 media" -- |
|  | 12 | THE COURT:  What line are you on? |
|  | 13 | MR. HURST:  I was looking at the top of example 3. |
|  | 14 | If you take a look at line 30, line 31, it says -- |
|  | 15 | THE COURT:  Hold on a second. |
|  | 16 | MR. HURST:  Sure. |
|  | 17 | THE COURT:  Let's see.  Column 10, line 44 in the |
|  | 18 | paragraph before the Claim 1 says, "The present invention now |
|  | 19 | being fully described it will be apparent to one of ordinary |
| 03:53 | 20 | skill in the art that many changes and modifications can be |
|  | 21 | made thereto without departing from the spirit or scope of the |
|  | 22 | appended claims."  What does that mean? |
|  | 23 | MR. HURST:  I would say that when they say, "The |
|  | 24 | present invention has now been fully described," and they |
|  | 25 | describe two examples that both parties agree are chemically |

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 453 of 500 PageID: 1732
Case 1:15-cv-10698-MLW Document 283 Filed 03/25/16 Page 77 of 119

77

```
       1   defined, that that's consistent with the present invention

       2   being a chemically defined cell culture media.

       3          THE COURT:  But it goes on to say, "It would be

       4   apparent to one of ordinary skill in the art that many changes

       5   and modifications can be made thereto without departing from

       6   the spirit or scope of the appended claims."

       7          MR. HURST:  I'd emphasize "without departing from the

       8   spirit or the scope of the appended claims."  The "spirit"

       9   being "Our present invention is."

03:54 10          THE COURT:  No.  I think it's saying, it seems to be

      11   saying to me, and I'm not ordinarily skilled in the art, that

      12   many changes and modifications can be made to the present

      13   invention without departing from the scope of the claim, that

      14   there's some flexibility.

      15          MR. HURST:  No question.  There's flexibility in the

      16   sense that as long as you're still creating chemically defined

      17   cell media culture, you can add chemically defined additions.

      18          THE COURT:  You're going to tell me again they were

      19   trying, but the soy hydrolysate wasn't chemically defined at

03:55 20   this time.

      21          MR. HURST:  No, but you have to remember the

      22   question -- when you're writing a claim, you're writing for the

      23   future.  And when you cite art in your --

      24          THE COURT:  I don't think that's right.  I think

      25   you're writing for a person ordinarily skilled in the art.
```

```
 1    What would that person at that time understand.

 2          Because this goes to -- did I ask you yesterday or

 3    today?  This goes to my understanding of the purpose of

 4    patents.  Patents define what's protected.  But they're

 5    intended to give notice to potential other inventors who might

 6    want to compete that you can do this.  You can't do this;

 7    you're excluded, but you can do that.  Strike a balance.  No.

 8    I would think you have to look at the person of ordinary

 9    skilled in the art at the time.

03:56 10          MR. HURST:  And I am.  And at the time, a person, one

11    of ordinary skill in the art would know for sure that soy

12    hydrolysate could be included if it was chemically defined and

13    not included if it was chemically undefined.

14          THE COURT:  I don't know.  Is there any evidence that

15    anybody chemically defined the soy in 2004?

16          MR. HURST:  Yeah.

17          THE COURT:  You said they were trying.

18          MR. HURST:  There's literally articles about that

19    subject.

03:56 20          THE COURT:  You said they were trying.

21          MR. HURST:  Yeah, but that means people know about it.

22          THE COURT:  And they know that people are trying.

23    Trying and succeeding are two different things.

24          MR. HURST:  The patent lasts for 17 years, so they

25    know, people working on this, they don't want to -- they're
```

        1    including within the scope of their claims.  If I'm right that

        2    the present invention is chemically defined media cell culture,

        3    then that means soy hydrolysate can be -- and it's the only

        4    optional ingredient.  That optional ingredient can be added

        5    throughout the term of the patent as long as it's chemically

        6    defined.

        7             THE COURT:  Go ahead.

        8             MR. HURST:  So the claims themselves, obviously, they

        9    only list chemically defined.  When you limit it to 61

03:57  10    ingredients, they're all chemically defined ingredients.

       11             Now, let's get to the word "comprising," Your Honor.

       12             THE COURT:  Okay.

       13             MR. HURST:  If you go to slide 38, this is the case

       14    that I cited earlier.  It's *Gillette*.

       15             THE COURT:  Hold on a second.  Okay.  What page?

       16             MR. HURST:  Page --

       17             THE COURT:  1376.

       18             MR. HURST:  That's right.  "The term 'comprising' is

       19    not a weasel word with which to abrogate claim limitations, or

03:58  20    to impermissibly expand a claim's scope."

       21             THE COURT:  Hold on a second.  I read that.  Go ahead.

       22             MR. HURST:  In this case the whole patent was -- it's

       23    *Gillette* razors.  It was about a three-blade razor, and it used

       24    the word "comprising," and the question was, Well, does that

       25    mean you can alter the number of blades because it says

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 456 of 500 PageID: 1735
Case 1:15-cv-10698-MLW Document 233 Filed 03/25/16 Page 80 of 119

80

1    "comprising"?  Adding or subtracting -- or adding I guess

2    another blade.  And the Court said, No.  "Comprising" can't do

3    that much work.  And here, our view is that the word

4    "comprising" can't do so much work that you're literally

5    sweeping in all the problems from the prior art that you say

6    you solved.

7        THE COURT:  I'm looking at *Gillette,* which I haven't

8    studied, but the next line says, "The dependent claims

9    themselves demonstrate that the blade unit of the invention

03:59 10   contains only three blades, including a single second blade."

11   Then it says on the next page, 1377, "Specification similarly

12   limits the invention to a blade unit having only three blades."

13   Let me read this.

14        Okay.  Go ahead.

15        MR. HURST:  So in *Gillette,* they're doing what I'm

16   doing, which is they're saying, Okay, it has the word

17   "comprising" but you can't stop there.  You have to look

18   elsewhere to decide whether or not it makes any sense to allow

19   the additions that the patentee is proposing.

04:00 20        THE COURT:  The first place the Court looked in

21   *Gillette* was to the other claims.  Did the other claims help

22   you here?

23        MR. HURST:  I don't think they help us.  They also, in

24   my view, don't hurt us.  But the specification helps us.  Take

25   a look at *Gillette* while you have it.  If you go to page 1377

the last paragraph on 1377. "We have construed claims to be limited to one type of device where a written description has emphasized features of that device and criticized other similar devises." They cite *SciMed*. There are a lot of cases like that.

That's what we have here right? We have here a specification that says, The problem in the prior art is chemically defined. The need is chemically defined. Our present invention is chemically defined. Two examples, chemically defined title, abstract, chemically defined. And Janssen is in the courtroom now saying, No, no, no. It also includes chemically undefined, and that's what these cases say you ought not be doing.

So this is Dr. Wurm. This is at slide 39.

THE COURT: Hold on a second. Dr. Wurm is --

MR. HURST: The expert witness that Janssen used.

THE COURT: Right.

MR. HURST: But what he's saying is, "Comprising" means if you want to, you can add serum, you can add animal serum. But that's literally what the spec says they're trying to overcome. That's what they're saying the problem with the prior art their invention solved. And he's reading the claims to say, yeah, you can toss in bovine syrup and the risk of mad cow disease. That's how he's reading it, and that's how Janssen is reading it.

Case 2:16-cv-01925-JMV-MF  Document 69-1  Filed 04/13/17  Page 458 of 500 PageID: 1737
Case 1:15-cv-10698-MLW  Document 233  Filed 03/25/16  Page 82 of 119

82

```
 1              So let's get to Claim 4.  I know that's the part

 2    that's causing you the most hesitation.  So I'm going to slide

 3    40.

 4              THE COURT:  Claim 4.  Okay.

 5              MR. HURST:  The first thing I wanted to note, it says,

 6    "optionally adding," "optionally."  We cited a case to you --

 7    that's the oddest thing in the world.  "Optionally" makes it

 8    meaningless, right?

 9              THE COURT:  What case is that?

10              MR. HURST:  We cited -- I'm going to have somebody --

11    I'm going to get the cite for you in a second.

12              THE COURT:  All right.  Go ahead.

13              MR. HURST:  It says it makes the claims undefined.

14    The point is, it's a meaningless thing to say in a claim,

15    because if it's optional, you don't need it and you can still

16    infringe.  And if you add it, what's the difference, right?

17              THE COURT:  Say that again.  I'm not following you.

18              MR. HURST:  If it says "optionally adding," that means

19    it's not required to meet the scope of the claims.  If so, why

20    do you include the phrase "optionally added"?  It's an oddity.

21    It's an odd thing to be doing.

22              THE COURT:  You couldn't say you have the option of

23    adding one of the four things in F in column 12?

24              MR. HURST:  You have that option, but say you did none

25    of those things, right, you didn't add anything.  You'd still
```

```
 1  fall within the scope of the claims because of the world
 2  "optional."  And we cited the case on page 10 of our reply
 3  brief.
 4            THE COURT:  What case is that?
 5            MR. HURST:  It's *Hockeyline*, Southern District of New
 6  York, 2013.
 7            THE COURT:  *Hockeyline?*
 8            MR. HURST:  *Hockeyline*.
 9            THE COURT:  Let me get it.  What page?
04:05 10         MR. HURST:  Looks like it spills from 5 to 6.
11            THE COURT:  5 to 6.
12            MR. HURST:  I think it's really towards the end of the
13  opinion.  It's actually --
14            THE COURT:  Here.
15            MR. HURST:  Very last line.
16            THE COURT:  It's on 6, isn't it?
17            MR. HURST:  I think the printout I have -- I'm not
18  sure it matches up.  It's a Westlaw printout.
19            THE COURT:  It says here, "The Court cannot agree with
04:06 20  the plaintiff's reading grammatically the adverb 'optionally'
21  until claim 9 modifies" -- is that what you want me to look
22  at."
23            MR. HURST:  The conclusion.  "By using this word
24  'optionally.'"  "Because there's no way for the public to know
25  the exact bounds of the claimed invention, claim 9 is
```

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 460 of 500 PageID: 1739
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 84 of 119

84

1    indefinite."  It spills -- literally that's the last sentence.

2              THE COURT:  Is that the issue here?

3              MR. HURST:  Well, no.

4              THE COURT:  Right now you're not arguing that the

5    claim is invalid.  You're asking me to define it.

6              MR. HURST:  What I'm suggesting, Your Honor, is that

7    it shows that you can practice this invention without -- even

8    this claim -- without soy hydrolysate at all, without any of

9    these things.  So it's an odd thing to be putting in here.  But

04:07  10    they did put it in there.  But maybe the reason they put it in

11    there is optionally.  I don't know.  It's in this Franek

12    article that we've cited and talked about.

13              THE COURT:  Which article?

14              MR. HURST:  It's the Franek.  It's cited in the

15    patent.  It's at the top of column 1 of all their references.

16    But this is what I was talking about.  One of ordinary skill in

17    the art, when they read that, they would know about Franek.

18    When they read the optional use of soy hydrolysate --

19              THE COURT:  Here.  Is that the article that says

04:07  20    they're trying to chemically define the soy?

21              MR. HURST:  Yeah.  It shows what they're doing.

22              THE COURT:  Let me get it.

23              MR. HURST:  While you're looking, Your Honor, just to

24    make a --

25              THE COURT:  Just wait.

 1           MR. HURST:  Okay.

 2           THE COURT:  What's the significance of this article in

 3   pertinent part?

 4           MR. HURST:  So I have some of the parts on slide 41.

 5   I can walk you through it, what's happening here.

 6           THE COURT:  Go ahead.

 7           MR. HURST:  They talk about the beneficial effect of

 8   protein hydrolysates on the growth of animal cell cultures.

 9   And it's been known for a long time there's been efforts to try

04:09 10   to define it to try to replace animal serum with all the

11   drawbacks the specification recites.

12           They say, "A substantial drawback of most commercially

13   available crude protein digests is the presence of nonpeptide

14   components of mostly unknown nature."  And they talk about a

15   lot of the drawbacks just like the specification does.

16           They say, "Typically, tens of percent" can be of

17   ill-defined character when you're using hydrolysates.  They

18   talk about attempts at replacing these crude protein

19   hydrolysates and nutrient medium by defined peptides.

04:09 20           THE COURT:  Have been reported several --

21           MR. HURST:  Several attempts.

22           THE COURT:  -- attempts.

23           MR. HURST:  Right.

24           THE COURT:  Doesn't that communicate that -- wouldn't

25   that communicate to one ordinarily skilled in the art that

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 462 of 500 PageID: 1741
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 86 of 119

86

1   there hadn't been any success despite at least a decade or

2   several decades' effort?

3          MR. HURST:  And as long as there has been no success,

4   you don't use that optional ingredient.  As soon as it is a

5   success, you use that optional ingredient.

6          Here is what they say at the end.  Here is what

7   they're doing, Your Honor.  I'll explain what this means.  But

8   "Resolution of the enzymic hydrolysates of plant proteins by

9   low-pressure liquid chromatography on small-pore size exclusion

04:10 10 matrices is a crucial step toward obtaining peptide fractions

11  of substantially higher quality."  And they're talking about

12  what's going on right now to try to make this optional

13  ingredient available.

14         What they're really doing -- what you do is you

15  pulverize the soy protein, okay?  And you get -- it's just --

16  it breaks apart into amino acids, vitamins, peptides, okay?

17  What they're doing is they're using chromatography.  It's a

18  method of separating individual components, sometimes by size,

19  sometimes by different of their properties.  And what they're

04:11 20 saying is, this process might enable you to extract from the

21  mix only what you care about, i.e., defined.

22         THE COURT:  Does this article use the term "chemically

23  defined"?

24         MR. HURST:  No.  But the title says, "Preparation of

25  Defined Peptide Fractions."  They're not saying they've done

Case 2:16-cv-01925-JMV-MF  Document 69-1  Filed 04/13/17  Page 463 of 500 PageID: 1742
Case 1:15-cv-10698-MLW  Document 253  Filed 03/25/16  Page 87 of 119

87

1    it.  Here, "Defined peptides.  Attempts at replacing crude

2    protein hydrolysate in nutrient media by defined peptides have

3    been reported several decades ago."  It's been going on for a

4    while.  If it hasn't been accomplished you don't use the

5    optional ingredient.

6            THE COURT:  This says you can use the optional

7    ingredient.

8            MR. HURST:  Not if I'm right --

9            THE COURT:  Not if you're right, but I'm trying to

04:12 10    determine if you're right.

11            MR. HURST:  I think that assumes the answer.

12            THE COURT:  I think you're assuming the answer.  I

13    understand your argument.  Move on.

14            MR. HURST:  Okay.  Here is the last thing.  Maybe I

15    should have started with this because I'm not -- there's a huge

16    logical problem, huge logical problem with saying you can add

17    chemically undefined soy hydrolysate into this patent.  Huge

18    logical problem, okay?

19            Here is why.  If you made soy hydrolysate, you just

04:12 20    pulverized it, without knowing what amino acids are in there,

21    what vitamins are in there, and you tossed it into the cell

22    culture media from Claim 1, you could no longer determine the

23    concentrations.  Claim 1 requires -- Your Honor, there's a

24    logical problem.  Claim 1 requires specific concentrations

25    sometimes, Your Honor, to the fifth decimal point.  That's how

1    precise, to the fifth decimal point.

2         And Claim 1 includes -- there's only 21 amino acids in

3    the world, right?  It includes amino acids.  It includes

4    vitamins.  If you attempted to add undefined soy hydrolysate,

5    you would be varying the concentrations.  And because you don't

6    know the amount or what you're adding, you would have no way of

7    knowing whether you met the concentrations in Claim 1.  So

8    there's a logical problem.  Does that make sense?

9         THE COURT:  No.

04:13 10       MR. HURST:  Let me try again.

11        THE COURT:  No.  If you're making a cake and you put

12   ingredients in in a specific amount -- if you want to make this

13   particular chocolate cake, you put each of the ingredients in

14   in this specific amount.  Then maybe you say it's optional to

15   put in red coloring or whatever, white.  I don't know.

16   Something that would change the color of chocolate, not brown.

17   I don't think that would change the amounts of the essential

18   ingredients that you put in.  You would have just added some

19   other ingredient.

04:14 20       MR. HURST:  The point that I didn't make clearly

21   enough maybe is the ingredients you're adding with soy

22   hydrolysate, they match up inevitably with the ingredients that

23   are set forth in Claim 1.

24        THE COURT:  What do you mean "match up"?

25        MR. HURST:  I'm going to give you an example.

           1            THE COURT:  You're telling me all these things.  Maybe
           2   the claims are invalid.
           3            MR. HURST:  That wouldn't make it invalid.  I think
           4   that would prove my point that soy hydrolysate, to the extent
           5   it's going to be added, has to be chemically defined.
           6            THE COURT:  All right.  I understand the argument.
           7            MR. HURST:  Just give me -- it will take one second,
           8   and I know it's late.  I'm just trying to give you an example.
           9            THE COURT:  Not as late as it's going to get.  Go
04:15     10   ahead.
          11            MR. HURST:  Here is one.  So L --
          12            THE COURT:  What are you reading from?
          13            MR. HURST:  Claim 1.
          14            THE COURT:  From Claim 1?
          15            MR. HURST:  Yeah.  If you look at column 11.
          16            THE COURT:  Hold on a second.  I have to find my copy.
          17   Claim 1.  Go ahead.
          18            MR. HURST:  So Claim 1 has arginine HCL at 200 to
          19   5,000 milligrams, right?
04:16     20            THE COURT:  Where is that?  What column?
          21            MR. HURST:  Column 11, ten lines down, just giving one
          22   example.
          23            THE COURT:  Go ahead.
          24            MR. HURST:  So now it has to be within that range.  If
          25   you pulverized the soy hydrolysate and you had no idea what you

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 466 of 500 PageID: 1745
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 90 of 119

90

```
 1    were adding was a bunch of undefined components, you wouldn't

 2    have any way of knowing whether you were inside or outside that

 3    concentration.  So logically then the soy hydrolysate that is

 4    being active in Claim 4 optionally has to be chemically

 5    defined, in our view.  In any event, soy hydrolysate is not a

 6    protein, so it doesn't address the protein issue.  It's a

 7    nonprotein.

 8              THE COURT:  Is it your contention that there has to be

 9    no protein?

10    MR. HURST:  That is our contention.  That's part of

11    the "chemically defined" definition.  Here is what I would --

12              THE COURT:  What slide is that?

13              MR. HURST:  I was actually just going to sum up, Your

14    Honor.

15              THE COURT:  Okay.

16              MR. HURST:  Sum up, on slide 21, I'll pick one of the

17    large charts.  Your Honor, I just got that Gilead note quote

18    that I gave you before.  I'm being told it was actually a quote

19    from the dissent, but Gillette is quoting a majority, Spectrum

20    Intern --

21              THE COURT:  Hold on a second.  What page of Gillette?

22              MR. HURST:  What page do I cite in Gillette or

23    Spectrum?

24              THE COURT:  I don't know what language you're citing.

25              MR. HURST:  Where "'Comprising' can't be a weasel
```

Case 2:16-cv-01925-JAK-MRW Document 69-1 Filed 04/13/17 Page 467 of 500 Page ID: 1746
Case 1:15-cv-10698-MLW Document 233 Filed 03/25/16 Page 91 of 119

91

1    word."  Unfortunately --

2           THE COURT:  That's the dissent?

3           MR. HURST:  Unfortunately, yeah.  The *Gillette* quote

4    from was from a dissent.  But *Gillette* is quoting from a

5    majority in *Spectrum Intern v. Sterilite Corp.*, 164 F.3d 1372

6    at 1376.  But it's the same concept.

7           THE COURT:  Hold on just one second.

8           MR. HURST:  Sure.

9           THE COURT:  Let me get *Spectrum*.

04:19 10          This is a case where Spectrum argued one thing to get

11   the patent and then took a different position with regard to

12   infringement?  This is in the context of contrary prosecution

13   history.

14          MR. HURST:  I think that might be right, Your Honor.

15          THE COURT:  I also see on their -- I don't see the

16   "weasel word" discussion.

17          MR. HURST:  Page 1380, Your Honor.

18          THE COURT:  1380?

19          MR. HURST:  Did I say the wrong page?  I apologize if

04:21 20   I did.  "'Comprising' is not a weasel word."

21          THE COURT:  There it is, yeah.  Okay.

22          MR. HURST:  Let me find just the -- in terms of --

23   maybe what I just want to emphasize in terms of -- if I were to

24   put a balance -- I understand and I can hear Your Honor that

25   this soy hydrolysate is causing you some hesitation, the

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 468 of 500 PageID: 1747
Case 1:15-cv-10698-MLW Document 253 Filed 08/25/16 Page 92 of 119

92

        1    optional ingredient in Claim 4.  But let's balance that against

        2    all the present invention case law and the very clear present

        3    invention statements in the claim.  You couple that together --

        4            THE COURT:  What are you looking at, 21?

        5            MR. HURST:  I'm looking at 29.

        6            THE COURT:  What slide are you looking at?

        7            MR. HURST:  29.  So my thought would be to balance the

        8    optional ingredient as construed by the art saying that they're

        9    working on defined soy hydrolysates, in particular, all the

04:22  10    present invention case law and the clear present invention

       11    statements here would say that the invention is chemically

       12    defined and therefore shouldn't be chemically undefined.

       13    Couple that with the --

       14            THE COURT:  Which slide has the case law?

       15            MR. HURST:  I went through the case law earlier.

       16            THE COURT:  Which slide was that on?

       17            MR. HURST:  Let me say -- slide 13.  I'm sorry.

       18    That's wrong.  Slide 18, slide 19, and we also cited in our

       19    footnote in page 6, note 2, page 6, note 2, of a reply brief

04:23  20    where we have a string cite of cases relying on present

       21    invention.

       22            THE COURT:  Okay.  Thank you.

       23            MR. HURST:  Couple that with -- the optional

       24    ingredient in Claim 4 against the present invention statements

       25    in the present invention case law.  Just add on to the scale

1    title and abstract, which says, Listen, our invention is

2    chemically defined, not chemically undefined.

3         Place that in the context of the need in the art,

4    where they say, Look at all the disadvantages in the art, and

5    what do you need?  You need a chemically defined media culture,

6    and they say that's the need right before they describe their

7    invention in two examples, both of which are chemically defined

8    media culture, cell culture media.

9         So all of that points in our view in only one

04:24 10   direction, which is "chemically defined" not "chemically

11   undefined."  And if Janssen were correct, Your Honor, you could

12   literally put bovine syrup in Claim 1.  And that's what they

13   said don't do.  If they're right, bovine syrup with those 61

14   ingredient infringes Claim 1.

15        THE COURT:  But even if you need the 61 -- I don't

16   know.  It sounds to me like you're asking me to define the

17   invention, not the term.

18        Okay.  I mean, I've heard you.  I'm going to continue

19   to think about it.

04:24 20        MR. HURST:  Sure, sure.  I don't think I am, though.

21        THE COURT:  All right.

22        MR. HURST:  I'm saying you're adding -- it's just like

23   all these cases.  It's not every kind of the broad word.  It's

24   the kind they say they invented.  It's as simple as that.  It's

25   "chemically defined cell culture media."

1          THE COURT:  How do you want me to construe this claim?

2     Have you abandoned the alternative construction "nutritive

3     media free of all proteins for culturing eukaryotic cells" that

4     your expert said was wrong?

5          MR. HURST:  Well, in his defense --

6          THE COURT:  Just tell me what your construction is.

7          MR. HURST:  Number one, "chemically defined media."

8     That's what we want.  We want "Chemically defined media," and

9     all we did was add to that.

04:25 10          THE COURT:  Here, look.  First of all -- and I must

11     have discussed this with you previously.  My strong preference

12     is for doing *Markman* constructions in the context of motions

13     for summary judgment because it gets very abstract.  You agreed

14     that it would be useful in this case, helpful in this case, to

15     do it or try to do it now.  And because I recognize the urgency

16     of this and the new statutory regime, a lot of money is

17     involved.  It's important to the parties.  I'll try.

18          But to put a new construction in a late brief is not

19     appropriate.  And ordinarily, if it came in a reply brief in an

04:26 20     ordinary case, I wouldn't even consider it.  But I need to know

21     because now I'm -- I need to know what I'm being asked.  And

22     this is a question I asked you at the outset, because it frames

23     everything.  Am I correct that you're asking me to construe

24     "cell culture media" to mean "chemically defined media, i.e.,

25     media compositions containing only known chemical compounds

1    that are free of all proteins, even those not of animal origin,

2    such as recombinant proteins optimized for biopharmaceutical

3    production"?

4         MR. HURST:  I am.

5         THE COURT:  Okay.  Then I'll decide whether -- based

6    on what I know now, that's the correct construction.  And this

7    is -- I asked Ms. Royzman this.  I don't know if I asked you or

8    whether you responded to it also.  But am I correct that, you

9    know, *Markman* constructions can evolve or change in the course

04:27 10   of a case?

11        MR. HURST:  It can.

12        THE COURT:  So I'll do the best I can now.

13        MR. HURST:  Just to add one quick thing, Your Honor.

14   What we're saying is "chemically defined media," everything

15   after "i.e.," that's a quote from their definition.  So it

16   looks long, but we just pulled their definition from the

17   specification into that, that's that parenthetical.  And the

18   reason for the alternative construction was only to try to

19   eliminate the soy hydrolysate optional ingredient issue because

04:28 20   it's not a protein.  And I understand Your Honor's comments,

21   but our key thing is "chemically defined."  That's our key

22   thing.  "Chemically defined."  Is it chemically defined or

23   chemically undefined.  That is the core issue.

24        THE COURT:  Well, look, I've spent a lot of time

25   preparing for this, and I focused on the two proposed

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 472 of 500 PageID: 1751
Case 1:15-cv-10698-MLW Document 253 Filed 03/25/16 Page 96 of 119

96

```
 1    constructions.  That was developed by an infinite number of
 2    lawyers apparently on each side.  So that's what I'm going to
 3    decide.  Actually, I asked you about the alternative,
 4    "nutritive media free of all proteins for culturing eukaryotic
 5    cells."  Where did you first introduce that proposed
 6    construction?
 7              MR. HURST:  It was in our reply brief.  We had two
 8    briefs.  In our second brief.
 9              THE COURT:  A, that's not appropriate.  B, that's the
10    one your expert in his deposition said was wrong, correct?
11              MR. HURST:  Because it didn't have the word
12    "chemically defined."  And I understand why he did that, but he
13    did make that mistake.  And it wasn't a happy moment, Your
14    Honor.  I saw you smiling.
15              THE COURT:  Because it didn't have --
16              MR. HURST:  So he read it.  He thought it was
17    Janssen's because it didn't have "chemically defined," which is
18    the core issue --
19              THE COURT:  I see.
20              MR. HURST:  He made a mistake.
21              THE COURT:  Oh, he just took that position because he
22    thought it was Janssen's?  In other words, you pay him, and
23    he'll take whatever position he thinks will help you.  That's
24    what you're arguing.
25              MR. HURST:  No, I'm not, Your Honor.
```

Case 2:16-cv-01925-JMV-MF  Document 69-1  Filed 04/13/17  Page 473 of 500 PageID: 1752
Case 1:15-cv-10698-MLW  Document 253  Filed 03/25/16  Page 97 of 119

97

            1              THE COURT:  That's what you're communicating to me

            2    shows the wisdom of *Phillips*.  Okay.

            3              MR. HURST:  Just please, just one second.  The whole

            4    issue turns --

            5              THE COURT:  If we get --

            6              MR. HURST:  He read this without "chemically defined"

            7    and said to himself, Well, that's not what I've been proving --

            8              THE COURT:  How do you know what he said to himself?

            9    Did you ask him why he said that in the deposition?

    04:30  10              MR. HURST:  We know what he did.

           11              THE COURT:  Did you ask him?

           12              MR. HURST:  Yeah.  It was explained on the record.  He

           13    wasn't paying attention.  He thought it must have been

           14    Janssen's, not ours.

           15              THE COURT:  He said that?

           16              MR. HURST:  Yeah, that's what he said.  He read it

           17    quickly.  He wasn't paying attention.  This was ours.  He saw

           18    this -- look, I'm not making excuses.

           19              THE COURT:  If we have a trial -- here.  It's too

    04:30  20    late.  It's too late.

           21              Okay.  Let me put it this way.  This confirms my view

           22    developed over 31 years in dealing with patent cases that the

           23    Federal Circuit is certainly right in discounting and saying we

           24    should discount the expert testimony that is prepared for

           25    litigation purposes because it may suffer from bias.  That's

 1    just an observation.  All right.

 2              MR. HURST:  Judge --

 3              THE COURT:  You're not finished yet?

 4              MR. HURST:  Just one thing.  Just so sometimes -- I do

 5    a lot of these *Markman* hearings.  Sometimes the outside makes

 6    points you address or the judge makes points you address.  I

 7    really want to emphasize our key issue is, is it chemically

 8    defined or not chemically undefined.

 9              THE COURT:  If it's that simple, why didn't you say

04:31 10    that at the outset of all your briefs?

 11             MR. HURST:  We did.  This is the definition of

 12    "chemically defined" in the spec.  We just took the definition

 13    of "chemically defined" from the spec.  That's the core issue

 14    between the parties.

 15             THE COURT:  They said that would be optimal, ideal.

 16             All right.  Let me ask the plaintiff, how do you

 17    distinguish *Gillette*?

 18             MS. ROYZMAN:  I'm sorry, Your Honor, *Gillette* was the

 19    comprising case --

04:31 20             THE COURT:  The razor blade case.

 21             MS. ROYZMAN:  Razor blade case.

 22             THE COURT:  Mr. Hurst says this case is like *Gillette*.

 23             MS. ROYZMAN:  Then he pointed out -- hold on, Your

 24    Honor.  So we read through all of the comprising cases that

 25    defendants cited, and I think, as Mr. Hurst pointed out,

<table>
<tbody>
<tr><td>1</td><td>*Gillette* cited *Spectrum* or something like that.  And these</td></tr>
</tbody>
</table>

          1    *Gillette* cited *Spectrum* or something like that.  And these

          2    cases are very easy to distinguish for the reasons that Your

          3    Honor actually started discussing while looking through, I

          4    believe, *Spectrum*.

          5         These are cases where you have a prosecution history

          6    disclaimer or you have a disclaimer of some kind.  And at that

          7    point, if you have a disclaimer or you relinquish something,

          8    you can't use "comprising" to put it back in.  But that's not

          9    our situation at all.  In our claims, "comprising" serves an

04:33   10    essential and necessary function because they are disclosed

         11    embodiments which are chemically undefined.

         12         THE COURT:  Where are "disclosed embodiments that are

         13    chemically undefined" in your patent?

         14         MS. ROYZMAN:  Okay.  So I think I may have left my

         15    patent -- okay.  Those are the two that we discussed in columns

         16    7 and 8.  So in column 7, Your Honor, it begins with line 53

         17    and goes through lines 83 at slide 61 and 62 of our

         18    presentation.  And these are embodiments of the invention, as

         19    cell culture media.  It explicitly --

04:34   20         THE COURT:  These are the references to the soy?

         21         MS. ROYZMAN:  Yes, absolutely.  And as Mr. Hurst had

         22    to acknowledge and as his expert acknowledged at his

         23    deposition, to this day, it's impossible to define soy

         24    hydrolysate.  It is chemically undefined.  There's nothing in

         25    this patent whatsoever that says soy hydrolysate is somehow

```
 1    defined, because that wouldn't even make any sense.  Nothing

 2    like that existed in 2004, and nothing like that exists today.

 3            THE COURT:  Are there other points that Mr. Hurst made

 4    that you'd like to address?

 5            MS. ROYZMAN:  Mr. Hurst made a number of statements

 6    about present invention, and I will just address those very

 7    quickly.  And he also pointed Your Honor to a whole footnote of

 8    present invention case law, and all of those cases are in

 9    opposite.  And let me just explain why.

10            So slide 54, please.  So Mr. Hurst focused you on two

11    present invention statements or two invention statements.  And

12    they're in our slide 54.  I had referred you to them as well.

13    And these are not statements that even say the present

14    invention is a chemically defined media because that just

15    wouldn't be true.  They talk about that it relates to

16    chemically defined media compositions.  It provides

17    compositions, and then you can use those 61 ingredients with

18    other chemically defined ingredients or undefined ingredients.

19    And over and over in the patent -- could I have slide 55,

20    please -- talks about the invention being a cell culture media.

21    The invention also --

22            THE COURT:  I'm sorry.  This is 55?

23            MS. ROYZMAN:  Yes.  And this is four of the

24    statements.  There are seven such statements.  I believe

25    they're all cited in our answer answering brief, along with the
```

1    relevant case law.

2          But the point is that over and over we say -- and now

3    in connection with cell culture media, that the invention is

4    just the cell culture media, soluble composition for making a

5    cell culture media.  And of course it makes sense that we say

6    that because we disclose and we claim chemically undefined

7    embodiments, that constructions being advocated by Mr. Hurst

8    are contrary to established claim construction principles.

9          THE COURT:  I guess at the moment -- it's possible I'm

04:37 10    wrong.  I'm due to be.  I come back to it.  I'm being asked to

11    define "cell culture media."

12          MS. ROYZMAN:  Yes.

13          THE COURT:  If there's something that requires the

14    invention to be chemically defined, in my present conception

15    it's not that term.  It's something else, like, it has to

16    comprise these ingredients, and, you know, if a jury at some

17    point in these proportions were persuaded that if you throw soy

18    in there, it will affect the concentrations of the other

19    things, as Mr. Hurst was arguing, based on -- as Mr. Hurst

04:38 20    arguing, maybe there will a problem with the invention.  But I

21    think my task right now is more limited to just, what does

22    "cell culture media" mean?  That's all I was asked to do.

23    That's what I'm prepared to do.

24          MS. ROYZMAN:  No.  Your Honor, we completely agree.

25    It's just that defendants are arguing that "cell culture media"

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 478 of 500 PageID: 1757
Case 1:15-cv-10698-MLW Document 233 Filed 08/25/16 Page 102 of 119

102

1   has this definition and that these present invention statements

2   somehow demand that.  Could I have the next slide?  The law is

3   just to the contrary.

4          THE COURT:  What's the next slide?

5          MS. ROYZMAN:  56.  It's slide 56, Your Honor.  It's

6   the *Absolute Software* case.  And I don't actually think there

7   are any invention statements in Mr. Hurst's favor.  But even if

8   there were, unless the statements are uniform and unless

9   there's no intrinsic evidence to the contrary, those statements

04:39 10   are not limiting.  That's just simply the law and their

11   statements, statement after statement, that just say this

12   invention is a composition for making a cell culture media.

13   That's the law.  And Mr. Hurst ignores each one of those

14   statements.

15          THE COURT:  All right.  It's 20 of 5:00.  I'm going to

16   hold you hostage here for a while because I may be able to

17   decide this this afternoon, and then I'll let you know what

18   time to come back tomorrow.  Court is in recess is.

19          (Recess taken 4:39 p.m. to 5:14 p.m.)

05:13 20          THE COURT:  Once again, I'm going to decide this

21   matter orally and construe the term "cell culture media" as

22   used in Claim 1 particularly of the '083 patent.  I'm doing

23   this because there's urgency to having the matter decided in

24   view of the relatively new regime for litigating issues

25   concerning biosimilar drugs.  I'm doing it because I'm immersed

Case 2:16-cv-01925-JMV-JBC   Document 69-1   Filed 04/13/17   Page 479 of 500 PageID: 1758
Case 1:15-cv-10698-MLW   Document 233   Filed 08/25/16   Page 103 of 119

103

 1   in the issue.  The transcript, again, will be a record of the

 2   decision.  I may convert it into a more formal memorandum and

 3   order.

 4          In addition, as the parties recognize, a *Markman*

 5   construction of a claim can evolve or change in the course of a

 6   case.  The parties have each asked me to do this claim

 7   construction before we get to summary judgment, if summary

 8   judgment is ever appropriate.  I'm trying to be of service.

 9   But it's conceivable, as more work is done, the claim

05:15 10   construction could evolve or change.  I don't anticipate that

11   now, however.

12          I have studied this deeply based on the submissions.

13   I construe the term "cell culture media" as used in Claim 1 in

14   patent number 7,598,083, the '083 patent, to mean nutritive

15   media for culturing cells.  This is the construction advocated

16   by the plaintiffs, Janssen Biotech and New York University.  It

17   is, I find, the plain meaning of the term for people skilled in

18   the art.  In reaching this conclusion, I've applied the

19   standards for claim construction in the relevant cases that

05:16 20   include but are by no means limited to *Phillips*, 415 F.3d 1303

21   at 1312 to 19, *Renishaw*, 158 F.3d 1243 at 1248 to 50, *Comark*,

22   156 F.3d 1182 at 1186 to 87, *Thorner*, 669 F.3d 1362 to 67.  All

23   of those are Federal Circuit cases.  I've also considered the

24   key cases cited today, particularly in the arguments.  In

25   addition, I've taken the approach I described through *Markman*

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 480 of 500 PageID: 1759
Case 1:15-cv-10698-MLW Document 233 Filed 08/25/16 Page 104 of 119
104

1    in *Biogen v. Berlex*, 113 F. Supp. 2d, 77 at 95 to 96.

2         Claim 1 of the '083 patent is "a soluble composition

3    suitable for producing a final volume of cell culture media

4    wherein the composition comprises the following components in

5    the following amounts per liter of the final volume of cell

6    culture media."  This sentence is followed by a list of 61

7    chemicals in certain defined concentration ranges for each.

8         The plaintiffs and defendants propose constructions of

9    the term "cell culture media" in their opening briefs as

05:18 10   follows:

11        Janssen asserts that "cell culture media" has its

12   plain and ordinary meaning to those skilled in the art; that

13   is, a nutritive media for culturing cells.  Until its reply

14   brief at least, the defendant asserted that "cell culture

15   media" means chemically defined media, i.e. media compositions

16   containing only known chemical compounds and are free of all

17   proteins, even those not of animal origin, such as recombinant

18   proteins, optimized for biopharmaceutical use.

19        In their reply brief, which is an utterly

05:19 20   inappropriate time for a party to add a new argument or change

21   its argument and which the jurisprudence indicates is a basis

22   for disregarding the argument, the defendants asserted that

23   "cell culture media" should be construed to mean nutritive

24   media free of all proteins for culturing eukaryotic cells.

25   This is a proposed construction that was not in the prehearing

Case 2:16-cv-01925-JMV-MF  Document 69-1  Filed 04/13/17  Page 481 of 500 PageID: 1760
Case 1:15-cv-10698-MLW  Document 233  Filed 08/25/16  Page 105 of 119

105

1    statements required by our local rules and my orders.

2         In essence, the defendants argue that "cell culture

3    media" should be construed to, one, exclude media containing

4    any proteins like defendants' media; and two, include only

5    media that are optimized for biopharmaceutical production.

6    That's the assertion in the defendants' opening brief at page

7    15.  In particular, they argue that the specification indicates

8    that "cell culture media" must be construed to mean chemically

9    defined media and that the specification of the '083 expressly

05:20  10   defines "chemically defined" as media composition containing

11   only known chemical compounds and are free of all protein, even

12   those not of animal origin, such as recombinant proteins,

13   language that comes from column 1, lines 46 to 49 of the

14   Background of Invention in the specification.

15        In the alternative, defendants argue that the term

16   should be construed of being free of all proteins, regardless

17   of whether the media must also be chemically defined.

18   Plaintiffs argue that no construction is necessary because the

19   meaning of "cell culture media" is obvious and universally

05:21  20   understood.  In the alternative, they argue that it should be

21   construed according to the plain and ordinary meaning, which is

22   nutritive media for culturing cells.  As indicated earlier, I

23   find that the plaintiffs' proposed construction is correct.

24        With regard to the standard and process for construing

25   the term "cell culture media," I've done the following:

1         I've decided how a person ordinarily skilled in the

2   art would understand the claim term "cell culture media" in

3   Claim 1 of the '083 patent.  As instructed by *Phillips* at 1312

4   and 1313, I have started with the claim term and considered its

5   ordinary and customary meaning.  I've also considered the

6   specification and the fact that the parties agree there isn't

7   any prosecution history -- well, I've also considered the

8   specification as a person of ordinary skill in the art would.

9   I've considered the prosecution history, but as the parties

05:23 10   seem to agree, it does not have direct relevance to the

11   construction of the claim now at issue.

12        I've also considered whether the inventor clearly

13   expressed an intent to be its own lexicographer, and to give a

14   term in the patent a unique meaning different from what would

15   commonly be understood by a person skilled in the art, as

16   *Thorner* instructs at 669 F.3d 1362.  In addition, I've

17   considered whether the patentee disavowed part of the otherwise

18   broad scope of the claim, Claim 1.

19        Finally, I've considered extrinsic evidence concerning

05:24 20   relevant scientific principles that are, and were in 2004, when

21   the patent was issued, available to persons skilled in the art,

22   including technical dictionaries and treatises, as *Phillips* at

23   1314 and 1318 and *Renishaw*, 158 F.3d at 1250 indicate a court

24   may and should do.

25        I have the discretion to consider expert testimony on

1    the meaning of the term.  However, I understand, as the Federal

2    Circuit indicated in *Phillips* at 1318, it should be discounted

3    if it's clearly at odds with the claim construction mandated by

4    the language of the claim, the written description of the

5    prosecution history, and it should also be discounted to the

6    extent the Court discerns that it was prepared for litigation

7    and therefore suffers from bias.

8         As I mentioned earlier, there's a small Federal

9    Judicial Center volume, Anatomy of a Patent Case, that in

05:25 10   Chapter 9, Section 5B at 101 makes the same point about

11   essentially encouraging courts to be skeptical about expert

12   testimony prepared for litigation.  What I've been educated to

13   understand so far about defendants' expert indicates that that

14   skepticism is well founded in this case.

15        I find that in this case the inventor did not act as

16   its own lexicographer concerning the term "cell culture media."

17   To act as its own lexicographer, the patentee must clearly set

18   forth a definition of the disputed claim term other than its

19   plain and ordinary meaning.  It is not enough for the patentee

05:26 20   to simply disclose a single embodiment or use a word in the

21   same manner in all embodiments, as the Federal Circuit said in

22   *Thorner*, 669 F.3d at 1365.

23        I also find that the inventor did not disavow the

24   usual broad meaning of "cell culture media" in the

25   specification.  After explaining in *Thorner* the high standard

1    for finding that a patentee acted as its own lexicographer, the

2    Federal Circuit wrote at 1366, "The standard for disavowal of

3    claim scope is similarly exacting.  Where the specification

4    makes clear that the invention does not include a particular

5    feature, that feature is deemed to be outside the reach of the

6    claims of the patent, even though the language of the claims

7    read without reference to the specification might be considered

8    broad enough to encompass the feature in question.

9         "The patentee may demonstrate intent to deviate from

05:27 10   the ordinary and custom meaning of a claim term by including in

11   the specification expressions of manifest exclusion or

12   restriction representing a clear disavowal of the claim term."

13        The Federal Circuit also addressed this in *Luminara*

14   and said, "Absent lexicography or disavowal, we do not depart

15   from the plain meaning of the claims," citing *Thorner*.  To act

16   as a lexicographer, a patentee must clearly set forth a

17   definition of the disputed claim term and clearly express an

18   intent to redefine the term.  Similarly, disavowal requires

19   that the specification or prosecution history make clear that

05:28 20   the invention does not include a particular feature.  While

21   such disavowal can occur either explicitly or implicitly, it

22   must be clear and unmistakable.  We have found disavowal or

23   disclaimer based on clear and unmistakable statements by the

24   patentee that limit the claims, such as "The present invention

25   includes," or "The present invention is," or "All embodiments

Case 2:16-cv-01925-JAK-AFM   Document 69-1   Filed 04/13/17   Page 485 of 500   Page ID: 1764
Case 1:15-cv-10698-MLW   Document 233   Filed 08/25/16   Page 109 of 119

109

1  of the present invention are."

2      I do not, however, discern the required clear

3  disavowal of the usual claim scope in the specification of the

4  '083 patent.

5      The term "culture medium" has a definite meaning that

6  would be familiar to a person skilled in the art for the

7  purpose of this case.  The Oxford English Dictionary, which the

8  plaintiff submitted as Exhibit 6 to docket number 149-7,

9  defines "culture medium" as "a nutrient liquid or solid in or

05:29 10  on which microorganisms, cells, et cetera, are cultivated."

11  There are similar definitions in the other lay dictionaries

12  submitted by plaintiffs as Exhibits 3, 4 and 5.

13      More significantly, the Oxford Dictionary of

14  Biochemistry and Molecular Biology, a technical dictionary,

15  defines "culture medium" as "any nutrient medium that is

16  designed to support the growth or maintenance of a culture."

17  That is in evidence in docket number 149-3 as Exhibit 2.

18  Phillips, 415 F.3d at 1318 notes the particular value of

19  technical dictionaries in determining what a term would mean to

05:30 20  the person ordinarily skilled in the art.

21      The term "cell culture medium" has also been

22  interpreted in many cases.  In SkinMedica, 727 F.3d. 1187 at

23  1190, it was construed to mean "an artificial environment, such

24  as a liquid, that is outside the body, in vitro, and supplies

25  the components necessary to meet the nutritional needs required

Case 2:16-cv-01925-JMV-MF  Document 69-1  Filed 04/13/17  Page 486 of 500 PageID: 1765
Case 1:15-cv-10698-MLW  Document 233  Filed 08/25/18  Page 110 of 119
110

1    to grow cells."  *SkinMedica* is a 2013 Federal Circuit case.

2         In 2000, in *Biogen v. Berlex,* 113 F. Supp. 2d 77 at

3    83, I, without controversy in that case, defined a culture

4    medium as "a solution that contains the nutrients required for

5    maintenance and growth of the cell."  Therefore, "absent a

6    special and particular definition created by the patent

7    applicant, the terms in the claim, Claim 1, must be given their

8    ordinary and accustomed meaning," as the Federal Circuit said

9    *Renishaw*, 158 F.3d at 1249.

05:32 10         In Claim 1, the term "cell culture media" is

11   unmodified.  Accordingly, as the Federal Circuit also said in

12   *Renishaw*, quoting *Specially Composites,* 845 F.2d 981 at 987,

13   "Unless the specification requires a limitation, that

14   limitation should not be read from the specification into the

15   claim."

16         In this case I recognize that the specification

17   includes or the patent includes the following:  The title is

18   "Chemically Defined Media Compositions."  Under "Field of

19   Invention," the specification states, "The present invention

05:33 20   relates to chemically defined media compositions for the

21   culture of eukaryotic cells."  As I will reiterate, it doesn't

22   say, "The present invention is" or "only is chemically defined

23   media compositions."

24         Under "Field of Invention," the patent states -- I'm

25   sorry.  So as I said it -- under "Field of Invention," the

Case 2:16-cv-01925-JMV-MF  Document 69-1  Filed 04/13/17  Page 487 of 500 PageID: 1766
Case 1:15-cv-10698-MLW  Document 233  Filed 08/25/18  Page 111 of 119

111

1    patent states, "The present invention relates to chemically

2    defined media compositions for the culture of eukaryotic

3    cells."  It doesn't say, "The present intention is."  Nor does

4    it there or elsewhere, I believe, say, "The present invention

5    includes," or "All embodiments of the present invention are,"

6    as was the situation in the cases cited in *Luminara*, where

7    disavowal of broad claim language was found by virtue of the

8    specification.

9          In addition, in describing the desirability of a cell

05:35 10   culture media that will not become contaminated, the background

11   of invention states, in part, "Ideally, such media are

12   chemically defined such that the media compositions contain

13   only known chemical compounds and are free of all proteins,

14   even those not of animal origin, such as recombinant proteins."

15   "Ideally," commonly, colloquially, means preferably, or,

16   according to the Macmillan dictionary, "In the best possible

17   way."  This language in the "Background of the Invention"

18   section does not suggest, let alone state, that the cell

19   culture media being patented must be free of all proteins.

05:36 20   Rather it addresses the type of medium that would be best and

21   therefore preferable.

22         Moreover, this statement relates to the background of

23   the invention claimed.  It is not specific to the invention

24   claimed.  In addition, it does not address the term "cell

25   culture media."  The detailed description of the invention

Case 2:16-cv-01925-JMV-JBC Document 69-1 Filed 04/13/17 Page 488 of 500 PageID: 1767
Case 1:15-cv-10698-MLW Document 233 Filed 08/25/18 Page 112 of 119

112

1    states that, "The present invention provides chemical

2    compositions useful in the culture of eukaryotic cells."

3    That's column 4, lines 30 to 31.  This, like the language just

4    discussed, addresses the nature of the invention, not the

5    meaning of the term "cell culture media," which is only part of

6    the language in Claim 1 that describes the invention claim.

7          Moreover, that statement should not be viewed in

8    isolation.  I also recognize that the two examples -- or two

9    examples in the patent at least, perhaps all three, are

10   embodiments involving chemically defined culture media.

11   However, as the plaintiff has argued, "because claim terms are

12   normally used consistently throughout the patent, the usage of

13   the term in one claim can often illuminate the meaning of the

14   same term in other claims," as the Federal Circuit said in

15   *Phillips* at 1314.

16         In Claim 4 of the '083, the invention described is "a

17   composition comprising a cell culture media made by steps

18   comprising," and then F says, "optionally adding at least one

19   substance selected from a group consisting of, among other

20   things, soy hydrolysate."  "Soy hydrolysate," as defendant, I

21   believe, acknowledges and as the record indicates, is not

22   chemically defined.  There may have been long efforts to

23   chemically define "soy hydrolysate."  There's no report that

24   they've succeeded, and certainly as of 2004, they had not.

25         In Celltrion's claim construction reply brief at 11,

Case 2:16-cv-01925-JAK-AFM   Document 69-1   Filed 04/13/17   Page 489 of 500   Page ID: 1768
Case 1:15-cv-10698-MLW   Document 233   Filed 08/25/16   Page 113 of 119

113

1  it writes, "To be sure, 'soy hydrolysate' typically is not

2  chemically defined."  Therefore, that Claim 4 and I think also

3  Claim 10, which references soy hydrolysate, would communicate

4  to a personal reasonably skilled in the art that the invention

5  had to include the chemicals listed in Claim 1 in the

6  proportions stated.  The invention could also include elements

7  that are chemically undefined, such as soy hydrolysate.

8       At times the specification uses the term "cell culture

9  media" without reference to it being chemically defined.

05:42 10  Examples of this are in slide 55 that Janssen presented today,

11  and its Exhibit E patent specification says, among other

12  things, "One aspect of the invention is a soluble composition

13  suitable for producing cell culture media."  Elsewhere it says,

14  "The invention also provides compositions comprising cell

15  culture media."  Elsewhere it states, "In one embodiment, the

16  invention provides a composition comprising of cell culture

17  medium made by steps comprising certain things."  In addition,

18  the patent states in another embodiment, "The invention

19  provides a composition comprising a cell culture media made by

05:43 20  certain steps."

21       So the Federal Circuit in *Absolute Software*, 659 F.3d

22  1121 at 1136 said, "We have found the use of the phrase

23  'present invention' or 'this invention' is not always so

24  limiting," as the defendant would contend here about similar

25  but not the same language, "such as where the reference is to a

Case 2:16-cv-01925-JAK-JME Document 69-1 Filed 04/13/17 Page 490 of 500 Page ID: 1769
Case 1:15-cv-10698-MLW Document 233 Filed 08/25/16 Page 114 of 119

114

1    certain limitation as being the invention are not uniform or

2    other portions of the intrinsic evidence do not support

3    applying the limitation to the entire patent."  At best, I'm

4    not even finding this, there is inconsistency in the

5    specification.

6          As the Federal Circuit said in *Thorner*, 669 F.3d 1365

7    to 66, "It is not enough for a patentee to simply disclose a

8    single embodiment or use a word in the same manner in all

9    embodiments.  The patentee must clearly express an intent to

05:44 10  redefine the term at issue to serve as its own lexicographer or

11   disavow the broad claim language."  In this case, Janssen has

12   done less than that.

13         As described earlier, the term "cell culture media"

14   alone would be clear to a person, that is, clearly understood

15   by a person ordinarily skilled in the art.  When read in the

16   context of the rest of Claim 1, the specification would not

17   communicate to such a person that the term "cell culture media"

18   means a composition containing known chemical compounds and are

19   free of all proteins, as the defendant in part contends.  Nor

05:45 20  is the defendants' alternative construction correct.  Nutritive

21   media free of all proteins for culturing new eukaryotic cells

22   was said to be wrong by the defendants' expert himself.

23         As explained earlier, the invention claimed in Claim 1

24   is a soluble composition suitable for producing a final volume

25   of the cell culture media wherein the composition comprises the

Case 2:16-cv-01925-JMV-MF  Document 69-1  Filed 04/13/17  Page 491 of 500 PageID: 1770
Case 1:15-cv-10698-MLW  Document 233  Filed 08/25/16  Page 115 of 119

115

1    following components in the following amounts per liter of the

2    final volume of cell culture media.  It then lists 61 chemicals

3    in certain concentration ranges.

4         If anything -- and this is an open question -- but if

5    anything, it would be the language about what the composition

6    comprises that would require that the cell culture media

7    include chemical components.  However, even that language would

8    not communicate to a person ordinarily skilled in the art that

9    the composition could not also include proteins or matters of

05:47 10   undefined chemical composition, like the soy.

11        As the Federal Circuit wrote in *Genentech*,

12   "'Comprising' is a term of art used in claim language which

13   means that the named elements are essential, but other elements

14   may be added and still form a construct within the scope of the

15   claim."  That's 112 F.3d 495 at 501.  <u>Chisum on Patents</u>, Volume

16   3-8, Section 806 at 1B2A, advises that the same definition of

17   "comprising" is appropriate.

18        Now this is not a case such as *Spectrum*, 164 F.3d 1372

19   at 1379, 80 where the word "comprising" was argued in a weasely

05:48 20   way to try to contradict a position taken in the prosecution

21   history in the prosecution of the patent.

22        As I indicated earlier, the specification in claim

23   language would tell a person reasonably skilled in the art that

24   the claimed invention could include "soy hydrolysate," which is

25   also indicated earlier as known to be chemically undefined.

Case 2:16-cv-01925-JAK-AJE Document 69-1 Filed 04/13/17 Page 492 of 500 Page ID: 1771
Case 1:15-cv-10698-MLW Document 233 Filed 08/25/18 Page 116 of 119

116

1        In construing "cell culture media" to mean nutritive

2   media for culturing cells, I'm not crediting the opinion of the

3   defendants' expert.  To the extent it helps the defendants, it

4   is an opinion generated for litigation that appears to be an

5   example of the litigation bias warned about in *Phillips* at

6   1318.  In any event, it's inconsistent with the written record

7   of the '083 patent.  It is the public record of the patent that

8   described the scope of the '083 invention for those skilled in

9   the art and provided notice of what was protected and what

05:49 10   alternatives would be permitted.  I've relied on that record.

11        Sorry to make you sit here so long, but I need to

12   explain my reasoning and my results.  Okay.  I still would like

13   to rule on the reexamination motion for summary judgment on the

14   '471, and I have to hear you and decide the requests for an

15   expedited trial.

16        Is there anything else that should be on the agenda?

17        MR. HURST:  I think we're going to ask for a 54(b)

18   judgment on the '471 patent.

19        THE COURT:  So 54(b), you want me to enter judgment so

05:50 20   it can be immediately appealed?

21        MR. HURST:  That's right, Your Honor.

22        THE COURT:  When are you going to do that?

23        MR. HURST:  I was just going to do it orally tomorrow.

24        THE COURT:  Well, why don't you write something.  Why

25   don't you confer and see whether you have a -- is that

Case 2:16-cv-01925-JMV-JAD Document 69-1 Filed 04/13/17 Page 493 of 500 PageID: 1772
Case 1:15-cv-10698-MLW Document 233 Filed 08/25/16 Page 117 of 119

117

```
 1    something that the plaintiffs likely is going to oppose?

 2              MR. DISKANT:  Frankly, I'd like to hear you --

 3              THE COURT:  What's that?

 4              MR. DISKANT:  I'd like to hear what Your Honor does on

 5    the reexam before my client is in a position to reach a

 6    conclusion on that.

 7              THE COURT:  All right.  If you want to make a

 8    motion -- are you admitted pro hac vice?

 9              MR. HURST:  I am.

10    THE COURT:  So you said you know the local rules.

11    Under local Rule 7.1B -- Mr. Kelly will tell you -- 7.1B, you

12    can't file any motion without conferring with your adversary.

13    So you'll have time to do that.

14              MR. HURST:  Thank you, Your Honor.

15              THE COURT:  Okay.  This may be a good candidate, but I

16    haven't thought about it.  If you disagree, I'll have to listen

17    to both sides.  You'll have to brief it -- or maybe you'll have

18    to brief it.

19              MR. DISKANT:  I think those are the only two items on

20    the agenda, Your Honor.

21              THE COURT:  Well, everything takes me longer to do

22    than I think it is.  So you should come back at 1:00 tomorrow,

23    too.  It will give me the morning to look more closely at the

24    reexamination issue and my other cases perhaps.

25              MR. DISKANT:  Your Honor, I'm sorry.  I've been
```

05:51 (line 10)
05:52 (line 20)

 1    reminded that there's also the stipulation --

 2            THE COURT:  About consolidating?

 3            MR. DISKANT:  Right, but that's stipulated to.

 4            THE COURT:  Right, right.  Good.  And I raised that

 5    yesterday, and I asked you to remind me.

 6            MR. DISKANT:  I was reminded by Ms. Royzman.

 7            THE COURT:  Okay.  All right.  Well, it's up to you,

 8    but now you know more than you knew yesterday.  So I encourage

 9    you to keep talking and to let me know if you've reached any

05:53 10    agreements that mean I don't have to continue to work on this.

 11            Court is in recess.

 12            THE COURT:  Again, with particular great thanks to the

 13    court reporter, as well as the rest of my staff.  I forgot to

 14    do what I conventionally do, and that is to order the parties

 15    to give the stenographer a dictionary of all the technical

 16    terms.  But you'd be amazed by how quickly she came up with the

 17    "soy" whatever.  But I appreciate everybody working so hard

 18    with me on this.  Court is in recess.

 19            (Recess taken 5:53 p.m.)

 20

 21

 22

 23

 24

 25

Case 2:16-cv-01925-JMV-MF Document 69-1 Filed 04/13/17 Page 495 of 500 PageID: 1774
Case 1:15-cv-10698-MLW Document 233 Filed 08/25/16 Page 119 of 119

119

CERTIFICATE OF OFFICIAL REPORTER


I, Kelly Mortellite, Registered Merit Reporter
and Certified Realtime Reporter, in and for the United States
District Court for the District of Massachusetts, do hereby
certify that pursuant to Section 753, Title 28, United States
Code that the foregoing is a true and correct transcript of the
stenographically reported proceedings held in the
above-entitled matter and that the transcript page format is in
conformance with the regulations of the Judicial Conference of
the United States.

                    Dated this 24th day of August, 2016.


                    /s/ Kelly Mortellite

                    _____

                    Kelly Mortellite, RMR, CRR

                    Official Court Reporter

# EXHIBIT 11

**From:**          Andrew Chalson
**Sent:**          Friday, March 24, 2017 1:10 PM
**To:**            'Warner, Kevin E.'; Nick Cerrito
**Cc:**            Park, Sam; Reig, Eimeric; Lin, Sharon; 'sjcorr@jonesday.com'; 'cmiller@jonesday.com';
                   Catherine Mattes; Jeffrey Matthews; Ross Misskelley; Eric Stops; Robert Wilson
**Subject:**       RE: Celgene v Actavis (Abraxane) - motion scheduling


Kevin,

As we discussed on Wednesday, Celgene does not object to Actavis submitting a proper reply in and of itself.  Rather, as we discussed, we are concerned about the schedule in this case, and the timing of your briefing (including the requested reply) only heightens that concern, as does your refusal to discuss the impact on the schedule at this time.  Nevertheless, if you insist, Celgene will not object to a 5-page double-spaced reply on April 19th that is properly limited to the issues raised in Celgene's opposition.

**Andrew Chalson**
*Partner*
**Quinn Emanuel Urquhart & Sullivan, LLP**

51 Madison Avenue, 22nd Floor
New York, NY 10010
212.849.7112 Direct
212.849.7100 FAX
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Warner, Kevin E. [mailto:KWarner@winston.com]
**Sent:** Thursday, March 23, 2017 3:33 PM
**To:** Andrew Chalson <andrewchalson@quinnemanuel.com>; Nick Cerrito <nickcerrito@quinnemanuel.com>
**Cc:** Park, Sam <SPark@winston.com>; Reig, Eimeric <EReigPlessis@winston.com>; Lin, Sharon <SLin@winston.com>; 'sjcorr@jonesday.com' <sjcorr@jonesday.com>; 'cmiller@jonesday.com' <cmiller@jonesday.com>; Catherine Mattes <catherinemattes@quinnemanuel.com>; Jeffrey Matthews <jeffreymatthews@quinnemanuel.com>; Ross Misskelley <rossmisskelley@quinnemanuel.com>; Eric Stops <ericstops@quinnemanuel.com>; Robert Wilson <robertwilson@quinnemanuel.com>; Warner, Kevin E. <KWarner@winston.com>
**Subject:** RE: Celgene v Actavis (Abraxane) - motion scheduling

Andrew,
It looks like we're in agreement on 3/29 and 4/12, and we also will not object to Celgene responding exclusively to the amended portions of our contentions within a reasonable time if amendment is allowed.  However, Actavis maintains that it should have a reply opportunity in the briefing because Actavis is the party requesting relief.  If you still disagree, we can submit a proposed schedule noting that disagreement along with a cover letter asking the Court to decide whether it will allow us the requested reply.  Let me know your position and we will draft a joint letter to the Court.

Your other comments are irrelevant side issues that we will not address except to say that we disagree Actavis is seeking "that much additional time," as you say, in this schedule.  We also disagree that there is any need to modify any

1

part of the fact discovery schedule now.  If you make a request to do so, we will address the request at that time as appropriate.

**Kevin Warner**
Winston & Strawn LLP
D: +1 (312) 558-5852
winston.com



---

**From:** Andrew Chalson [mailto:andrewchalson@quinnemanuel.com]
**Sent:** Wednesday, March 22, 2017 12:29 PM
**To:** Warner, Kevin E. <KWarner@winston.com>; Nick Cerrito <nickcerrito@quinnemanuel.com>
**Cc:** Park, Sam <SPark@winston.com>; Reig, Eimeric <EReigPlessis@winston.com>; Lin, Sharon <SLin@winston.com>; 'sjcorr@jonesday.com' <sjcorr@jonesday.com>; 'cmiller@jonesday.com' <cmiller@jonesday.com>; Catherine Mattes <catherinemattes@quinnemanuel.com>; Jeffrey Matthews <jeffreymatthews@quinnemanuel.com>; Ross Misskelley <rossmisskelley@quinnemanuel.com>; Eric Stops <ericstops@quinnemanuel.com>; Robert Wilson <robertwilson@quinnemanuel.com>
**Subject:** RE: Celgene v Actavis (Abraxane) - motion scheduling

Kevin,

We are surprised that Actavis requires that much additional time to prepare a motion that it's been contemplating for at least the past several weeks, but we are willing to work with you to expedite this process.  Specifically, we are willing to accept your proposed dates and page limits/formatting for the opening (3/29) and responsive (4/12) briefs, but we propose to end the briefing there so that Judge Falk has as much time as possible to render a decision.

Also, as you previously stated when the parties met and conferred, it is our understanding that, if Actavis prevails on any portion of its motion, it will not object to providing Celgene with a reasonable time to respond to any amended contentions.

Finally, Celgene reserves the right to seek an appropriate extension of fact discovery should Actavis prevail on any portion of its motion to provide sufficient time to respond to, and to take discovery pertaining to, any amended contentions.

Please confirm the above or let us know if you'd like to discuss.

Thanks,

**Andrew Chalson**
*Partner*
**Quinn Emanuel Urquhart & Sullivan, LLP**

51 Madison Avenue, 22nd Floor
New York, NY 10010
212.849.7112 Direct
212.849.7100 FAX
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Warner, Kevin E. [mailto:KWarner@winston.com]
**Sent:** Wednesday, March 22, 2017 10:40 AM
**To:** Nick Cerrito <nickcerrito@quinnemanuel.com>; Andrew Chalson <andrewchalson@quinnemanuel.com>
**Cc:** Park, Sam <SPark@winston.com>; Reig, Eimeric <EReigPlessis@winston.com>; Lin, Sharon <SLin@winston.com>; 'sjcorr@jonesday.com' <sjcorr@jonesday.com>; 'cmiller@jonesday.com' <cmiller@jonesday.com>; Warner, Kevin E. <KWarner@winston.com>
**Subject:** RE: Celgene v Actavis (Abraxane) - motion scheduling

Counsel,
Can you please confirm today your agreement with this schedule?  Thanks,

**Kevin Warner**
Winston & Strawn LLP
D: +1 (312) 558-5852
winston.com



---

**From:** Warner, Kevin E.
**Sent:** Monday, March 20, 2017 1:13 PM
**To:** Nick Cerrito (NickCerrito@quinnemanuel.com) <NickCerrito@quinnemanuel.com>; Andrew Chalson (andrewchalson@quinnemanuel.com) <andrewchalson@quinnemanuel.com>
**Cc:** Warner, Kevin E. <KWarner@winston.com>; Park, Sam <SPark@winston.com>; Reig, Eimeric <EReigPlessis@winston.com>; Lin, Sharon <SLin@winston.com>
**Subject:** Celgene v Actavis (Abraxane) - motion scheduling

Nick and Andrew,
Following up on our call with Judge Falk last week about Actavis's request for leave to serve amended invalidity contentions, we propose the following schedule:

3/29: Actavis files opening letter brief in support of its position, 10 page limit (double-spaced, per the Court's request).
4/12: Plaintiffs file responsive letter brief, 10 page limit
4/19: Actavis files letter brief in reply to Plaintiffs' response, 5 page limit.

Let us know if you agree and we will prepare an appropriate proposed order for submission to the Court.  I'm available to discuss.  Thanks,

**Kevin Warner**
Winston & Strawn LLP
D: +1 (312) 558-5852
winston.com



The contents of this message may be privileged and confidential. If this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under applicable tax laws and regulations.